**MCDERMOTT WILL & SCHULTE LLP**
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: mhelt@mcdermottlaw.com
jhaake@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel M. Simon (*pro hac vice* pending)
Carmen Dingman (*pro hac vice* pending)
Landon Foody (*pro hac vice* pending)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email: dsimon@mcdermottlaw.com
cdingman@mcdermottlaw.com
lfoody@mcdermottlaw.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| In re:<br><br>INSPIRED HEALTHCARE CAPITAL HOLDINGS, LLC, *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-90004 (MXM)<br><br>(Joint Administration Requested) |

**DECLARATION OF M. BENJAMIN JONES IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, M. Benjamin Jones, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

[1] The last four digits of Inspired Healthcare Capital Holdings, LLC's federal tax identification number are 6696. There are 161 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/InspiredHealthcare. The Debtors' mailing address is 7033 East Greenway Parkway, Suite 250, Scottsdale, AZ 85254.



GN DEFENDANTS EXHIBIT 8

## BRIEF BACKGROUND[2]

1. Founded in 2016, Inspired Healthcare Capital, LLC (the "Debtor Sponsor") and its affiliated and interrelated entities (collectively, the "Company" or "Debtors") acquire or develop and oversee upscale Senior Living Communities ("Communities") throughout the country. Each Community offers its residents (each, a "Resident" and collectively, the "Residents") a welcoming and peaceful place where they are treated with dignity. The Communities provide their Residents with various services, which may include independent-living, assisted-living, and memory-care services and have been recognized with numerous awards.[3] Examples of care for the Residents include providing management of prescriptions, meals, laundry services, social, and physical activities, ensuring that Residents make it to medical appointments and other care necessary for their daily lives.

2. As of the Petition Date, the Company owns (a) 33[4] operating senior-living facilities located in Texas (4), Illinois (2), Wisconsin (2), Alabama (1), Michigan (2), Connecticut (1), Florida (7), Nevada (3), Georgia (5), Massachusetts (1), Minnesota (1), New Jersey (1), Oregon (2), and Maryland (1), each of which is held by an individual DST or LLC (as discussed below), and (b) two (2) partially completed Communities located in Oregon and three (3) parcels of real property on which senior-living facilities were to be developed located in Arizona (2) and Georgia (1). In total, the operating Communities have 444 independent-living units, 1,897 assisted-living

---

2 Capitalized terms that are not defined in this "Preliminary Statement" have the meaning ascribed to such terms later in this Declaration.

3 The Company's Communities have been awarded with numerous awards, including "Best Senior Living" in 2025 (Candle Light Cove), "Best Assisted Living & Best Memory Care" in 2025 (The Landing of North Haven) and "Best Assisted Living & Best Memory Care" in 2025 (Arbor Terrace Naperville) by US News and World Report, "Best of Assisted Living" from 2020 (Orchard at Brookhaven) and "Best of Assisted Living" in 2021 (Orchard at Athens).

4 One of the senior living facilities in Florida was damaged by a hurricane and does not currently have any Residents.

units, and 776 memory-care units. As of the Petition Date, the Communities are home to approximately 2,620 Residents and employ approximately 1,950 employees, of which approximately 615 are Debtor employees.[5] While the Company owns the Communities, contracts with the Residents, and the licenses to operate the Communities, the day-to-day operations at each Community are handled by third-party management companies.

3. The Company raised capital for acquisitions and working capital in two ways. ***First***, the Company formed and managed Investment Funds (as defined below) that have collectively raised over $390 million through private-placement offerings of equity or debt (depending on the Investment Fund) to investors ("Fund Investors"). Generally, such proceeds were loaned to the Debtor Sponsor to be utilized in its discretion (a) to provide loans to finance senior-housing projects developed by its affiliates (b) to provide short-term bridge financing to its affiliates, and (c) to invest in real estate assets, including assets acquired from or to be sold to its affiliates. ***Second***, commencing in 2020, the Company raised funds by using Delaware statutory trusts (each, a "DST") as part of an offering to sell the beneficial interests of the DST pursuant to private-placement offerings to investors ("DST Investors"), many of whom were able to receive tax benefits from the structure. Since inception, the Company has raised more than $1.2 billion in cash from 3,300 Fund Investors, 2,300 DST Investors, and 200 Development Investors (as defined below).[6]

4. The Company structured its integrated business by having the DSTs lease the Communities to Master Tenants[7] pursuant to Master Leases (as described below). The Master

---

[5] Certain of the Community-level employees are employed by Third-Party Managers (as defined herein).

[6] An investor is counted for each investment vehicle in which it invested.

[7] The Master Tenants are owned by Inspired Healthcare Capital Holdings, LLC ("Holdings").



GN DEFENDANTS EXHIBIT 8

Tenants make payments pursuant to a formula set out in the Master Lease.[8] The Master Leases also require payment of Community operating costs. The trust agreement governing each DST also requires payment of debt service, for those DSTs with funded debt, the DSTs allocated share of corporate overhead expenses—e.g., expenses related to accounting, human resources, information technology, legal, and marketing services used at the DSTs—and, if there are sufficient funds after payment of such amounts, dividends to the beneficial owners of the DSTs. Historically, many Communities never generated sufficient net operating income to pay all obligations under the Master Lease. Of the 31 DST Communities, only 8 operated without direct cash subsidy from the Debtor Sponsor, and all the Communities received services from the Debtor Sponsor for which they did not pay.

5. As the portfolio of Communities grew, the Company expanded into new business lines to capture additional revenue sources. Among other things, the Company established a management company, Volante Senior Living ("VSL"), so it could wholly manage the Communities, as well as marketing, construction, development, and architectural-design companies to support the Company, Communities, and Development Projects (collectively, the "Verticals"). The Company was unable to operate these Verticals successfully and ultimately discontinued operations at each Vertical.

6. To address (a) liquidity constraints resulting from underperformance at certain communities, (b) losses incurred at the Verticals, (c) distributions to lenders and creditors, and (d) non-business related cash uses, certain members of the former management team and certain broker dealers raised more money from other sources and managed cash flows between its

[8] The "Stated Rent" is calculated on a percentage of the equity raised at the respective Community and the amount required at each Community, if applicable, to pay debt-service costs associated with the purchase-money financing, which is "Base Rent."

businesses to meet the needs of the enterprise. At times, this included using funds from Communities that were producing healthy net operating income (approximately 8) and money raised from Investment Funds to support other Communities and their related DSTs that were not producing sufficient net operating income to pay their debt obligations or make investor distributions.

7. On April 30, 2025, the Securities and Exchange Commission (the "SEC") initiated a formal investigation into the Company. In response to the investigation, the Company stopped making distributions to investors and lenders.[9] The Company has worked cooperatively with the SEC in its review. Unfortunately, various parties, including investors and lenders, have initiated litigation against the Company arising from interruption of investor distributions and the news of the SEC review. These lawsuits have exacerbated the Company's financial difficulties and risked the value of the enterprise.

8. In response to these serious matters, the Company retained independent restructuring advisors and made changes to its corporate governance. Specifically, the Company appointed (a) CRS Capstone Partners LLC ("Capstone") as the independent manager of Debtor Sponsor and Holdings and (b) Inverness Advisors, LLC, which was succeeded by Trinity River Advisors, LLC ("Trinity River" and together with Capstone, the "Independent Managers"), as the independent manager of the limited liability companies that serve as the signatory trustees to the DSTs. The Independent Managers immediately took decisive action to secure the Company's books, records, and emails and eliminate former management's access to bank accounts and Company credit cards.

[9] The Company stopped making payments to investors in June 2025 and, with certain exceptions, stopped making payments to lenders in October 2025.



GN DEFENDANTS EXHIBIT 8

9. In addition, the Company retained McDermott Will & Schulte as restructuring counsel and appointed me as Chief Restructuring Officer ("CRO"), with assistance from my team at Ankura. In the past several months, the Company and its restructuring advisors and restructuring lawyers have engaged constructively with various stakeholders to establish a path forward to safeguard the care of the thousands of Residents at the Communities while preserving and maximizing value for its stakeholders. The Company has also engaged Raymond James & Associates, Inc. ("Raymond James") as its investment banker to evaluate potential transactions to maximize the value of the Company's assets and interests for all stakeholders. The Company has initiated a process and been in contact with numerous parties interested in a transaction or transactions.

10. The Company has initiated these bankruptcy proceedings to pursue three goals: (a) ensure continued quality care and services for the Residents, (b) access funding to pursue transactions that will maximize the value of the Debtors' estates for all stakeholders, and (c) preserve claims and causes of action and establish a centralized process for claims and causes of action to be adjudicated for the benefit of all stakeholders.

## INTRODUCTION

11. On February 2, 2026 (the "Petition Date"), Holdings and each of its Debtor affiliates and subsidiaries, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Court").

12. I am the Debtors' CRO. I am a Senior Managing Director at Ankura Consulting Group, LLC ("Ankura") and the Global Co-Head of Ankura's Turnaround & Restructuring



**GN DEFENDANTS EXHIBIT 8**

Practice. I have more than 25 years of financial-restructuring, interim-management, turnaround, and financial-advisory experience, with a significant emphasis on the U.S. healthcare industry. During that time, I have advised and assisted distressed companies with numerous complex financial, operational, and strategic situations, including serving as interim management, chief restructuring officer, and strategic restructuring advisor of such entities and assisting with, among other things, financial-statement analysis, expert-witness services, financial-projection development, liquidity and cash management, M&A support, stakeholder negotiations, balance sheet recapitalization and restructurings, postpetition financing and sourcing, and bankruptcy preparation and administration. I also have extensive healthcare-sector experience and have advised hospitals, outpatient-rehabilitation facilities, skilled-nursing facilities, continuing-care-retirement communities, and other healthcare-service providers.

13. I have served as president, chief restructuring officer, and chief financial officer for private and public companies. In addition, I have played key roles in dozens of other high-profile restructurings, mergers, and acquisitions, assisting clients both in and outside of chapter 11, including, among others, *In re Azzur Group Holdings LLC*, Case No. 25-10342 (KBO) (Bankr. D. Del. Mar. 2, 2025); *In re LaVie Care Centers, LLC*, Case No. 24-55507 (PMB) (Bankr. N.D. Ga. June 2, 2024); *In re Gulf Coast Health Care, LLC*, Case No. 21-11336 (KBO) (Bankr. D. Del. Oct. 14, 2021); *In re KB US Holdings, Inc.*, Case No. 20-22962 (SHL) (Bankr. S.D.N.Y. Aug. 23, 2020); *In re High Ridge Brands Co.*, Case No. 19-12689 (BLS) (Bankr. D. Del. Dec. 18, 2019); *In re Trident Holding Company, LLC*, Case No. 19-10384 (SHL) (Bankr. S.D.N.Y. Feb. 10, 2019); *In re Penn Traffic Co.*, Case No. 09-14078 (BLS) (Bankr. D. Del. Nov. 18, 2009); *In re Caraustar Industries, Inc.*, Case No. 09-73830 (MGD) (Bankr. N.D. Ga. May 31, 2009); *In re Milacron*, Case No. 09-11235 (JVA) (Bankr. S.D. Ohio Mar. 9, 2009); *In re World Health Alternatives, Inc.*, Case



GN DEFENDANTS EXHIBIT 8

No. 06-10166 (PJW) (Bankr. D. Del. Feb. 21, 2006); *In re Lionel L.L.C.*, Case No. 04-17324 (BRL) (Bankr. S.D.N.Y. Nov. 15, 2004); *In re Centennial HealthCare Corporation*, Case No. 02-74974 (JEM) (Bankr. N.D. Ga. Dec. 20, 2002); *In re Golden Books Family Entertainment, Inc.*, Case No. 01-1920 (RRM) (Bankr. D. Del. June 4, 2001); *In re Mariner Post-Acute Network, Inc.*, Case No. 00-00113 (KG) (Bankr. D. Del. Jan. 18, 2000). Prior to joining Ankura, I began my career at Ernst & Young, focusing on valuations and middle-market corporate-finance transactions and later joined CDG Group to focus on restructurings and reorganizations. I hold a Bachelor of Science in Accounting, with distinction, from Wake Forest University.

14. Ankura was retained to provide the Company with chief restructuring officer services under an engagement letter dated as of November 3, 2025, which contemplated Ankura assisting the Company with, among other things, (a) the creation and review of various financial analyses and forecasts, (b) the evaluation of future cash flows and development of a restructuring plan, (c) preparation for a chapter 11 bankruptcy, if necessary, and (d) transaction and reorganization support. On November 21, 2025, I was appointed as the Debtors' CRO. As CRO, I report to James Calandra of Capstone, in his capacity as independent manager of the Debtor Sponsor and Holdings and its direct and indirect subsidiaries for actions related to reorganization.

15. In my capacity as CRO, I have personal knowledge of and am familiar with the business affairs, day-to-day operations, books and records, and financial condition of the Debtors, and I am authorized to submit this declaration (the "Declaration") on behalf of the Debtors. Except as otherwise indicated herein, all statements set forth in this Declaration are based on my personal knowledge, my review of relevant documents and information concerning the Company's operations, financial affairs, and restructuring initiatives, my discussions with key members of the Company's management who oversee the day-to-day business operations and affairs, my

discussions with the Company's Third-Party Managers, my opinion based on my experience and knowledge of the senior-living industry, and my review of the Debtors' operations and financial condition or my discussions with the Debtors' advisors or other agents or representatives. The statements in this Declaration are accurate to the best of my knowledge, information, and belief. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

16. I submit this Declaration to assist the Court and the parties-in-interest in understanding the circumstances that led to the commencement of the Chapter 11 Cases and in support of (a) the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code and (b) the relief that the Debtors have requested pursuant to the motions and applications (collectively, the "First Day Pleading(s)") filed contemporaneously with this Declaration, which seek procedural and substantive relief that will facilitate the Debtors' orderly transition into chapter 11, help avoid immediate and irreparable harm to the Debtors' estates, and preserve their value. I am familiar with the contents of each First Day Pleading and believe that the relief sought in each pleading will allow the Debtors to fulfill their duties as debtors-in-possession, minimize possible disruption to the Debtors' business that may be caused by commencement of the Chapter 11 Cases, and position the Debtors to effectuate an efficient restructuring through chapter 11, all while prioritizing the continued and uninterrupted care of their Residents.

17. To assist the Court and parties-in-interest in understanding the Debtors' business and to explain and support the relief sought in the First Day Pleadings, this Declaration is organized in the following six parts:

- **Part I** provides an overview of the Company's corporate history.
- **Part II** describes the Company's business model and corporate structure.



GN DEFENDANTS EXHIBIT 8

- **Part III** provides an overview of the Company's prepetition capital structure.

- **Part IV** describes the circumstances leading to the commencement of the Chapter 11 Cases.

- **Part V** describes the Company's pre-filing negotiations with key stakeholders and the objectives of the Chapter 11 Cases.

- **Part VI** sets forth the various First Day Pleadings filed in the Chapter 11 Cases, which the Debtors believe are critical to administering the Chapter 11 Cases and preserving and maximizing the value of the Debtors' estates.

## PART I:
## COMPANY'S CORPORATE HISTORY

### A. Founding, Adoption of DST Investment Model, and Expansion

18. In 2016, Luke Lee and others formed a firm in Scottsdale, Arizona specializing in investments in the senior-housing sector, which ultimately became the Company. Mr. Lee served as the Chief Executive Officer of the Debtor Sponsor. Prior to serving in this role, Mr. Lee served as vice president and acquisitions manager for real estate investment trusts ("REITs"). The Company, through Debtor Sponsor subsidiaries, initially raised funds to acquire nine investment properties through a limited-partnership structure. The Company ultimately exited those investments. In 2020, the Company began to focus on the DST model for raising funds from DST Investors and investing in senior-housing communities. The Company's first DST-sponsored property was Salterra at Ashbrook, a 96-unit senior-housing community located in Villa Rica, Georgia. The Company acquired Salterra at Ashbrook around November 2020.

19. Following the acquisition of Ashbrook, the Company began to expand rapidly using the DST model and completed private-placement offerings for other senior-living communities, acquiring nine (9) Communities in 2021 and another thirteen (13) Communities in 2022. The

Company continued acquiring Communities, acquiring seven (7) Communities in 2023, two (2) in 2024, and one (1) in 2025. The Company also acquired five (5) real estate properties for development, two of which are still under development and three of which remain undeveloped land (the "Development Projects"). The Company has 33[10] operating senior-living facilities across 14 states (the "Communities"). Attached as **Exhibit A** is a map of the Company's Communities and Development Projects.

20. The Communities take different forms, including a community-style setting or an apartment-complex-style development. Examples of each Community style is shown below, which are pictures of Ashbrook Village and Orchard at Brookhaven, both of which are located in Georgia.





21. The Communities include amenities for the Residents – such as swimming pools, a dining hall, a barber shop, and other features.

[10] One of the Communities, Salterra at St. Petersburg, was damaged by a hurricane and does not currently have any Residents.





**B. Management and Ancillary Services**

22. The Company previously managed day-to-day operations at 23 Communities through affiliated entities under VSL. The Company also provided ancillary services to the Communities as a way to keep revenues within the Company's cash ecosystem, as more fully described in Part II. However, beginning on or around July 1, 2025, the Company transitioned all day-to-day operations at the Community level to third-party managers pursuant to management agreements. The Company also discontinued its ancillary-service businesses to the Communities prior to the Petition Date.

**PART II:**
**<u>COMPANY'S BUSINESS MODEL AND CORPORATE STRUCTURE</u>**

**A. Company/Enterprise Business Model**

23. The Debtor Sponsor has structured the Company to include: (i) ten (10)[11] Debtor-fund entities formed as subsidiaries of Debtor Sponsor (the "<u>Investment Funds</u>"), which have collectively raised over $390 million through private-placement offerings (each, an "<u>Offering</u>") from more than 3,300[12] Fund Investors (as defined below), (ii) two (2) limited liability companies

[11] Each of the Investment Funds is included in the Organization Chart. Certain of the Investment Funds have repaid their investors and are no longer active.

[12] An investor is counted for each Investment Fund in which it invested.



GN DEFENDANTS EXHIBIT 8

that were used to raise over $20 million from more than two hundred investors for the development of two properties known as Creswell and Winery Lane (the "Development Investors"), (iii) over 100 entities formed as subsidiaries under Holdings, which were created to provide administrative, operational, and financial support to the Communities and Development Projects, and (iv) various other entities formed as subsidiaries under Holdings to construct, design, market, or manage senior-living facilities. In total, 161 entities, including Holdings and Debtor Sponsor, are Debtors in these Chapter 11 Cases. A detailed organizational chart of the Debtors is attached as **Exhibit B** (the "Corporate Chart").

24. The Company's business model can be distilled down to four primary phases, which may not necessarily occur in the following order:

- *Fund Raising*: The Debtor Sponsor with the help of broker-dealers sells equity securities in or promissory notes from a Fund to investors ("Fund Investors") to raise capital to be used by the Company to (i) acquire Communities, (ii) capitalize Development Projects, and (iii) provide working capital to Communities and the Company;

- *Section 1031 Exchanges*: Upon identifying an acquisition opportunity, Debtor Sponsor with the help of broker-dealers sells securities in Delaware statutory trusts (each, a "DST" and collectively, the "DSTs") to investors seeking a Section 1031 Exchange (as defined below);

- *Acquisition*: The Debtor Sponsor uses the cash raised from a Section 1031 Exchange and, as needed, additional financing, to acquire an operating Community (as opposed to a Development Project); and

- *Ownership and Operation of a Community*: Through a series of transactions and newly formed subsidiaries, Holdings and Debtor Sponsor own, design, construct, operate, market, manage/oversee, and provide back-office services to the Community.

25. As discussed below, generally speaking, there are at least three entities associated with each Community, all of which are Debtors in these Chapter 11 Cases: (a) a DST, which holds



GN DEFENDANTS EXHIBIT 8

legal title to the Community real estate, (b) a Signatory Trustee, which is responsible for managing the DST, and (c) a Master Tenant, which (i) leases the real estate from the DST, (ii) contracts with (or sub-leases to) Residents, and (iii) is responsible for operating the Community. The following chart provides a summary of the relationships between Holdings, the DST, the Signatory Trustee, the Master Tenant, the Resident, the Depositor (each as defined below), and DST Investors:




**Summary Description of Entities**

- **DST** – Each DST is the legal owner of the real property where the Community is located. The DST is structured to attract DST Investors seeking a Section 1031 Exchange. To maintain its tax status, the Company has created (i) the landlord-tenant relationship between the DST and Master Tenant, and (ii) the existence of the Signatory Trustee as manager of the DST. Both the Master Tenant and Signatory Trustee are subsidiaries of and controlled by Holdings.

- **Master Tenant** – Each "Master Tenant" is a limited liability company created for each Community. All the Master Tenants are wholly owned subsidiaries of Holdings. The Master Tenant is the "operator" of each applicable Community pursuant to a lease (each, a "Master Lease") with the applicable DST landlord. Importantly, the Master Tenants hold the relevant licenses required by each state or locality to operate the Communities. The Master Tenants also contract with Residents at each Community for a resident fee, and they subcontract their management responsibilities to third-party managers. The Master Tenants, through rent payments, act as a 'clearinghouse' or conduit between Holdings, the operations at each Community, and its respective DST landlord, thereby allowing the DSTs to maintain their tax status. Any excess cash held by the Master Tenant is then distributed to Holdings.

- **Residents** – Residents at each Community execute a "Resident Agreement" with the Master Tenant (or in some cases the Manager) to live at the Communities and receive the services provided at each Community in exchange for a fee.

- **Signatory Trustee** – Each "Signatory Trustee" is a limited liability company wholly owned by Holdings that is created for each Community to act as the trustee of the DST. Each Signatory Trustee receives a fee (the "Signatory Trustee Fee") from the DST, which is ultimately remitted to Holdings.

- **Depositor** – Each "Depositor" is a limited liability company that is a subsidiary formed under Holdings to facilitate the acquisition of a Community as described more fully below.

- **DST Investors** – The DST Investors are investors who received beneficial interests in DSTs, which may include individuals or entities who invested to benefit from the tax status of the DST, including a Section 1031 Exchange (as defined below).

- **Fund Investors** – The Fund Investors are investors who have invested in the Investment Funds.

- **Delaware Trustee** – Each "Delaware Trustee" is a Delaware trustee, which is required by the DST Act (as defined below). The Delaware Trustees are in addition to the Signatory Trustees, but the Delaware Trustees have no role in the DSTs' management.

- **Managers** – Each "Manager" is a manager responsible for the operations of each Community pursuant to a management agreement directly with the applicable Master Tenant or a sub-management agreement with an affiliate of the Company. Historically, VSL, a Holdings subsidiary, was a Manager providing management services to



GN DEFENDANTS EXHIBIT 8

some Communities. However, all current Managers are third parties (the "Third Party Managers")[13] and unrelated to the Debtors.

26. In addition to the acquisition of operating Communities, the Company also purchased real estate and oversaw the construction of new senior-living Communities through the Development Projects. Development Projects have been acquired (a) through a newly formed limited liability company that purchases the Development Project with funds either advanced from or loaned by the Debtor Sponsor or a third-party bridge lender, or (b) from funds that were raised by a wholly owned subsidiary of Holdings. Once construction was completed, the Debtor Sponsor "sponsored" a sale of the completed Development Project to a DST at fair market value.

**B. Operations – Debtor Sponsor and Investment Funds (i.e., "Fund Raising")**

27. As discussed above, the Debtor Sponsor is currently managing ten (10) Investment Funds, which have raised over $390 million through the sale of either (i) promissory notes or (ii) equity securities through private-placement offerings. The Investment Funds' investment strategies were generally focused on financing senior-housing and healthcare-related real estate projects. These funds were deployed by the Debtor Sponsor and its affiliates for, among other things, (i) acquiring Communities, (ii) financing Development Projects, and (iii) providing working capital both for the Company and individual DSTs. As of the Petition Date, there are approximately 1,967 investors or noteholders in the Investment Funds, of which 269 are invested in multiple funds. A chart of the relevant Investment Funds is set forth below:

| Name of Fund | Date of Offering | Offering Amount & Amount Raised | Notes |
|---|---|---|---|
| Inspired Healthcare Capital Fund LP | 10/1/2017 | Offering Amount: $20.0 million | The initial investment made by the LP Investment Fund was a minority ownership interest in a |

[13] The Third-Party Managers are Orchard at Athens II LLC, Orchard at Brookhaven II, LLC, Blake Management Group LLC, RSC Eatonton Management, LLC, Capri Communities, LLC, Blue Ridge Senior Housing, LLC, LCB Senior Living, LLC, IntegraCare Easton, LLC, Thrive Senior Living LLC, Leisure Care, LLC, and White Glove Consulting LLC.

| Name of Fund | Date of Offering | Offering Amount & Amount Raised | Notes |
|---|---|---|---|
| | | potential to increase up to $30.0 million<br><br>Amount Raised: $16.0 million | build-to-suit development of a senior housing facility leased to Holiday Development, LLC. Later the LP Investment Fund formed nine single purpose entities[14] to acquire property and invest in assisted living facilities throughout Oregon, Washington, and Montana. |
| Inspired Healthcare Capital Income Fund LLC | 10/1/2019 | Offering Amount: $8.0 million; potential to increase up to $15.0 million<br><br>Amount Raised: $11.7 million | The proceeds of these promissory notes were given to the Debtor Sponsor and could be used at the sole discretion of the Debtor Sponsor to fund deposits, certain acquisition costs, renovation and development costs on senior housing facilities. |
| Inspired Healthcare Capital Income Fund 2 LLC | 8/1/2020 | Offering Amount: $20.0 million; potential to increase up to $45.0 million<br><br>Amount Raised: $36.8 million | The proceeds of these promissory notes were given to the Debtor Sponsor and could be used at the sole discretion of the Debtor Sponsor to fund deposits, certain acquisition costs, renovation and development costs on senior housing facilities. |
| Inspired Healthcare Capital Income Fund 3 LLC | 6/8/2021 | Offering Amount: $20.0 million; potential to increase up to $100.0 million<br><br>Amount Raised: $58.6 million | The funds received through these equity purchases were given to the Debtor Sponsor and were intended to be used by the Debtor Sponsor for short-term bridge financing and to invest in real estate assets. |
| Inspired Healthcare Capital Income Fund 5 LLC | 2/23/23 | Offering Amount: $25.0 million; potential to increase up to $100.0 million<br><br>Amount Raised: $134.8 million | The funds received through these equity purchases were given to the Debtor Sponsor and were intended to be used by the Debtor Sponsor for short-term bridge financing and to invest in real estate assets. Funds were used to pay investors of Inspired Healthcare Capital |

[14] The nine entities are: (a) IHC - Artesian Place, LLC; (b) IHC - Awbrey Place, LLC; (c) IHC - Carriage Place, LLC; (d) IHC - Cascade Place, LLC; (e) IHC - Chinook Place, LLC; (f) IHC - Creekside Place, LLC; (g) IHC - Hillside Place, LLC; (h) IHC - Laurel Place, LLC; (i) IHC - The Lodge, LLC.

| Name of Fund | Date of Offering | Offering Amount & Amount Raised | Notes |
|---|---|---|---|
| | | | Fund LP and Inspired Healthcare Capital Income Fund 3 LLC. |
| Inspired Healthcare Capital Income Fund 5 Notes LLC | 9/20/23 | Offering Amount: $6.0 million<br><br>Amount Raised: $5.1 million | The proceeds of these promissory notes were given to the Debtor Sponsor and utilized to provide bridge financing. This Investment Fund also possesses a first lien deed of trust recorded in its favor with regard to the property located at 351 Southeast 5th Avenue Hillsboro, Oregon owned by IHC-Harmony PropCo, LLC ("Harmony PropCo") pursuant to that certain Deed of Trust and Fixture Filing, dated as of October 30, 2023. Additionally, payment of these promissory notes was guaranteed by the Debtor Sponsor. |
| IHC Development Fund III, LLC | 02/23/24 | Offering Amount: $30.0 million; potential to increase up to $50.0 million<br><br>Amount Raised: $28.4 million | The proceeds raised by the Investment Fund were given to the Debtor Sponsor to be utilized by the Debtor Sponsor in its discretion to (a) provide loans to finance senior housing projects being developed by affiliates or third parties and (b) pay for the costs of the offering and the Investment Fund. |
| Inspired Healthcare Capital Liquidity Fund LLC | 8/5/24 | Offering Amount: $25.0 million; potential to increase up to $100.0 million<br><br>Amount Raised: $92.0 million | The proceeds raised by the Investment Fund were given to the Debtor Sponsor to be utilized by the Debtor Sponsor in its discretion to (a) provide loans to finance senior housing projects being developed by affiliates or third parties and (b) pay for the costs of the offering and the Investment Fund. |
| IHC Development Fund IV, LLC | 1/23/25 | Offering Amount: $30.0 million; potential to increase up to $50.0 million | The proceeds raised by the Investment Fund were given to the Debtor Sponsor to be utilized by the Debtor Sponsor in its discretion to (a) provide loans to |

| Name of Fund | Date of Offering | Offering Amount & Amount Raised | Notes |
|---|---|---|---|
| | | Amount Raised: $7.5 million | finance senior housing projects being developed by affiliates or third parties and (b) pay for the costs of the offering and the Investment Fund. The IHC Development Fund IV, LLC provided additional disclosure to investors, and stated it would make an investment to build a senior housing facility in southeast area of metropolitan Phoenix, Arizona to be secured by an interest in the project senior to the Investment Fund's equity investment. |
| IHC Security Income Fund LLC | 4/16/25 | Offering Amount: $18.0 million; potential to increase up to $50.0 million<br><br>Amount Raised: $1.7 million | The proceeds of these promissory notes were given to the Debtor Sponsor to be utilized by the Debtor Sponsor in its discretion to (a) provide loans to finance senior housing projects being developed by affiliates (b) provide short-term bridge financing to affiliates, and (c) to invest in real estate assets, including assets acquired from or to be subsequently sold to affiliates. This Investment Fund also received a pledge of the equity of Inspired Senior Living of Creswell Development, LLC from Inspired Healthcare Capital Holdings, LLC. |

**C. Operations – The Communities**

**i. DSTs and Section 1031 Exchanges**

28. The Company adopted a business model using DSTs to acquire Communities to attract investors from the multi-billion-dollar "Section 1031 Exchange" market. Through a private-placement program sponsored by the Debtor Sponsor and run by broker-dealers, DST Investors purchased beneficial interests in a DST ("DST Interests"). The Offering was designed primarily



GN DEFENDANTS EXHIBIT 8

for prospective investors seeking a Section 1031 Exchange. An Offering remained open until either a specified amount of DST Interests were sold or a certain period had passed. When an investor agreed to invest in the DST, the investor transferred its cash to a bank account controlled by the Debtor Sponsor and, in return, received its DST Interests.

29. Each DST is governed by a trust agreement (a "Trust Agreement") and controlled by a Signatory Trustee, which is a limited liability company wholly-owned by Holdings. Each DST also has a Delaware trustee, which is required by the DST Act. Historically, Mr. Lee, as manager of the Signatory Trustees, managed the DSTs. However, in October 2025, Mr. Lee appointed Inverness Advisors, LLC to serve as an independent third-party manager of each Signatory Trustee. On January 30, 2026, Trinity River succeeded Inverness as the independent third-party manager of each Signatory Trustee. Trinity River has the power to manage each DST pursuant to its governing documents. As of the Petition Date, the Company owns minimal DST Interests in 27 DSTs. The other DSTs have been fully subscribed; as a result, the Company does not have a beneficial interest in those entities. Nevertheless, the Company remains the sole owner of the Signatory Trustees, which manage the DSTs, and the sole owner and manager of the Master Tenants, which hold the licenses to operate each of the Communities and contract with the Residents.

**ii. Acquisition of the Community**

30. The Debtor Sponsor researched and identified acquisition or investment opportunities in the form of operating Communities or locations to develop a Community. After identifying an opportunity, the Debtor Sponsor would raise funds and begin negotiations for the acquisition or investment. Once a sale agreement was executed, and the Section 1031 Exchange was effectuated as described above, the cash in the applicable DST bank account was used to close the acquisition. If the Offering raised insufficient funds to acquire the Community, the Company

would obtain a bridge loan to provide sufficient funding to complete the transaction. The bridge loan may have been provided by a third-party lender or the Debtor Sponsor. The Company used such funds to make a loan to the Depositor, which made a capital contribution to the DST acquiring the Community in an amount equal to the shortfall. The DST repaid this capital contribution through subsequent equity raises by the DST and the Depositor used such payments to repay the bridge loan. The Depositor was dissolved or went dormant following the acquisition of the Community and, if applicable, repayment of the bridge loan.

31. In certain circumstances, a DST financed a portion of the acquisition with a loan from a third-party lender who received a lien on the real estate of the Community. As of the Petition Date, 15 Debtor-entities (collectively, the "Encumbered Debtors") are parties to third-party loan agreements with a total indebtedness of approximately $260 million, which is described in greater detail below.[15]

**iii. Ownership and Operation of the Communities**

**a. The Master Lease Between DST and Master Tenant**

32. Concurrent with the acquisition of a Community, a DST entered into a master lease agreement (a "Master Lease") with a Master Tenant, a copy of which was included in the materials provided to DST Investors in connection with an Offering. The Master Tenants are wholly owned and managed by Holdings. Master Tenants are denoted as "MT" on the Corporate Chart (*e.g.* "Inspired Senior Living of Appleton MT, LLC").

33. The DSTs' and Master Tenants' landlord-tenant relationship is necessary because the Tax Code prohibits the DST from operating the Community to maintain its tax attributes. Accordingly, a Master Lease requires a Master Tenant to assume responsibility for the operation,

[15] IHC - Hanover Propco, LLC is wholly owned by Holdings.



GN DEFENDANTS EXHIBIT 8

repair, maintenance, and management obligations of a Community, as well as for all costs and expenses incurred in connection with the Community (subject to certain exceptions). The Master Tenant is also required to make monthly rental payments to the DST, which can be broken down into "Stated Rent"[16] and "Base Rent"[17] (collectively, "Master Stated Rent").

34. The Master Tenants are formed to hold the required licenses to operate the Communities, contract with Residents, and to allow the DSTs to take advantage of the Section 1031 Exchange market and serve as a conduit to allow the Communities to transfer net operating income to the DSTs. If there are funds remaining after payment of Master Stated Rent to a DST, the applicable Master Tenant will distribute these excess funds to Holdings, with Holdings free to use these funds as needed, which may include the expenses of underperforming DSTs, as more fully described in Part IV.

**b. Management of Communities**

35. Contemporaneous with its entry into a Master Lease, a Master Tenant enters into a management agreement ("Management Agreement") with the relevant SHMG entity. SHMG then enters into a sub-management agreement with a professional management company. A highly skilled and specialized manager is necessary because the Communities serve the health and safety needs of their Residents and, as such, are heavily regulated at the local, state, and federal levels. As discussed above, all Communities are currently managed by Third-Party Managers.

36. Under the Company's management structure, on a monthly basis the Third-Party Managers remit to the Master Tenants each Community's net operating income ("NOI"), which is the amount of funds remaining, if any, after the Manager has paid Community operating costs and

---

[16] "Stated Rent" is a monthly payment equal to a percentage of the equity invested in the Community as described in the private placement memorandum of each DST.

[17] "Base Rent" is a monthly payment equal to amounts owed to third-party lenders by Encumbered Debtors.

collected its management and incentive fees. The Master Tenant, as a conduit and otherwise as a clearinghouse for the benefit of the DST, uses the NOI, if any, to pay Master Stated Rent to the DST, which then uses those funds to (i) satisfy any applicable expenses under the Master Lease and the Trust Agreement,[18] (ii) to the extent applicable, satisfy monthly debt-service obligations, and (iii) make distributions to DST Investors.

**iv. Cash Flow**

37. Historically, cash came into the Company from (a) investors at the Investment Fund level, (b) the DST level, (c) the fees earned by the Debor Sponsor from the Investment Funds and DSTs, and (d) funds generated at the Community level. A schematic of the cash-management system is attached to the Cash Management Motion[19] filed contemporaneously herewith.

38. At the Community level, the Managers pay the applicable Community's monthly operating expenses from the operating revenue generated at such Community. Following the payments of operating expenses, including the payment of management fees, the NOI, if any, from the Community is transferred to a bank account controlled by the Master Tenant. When the operating revenues were insufficient to satisfy the operating expenses, the Master Tenant historically received a contribution from Holdings to cover the shortfall.

39. At the Master Tenant level, the Master Tenant transfers funds that it receives from the Community to the applicable DST in the form of a payment of the Master Stated Rent. When the funds held by a Master Tenant were insufficient to satisfy the Master Stated Rent, the Master Tenant historically received a contribution from Holdings to cover the shortfall to be passed onto

---

[18] As set forth below, the DSTs are required to pay a Reallocation Fee (as defined herein) to Debtor Sponsor. Prior to July 2025, these fees were generally accrued but not paid.

[19] A description of the cash management system is more fully set forth in *The Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Existing Cash Management System and Maintain their Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records; and (II) Granting Related Relief* (the "Cash Management Motion").



GN DEFENDANTS EXHIBIT 8

the DST. If a Master Tenant held excess cash following the payment of Master Stated Rent, the Master Tenant would transfer such funds to Holdings where the cash, among other uses, was distributed on an as-needed basis to satisfy the cash shortfalls of other Master Tenants.

40. At the DST level, the DST was to use the payments that it received from the Master Tenant to pay (a) costs and expenses of the trust, including costs and expenses owed to the Debtor Sponsor or its affiliates for services that could be performed directly for the DSTs by independent parties such as legal or accounting services, among others (the "Reallocation Fees"),[20] (b) fees owed to the Signatory Trustee ("Signatory Trustee Fees"), (c) debt service, (d) asset-management fees to Master Tenants, and (e) distributions to DST Investors.

41. At the Holdings and the Debtor Sponsor level, Holdings receives excess cash flow from the Master Tenant and historically received funds from the Debtor Sponsor, which may have included funds raised and fees generated from the Investment Funds. Debtor Sponsor used these funds to administer the Company, including the provision of back-office services and payment of professionals such as accountants and attorneys. Holdings also used these funds to distribute to Master Tenants to cover shortfalls, with the Debtor Sponsor using funds to make distributions to investors in the Investment Funds.

**v. Liquidity and Operational Support for Communities**

42. As discussed above, Holdings made various distributions to the Master Tenants to support Community shortfalls and Master Stated Rent payments to the DSTs. As of the Petition

[20] Section 4.04 of the Trust Agreements for all DSTs states that the "Trust shall pay directly, or reimburse the [Debtor] Sponsor or its Affiliates, as the case may be for all of the Trust's operating costs and expenses, an allocated amount that may exceed total actual expenses, including, but not limited to the costs of services that could be performed directly for the Trust by independent parties such as legal, accounting, secretarial or clerical, reporting, loan origination, transfer agent, data processing and duplicating services but which are in fact performed by the [Debtor] Sponsor or its Affiliates. Such amounts shall be paid from operating revenue."



GN DEFENDANTS EXHIBIT 8

Date, the Company's books and records indicate that these transfers to the Master Tenants equaled approximately $86 million.

43. In addition, Holdings and Debtor Sponsor provide back-office administrative support for all their subsidiaries and each DST. As consideration for such support, the trust agreements require the DSTs to repay Debtor Sponsor for all such costs and services through payments of the Reallocation Fees, which were described in the disclosure materials accompanying each Offering.

44. Historically, although DSTs incurred a Reallocation Fee of between $40,000 and $50,000 per month (depending on whether the DST is levered), such amounts were, generally, not collected; instead, they were accrued on the books and records and then recorded to the balance sheet as an asset of the Debtor Sponsor. Furthermore, the Reallocation Fees of $40,000 to $50,000 did not fully cover the administrative costs that the Debtor Sponsor and Holdings incurred on behalf of the Company, including the DSTs. Therefore, in October 2025, the Company, with assistance from its restructuring advisors, revised the methodology for calculating the Reallocation Fee to ensure that the Reallocation Fee covers all of the administrative costs incurred by the Debtor Sponsor and Holdings on behalf of the DSTs. As of the Petition Date, the aggregate accrued and unpaid Reallocation Fees are approximately $59 million across all DSTs.[21]

**D. Operations – Miscellaneous**

**i. Development Projects**

45. In addition to overseeing the operations and acquisitions of operating Communities, the Company also purchased real estate and oversaw the construction and development of new

[21] The $59 million reflects the historical amounts that were accrued in the amounts of $40,000 or $50,000 and amounts accrued under the revised methodology for calculating the Reallocation Fees. The Reallocation Fees may be higher if historical administrative costs are included in the calculation.



GN DEFENDANTS EXHIBIT 8

senior-living facilities through Development Projects. The acquisition of a Development Project was funded by investors through a series of transfers. During construction, the Development Project is owned by a limited liability company, which is a wholly owned subsidiary of Holdings with the goal of selling or recapitalizing the completed Community. As shown on the map attached as Exhibit A, the current Development Projects are:

- Inspired Senior Living of Winery Lane Development, LLC ("Winery Lane")
- Inspired Senior Living of Creswell Development, LLC ("Creswell")

46. In addition, the Company holds the raw land listed below, which was purchased in anticipation of future developments:

- Inspired Senior Living of San Tan Development, LLC ("San Tan")
- Inspired Senior Living of Payson Development, LLC (f/k/a IHC – Payson PropCo LLC) ("Payson")
- IHC – Augusta II Propco, LLC ("Augusta PropCo")

**ii. Related Verticals**

47. In addition to the entities formed to acquire, own, and operate the Communities and Development Projects, the Company formed a series of subsidiaries under Holdings, many of which were used to expand the Company's operations into "verticals" related to its core operations such as construction, marketing, and management services.[22] These new ventures included VSL entities, as well as the following entities, which are management, design, construction, and/or marketing companies:

| Name | Date Formed | Wound Down | Purpose |
|---|---|---|---|
| Lucas Construction Holdings, LLC | October 2021 | Third Quarter of 2024 | Construction management services company that was |

[22] Certain of the subsidiaries did not provide services and were formed to hold personal property.

| Name | Date Formed | Wound Down | Purpose |
|---|---|---|---|
| | | | licensed to be a general contractor. Lucas Construction served as the general contractor for Creswell and Winery Lane. It was also intended to provide services for San Tan and Payson. While it solicited third-party work, it never executed work for third-parties. |
| Innov8tion Holdings, LLC & Innov8tion Marketing, LLC | May 2023 | Third Quarter of 2024 | In-house marketing company that was responsible for marketing communities/development projects to prospective residents. |
| Cre8tive Holdings, LLC & Cre9tive Architects, LLC | January 2022 | Third Quarter of 2024 | In-house architect and interior design company. This Vertical may have done work related to potential development and design for the Oregon Development Projects as well as Land Developments. |
| Nsite Development, LLC | January 2020 | Third Quarter of 2024 | In-house development arm tasked with expanding footprint via acquisition of properties/land for development. |
| Senior Housing Marketing Agency, LLC | November 2020 | N/A | In-house marketing agency tasked with marketing the Company's Communities to potential investors. |
| Senior Housing Management Group, LLC | September 2020 | N/A | In-house manager that subcontracts management to Third-Party Managers. |
| SHMG-Augusta GA, LLC | November 2022 | N/A | In-house manager that subcontracts management of Augusta Community to Third-Party Managers. |
| SHMG-Naperville IL, LLC | April 2022 | N/A | In-house manager that subcontracts management of Naperville Community to Third-Party Managers. |

48. In recognition that these Verticals were a significant cash drain on the Company, steps were taken to wind down these entities. As of the Petition Date, none of these entities are

operating, and the services they provided were either discontinued or transferred to third parties. For example, VSL's management responsibilities were largely replaced or assigned from VSL to Third-Party Managers pursuant to certain assignment agreements to a consultant Manager. However, under the terms of such assignment agreements, VSL continues to serve as a pass-through employer for the employees at some Communities that were previously managed by VSL with such employees being paid by the operations of the relevant Community.

49. Additionally, Mr. Lee formed certain entities to hold assets, invest in land, and make other investments. Mr. Lee formed MSL Management, LLC as a wholly-owned subsidiary of Holdings to hold luxury vehicles that were acquired by using Company funds. Further, Mr. Lee formed ZOL Management, LLC, which is a wholly owned subsidiary of Holdings that was formed to hold a condo in Las Vegas that was purchased with the Company's funds. Mr. Lee also formed LMZ Ventures, LLC ("LMZ Ventures"), which was formed under Realty Cap Advisors, LLC and is not a debtor. LMZ Ventures was formed to make investments outside of the Company. Finally, on information and belief, Mr. Lee is a member, along with his wife, in LMZ LLC, which owns title to real estate in Arizona purchased with Company funds. These expenditures were recorded on the Company's books and records.

## PART III:
## COMPANY'S CAPITAL STRUCTURE

### A. Third-Party Lender Secured Debt Obligations

50. As noted above, the Encumbered Debtors, all of which are Debtors in these Chapter 11 Cases, have funded-debt liabilities. As of the Petition Date, such parties have approximately $260 million in aggregate funded debt outstanding incurred in connection with the acquisition of

a Community pursuant to the terms of 15 different loan agreements (collectively, the "Third-Party Loans") with ten (10) different lenders, as reflected in the following summary:

| Debtor | Lender | Approximate Outstanding Principal Amount |
|---|---|---|
| Inspired Senior Living of Delray Beach DST | Comerica Bank | $24,740,519 |
| Inspired Senior Living of Dunedin DST | Provident Bank | $15,202,537 |
| IHC - Candle Light Cove DST | Provident Bank | $15,294,081 |
| Inspired Senior Living of Hamilton DST | Provident Bank | $55,931,978 |
| Inspired Senior Living of North Haven DST | Provident Bank | $20,275,419 |
| Inspired Senior Living of Fort Myers DST | Stride Bank | $11,041,344 |
| Inspired Senior Living of Brookhaven DST | Synovus | $17,940,983 |
| Inspired Senior Living of Melbourne DST | Synovus | $14,295,003 |
| Inspired Senior Living of Reno DST | Synovus | $20,827,719 |
| Inspired Senior Living of Grapevine DST | Texas Security Bank | $13,208,100 |
| Inspired Senior Living of Eugene DST | HPI Fairmount Lender, LP | $14,324,054 |
| IHC - Hanover Propco, LLC[23] | Union Bank | $6,551,110 |
| Inspired Senior Living of St. Petersburg DST | Webster Bank | $13,747,303 |
| Inspired Senior Living of Augusta DST | Integrity Life Insurance Company | $16,885,000 |
| Hunan 1 LLC | Western Alliance Bank | $340,000 |
| | **TOTAL** | **$258,804,259** |

51. Each Third-Party Loan is secured by a putative first-priority lien on and security interest in substantially all assets of each Encumbered Debtor, respectively.

52. Other than the 15 Encumbered Debtors identified above, no other DST Debtors have any outstanding funded-debt obligations owed to non-debtor third parties. Moreover, other than the Encumbered Debtors, no other Debtors' assets are encumbered by liens related to funded-debt obligations (except as described below).

[23] IHC – Hanover Propco, LLC is a wholly-owned subsidiary of Holdings.



GN DEFENDANTS EXHIBIT 8

**B. Secured Intercompany Liens**

53. On or about October 30, 2023, Harmony PropCo granted a first-lien deed of trust and fixture filing on the property for the Community located in Hillsboro, Oregon known as Elena's Manor. The deed of trust secures promissory notes in an amount up to $6 million issued by Inspired Healthcare Capital Income Fund 5 Notes LLC, which were raised to provide bridge financing. The total amount outstanding as of the Petition Date is approximately $5.07 million.

54. On or about September 16, 2025, two Investment Funds loaned approximately $8 million to the Company in exchange for a promissory note secured by deeds of trust, respectively. Specifically, IHC Security Income Fund, LLC ("IHC Security Income Fund") loaned the Company approximately $1.5 million and IHC Development Fund IV, LLC (together with IHC Security Income Fund, the "Investment Fund Lenders") loaned the Company approximately $6.5 million. In exchange, the Investment Fund Lenders were each respectively granted deeds of trust against property held by Creswell, Payson, and San Tan. Additionally, as explained above, Income Fund 5 holds a security interest in property held by Harmony PropCo.

55. On or about January 29, 2026, (i) IHC Development Fund III, LLC loaned $536,909.34 to Augusta PropCo, (ii) Inspired Healthcare Capital Income Fund 5, LLC loaned $279,274.13 to Augusta PropCo and (iii) Inspired Healthcare Capital Liquidity Fund, LLC loaned $357,797.56 to Augusta PropCo (collectively, the "Augusta Loan"). Each Augusta Loan is evidenced by a promissory note and is further secured by a deed of trust to secure debt, which grants a security interest in the Augusta PropCo's assets.

**C. Miscellaneous Secured Liens**

56. Certain Communities and Development Projects have mechanic's or other similar liens on assets of such Communities and Development Projects. The Debtors estimate that Creswell has approximately $2.6 million of mechanics' liens and Winery Lane has approximately

$2.7 million of mechanics' liens. Additionally, there is an architect's lien in the asserted amount of $234,000 on property held by Augusta PropCo.[24]

**D. Unsecured Debt Obligations**

57. In addition to the secured-debt obligations described above, the Debtors have numerous unsecured-debt obligations, which include, among other things, (a) accounts payable and accrued expenses to the Company's vendors, (b) litigation claims (including those currently in pending litigation), and exposure incurred but not yet reported, (c) unsecured notes issued by Investment Funds to Fund Investors, and (d) accrued employee compensation for employees that are not employed by Third-Party Managers (a portion of which the Company expects to pay pursuant to the First Day Pleadings). An overview of general unsecured claims is provided below:[25]

*($ in millions)*

| | Description | | Amount |
|---|---|---|---|
| 1. | Unsecured Investor Promissory Notes | $ | 148.1 |
| 2. | Other Unsecured Loans | | 1.8 |
| 3. | Accounts Payable | | 4.2 |
| 4. | Accrued Expenses | | 6.9 |
| 5. | Accrued Payroll & Benefits | | 4.8 |
| **6.** | **Total Unsecured Liabilities** | **$** | **165.8** |

**PART IV:**
**EVENTS LEADING TO THE CHAPTER 11 CASES**

**E. The Company's Relationship with Certain Broker Dealers**

58. The Company was heavily reliant on capital raises by various broker dealers. These broker dealers profited from their role in capital raises for the Company, receiving more than $100

[24] Creswell, Winery Lane, and Augusta PropCo are not part of the proposed DIP collateral.

[25] The balances contained in the table are as of November 30, 2025.

million in commissions and fees. Emerson Equity, LLC ("Emerson") was the managing broker dealer on 29 of the DSTs and all the Investment Funds.

**F. The Company's Decision to Prioritize Investor Distributions Over the Business**

59. The largest contributing factors to the Company's entry into bankruptcy were (a) underperformance at certain communities and (b) the decision to prioritize investor distributions. The Master Leases require operating costs to be paid, and the Trust Agreements require Reallocation Fees, asset-management fees, signatory-trustee fees, debt service, if applicable, and other trust-operating expenses to be paid prior to investor distributions. Despite Communities generating insufficient NOI to pay the Master Stated Rent, the Master Tenants continued to pay Master Stated Rent. The Debtor Sponsor would make up the shortfall to Master Tenants of underperforming Communities by providing funds from the Investment Funds and other sources so that the Master Tenant could continue to pay debt service and make distributions to investors. Holdings contributed approximately $86 million to 23 Master Tenants to cover shortfalls at the Communities and make debt service and investor distributions. In addition, at least $59 million in accrued Reallocation Fees remained unpaid on the Petition Date with the Company having used funds from the Investment Funds to satisfy its administrative costs and expenses.

**G. Expansion of Operations into New Verticals**

60. As noted above, as the network of Communities grew, the Company expanded into new business lines to capture additional revenue sources, *i.e.,* the Verticals. Among other things, the Company established (a) VSL to serve as a captive management company to allow the Company to self-manage its Communities and (b) other Verticals that contained marketing, construction, development, and architectural design companies to support the Company as well to

offer such services to third parties.[26] The Company was unable to operate the Verticals successfully, which ultimately further drained liquidity and available resources.

**H. Mismanagement and Misappropriation of Company Funds**

61. The Company has raised more than $1.2 billion in cash from both Fund Investors and DST Investors. But it appears from my team's preliminary analysis that not all these funds were used for their intended purposes or benefited the Company. Money was used by former management to acquire luxury cars, a condo in Las Vegas, and for significant non-business expenses and purchases, including the purchase of real estate titled in a non-debtor company's name owned by Mr. Lee and his wife and the payment of personal expenses. These expenditures were recorded on the Company's books and records.

**I. Investigation and Pending Litigation**

62. In April 2025, the SEC issued an investigative subpoena to the Company. Through special SEC counsel, the Company is working with the SEC to provide the requested information. Additionally, in November 2025, the securities division of the Arizona Corporation Commission issued a subpoena to the Company as part of an investigation of the Company.

63. Beginning in July 2025, the Company halted all distributions to DST Investors and Fund Investors in response to the commencement of the SEC's investigation. In October 2025, the Company also suspended debt-service payments to preserve liquidity. Because of the suspended investor distributions and debt-service payments, certain investors and lenders have filed lawsuits against the Company. The lawsuits include four receivership actions filed in Georgia, Florida, and Nevada, an investor suit in Arizona, and a foreclosure auction in Grapevine, Texas, scheduled for

[26] In practice, the Verticals never provided services to third parties.



GN DEFENDANTS EXHIBIT 8

February 3, 2026. Additionally, there are mechanics' lien actions on properties in Oregon and threats of foreclosure. Finally, DST Investors and Fund Investors have threatened litigation.

## PART V:
## THE PATH FORWARD

### J. Management Changes

64. In October 2025 the Company retained Mr. Calandra (through Capstone) to serve as an independent manager for each of Holdings and Debtor Sponsor, with Mr. Calandra having been delegated exclusive authority with respect to all matters related to restructuring the Company. In addition, as of the filing of these Chapter 11 Cases, the Company retained Mark Andrews (through Trinity River) to become the sole manager of the Signatory Trustees, which, in turn, are the sole managers of the DSTs. Capstone and Trinity River have complete power and authority to bind the Company in connection with any restructuring matter and no other manager or member (including Luke Lee) may take any action or bind the Company, directly or indirectly, in any manner that could impact any restructuring matter.

### K. Preservation of Books and Records and Cash Management Safeguards

65. One of the first actions undertaken by the Independent Managers was to secure all the Company's books and records, including email, to ensure that at the appropriate time, a thorough investigation can be undertaken. The preservation of the Company's books and records will ensure that all claims and causes of action are preserved for the benefit of the Company and its relevant stakeholders.

66. Additionally, the Company has instituted safeguards protecting its cash management system, which include review and approval procedures. For example, the Third-Party Managers are contractually required to provide the Company with monthly reports of their Community-level accounts. Additionally, the Company's treasury team has the ability to view the

Third-Party manager bank accounts on a daily/weekly basis. I also review and approve all the Company's corporate disbursements. Accordingly, I believe that there are oversight and safeguards related to the Debtors' cash management system.

**L. Prepetition Efforts to Improve Liquidity and Formulate a Marketing and Sale Process**

67. In the months immediately preceding the Petition Date, the Company engaged in a series of transactions in an effort to improve liquidity. In addition to downsizing operations, winding down affiliated entities, and transferring management functions and certain lines of business to third parties, the Company sought to monetize certain non-essential assets.

68. With the advice of their restructuring professionals, the Company initiated a comprehensive process to explore all sale and restructuring options, including an UPREIT transaction or plan sponsor. The Company will explore these alternatives with an eye toward ensuring resident care, minimizing disruption at the Community level, and maximizing value for all stakeholders. In the coming days, the Company intends to file a motion seeking approval of bid procedures (the "Bid Procedures Motion"), which I believe will propose a reasonable and appropriate timeline for the Debtors' postpetition marketing and sale process.

69. As will be further described in the Bid Procedures Motion, prior to the Petition Date, Raymond James prepared a confidential information memorandum and other marketing materials, established a virtual data room, and prepared a non-disclosure agreement. Following commencement of these Chapter 11 Cases, Raymond James initiated a marketing process to solicit interest in all strategic alternatives while the Company seeks approval of its proposed bid procedures in parallel.

**M. DIP Negotiations**

70. When it became clear that a chapter 11 filing would likely be necessary and in the best interests of the Company and its stakeholders, the Company's focus turned to ensuring that it could obtain necessary debtor-in-possession financing ("DIP Financing") to fund the chapter 11 process. I have worked closely with the Company and its advisors to evaluate the Company's cash-flow forecasts. Based on management's forecasts and Ankura's evaluation of the Company's cash needs during the Chapter 11 Cases, the Company determined that it would require access to cash collateral and postpetition DIP funding of approximately $35 million to provide sufficient liquidity to administer the Debtors' estates, including to fund payroll for the Company's employees, pay vendors, pay restructuring costs, and make other payments that are essential or appropriate for the continued operation of the Company's businesses. I believe that the Company's ability to continue making such payments during the Chapter 11 Cases is essential to the Company's continued operation and the preservation of its assets during the pendency of the Chapter 11 Cases.

71. Raymond James marketed the financing and identified potential lenders. After negotiating with the potential lenders, the Company, in consultation with its professionals, selected Lapis Municipal Opportunities Fund V. LP (the "DIP Lender") to provide DIP Financing. In the exercise of its sound business judgment, the Company negotiated extensively with the DIP Lender for access to critical and necessary financing and the terms of the DIP Financing.

72. Recognizing that failure to secure DIP Financing could jeopardize Resident care or result in the transfer of these facilities (which, by itself, would not address any of the existing liabilities), these parties ultimately agreed to provide funds necessary to finance the Chapter 11 Cases and continue to prioritize Resident care in the form of a $35 million facility (the "DIP Facility"). Under the DIP Facility, all Debtors will be obligated and will grant the DIP Lender a superpriority administrative expense claim. In addition, the DIP Facility only encumbers the assets

of a limited subset of Debtors with first priority liens – those without prepetition funded obligations, as set forth in greater detail in the declaration in support of the DIP Facility filed contemporaneously herewith, I believe that, after taking into consideration the costs and benefits of alternative proposals, no lender provided financing to the Debtors on superior terms to those proposed in connection with the DIP Facility.

## PART VI:
## FIRST-DAY PLEADINGS

73. To minimize the possible adverse effects on the Company's business, the Debtors have filed various First Day Pleadings to allow the Debtors to meet necessary obligations and fulfill their duties as debtors-in-possession for the purposes of preserving value for all the Debtors' stakeholders. I am familiar with the contents of each of the First Day Pleading and believe that the relief sought therein (a) is necessary to enable the Debtors to operate during the pendency of the Chapter 11 Cases with minimal disruption or loss of productivity and value; and (b) is in the best interests of the Debtors' estates, members, and creditors. The facts set forth in each First Day Pleading are incorporated herein by reference.

74. The First Day Pleadings that are sought to be heard at the first-day hearing include the pleadings set forth below:

Administrative Pleadings

- *Notice of Designation as Complex Chapter 11 Bankruptcy Case* [Docket No. 2].
- *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 3] (the "Joint Administration Motion").
- *Debtors' Emergency Application for Entry of Order Authorizing the Retention and Employment of Epiq Corporate Restructuring LLC as Claims, Noticing, Solicitation, and Administrative Agent Effective as of*



GN DEFENDANTS EXHIBIT 8

*the Petition Date* [Docket No. 5] (the "Claims Agent Retention Application").

- *Debtors' Emergency Motion for Entry of Order (I) Extending Time to File (A) Schedules and Statements of Financial Affairs and (B) 2015.3 Reports, and (II) Granting Related Relief* [Docket No. 6] (the "SOAL/SOFA Motion").

- *Debtors' Emergency Motion for Entry of Order (I) Authorizing the Debtors to (A) File (1) a Consolidated Creditor Matrix, (2) a Consolidated List of their 30 Largest Unsecured Creditors, and (3) 33 Consolidated Monthly Operating Reports, (B) Redact Certain Personally Identifiable Information for Individual Creditors, and (C) Implement Procedures to Protect Confidential Resident Information; (II) Establishing a Complex Service List; (III) Approving the Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases; and (IV) Granting Related Relief* [Docket No. 4] (the "Creditor Matrix Motion").

Operational Pleadings Requiring Immediate Relief

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Prepetition Taxes and Fees; and (II) Granting Related Relief* [Docket No. 9] (the "Taxes Motion").

- *Debtors' Amended Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Satisfy Prepetition Employee Compensation and Benefit Obligations and (B) Continue their Employee Programs Policies and Procedures in the Ordinary Course; and (II) Granting Related Relief* [Docket No. 27](the "Wages Motion").

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain their Insurance Policies, Surety Bonds, and Letters of Credit, (B) Honor All Obligations Related Thereto, and (C) Amend, Renew, Supplement, Extend, or Replace Existing Coverage; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [Docket No. 7] (the "Insurance Motion").

- *Debtors' Emergency Motion for Entry of Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Providers; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; and (III) Granting Related Relief* [Docket No. 8] (the "Utilities Motion").

- *Debtors' Emergency Motion for Entry of Order (I) Authorizing the Debtors to (A) Maintain, Administer, and Modify their Refund Programs*

*and Practices and (B) Honor Prepetition Obligations Related Thereto; and (II) Granting Related Relief* [Docket No. 12] (the "Refund Motion").

- *Debtors' Emergency Motion for Entry of Order (I) Authorizing the Debtors to (A) Honor and Incur Obligations to Third-Party Managers and (B) Obtain New Third-Party Management Agreements, (II) Extending Statutory Protections to Third-Party Managers, and (III) Granting Related Relief* [Docket No. 13] (the "Third-Party Manager Motion").

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue their Existing Cash Management System and Maintain Their Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records; and (II) Granting Related Relief* [Docket No. 11] (the "Cash Management Motion").

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 28] (the "DIP Motion").

75. I have reviewed each First Day Pleadings (including the exhibits and schedules attached thereto) listed above and, to the best of my knowledge, I believe the facts set forth in the First Day Pleadings are true and correct. If I were called to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

76. Further, based on my personal knowledge, information supplied to me by other members of the Debtors' management, my review of relevant documents, my opinion based on my experience, discussions with the Debtors' advisors, and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First Day Pleadings is necessary for the Debtors to effectuate a smooth transition into chapter 11 and to avoid irreparable harm to their businesses and estates during the pendency of the Chapter 11 Cases, and is in the best interests of the Debtors' patients, Residents, creditors, estates, and other stakeholders.



GN DEFENDANTS EXHIBIT 8

77. As it relates to the Third-Party Manager Motion, I believe that the Third-Party Managers would stop providing critical services if the Debtors failed to honor their obligations to the Third-Party Managers. This poses a risk of catastrophic harm to the Debtors because the Third-Party Managers (a) employ the Community-level workforce, (b) possess the systems and processes and procedures to operate the Communities, and (c) have local knowledge critical to the operations and Residents. The loss of any of the Third-Party Operators would have an immediate impact that would harm Residents, jeopardize the Debtors' business, and erode value for all stakeholders. Moreover, replacing a Third-Party Manager would be difficult, if possible at all, and costly because of the legacy knowledge that the Third-Party Manager has relating to its respective Community as well as the local population's familiarity with the Third-Party Manager. In conclusion, I do not believe that any practical or legal alternative exists for the debtor other than to make the payments to the Third-Party Manager as outlined in the Third-Party Manager Motion and I further believe that such relief is critical and necessary to the continued care of the Residents, the Communities continued operations, and success of these Chapter 11 Cases.

78. Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I believe that the relief sought in the First Day Pleadings should be granted by the Court in its entirety, together with such other and further relief for the Debtors as this Court deems just and proper, in the most expeditious manner possible.

*[Remainder of page intentionally left blank.]*



**GN DEFENDANTS EXHIBIT 8**

In conclusion, for the reasons stated herein and in each First Day Motion, I respectfully request that each First Day Motion be granted in its entirety, together with such other and further relief as the Court deems just and proper. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 4, 2026

By: *<u>/s/M. Benjamin Jones</u>*
Name: M. Benjamin Jones
Title: Chief Restructuring Officer
Inspired Healthcare Capital, LLC
Inspired Healthcare Capital Holdings, LLC

<u>**EXHIBITS**</u>

**Exhibit A – Location of Communities and Developments**
**Exhibit B – Organizational Chart**
**Schedule 1 – List of Debtor Entities**



GN DEFENDANTS EXHIBIT 8

# Exhibit A
## Location of Communities and Developments




- = Operating Communities
- = Non-Operating Communities
- = Community Developments
- = Land for Development
- ★ = Headquarters, Scottsdale, AZ

1. The Resident at Cedar Dell - Dartmouth, MA
2. The Landing at North Haven - North Haven, CT
3. Azalea at Hamilton - Hamilton Township, NJ
4. Candle Light Cove - Easton, MD
5. Orchard at Athens - Athens, GA
6. Orchard at Brookhaven - Atlanta, GA
7. Salterra at Ashbrook - Villa Rica, GA
8. Harbor at Harmony Crossing - Eatonton, GA
9. Thrive at Augusta - Martinez, GA
10. Salterra at Peachtree - Trussville, AL
11. Salterra at Melbourne - Melbourne, FL
12. Azalea at Delray Beach - Delray Beach, FL
13. Salterra at Fort Myers - Fort Myers, FL
14. Salterra at Pinellas Park - Pinellas Park, FL
15. Salterra at Largo - Largo, FL
16. Salterra at Dunedin - Dunedin, FL
17. Salterra at Chesterfield - Chesterfield, MI
18. Mariella of Lake Orion - Lake Orion, MI
19. Ballard Glenn - Appleton, WI
20. Teal Shores - Mequon, WI
21. Mariella of Arlington Heights - Arlington Heights, IL
22. Arbor Terrace Naperville - Naperville, IL
23. Salterra at Hanover - Hanover, MN
24. Mariella of Grapevine - Grapevine, TX
25. Mariella of Round Rock - Round Rock, TX
26. Mariella of Sage Springs - Sage Springs, TX
27. The Blake at New Braunfels - New Braunfels, TX
28. Salterra at Las Vegas - Las Vegas, NV
29. Salterra at Carson Valley - Carson Valley, NV
30. Mariella of Reno - Reno, NV
31. The Archer Senior Living at Crescent Park - Eugene, OR
32. Elena's Manor - Hillsboro, OR
33. Salterra at St. Petersburg - St. Petersburg, FL
34. Inspired Senior Living of Creswell Development, LLC
35. Inspired Senior Living of Winery Lane Development, LLC
36. Inspired Senior Living of Payson Development, LLC Payson, AZ
37. Inspired Senior Living of San Tan Development, LLC Queen Creek, AZ
38. Augusta II Propco, LLC - Augusta, GA

**Exhibit B**

**Organizational Chart**

**Inspired Healthcare Capital Holdings, LLC, et al.**
**Organizational Chart**



**Schedule 1**

**List of Debtor Entities**

| | |
|---|---|
| 1. | Inspired Healthcare Capital Holdings, LLC |
| 2. | Inspired Senior Living of Appleton ST, LLC |
| 3. | Inspired Senior Living of Arlington Heights ST, LLC |
| 4. | IHC - Ashbrook ST, LLC |
| 5. | Inspired Senior Living of Athens ST, LLC |
| 6. | Inspired Senior Living of Augusta ST, LLC |
| 7. | Inspired Senior Living of Brookhaven ST, LLC |
| 8. | IHC - Candle Light Cove ST, LLC |
| 9. | Inspired Senior Living of Carson Valley ST, LLC |
| 10. | Inspired Senior Living of Chesterfield ST, LLC |
| 11. | Inspired Senior Living of Dartmouth ST, LLC |
| 12. | Inspired Senior Living of Delray Beach ST, LLC |
| 13. | Inspired Senior Living of Dunedin ST, LLC |
| 14. | Inspired Senior Living of Eatonton ST, LLC |
| 15. | Inspired Senior Living of Eugene ST, LLC |
| 16. | Inspired Senior Living of Fort Myers ST, LLC |
| 17. | Inspired Senior Living of Grapevine ST, LLC |
| 18. | Inspired Senior Living of Hamilton ST, LLC |
| 19. | Inspired Senior Living of Lake Orion ST, LLC |
| 20. | Inspired Senior Living of Largo ST, LLC |
| 21. | Inspired Senior Living of Las Vegas ST, LLC |
| 22. | Inspired Senior Living of Melbourne ST, LLC |
| 23. | Inspired Senior Living of Mequon ST, LLC |
| 24. | Inspired Senior Living of Naperville ST, LLC |
| 25. | Inspired Senior Living of New Braunfels ST, LLC |
| 26. | Inspired Senior Living of North Haven ST, LLC |
| 27. | IHC-Peachtree ST, LLC |
| 28. | Inspired Senior Living of Pinellas Park ST, LLC |
| 29. | Inspired Senior Living of Reno ST, LLC |
| 30. | Inspired Senior Living of Round Rock ST, LLC |
| 31. | Inspired Senior Living of San Marcos ST, LLC |
| 32. | Inspired Senior Living of St. Petersburg ST, LLC |
| 33. | Inspired Senior Living of Appleton MT, LLC |
| 34. | Inspired Senior Living of Arlington Heights MT, LLC |
| 35. | IHC - Ashbrook MT, LLC |
| 36. | Inspired Senior Living of Athens MT, LLC |
| 37. | Inspired Senior Living of Augusta MT, LLC |
| 38. | Inspired Senior Living of Brookhaven MT, LLC |
| 39. | IHC - Candle Light Cove MT, LLC |
| 40. | Inspired Senior Living of Carson Valley MT, LLC |
| 41. | Inspired Senior Living of Chesterfield MT, LLC |

| | |
|---|---|
| 42. | Inspired Senior Living of Dartmouth MT, LLC |
| 43. | Inspired Senior Living of Delray Beach MT, LLC |
| 44. | Inspired Senior Living of Dunedin MT, LLC |
| 45. | Inspired Senior Living of Eatonton MT, LLC |
| 46. | Inspired Senior Living of Eugene MT, LLC |
| 47. | Inspired Senior Living of Fort Myers MT, LLC |
| 48. | Inspired Senior Living of Grapevine MT, LLC |
| 49. | Inspired Senior Living of Hamilton MT, LLC |
| 50. | Inspired Senior Living of Lake Orion MT, LLC |
| 51. | Inspired Senior Living of Largo MT, LLC |
| 52. | Inspired Senior Living of Las Vegas MT, LLC |
| 53. | Inspired Senior Living of Melbourne MT, LLC |
| 54. | Inspired Senior Living of Mequon MT, LLC |
| 55. | Inspired Senior Living of Naperville MT, LLC |
| 56. | Inspired Senior Living of New Braunfels MT, LLC |
| 57. | Inspired Senior Living of North Haven MT, LLC |
| 58. | IHC-Peachtree MT, LLC |
| 59. | Inspired Senior Living of Pinellas Park MT, LLC |
| 60. | Inspired Senior Living of Reno MT, LLC |
| 61. | Inspired Senior Living of Round Rock MT, LLC |
| 62. | Inspired Senior Living of San Marcos MT, LLC |
| 63. | Inspired Senior Living of St. Petersburg MT, LLC |
| 64. | IHC-BI Holdings, LLC |
| 65. | Inspired Senior Living of Appleton DST |
| 66. | Inspired Senior Living of Arlington Heights DST |
| 67. | IHC – Ashbrook DST |
| 68. | Inspired Senior Living of Athens DST |
| 69. | Inspired Senior Living of Augusta DST |
| 70. | Inspired Senior Living of Brookhaven DST |
| 71. | Inspired Senior Living of Carson Valley DST |
| 72. | IHC – Candle Light Cove DST |
| 73. | Inspired Senior Living of Chesterfield DST |
| 74. | Inspired Senior Living of Dartmouth DST |
| 75. | Inspired Senior Living of Delray Beach DST |
| 76. | Inspired Senior Living of Dunedin DST |
| 77. | Inspired Senior Living of Eatonton DST |
| 78. | Inspired Senior Living of Eugene DST |
| 79. | Inspired Senior Living of Fort Myers DST |
| 80. | Inspired Senior Living of Grapevine DST |
| 81. | Inspired Senior Living of Hamilton DST |
| 82. | Inspired Senior Living of Lake Orion DST |
| 83. | Inspired Senior Living of Largo DST |
| 84. | Inspired Senior Living of Las Vegas DST |
| 85. | Inspired Senior Living of Melbourne DST |

| | |
|---|---|
| 86. | Inspired Senior Living of Mequon DST |
| 87. | Inspired Senior Living of Naperville DST |
| 88. | Inspired Senior Living of New Braunfels DST |
| 89. | Inspired Senior Living of North Haven DST |
| 90. | IHC – Peachtree DST |
| 91. | Inspired Senior Living of Pinellas Park DST |
| 92. | Inspired Senior Living of Reno DST |
| 93. | Inspired Senior Living of Round Rock DST |
| 94. | Inspired Senior Living of San Marcos DST |
| 95. | Inspired Senior Living of St. Petersburg DST |
| 96. | Inspired Healthcare Capital, LLC |
| 97. | Inspired Healthcare Capital Income Fund LLC |
| 98. | Inspired Healthcare Capital Income Fund 2 LLC |
| 99. | Inspired Healthcare Capital Income Fund 3 LLC |
| 100. | Inspired Healthcare Capital Income Fund 5, LLC |
| 101. | Inspired Healthcare Capital Income Fund 5 Notes, LLC |
| 102. | Inspired Healthcare Capital Liquidity Fund, LLC |
| 103. | Inspired Healthcare Capital Fund LP |
| 104. | IHC Security Income Fund LLC |
| 105. | IHC Development Fund III, LLC |
| 106. | IHC Development Fund IV, LLC |
| 107. | ZOL Management, LLC |
| 108. | Hunan, 1 LLC |
| 109. | MSL Management, LLC |
| 110. | Sukiyaki 10, LLC |
| 111. | Sukiyaki 14, LLC |
| 112. | IHC - Hanover Propco, LLC |
| 113. | Inspired Senior Living of Hanover, LLC |
| 114. | Inspired Senior Living of San Tan Development, LLC |
| 115. | San Tan Senior Living, LLC |
| 116. | Inspired Senior Living of Payson Development, LLC |
| 117. | Lucas Construction Holdings, LLC |
| 118. | Lucas Construction Group, LLC |
| 119. | Innov8tion Holdings, LLC |
| 120. | Innov8tion Marketing, LLC |
| 121. | Cre8tive Holdings, LLC |
| 122. | Cre8tive Architects, LLC |
| 123. | Inspired Healthcare Capital Fund Services, LLC |
| 124. | Nsite Development, LLC |
| 125. | Senior Housing Marketing Agency, LLC |
| 126. | Senior Housing Management Group, LLC |
| 127. | SHMG-Augusta GA, LLC |
| 128. | SHMG-Naperville IL, LLC |
| 129. | Inspired Senior Living of Creswell Development, LLC |
| 130. | Creswell Senior Living, LLC |



GN DEFENDANTS EXHIBIT 8

| | |
|---|---|
| 131. | Inspired Senior Living of Winery Lane Development, LLC |
| 132. | Winery Lane Senior Living, LLC |
| 133. | Volante HoldCo, LLC |
| 134. | Volante Senior Living, LLC |
| 135. | VSL-Arlington IL, LLC |
| 136. | VSL-Ashbrook GA, LLC |
| 137. | VSL-Carson Valley NV, LLC |
| 138. | VSL-Chesterfield MI, LLC |
| 139. | VSL-Delray Beach FL, LLC |
| 140. | VSL-Dunedin FL, LLC |
| 141. | VSL-Eugene OR, LLC |
| 142. | VSL-Fort Myers FL, LLC |
| 143. | VSL-Grapevine TX, LLC |
| 144. | VSL-Hamilton NJ, LLC |
| 145. | VSL-Lake Orion MI, LLC |
| 146. | VSL-Largo FL, LLC |
| 147. | VSL - Las Vegas NV, LLC |
| 148. | VSL-Melbourne FL, LLC |
| 149. | VSL - Peachtree AL, LLC |
| 150. | VSL-Pinellas FL, LLC |
| 151. | VSL-Reno, NV, LLC |
| 152. | VSL-Round Rock TX, LLC |
| 153. | VSL-San Marcos TX, LLC |
| 154. | VSL-St. Petersburg FL, LLC |
| 155. | VSL-Hanover MN, LLC |
| 156. | VSL-Harmony OR, LLC |
| 157. | VSL-Creswell OR, LLC |
| 158. | VSL-Roseburg OR, LLC |
| 159. | IHC-Augusta II Propco, LLC |
| 160. | IHC – Harmony PropCo, LLC |
| 161. | IHC – Harmony OpCo, LLC |



GN DEFENDANTS EXHIBIT 8