**ARBITRATION TRIBUNALS OF THE
FINANCIAL INDUSTRY REGULATORY AUTHORITY**

***In the Matter of the Arbitration Between:***

**BRETT W. HENRICKS AND ELIZABETH A. SHARP-HENRICKS, INDIVIDUALLY AND AS MEMBERS OF HENRICKS INVESTMENTS, LLC,**

**CLAIMANTS,**

**v.** **Case No. 25-01398**

**EMERSON EQUITY LLC,**

**RESPONDENT.**
**_____________________________________________/**

## FIRST AMENDED STATEMENT OF CLAIM

CLAIMANTS BRETT W. HENRICKS, INDIVIDUALLY AND AS A MEMBER OF HENRICKS INVESTMENTS, LLC (hereinafter collectively referred to as "B. HENRICKS") and ELIZABETH A. SHARP-HENRICKS, INDIVIDUALLY AND AS A MEMBER OF HENRICKS INVESTMENTS, LLC (hereinafter collectively referred to as "E. SHARP-HENRICKS", who together with "B. HENRICKS" are hereinafter collectively referred to as "CLAIMANTS") sue EMERSON EQUITY LLC (hereinafter referred to as "EMERSON" or "RESPONDENT") and allege the following:

## JURISDICTIONAL ALLEGATION

1. The jurisdiction of this Tribunal is invoked under the Federal Arbitration Act and pursuant to the arbitration clauses contained in (a) the licensing agreement that RESPONDENT has with the Financial Industry Regulatory Authority ("FINRA"), by which the firm individually and collectively agreed to submit all disputes and/or complaints (i) with customers and/or (ii) arising out of or in connection with its business and/or (iii) arising out of the employment or



GN DEFENDANTS EXHIBIT 9

termination of employment of its associated persons to arbitration; (b) FINRA *Code of Arbitration Procedure*; and (c) the FINRA Form U-4s of Eric James Bell and Ryan David Finch. See, e.g., Spear, Leeds & Kellogg v. Central Life Assur. Co., 85 F.3d 21 (2d Cir. 1996); Oppenheimer & Co., Inc. v. Neidhardt, 56 F.3d 352 (2d Cir. 1995); John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 59 (2d Cir. 2001); Vestax Sec. Corp. v. McWood, 280 F.3d 1078, 1080 (6th Cir. 2002).

## GENERAL ALLEGATIONS

### i. BRETT W. HENRICKS and ELIZABETH A. SHARP-HENRICKS

2. B. HENRICKS is sixty-nine (69) years old. His wife, E. SHARP-HENRICKS, is sixty (60) years old. CLAIMANTS reside in Colorado Springs, Colorado, and are both retired.

3. Eric James Bell (hereinafter referred to as "Bell") and Ryan David Finch (hereinafter referred to as "Finch") acted as CLAIMANTS' financial advisors. RESPONDENT knew that the monies CLAIMANTS intended to invest were funded in part through a 1031 exchange in which CLAIMANTS sold two fourplexes and B. HENRICKS' parents' home, the latter of which was **debt free** at the time of sale, and that these monies constituted a significant portion of their net worth.

### ii. Eric James Bell (CRD#: 7015161)

4. At all times relevant to the transactions alleged herein, Bell was a registered representative, employee and agent of RESPONDENT EMERSON, a FINRA member with its main office in San Mateo, California. (See attached Exhibit "A."). At all times relevant hereto, Bell was one of the financial advisors responsible for the handling of the transactions at issue with CLAIMANTS and was acting within the scope of his position of employment and/or agency with RESPONDENT EMERSON. Bell worked from an EMERSON branch office located in Greenwood Village, Colorado. (See Exhibit "A.").

**iii. Ryan David Finch (CRD#: 6379871)**

5. At all times relevant to the transactions alleged herein, Finch was a registered representative, employee and agent of RESPONDENT EMERSON. At all times relevant hereto, Finch was one of the financial advisors responsible for the handling of the transactions at issue with CLAIMANTS and was acting within the scope of his position of employment and/or agency with RESPONDENT EMERSON. Finch also worked from an EMERSON branch office located in Greenwood Village, Colorado. (See attached Exhibit "B.").

**iv. EMERSON EQUITY LLC (CRD#: 130032)**

6. During all time periods material hereto, RESPONDENT EMERSON was licensed and authorized to do business in the State of Colorado and did business through Bell and Finch, registered representatives of RESPONDENT EMERSON. RESPONDENT EMERSON is a registered securities broker/dealer with the State of Colorado, the Securities and Exchange Commission ("SEC"), and a member of the Financial Industry Regulatory Authority ("FINRA").

7. RESPONDENT negligently recommended that CLAIMANTS invest in highly leveraged, high commission, inflated DST real estate investments managed by NB Private Capital, LLC n/k/a Versity/Crew Enterprises and Inspired Healthcare Corporation (hereinafter collectively referred to as the "DST investments"). RESPONDENT misrepresented the risks of these DST investments and failed to conduct a reasonable due diligence on these investments. Further, RESPONDENT'S due diligence was conflicted because, among other things, Brian Nelson, a financial advisor with RESPONDENT, was a partial owner of NB Private Capital, LLC, the syndicator of most of the investments purchased by CLAIMANTS. Further, key marketing personnel at Inspired Healthcare Corporation were also licensed with RESPONDENT EMERSON, and RESPONDENT EMERSON was the principal broker-dealer responsible for

marketing these investments. RESPONDENT misrepresented the risks of these DST investments and failed to conduct a reasonable due diligence on these investments.[1]

8. The recommended investment strategy violated FINRA's suitability rules and FINRA Rule 2010, which states that "[a] member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade." RESPONDENT failed to provide CLAIMANTS with the risk disclosure documents (i.e., the private placement memoranda) for these investments prior to the sale, and failed to review these documents with CLAIMANTS. RESPONDENT failed to disclose, among other things, that these were high risk, highly leveraged investments offered by an investment sponsor with financial issues and a checkered history, and that CLAIMANTS were paying inflated fees (14.41% in fees and expenses on Versity Inspire On 22nd, DST, for example).

9. RESPONDENT'S investment recommendations were also unsuitable for CLAIMANTS in view of their financial situation, investment objectives and risk tolerance.

10. RESPONDENT agreed and undertook to perform the duties of a financial advisor and a brokerage firm in connection with recommending and supervising the recommendation of the transactions at issue with CLAIMANTS.

11. The acts committed by RESPONDENT, as alleged herein, were done by it personally through the use of the mails or other instrumentalities of interstate commerce. The acts of RESPONDENT and each employee, agent, and representative of RESPONDENT EMERSON (Bell and Finch) are deemed to be the acts of and are chargeable to and binding upon

[1] **This is a product case.** CLAIMANTS allege that RESPONDENT did not conduct a reasonable due diligence on these DST investments, that these investments were misrepresented to them, and that these investments were unsuitable for them because they were misrepresented to them and CLAIMANTS, therefore, did not understand the investments. These recommendations were also unsuitable for CLAIMANTS in view of their financial situation, needs and risk tolerance.

RESPONDENT EMERSON under principles of agency law, licensing, controlling person and the doctrine of *respondeat superior*.

12. RESPONDENT knew that CLAIMANTS trusted it to disclose all material facts concerning the investments recommended to them and to comply with all SEC, FINRA and state licensing requirements. Throughout the course of their investment relationship, RESPONDENT sought to and did engender CLAIMANTS' trust and confidence in its ability and willingness to do anything in its power to properly advance all of CLAIMANTS' investment objectives and needs. A fiduciary relationship existed between CLAIMANTS and RESPONDENT.

## I. RESPONDENT FAILED TO CONDUCT A REASONABLE DUE DILIGENCE ON THE DST INVESTMENTS

13. RESPONDENT EMERSON, acting through Bell and Finch, improperly recommended that CLAIMANTS purchase the following alternative investments:

| DATE | INVESTMENT | AMOUNT |
|---|---|---|
| 2/26/2021 | Versity Wolf Run, DST | $242,000.00 |
| 4/16/2021 | IHC - Peachtree, DST | $614,446.53 |
| 7/26/2021 | Inspired Senior Living of Athens, DST | $400,000.00 |
| 7/28/2021 | Versity Inspire On 22nd, DST | $300,000.00 |
| 4/4/2022 | Inspired Senior Living of Naperville, DST | $193,613.19 |
| | **TOTAL:** | **$1,750,059.72** |

14. RESPONDENT failed to conduct a reasonable due diligence on the DST investments, made material misrepresentations to CLAIMANTS concerning the DST investments, and failed to disclose material facts to CLAIMANTS concerning the DST investments.

### *i. RESPONDENT'S Duty to Conduct a Reasonable Due Diligence and Investigate and Independently Verify the Issuer's Representations and Claims in the Private Placement Memorandum*

15. The DST investments were 1031 exchange syndicated investments. *FINRA Notice*

*to Members 05-18* contains the following explanation of 1031 exchanges and admonitions concerning a broker dealer's obligation to conduct due diligence that are relevant to this investment:

**Executive Summary**

**This Notice addresses Section 1031 tax-deferred exchanges of real property for certain tenants-in-common ("TIC") interests in real property offerings.[FN1] In a TIC exchange, interests in real property are exchanged for instruments that generally are securities for purposes of the federal securities laws and NASD rules.[FN2] This Notice reminds members that when offering TIC interests that are securities to customers, members and their associated persons must comply with all applicable NASD rules, including those addressing:**

- **suitability;**
- **due diligence;**
- **splitting commissions with unregistered individuals or firms;**
- **supervision; and**
- **recordkeeping.**

**In addition, members relying on private offering exemptions from the registration requirements of the Securities Act of 1933 must ensure that their manner of offering TIC interests complies with all applicable requirements, including the prohibition on general solicitation.**

**Tax Status**

Typically, the sale of an investment, including an investment in real estate, is a taxable event, with the seller being responsible for capital gains taxes on the appreciation of the investment. Under Section 1031 of the Internal Revenue Code, however, an investor in income-producing or rental real estate may exchange the investment for another investment in income-producing or rental real estate of equal or greater value and defer payment of capital gains. In order to qualify for a deferral under Section 1031, an investor must acquire an interest in real estate in the exchange, not an interest in a partnership.

For example, if an investor purchased rental real property in 1972 for $50,000, the property to Roebuck may be worth $2 million dollars. The sale of the property would cause the seller to incur taxes on the profit. If the owner of the rental property exchanged the rental property for different real property, he could defer paying these taxes. Because of the difficulty of finding equal and offsetting properties for each investor, sponsors have offered interests in larger real estate offerings to pools of investors, in the form of TIC interests. In the example

provided, rather than exchanging a rental property valued at $2 million for a similarly valued property, the owner could pool his interest with other similarly situated property owners to acquire property or properties with a large enough value to provide tax deferral for all the investors. If, however, the pool of investors is treated as a partnership under the principles of federal tax law, the exchange will not qualify under Section 1031, and the taxes on the investors' profits will not be deferred under that section.

TIC exchanges have grown dramatically, from approximately $150 million in sales in 2001 to approximately $2 billion in 2004. The driving force behind the growth in TIC exchanges is their favorable tax treatment.

In March 2002, the IRS issued Revenue Procedure 2002-22, 1 C.B. 733 ("Rev. Proc. 2002-22"), which addresses the conditions under which the IRS will consider a request for a ruling that a TIC interest in rental real estate is not an interest in a partnership. Rev. Proc. 2002-22 describes the central characteristic of a tenancy in common (each owner is deemed to own individually a physically undivided part of the entire parcel of property) and sets forth 15 specific conditions that must be met before the IRS will consider issuing a ruling. If the arrangement among the investors is respected as a TIC interest in rental real estate, rather than an interest in a partnership, an exchange may qualify under Section 1031 if the other conditions of that section are satisfied.

**Securities Law Status**

When TICs are offered and sold together with other arrangements, they generally would constitute investment contracts and thus securities under the federal securities laws. An investment contract includes any contract, transaction or scheme in which persons invest their money in a common enterprise, with the expectation of profits to be derived predominantly from the efforts of others. TIC interests are generally investment contracts because the tenants in common invest in an undivided fractional interest in the rental real property by pooling their assets and sharing in the risks and benefits of the enterprise, while obtaining profits derived predominantly from the efforts of others, such as through contracts concerning leasing, management and operation of the acquired property. In addition to managing the property, TIC sponsors typically structure the TIC and negotiate the sale price and the loan. The fact that investors in a particular TIC program might have authority to terminate a management contract, or even to maintain or repair the property, would not demonstrate that the TIC interest is not an investment contract.

Although Section 1031 does not apply to an exchange of investment property for "interests in a partnership," "stocks, bonds, notes," or "other securities," the federal securities law definitions of those terms do not control interpretation of the tax laws. Accordingly, the fact that TIC interests typically are

investment contracts under securities laws does not inherently disqualify them as property that may be exchanged under Section 1031.

We have become aware that certain states may exempt particular types of TIC transactions from the definition of "security" under state law. We remind members, however, that a determination that a particular transaction does not involve a security for purposes of state law is not determinative for purposes of federal securities law.

**Application of NASD Rules to TIC Exchanges**

*TIC interests are a type of non-conventional investment ("NCI"). In NTM 03-71, NASD explained that members engaged in the sale of NCIs must ensure that those products are offered and sold in a manner consistent with the member's general sales conduct obligations, as well as address any special circumstances presented by the sale of those products. Among the issues highlighted in NTM 03-71 are members' responsibilities to:*

- *conduct appropriate due diligence;*
- *perform a reasonable-basis suitability analysis;*
- *perform customer specific suitability analysis for recommended transactions;*
- *ensure that promotional materials used by the member are fair, accurate, and balanced;*
- *implement appropriate internal controls; and*
- *provide appropriate training to registered persons involved in the sale of these products.*

**Suitability and Due Diligence**

*Before recommending a TIC exchange, members must have a clear understanding of the investment goals and current financial status of the investor.* In many cases, a TIC interest will constitute a significant portion of an investor's total assets. Because of the favorable tax treatment, investors often elect to invest the entire proceeds from the sale of an investment property in a TIC exchange. *Concentration of an investor's assets in a single asset class, however, is not suitable for many investors. Members must, with respect to each customer for whom they make a recommendation, consider the risks from over-concentration against the benefits of tax deferral and the investment potential of the underlying real estate asset(s).*

TIC interests are illiquid securities. NASD is not aware of any secondary market for TIC interests. Moreover, the tenant-in-common form of ownership may require unanimous consent to sell a TIC interest. The subsequent sale of TIC interests may only be possible at a significant discount to the net asset value of the undivided interest in the real estate. As fees charged in connection with a TIC

exchange increase, the money saved as a consequence of tax deferral will be offset. Accordingly, members should consider the effect of fees on each TIC exchange.

TIC exchange sponsors routinely obtain legal opinions regarding whether a particular TIC's offering structure will qualify as a like-kind exchange of real property under Section 1031. Given the importance of that tax treatment, a member should obtain a "clean" legal opinion that a TIC "should" or "will" qualify for exchange under Section 1031. If a sponsor failed to obtain a legal opinion, or only obtained a "more likely than not" opinion, that would be a material fact. In such a case, a member, as part of its due diligence responsibilities would be required to ascertain the specific tax status risks of the TIC exchange and inform the investor of the risks involved.

*In making a suitability determination in connection with a recommendation to a customer to purchase a TIC interest, a member must also consider whether the fees and expenses associated with TIC transactions outweigh the potential tax benefits to the customer. TICs structured with high up-front fees and expenses paid to the sponsor and/or salespersons of the selling broker-dealers raise particular concerns about the ability to make a suitable recommendation.* In addition, TIC transactions in many cases may not provide complete tax-free exchanges for investors ( e.g., in situations where the investor's debt ratio on the replacement property decreases, the difference may result in a taxable event for the investor). Members must take all of these factors into consideration when recommending a particular TIC transaction to a customer.

**NTM 03-71 reminds members that the type of due diligence that is appropriate will vary from product to product. NASD staff believes that it is not appropriate for members that recommend a TIC transaction simply to rely on representations made by the sponsor in an offering document. While the nature and extent of verification will vary with the facts and circumstances related to particular sponsors and offerings, members should make a reasonable investigation to ensure that the offering document does not contain false or misleading information. Such an investigation could include background checks of the sponsor's principals, review of the agreements ( e.g., property management, purchase and sale, lease AND LOAN AGREEMENTS) and property inspection. In addition, if the offering document contains projections, members should understand the basis for those projections, and the degree of likelihood that they will occur. For example, members should determine whether any projected yields can reasonably be supported by the property operations.**

**Licensing, Supervision and Recordkeeping**

Associated persons selling TIC interests must have passed the appropriate qualification examinations. Because TICs are typically structured as direct participation programs ("DPPs"), associated persons who sell them generally must

> have passed either the Series 7 or the Series 22 (Limited Representative -- Direct Participation Program securities). In addition, most states require the Series 63 State Agent's license. Also, as with any security, a TIC interest transaction must be reviewed and endorsed by a qualified principal in accordance with the member's supervisory procedures. A qualified principal for supervising TIC interests would be either a General Securities Principal (Series 24) or a DPP principal (Series 39).
>
> *In accordance with NASD Rule 3010, members should establish an appropriate supervisory system for the offer and sale of TIC interests. The system should include comprehensive written supervisory procedures reasonably designed to ensure compliance with all applicable rules, including suitability and sales practice requirements related to TIC transactions.* The supervisory system should address the sales practice issues discussed in this Notice, including ensuring that neither the member nor its registered representatives pay referral fees or otherwise share transaction-based compensation from TIC transactions with persons that would be deemed to be unregistered broker-dealers.
>
> NASD and SEC record keeping and retention requirements also apply to TIC transactions, and firms should establish appropriate procedures to comply with the applicable requirements in SEC Rules 17a-3 and 17a-4, and NASD Rule 3110. Due to the complexity and varying documentation requirements of TIC exchanges, firms should examine the records they maintain and ensure that applicable record keeping requirements are satisfied.

(See attached Exhibit "C.").

16. The DST investments were also private placements. In April 2010, FINRA issued a seminal notice, *Regulatory Notice 10-22,* "remind[ing] broker-dealers of their obligation to conduct a reasonable investigation of the issuer and the securities they recommend" in private placement offerings. FINRA noted, among other things, that:

> While the private placement market is an important source of capital for many U.S. companies, especially smaller issuers, FINRA has found **significant problems** in several recent examinations and investigations. These problems include fraud and sales practice abuses in Regulation D offerings.
>
> **The Securities and Exchange Commission (SEC) and federal courts have long held that a BD that recommends a security is under a duty to conduct a reasonable investigation concerning that security and the issuer's representations about it.** This duty emanates from the BD's "special relationship" to the customer, and from the fact that in recommending the security, the BD represents to the customer "that a reasonable investigation has been made and that [its] recommendation rests on the conclusions based on such investigation."

Failure to comply with this duty can constitute a violation of the antifraud provisions of the federal securities laws and, particularly, Section 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder. It can also constitute a violation of FINRA Rule 2010, requiring adherence to just and equitable principles of trade, and FINRA Rule 2020, prohibiting manipulative and fraudulent devices.

**In general, however, a BD "may not rely blindly upon the issuer for information concerning a company," nor may it rely on the information provided by the issuer and its counsel in lieu of conducting its own reasonable investigation. While BDs are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a "high degree of care" in investigating and independently verifying an issuer's representations and claims.**

*FINRA Suitability Obligations*

NASD Rule 2310 states that BD must have reasonable grounds to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer. This analysis has two principal components. First, the "reasonable basis" suitability analysis requires the BD to have a reasonable basis to believe, based on a reasonable investigation, that the recommendation is suitable for at least some investors. Second, the "customer specific suitability" analysis requires that the BD determine whether the security is suitable for the customer to whom it would be recommended.

*IN ORDER TO ENSURE THAT IT HAS FULFILLED ITS SUITABILITY RESPONSIBILITIES, A BD IN A REGULATION D OFFERING SHOULD, AT A MINIMUM, CONDUCT A REASONABLE INVESTIGATION CONCERNING:*

i) the issuer and its management;
ii) the business prospects of the issuer;
iii) the assets held by or to be acquired by the issuer;
iv) the claims being made; and
v) the intended use of proceeds of the offering.

A BD must conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer.

(See attached Exhibit "D.").

17. **FINRA issued the following additional admonition to brokerage firms that sold private placements:**

- FINRA has observed instances where some firms' reasonable diligence was

not sufficient in scope or depth to be considered a "reasonable investigation of the issuer and the securities."

- **No Reasonable Diligence** – Some firms failed to perform reasonable diligence on private placement offerings prior to recommending the offerings to retail investors. In some instances, firms performed no additional research about new offerings because they relied on their experience with the same issuer in previous offerings. **In other instances, some firms reviewed the offering memorandum and other relevant offering documentation, but did not discuss the offering in greater detail with the issuer or independently verify, research or analyze material aspects of the offerings**. FINRA also observed that some firms did not investigate red flags identified during the reasonable diligence process.

(See attached Exhibit "E.").

***ii. RESPONDENT'S Misrepresentations and Omissions of Material Fact Concerning the DST investments***

18. RESPONDENT failed to conduct a reasonable investigation ("due diligence") on the DST investments and the issuer's representations about the DST investments.

19. RESPONDENT failed to conduct a reasonable due diligence on these investments, these investments were misrepresented to CLAIMANTS as conservative, low risk investments, the risk of these investments were not disclosed to CLAIMANTS, and these recommendations were unsuitable for CLAIMANTS given RESPONDENT'S failure to conduct a reasonable due diligence and disclose all material facts concerning these investments to CLAIMANTS.

20. Ultimately, CLAIMANTS suffered substantial damages as a result of RESPONDENT and its agents' reckless and unsuitable investment recommendations based upon insufficient due diligence, material misrepresentations and omissions, and failure to supervise. RESPONDENT violated federal and state securities laws, as well as FINRA Rules, in the sale of these speculative investments.

21. It is well-settled that a brokerage firm which recommends a security has a duty to ensure that its representations have a reasonable basis:

> In summary, the standards . . . are strict. [A salesman] cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. By his recommendation, he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation. Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information.

Hanley v. SEC, 415 F.2d 589, 595-97 (2nd Cir. 1969) (emphasis added).[2] In short, a broker-dealer must not only "know the customer," but the broker-dealer must also know the "security." RESPONDENT did not "know" the DST investments because it failed to conduct a reasonable investigation ("due diligence") into these high-risk investments and the manager/syndicator/issuer/promoter/organizer before recommending these investments to CLAIMANTS.

22. When a brokerage firm recommends securities, the firm is under a duty to ensure that its representations have a reasonable basis. Brokerage firms have a duty to investigate securities they recommend to their clients in order to comply with their "reasonable basis" suitability requirement. RESPONDENT negligently violated this reasonable basis standard.

---

[2] See also Mac Robbins & Co., 41 S.E.C. 116-119 (1962), Aff'd. Sub. Nom. Berko v. S.E.C., 316 F.2d (2d Cir. 1963) ("The making of recommendations to prospective purchasers without a reasonable basis, couched in terms of either opinion or fact, designed to induce purchases, is contrary to the basis obligation of fair dealing borne by those who engage in the sale of securities to the public."); Alexander Reid & Co., 40 S.E.C. 986-990 (1962) (A broker's recommendation must be "responsibly made on the basis of actual knowledge and careful consideration."); Securities Exchange Act Release No. 6721 (February 2, 1962) ("the making of recommendations for the purchase of a security implies that the dealer has a reasonable basis for such recommendations, which in turn, requires that, as a prerequisite, he shall have made a reasonable investigation:); Rice, Recommendations by a Broker-Dealer; the Requirement for a Reasonable Basis, 25 Mercer L.Rev. 537 (1974) (A broker that does not have a reasonable basis for recommending a particular security cannot satisfy the suitability rule, "since a broker-dealer would have difficulty contending that a recommendation was suitable for a given customer when you lack adequate information about the security involved.")

23. In Lester Kuznetz, Exchange Act Release No. 23,525, 36 S.E.C. Docket 332, 1986 WL 625417 (Aug. 12, 1986), the SEC found that a broker made fraudulent representations in connection with the stock of a uranium mining company which had a market price. "When a securities salesman recommends securities, he is under a duty to ensure that his representations have a reasonable basis. This [the broker] Kuznetz failed to do." "Brokers and salesmen are under a duty to investigate . . . ." 1986 WL 7254147, at *3 & n.5 (footnote omitted). See also Sec. & Exch. Comm'n Litig. Release No. 5,493, 1972 WL 129512, at *1 (Aug. 10, 1972) (Investment advisors improperly "published untrue and false statements concerning the value of certain publicly traded securities without attempting to verify the truth of said information and without notifying the public that it was publishing as fact, items that they had failed to investigate and which turned out to be false."). "[A] broker has a duty to investigate stocks he recommends to his client. Clearly, a broker has the responsibility to know what he is recommending to his client." Mihara v. Dean Witter & Co., 619 F.2d 814, 825 (9th Cir. 1980).

24. RESPONDENT misrepresented and omitted to disclose numerous material facts to CLAIMANTS concerning the DST investments and their offerings, their operations, and the risks involved in these investments. RESPONDENT failed to review the risks of these investments with CLAIMANTS.

25. In connection with the above offer of securities, RESPONDENT failed to disclose the following material facts, among others, which were necessary to disclose in order to make the statements made, in light of the circumstances under which they were made, not misleading:

a. The financial condition of the Nelson Brothers, LLC, the DST investments and their offerings.

b. The potential risk of investing in this program.

26. **RESPONDENT negligently failed to conduct a sponsor level review of the**

**investment sponsors, including NB Private Capital, LLC, now known as Versity Investments, and its President and Co-Founder, Brian Nelson.** A sponsor level review, unlike an offering level review, consists of an in-depth review of the investment sponsor, i.e., NB Private Capital, LLC, and affiliated entities that support its investment programs, including their financial positions and track records. RESPONDENT misleadingly led CLAIMANTS to believe that such a sponsor level review had been conducted.

27. These DST investments likewise relied on bridge loans, referred to in the offering documents as "preferred equity loans". RESPONDENT failed to determine why Brian Nelson needed this financing, the terms of the financing, and the safeguards in place to ensure that the sponsor actually used investment sale proceeds to pay off these loans.

28. **RESPONDENT failed to disclose the following material facts, among others, to CLAIMANTS:**

**a. An equity provider, Terra Property Trust, Inc., had filed a lawsuit against Brian Nelson and others in March 2019, alleging that Brian Nelson had breached a guarantee given by him in connection with a preferred equity contribution in the NB Stadium View, DST offering. (See attached Exhibit "F.").**

**b. At least three prior Nelson Brothers offerings, NB Taylor Bend DST, NB Vue Mac DST and NB Loft Vue DST had filed for bankruptcy.**

**c. Nelson Brothers obtained bridge equity financing to fund its acquisition of real estate that would be sold in private placement offerings from, among other lenders, Knights Hill Ireland II DAC. Beginning at least in May 2021 or June 2021, if not earlier, the principals of Nelson Brothers directed that cash flows received from**

**private placement offerings be applied in a manner that was not consistent with the bridge equity financing loan agreements. (See attached Exhibit "G.")**

**d. Nelson had financial problems, including tax liens by the State of Oregon ($2,543.73 3/20/17) and the IRS ($66,406.28 11/14/16 and $676,512 5/25/17)**

29. RESPONDENT failed to disclose to CLAIMANTS that RESPONDENT had not conducted a proper due diligence on these investments. RESPONDENT violated its fiduciary duty to CLAIMANTS.

## II. RESPONDENT'S RECOMMENDATIONS WERE UNSUITABLE FOR CLAIMANTS IN VIEW OF THEIR FINANCIAL SITUATION, NEEDS, INVESTMENT OBJECTIVES AND RISK TOLERANCE

30. RESPONDENT improperly recommended that CLAIMANTS invest a significant amount of their life savings in high risk, illiquid alternative investments, namely the DST investments. As a result of RESPONDENT'S recommendations, a significant portion of CLAIMANTS' net worth was concentrated in these high-risk investments. The recommended investment strategy violated FINRA'S suitability rules and FINRA Rule 2010, which states that "[a] member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade." RESPONDENT failed to disclose the far greater risks of these alternative investments.

31. RESPONDENT'S recommended investment strategy violated FINRA'S suitability rules and FINRA Rule 2010, which states that "[a] member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade." RESPONDENT failed to disclose the risks of the DST investments.

32. RESPONDENT also failed to comply with FINRA's suitability rules, including but not limited to *Conduct Rules* 2111 and 2310. FINRA Rule 2111(a) *Suitability* reads as follows:

> A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connections with such recommendation.

(See attached Exhibit "H.").

33. RESPONDENT also ignored the guidance set forth in **FINRA Notice to Members 03-71** "*NASD Reminds Members of Obligations when Selling Non-Conventional Investments.*"

This Notice states in pertinent part:

> In the aftermath of the recent downturn in the equity markets, NASD reviewed the services and products offered by members and observed that retail investors were being offered an array of different investments as **alternatives** to conventional equity and fixed-income investments. These **alternative investments** do not fall under a common category; the staff review indicates that brokers and retail investors have shown increased interest in products such as asset-backed securities, distressed debt, and derivative products (for ease of reference these products are collectively referred to as non-conventional investments or "NCIs"). NCIs often have complex terms and features that are not easily understood. NASD staff reminds members that the fact an investment is an NCI does not in any way diminish a member's responsibility to ensure that such a product is offered and sold in a manner consistent with the member's general sales conduct obligations. This *Notice to Members* reminds members offering NCIs of their obligations to: (1) conduct adequate due diligence to understand the features of the product; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis in connection with any recommended transactions; (4) provide a balanced disclosure of both the risks and rewards associated with the particular product, especially when selling to retail investors; (5) implement appropriate internal controls; and (6) train registered persons regarding the features, risks, and suitability of these products.
>
> NASD is issuing this *Notice to Members* to remind members of their sales conduct obligations. Given the complex nature of NCIs and the potential for customer harm or confusion, members are cautioned to ensure that their sales conduct procedures fully and accurately address any of the special circumstances presented by the sale of NCIs. **Additionally, NASD is concerned that investors, particularly retail investors, may not fully understand the risks associated with these products.** Accordingly, NASD reminds members that the sale of NCIs, like more traditional

> investments, requires them to: (1) conduct appropriate due diligence with respect to these products; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis for recommended transactions; (4) ensure that promotional materials used by the member are fair, accurate, and balanced; (5) implement appropriate internal controls; and (6) provide appropriate training to registered representatives that sell these products. **Given the complex and, at times, difficult-to-understand nature of the NCIs, members should take particular care to assure that they are fulfilling these obligations.**
>
> **Customer-Specific Suitability**
>
> NASD cautions members against relying too heavily upon a customer's financial status as the basis for recommending NCIs. A customer's net worth alone is not necessarily determinative of whether a particular product is suitable for that investor. **Given the unique nature of NCIs, these products may present challenges when it comes to a member's duty to dispense its suitability obligation**; however, the difficulty in meeting such challenges cannot be considered as a mitigating factor in determining whether members have met their suitability obligations. **NCIs with particular risks may be suitable for recommendation to only a narrow band of investors capable of evaluating and being financially able to bear those risks**.
>
> **Training**
>
> For a variety of reasons, the need for adequate training is heightened when registered persons sell NCIs. **First, due to the unique nature of these products, many investors, especially retail investors, may not understand the features of the product, and may not fully appreciate the associated risks of investing in them.** Moreover, in light of the fact that investors may be turning to these products as an alternative to traditional equity and fixed income investments, **it is crucial for registered persons to provide full and balanced disclosure regarding both the risks and the rewards of these products**.

(See attached Exhibit "I.").

34. FINRA has made clear, as have the SEC and state regulators, that broker dealers and financial advisors cannot delegate their obligation to make suitable recommendations to the investor. In other words, a broker-dealer cannot recommend unsuitable investments and avoid liability by having the investor sign a document that includes disclaimers such as, "I know that this is an unsuitable investment" or "I know this is a high-risk investment." If a broker-dealer's suitability obligation could be shifted to the investor through a disclosure, the suitability rule would

be essentially nullified.

35. *The Supplementary Material* to FINRA Rule 2111 (the FINRA Suitability Rule) states:

> **.01 General Principles**. Implicit in all member and associated person relationships with customers and others is the fundamental responsibility for **fair dealing**. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of FINRA rules, with particular emphasis on **the requirement to deal fairly with the public**. **The suitability rule is fundamental to fair dealing and is intended to promote ethical sales practices and high standards of professional conduct.**
>
> **.02 Disclaimers. A member or associated person cannot disclaim any responsibilities under the suitability rule.**

(See Exhibit "H.").

36. The FINRA suitability rule required RESPONDENT to make only those recommendations that were consistent with CLAIMANTS' risk tolerance, investment objectives, financial situation and needs. "[I]n blatant disregard of the customer's financial situation, [the broker] recommended and effected transactions which were excessive and unsuitable. The duty to deal fairly with one's customer is well-established in this industry." Gordon James Mahedy, 1994 WL 650117, at *1 (NYSE Board of Directors Oct. 6, 1994).

37. Even if CLAIMANTS said they wanted speculative and illiquid investments, or if CLAIMANTS were sophisticated, RESPONDENT was still required to make suitable recommendations in accordance with CLAIMANTS' risk tolerance and investment objectives for their accounts.

> [W]hether or not the . . . committee considered Reynold's transactions appropriate is not the test for determining the propriety of his conduct. As a fiduciary, a broker is charged with making recommendations in the best interests of his customer even when such recommendations contradict the customer's wishes. Thus, even if the committee suggested that Reynolds engage in aggressive and speculative trading, Reynolds was obligated to counsel them in a manner consistent with the fund's financial situation. Reynolds failed to fulfill that obligation and thereby violated the

> NASD's suitability rule.

John M. Reynolds, Exchange Act Release No. 30,036, 50 S.E.C. Docket 504, 1991 WL 288500, at *3 (Dec. 4, 1991).

> The evidence . . . demonstrates that FPG was a speculative investor who was willing "to bet the ranch" on an extremely risky trading strategy . . . .
>
> Even though FPG was a speculative investor, this did not relieve [his broker] of the obligation to ensure that his recommendations were suitable for the client given the client's financial situation, needs, and other security holdings. NASD Conduct Rule 2310 requires that a registered representative, when recommending investments, determine that such investments are suitable for the customer. . . .
>
> "A broker must make a customer-specific determination of suitability, and he or she must recommend only those securities that fit the customer's financial profile and investment objective. . . ."
>
> [E]ven a purported sophisticated investor, who enjoys and encourages trading in speculative securities, is entitled to the protections of NASD Conduct Rule 2310. . . . "[A] customer's prior transactions . . . are not relevant in a suitability determination, and [a] history of risky trading [does not] mitigate [respondent's] conduct." . . .
>
> Even if [respondent] had explained the risk to [the customer], the securities he recommended for their account would still have been unsuitable. The SEC has made clear that even in those situations where a customer seeks to engage in highly speculative or otherwise aggressive trading, a representative is under a duty to refrain from making recommendations that are incompatible with the customer's financial profile.

Robert Joseph Kernweis, Case No. C02980024, 2000 WL 33299605, at *6-7 (NASDR Office Hrg. Officers Feb. 16, 2000).

> The fact that a customer . . . may be wealthy does not provide a basis for recommending risky investments. As the NASD points out, its suitability rule is grounded in "the fundamental responsibility for fair dealing" implicit in the relationship between a broker and his or her customers. For a broker to recommend risky or speculative investments, he must be satisfied that they are appropriate for the particular customer.

Arthur Joseph Lewis, Exchange Act Release No. 29,794, 49 S.E.C. Docket 1487, 1991 WL

294317, at *2 (Oct. 8, 1991) (footnotes omitted). "Even if we conclude that [the client] understood [the stockbroker's] recommendations and decided to follow them, that does not relieve [the stockbroker] of his obligation to make reasonable recommendations." Clinton Hugh Holland, Jr., Exchange Act Release No. 36,621, 60 S.E.C. Docket 2507, 1995 WL 757806, at *3 (Dec. 21, 1995).

38. Finally, as part of the "customer specific" suitability obligation, RESPONDENT was required to ensure that CLAIMANTS understood the investment. The broker must "be satisfied that the customer fully understands the risks involved and is not only able but willing to take those risks. That was not the situation here." Arthur Joseph Lewis, Exchange Act Release No. 29,794, 49 S.E.C. Docket 1487, 1991 WL 294317, at *2 (Oct. 8, 1991). "A broker also must be satisfied that the customer fully understands the risks involved and is . . . able . . . to take those risks." FINRA Notice to Members 10-22, 2010 WL 1625161, at *3 (footnote omitted). That RESPONDENT may have believed in the soundness of the investment and investment strategy at issue was insufficient. "A salesman's honest belief in an issuer's prospects does not warrant his making exaggerated and unfounded representations and predictions to others." James E. Cavallo, Exchange Act Release No. 26,639, 43 S.E.C. Docket 779, 1989 WL 991979, at *3 (Mar. 17, 1989).

39. CLAIMANTS did not understand the investment strategy recommended by RESPONDENT because the risks of the DST investments were not fully disclosed to them, and the DST investments were misrepresented to CLAIMANTS. RESPONDENT failed to review the material terms and risk factors of the DST investments and the investment strategy with CLAIMANTS.

40. RESPONDENT knew that CLAIMANTS trusted it and relied upon it to act in their best interest and promoted this trust and confidence. CLAIMANTS made clear and

RESPONDENT knew full well that they totally relied upon RESPONDENT to make all the investment recommendations.

41. RESPONDENT'S conduct was clearly in violation of FINRA's rules governing suitability (**i.e., reasonable basis suitability and individual suitability - ensuring that CLAIMANTS understood these investments and that these investments were suitable in view of their financial situation and needs, investment objectives, and risk tolerance**), due diligence and risk disclosure (including but not limited to Rules 2111 and 2310).

42. RESPONDENT misrepresented and omitted to disclose numerous material facts to CLAIMANTS concerning the investments, their operations, the risks involved in the investments, and the use of funds obtained from the sale of these investments to CLAIMANTS and others. RESPONDENT failed to review the risks of these investments with CLAIMANTS. These misrepresentations and non-disclosures continued after the initial investment and were never corrected. RESPONDENT'S actions were negligent and fraudulent.

43. In connection with the above offer of securities, RESPONDENT failed to disclose the following material facts, among others, which were necessary to disclose in order to make the statements made, in light of the circumstances under which they were made, not misleading:

a. The financial condition of the issuer.

b. The potential risks of investing in this program.

c. The use of investment proceeds.

d. The nature of the association between the issuer and companies that rendered services to the issuer.

e. The percentage of the investments used for sales commissions and other offering expenses.

f. The identity, background, experience and disciplinary history of the individuals associated with the issuer,

including the issuer's officers and principals.

44. RESPONDENT failed to disclose to CLAIMANTS that RESPONDENT had not conducted a proper due diligence on the DST investments. RESPONDENT EMERSON allowed Bell and Finch to hold themselves out as licensed representatives of RESPONDENT EMERSON and did not disclose to CLAIMANTS that the firm had not reviewed the DST investments and that the firm was not properly supervising Bell or Finch.

45. RESPONDENT violated its fiduciary duty to CLAIMANTS by handling CLAIMANTS' accounts in a manner that benefitted RESPONDENT the most, *i.e.*, maximization of commissions by purchasing a high-risk, high-commission and unsuitable alternative investment rather than acting in the best interest of CLAIMANTS, making material misrepresentations, failing to disclose material facts, failing to conduct a proper due diligence, and causing transactions that were inappropriate for CLAIMANTS given their financial situation and needs, risk tolerance and investment objectives.

46. FINRA Rule 3010 requires that each member establish and maintain a system to supervise the activities of each registered representative that is reasonably designed to achieve compliance with applicable securities laws and regulations and with the rules of FINRA. It must include written procedures that are established, maintained, and enforced. RESPONDENT EMERSON did not have an adequate system of supervision. There was no system for on-site or off-site supervisory review of representations, recommendations, and actions by its registered representatives. In actuality, RESPONDENT EMERSON simply relied upon its off-site salesmen to supervise themselves.

47. RESPONDENT committed numerous violations of FINRA *Rules of Fair Practice* in handling the transactions with CLAIMANTS, including:

A. FINRA Rules 2010, 2020, 2090, 2111, 2210 and 2310, among other things, by engaging in conduct inconsistent with high standards of commercial honor and just and equitable principles of trade, by failing to conduct a reasonable and proper due diligence investigation, by recommending a security that RESPONDENT did not "know," by recommending transactions that were unsuitable in view of CLAIMANTS' financial situation and needs, investment objectives and risk tolerance, by engaging in deceptive or other fraudulent devices or contrivances, by making material misrepresentations and by failing to make material disclosures; and

B. FINRA Rule 3110, by failing to establish and enforce a proper supervisory system over the activities of registered representatives that was reasonably designed to achieve compliance with applicable securities laws, rules, regulations, and statements of policy and procedure promulgated thereunder.

48. RESPONDENT'S violations of FINRA rules constitute negligence. As the Fifth Circuit observed in Miley v. Oppenheimer & Co., Inc., 637 F.2d 318, 333 (5th Cir. 1981), the "NYSE and FINRA rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account," and the lower court properly included a reference to these rules in its jury charge. See Mihara v. Dean Witter & Company, Inc., 619 F.2d 814, 824 (9th Cir. 1980) ("Appellants contend that the admission of testimony regarding the New York Stock Exchange and FINRA rules served to dignify those rules and regulations to some sort of standard. The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held.").

49. The Best Interest Obligation under Rule 15l-1(a) of the Securities Exchange Act of 1934 (hereinafter referred to as "Regulation Best Interest" or "Reg BI"), which became effective on June 30, 2020, established a standard of conduct for broker-dealers and associated persons when they recommend securities transactions to retail customers. Regulation Best Interest requires that

a broker, dealer, or associated person act in the best interest of a retail customer when making a recommendation of a securities transaction ("Reg BI's Best Interest Obligation"). Firms comply with Reg BI's Best Interest Obligation only if they comply with four component obligations ("Reg BI's Component Obligations"): the Disclosure Obligation, the Care Obligation, Conflict of Interest Obligation, and the Compliance Obligation. Similarly, associated persons of broker-dealers comply with Reg BI's Best Interest Obligation only if they comply with the Disclosure Obligation and the Care Obligation.

50. Reg BI's Care Obligation requires a broker, dealer, or associated person of a broker or dealer, in making a recommendation of a securities transaction, to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with the recommendation.

51. Reg BI's Care Obligation also requires a broker, dealer, or associated person, in recommending a securities transaction to a retail customer, to exercise reasonable diligence, care, and skill to have a reasonable basis to believe the recommendation is in the best interests of that customer, based on the customer's investment profile and the potential risks, rewards, and costs associated with the recommendation.

52. Reg BI's Compliance Obligation, another Component Obligation of the Best Interest Obligation, requires brokers or dealers to (a) establish, (b) maintain, and (c) enforce written policies and procedures reasonably designed to achieve compliance with Reg BI.

53. RESPONDENT'S DST investment recommendations to CLAIMANTS violated Reg BI.

54. RESPONDENT also violated, among others, the following rules of the Colorado Division of Securities, 3 Code Colo. Regs. 704-1:51-4.7, *Unfair and dishonest dealings*:

The following practices shall be deemed to be "unfair and dishonest dealings" . . .

B. Recommending to a customer the purchase, sale or exchange of any security without reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the information furnished by the customer after reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other information known by the broker-dealer or sales representative . . . .

G. Failing to comply with any of the following applicable fair practice or ethical standards contained in the following sections of the FINRA Rules:

1. Section 2000, Duties and Conflicts; and
2. Section 3000, Supervision and Responsibilities Relating to Associated Persons . . . .

55. RESPONDENT'S violations of the Colorado Division of Securities' rules constitute negligence, as do RESPONDENT'S violations of FINRA rules. The FINRA rules constitute the standard of the industry, and the First District Court of Appeals of Florida noted in Dean Witter Reynolds, Inc. v. Hammock, 489 So.2d 761, 767 (1986), that the "case law is clear that evidence of violation of industry standards is admissible as non-conclusive evidence of negligence." See also St. Louis-San Francisco R.R. Co. v. White, 369 So.2d 1007 (Fla. 1st D.C.A. 1979); St. Louis-San Francisco R.R. Co. v. Burlison, 262 So.2d 280 (Fla. 1st D.C.A. 1972); Clements v. Boca Aviation, Inc., 444 So.2d 597 (Fla. 4th D.C.A. 1984); Nance v. Winn Dixie Stores, Inc., 436 So.2d 1075 (Fla. 3rd D.C.A. 1983); Reese v. Seaboard Coastline R.R. Co., 360 So.2d 27 (Fla. 4th D.C.A. 1978).

56. RESPONDENT'S violations of the Colorado Division of Securities' rules constitute negligence *per se* because these rules were enacted for the protection of investors such as CLAIMANTS. See Baldwin v. GTE South, Inc., 439 S.E.2d 108 (N.C. 1994) (wherein the Supreme Court of North Carolina held that "a safety statute or a safety regulation having the force and effect of a statute creates a specific duty for protection of others. A member of the class intended to be protected by a statute or regulation who suffers harm proximately caused by its

violation has a claim against the violator.")(The Court also cited case law "applying negligence per se analysis used for statutes to regulations having the force and effect of a statute.") Also see Moss v. J.C. Bradford & Co., 446 S.E. 2d 799, 805 (N.C. 1994) (wherein the Supreme Court of North Carolina held that: "The rules of the various exchanges, promulgated as they are with the express Congressional authorization . . . possess the force of law.");

> [B]ased on my finding that Plaintiffs are members of the class the Florida securities acts were designed to protect, and their injuries were of the kind the Acts were enacted to prevent, I find Plaintiffs have alleged sufficient facts to support their sixth claim based on negligence *per se*. See [Palmer v. Shearson Lehman Hutton, Inc., 622 So. 2d 1085, 1090 (Fla. Dist. Ct. App. 1993)] (denying summary judgment on plaintiff's negligence per se claim because "a jury could lawfully find that [defendant-securities firm] knowingly and willfully filed with the [state regulatory authorities] false information concerning the reason for [ex-employee/tortfeasor's] termination, in violation of the legal obligations intended to protect investors from such conduct that were imposed on [defendant-securities firm] by [state securities laws]"); accord [Twiss v. Kury, 25 F.3d 1551, 1555-56 (11th Cir. 1994)].

Prymak v. Contemporary Financial Solutions, Inc., 2007 WL 4250020, at *10 (D. Colo. Nov. 29, 2007).

57. Further, the contracts between RESPONDENT and CLAIMANTS include not only securities industry rules and regulations, but also the internal rules and regulations established to govern the conduct of RESPONDENT EMERSON'S own employees (Bell and Finch), such as the internal supervisory procedures and compliance manuals. (See, e.g., Miller v. Johnston Barney, Fed. Sec. L. Rpts. CCH ¶ 92,498 (1986) at 93,031.) For example, in Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981), the Sixth Circuit rejected Prudential-Bache Securities Inc.'s argument that the District Court should not have relied on Bache's internal rules, as codified in its Standard Practice Instructions Manual, as evidence of the proper standard of care:

> When a defendant has disregarded rules that it has established to govern the conduct of its own employees, evidence of those rules may be used against the defendant to establish the correct standard of care. The content of such rules may also indicate knowledge of the risks involved and the precautions that may be necessary to

> prevent the risks. Montgomery v. Balt. & Ohio R.R., 22 F.2d 359 (6th Cir. 1927). See also Prosser, The Law of Torts § 33 (4th Ed. 1971). The District Court correctly measured Bache's conduct by the standard of prudence it has established for its own employees.

Id. at 820.

58. RESPONDENT violated numerous internal policies in connection with the high-risk and high commission alternative investment recommendations to CLAIMANTS.

59. The acts committed by RESPONDENT and its employees, agents, and representatives, as alleged herein, were done by them personally through the use of the mails or other instrumentality of interstate commerce. The acts of RESPONDENT and its employees, agents, or representatives as alleged herein are deemed to be the acts of and are chargeable to and binding upon RESPONDENT.

60. RESPONDENT EMERSON is directly liable because it participated in, aided, and/or supervised (or failed to properly supervise) the transactions heretofore mentioned. RESPONDENT is also liable under the doctrines of *respondeat superior*, licensing, controlling person, and agency principles for the negligent actions and breaches of duty by Bell and Finch while in the scope of their employment with RESPONDENT EMERSON.

61. CLAIMANTS have been greatly damaged as a result of this misconduct. CLAIMANTS were saddled with high-risk, high commission and illiquid private placement investments. CLAIMANTS seek the recovery of compensatory damages in an amount to be determined by the arbitration panel, as well as benefit of the bargain damages, lost opportunity costs, model portfolio damages, attorney's fees, costs and prejudgment interest from RESPONDENT. CLAIMANTS' claim includes all investments wrongfully sold to CLAIMANTS.

62. Prejudgment interest is an element of damages which is mathematically computed from the date of the purchase. In re MetLife Demutualization Litigation., 624 F. Supp. 2d 232, 271

(E.D.N.Y. 2009) (Damages under the securities laws include prejudgment interest.); Weft, Inc. v. G.C. Investment Assoc., 630 F. Supp. 1138, 1144 (E.D.N.C. 1986) ("Plaintiffs are also entitled to interest on the amount paid in exchange for the partnership units from the date of purchase."); Henson v. Morgan Stanley DW Inc., 2005 WL 1806426, at *6 (M.D. Tenn. 2005) (vacating securities arbitration award that was not issued in accordance with the mathematical calculation of damages, including prejudgment interest).

63. RESPONDENT'S failure to conduct a proper due diligence, misrepresentations, omissions, and unsuitable recommendations to CLAIMANTS were egregious, as were RESPONDENT'S supervisory omissions. These acts by RESPONDENT and its agents constituted independent torts for which CLAIMANTS seek recovery. In addition, these acts were done with wanton, reckless disregard of the rights and property of CLAIMANTS, and CLAIMANTS are also entitled to punitive damages in an amount to be determined by the panel.

64. Punitive damages are further warranted due to RESPONDENT'S *fraudulent concealment* of its misconduct, which constitute independent torts for which CLAIMANTS seek recovery. RESPONDENT assured CLAIMANTS that their DST investments were safe and that their principal was not at risk. RESPONDENT EMERSON failed to disclose the inaccurate and incomplete nature of Bell's and Finch's representations, failed to conduct a proper due diligence, and failed to disclose that the securities were high-risk investments unsuitable in view of CLAIMANTS' financial situation and needs, risk tolerance and investment objectives for their accounts.

65. RESPONDENT EMERSON'S failure to disclose the inaccurate and incomplete nature of Bell's and Finch's representations, the lack of due diligence, the unsuitable nature of the investment recommendations, and the resulting concentration of CLAIMANTS' accounts in high-

risk and unsuitable investments as well as EMERSON'S failure to supervise not only warrants punitive damages but toll all statutes of limitation periods in view of RESPONDENT'S fiduciary relationship with CLAIMANTS and constitute independent torts for which CLAIMANTS seek recovery. The Southern District of Florida made the following statement on the issue of fraudulent concealment in a fiduciary relationship:

> . . . [T]he law of fraud 'does not require that an aggrieved party have proceeded from the outset as though he were dealing with thieves.' First Federal Savings & Loan Assoc. v. Dade Federal Savings & Loan Assoc., 403 So.2d 1097, 1100 (5th DCA 1981).
>
> The existence of a fiduciary relationship between the Plaintiff and the Defendant, and silence on the part of the Defendant when there is a duty to disclose facts, can constitute a fraudulent withholding of facts. Less than full disclosure on the part of a Defendant in a fiduciary relationship lawsuit can be sufficient to establish fraudulent concealment.

Wilder v. Meyer, 779 F. Supp. 164, 168-69 (S.D. Fla. 1991). **In short, whether a fiduciary relationship exists, acts of omission (failure to disclose material facts) can constitute fraudulent concealment.** "A breach of a fiduciary duty of disclosure is tantamount to concealment for limitations purposes." Dernick Resources, Inc. v. Wilstein, 312 S.W.3d 864, 878 (Tex. App.-Houston [1 Dist.] 2009). Further, the fraudulent concealment cannot be mitigated by the mere forwarding of a prospectus containing information that contradicts material representations made orally to investors. See In Re Robert A. Foster, Sec. Ex. Rel. No. 34408 (July 20, 1994) ("Broker/dealers and their registered representatives 'owe a special duty of fair dealing to their clients.' The making of misrepresentations runs directly contrary to those fiduciary duties" and can render a broker/dealer liable in private actions "even where the investor has access to a prospectus providing full disclosure.").

66. A fiduciary relationship of trust and confidence exists between securities brokers and their customers.

> The jury in this case concluded that [the brokerage firm] had . . . violated . . . both the federal securities law and the Texas common law of fiduciary duty of investment brokers. [T]here is sufficient evidence in the record . . . to support a finding that [the brokerage firm] breached its Texas common law fiduciary duty.

Miley v. Oppenheimer & Co., 637 F.2d 319, 325 (5th Cir. 1981).

> The relationship between a securities broker and its customer is that of principal and agent, and the relationship between agent and principal is a fiduciary relationship. . . . The law imposes upon the broker the duty to disclose to the customer information that is material and relevant to the order.

Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc., 794 F.2d 198, 200 (5th Cir. 1986) (Texas case) (citations and quotation marks omitted).

> [A] fiduciary relationship existed between the broker-Defendant and Mrs. Spence during her lifetime . . . .
>
> . . . .
>
> What the Defendant overlooks, however, is the fiduciary relation then existing between the parties whereby the Defendant consented as a matter of law to have his conduct measured by the standards of the finer loyalties exacted by Courts of Equity.

Pace v. McEwen, 574 S.W.2d 792, 796, 798 (Tex. Ct. Civ. App. 1978).

67. The fiduciary relationship between broker and customer and associated duties can also be seen in Vucinich v. PaineWebber Jackson & Curtis, Inc. *et al*, 803 F.2d 454 (9th Cir. 1986), where the court held that the fiduciary relationship that exists between a broker and his customer imposes upon the broker the duty to monitor the customer's accounts and affirmatively advise the client/customer as to any changed circumstances. The Court found that the broker's representations regarding monitoring of a customer's accounts tolled the running of the statute of limitations [e.g., the prescription period] until such time as the broker fulfilled his obligation to advise the customer regarding matters relevant to possible misrepresentations. (citing Twomey v. Mitchum, Jones, & Templeton, Inc., 262 Cal. App. 2d 690 727-729, 69 Cal. Rptr. 222 (1968). Further, the fraudulent concealment cannot be mitigated by the mere forwarding of a prospectus containing information

that contradicts material representations made orally to investors. Luksch, *et al.* v. Latham, 675 F. Supp. 1168 (N.D. Cal. 1987).

68. Numerous other courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients/customers. See Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979) (a securities broker dealer is a fiduciary who owes its customer a high degree of care in transacting business); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2nd Cir. 1978) (registered representative, as broker for investor, owed investor a fiduciary duty); Moholt v. Dean Witter Reynolds, Inc., 478 F.Supp. 451 (D.D.C. 1979) (stockbrokers are in a position of quasi-fiduciaries and are held to high degree of trustworthiness and fair dealing); Pachter v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "the utmost good faith" toward him); Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker stands in special relationship to client and owes him a duty to use reasonable care and to act in good faith); Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes, controls the account); Jaksich v. Thomson McKinnon Securities, Inc., 582 F.Supp. 485 (S.D.N.Y. 1984) (under New York law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); Utah State University of Agriculture and Applied Science v. Sutro & Co., 646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the authority of a trustee dealing with public funds); E.F. Hutton & Co. v. Weeks, 166 Ga.App. 443, 304 S.E.2d 420 (1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith).

69. All limitations periods are tolled under the legal doctrines of accrual, continuous treatment, continuous representation, and continuing wrong.[3] See, e.g., Keller v. Reed, 603 So.2d 717, 719 (Fla. 2d DCA 1992) (accrual); Hall v. Steiner, 543 N.Y.S.2d 190 (N.Y. App. Div. 1989) (continuous treatment); Wilder v. Meyer, 779 F.Supp. 164 (S.D. Fla. 1991) (continuous representation); and Newport Largo, Inc. v. Monroe County, 706 F.Supp. 1507 (S.D. Fla. 1988) (continuing wrong). Further, all limitations periods are tolled under the doctrine of "blameless ignorance" or "*contra non valentem agere nulla currit praescriptio*." This doctrine stops the running of the limitations period when the cause of action is not known or reasonably knowable by CLAIMANTS even if their ignorance was not induced by RESPONDENT. Stated simply, CLAIMANTS did not comprehend that they had been sold high-risk, unsuitable investments for their accounts and that their legal rights had thus been violated.

70. In Miley v. Oppenheimer & Co., Inc., 637 F.2d 318, 332 (5th Cir. 1981), the Fifth Circuit cited the following passage from Goldberg's book entitled *Fraudulent-Dealer Practices* in support of awarding punitive damages that is very appropriate in this case:

> Most courts in the past have seen fit, when they find the broker-dealer's hand in the till, to simply request the removal of the offending appendage. And when the till is empty, and the broker-dealer's fingerprints are all that remain where the money once lay, all the courts do is to require the crook to replace the booty. If ever there was a situation where crime pays it is in such circumstances; heads the dishonest broker-dealer wins and tails everyone breaks even. No wonder one commentator saw fit to term the average recovery in trading cases as creating for the broker-dealer a "low risk larceny."
>
> . . . [T]he only sure way of deterring such conduct in the future is to take the profit away from the wrongdoers and slap on an additional amount as punitive damages: an award equal to treble damages would be fair, reasonable, and well within the public interest.

The Arbitrator's Manual states the following in a quote from Aristotle:

Equity is justice in that it goes beyond the written law. And it is

[3] Statutes of limitation of course only apply in civil actions, not arbitration proceeding.

> equitable to prefer arbitration to the law court, for the arbitrator keeps equity in view, whereas the judge looks only to the law, and the reason why arbitrators were appointed was that equity might prevail.

CLAIMANTS seek relief in equity, including restitution, rescission, specific performance, and any other equitable relief which this panel deems appropriate.

**COUNT I**

**VIOLATIONS OF FEDERAL SECURITIES LAWS**

71. CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 70 above, as if fully contained herein.

72. The DST investments sold to CLAIMANTS and described in paragraphs 1 through 71 above constitutes securities as defined in Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10).

73. Under Section 15 of the Securities Act, 15 U.S.C. § 77o, and Section 20 of the Securities Exchange Act, 15 U.S.C. § 78t, RESPONDENT EMERSON was a controlling person over the conduct described in paragraphs 1 through 72 above.

**A. Fraud in Offer or Sale of Securities**

74. RESPONDENT, by engaging in the conduct described in paragraphs 1 through 73 above, directly, indirectly, or through persons it controlled, offered to sell or sold a security, by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, and by means of a prospectus or oral communication which included an untrue statement of a material fact and/or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

75. By reason of the foregoing, RESPONDENT directly, indirectly, or through persons it controlled, violated and is subject to liability under Sections 12(2) and 15 of the Securities Act,

15 U.S.C. §§ 77l(2), 77o.

**B. <u>Fraud in Connection With the Purchase or Sale of Securities</u>**

76. RESPONDENT, by engaging in the conduct described in paragraphs 1 through 75 above, directly, indirectly, or through persons it controlled, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with *scienter*:

a. Employed devices, schemes, or artifices to defraud;

b. Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

77. By reason of the foregoing, RESPONDENT directly, indirectly, or through persons it controlled, violated and is subject to liability under Sections 10(b) and 20 of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**WHEREFORE**, CLAIMANTS request this panel to enter an award for actual damages and rescission together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, attorney's fees, costs, punitive damages in an amount to be determined by the arbitration panel, and such other relief as is deemed proper and necessary.

**COUNT II**

**<u>VIOLATIONS OF THE COLORADO SECURITIES ACT</u>**

78. CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 77 above, as if fully contained herein.

**A. <u>Unsuitable Recommendations, Misrepresentations and Omissions of Material Fact</u>**

79. Sections 11-51-501 and 11-51-604(3) and (4) state that a purchaser is entitled to rescission, along with legal interest, costs and attorney's fees, from a brokerage firm that offers or sells a security by means of (i) any device, scheme or artifice to defraud, (ii) the making of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (iii) engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit.

80. RESPONDENT EMERSON, acting through Bell and Finch, made numerous false and misleading statements to CLAIMANTS concerning the DST investments and failed to disclose numerous material facts to CLAIMANTS concerning the DST investments, all as more fully stated above. CLAIMANTS accordingly are entitled to rescission of their Nelson Brothers investment transactions pursuant to Sections 11-51-501 and 11-51-604 of the Securities Act of Colorado.

81. Sections 11-51-604(5) states that every person who, directly or indirectly, controls a person liable under the Act is liable jointly and severally with and to the same extent as such controlled person, unless the controlling person sustains the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. RESPONDENT EMERSON is liable as a controlling person over Bell and Finch.

82. RESPONDENT EMERSON is liable under the doctrine of *respondeat superior* for Bell's and Finch's violations of the Securities Act of Colorado. In addition, RESPONDENT is liable under the Securities Act of Colorado, Section 11-51-604(5)(c), as an aider and abetter in Bell's and Finch's activities. Under Colorado law, not only is the perpetrator liable but also every

broker-dealer who made, participated in or induced the unlawful sale or purchase is jointly and severally liable in an action under Sections 11-51-301 and 11-51-501.

**WHEREFORE**, CLAIMANTS pray for compensatory damages under the Securities Act of Colorado, interest at the legal rate, costs, reasonable attorney's fees under the Securities Act of Colorado, and punitive damages in an amount to be determined by the arbitration panel.

## COUNT III

## VIOLATION OF COLORADO CONSUMER PROTECTION ACT

83. CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 82 above, as if fully contained herein.

84. RESPONDENT, acting through its representatives (Bell and Finch), by engaging in the conduct previously described, engaged in unfair or deceptive practices, including without limitation the following, in violation of § 6-1-105(e), (g), and (u), C.R.S.:

a. Making false representations as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, services, or property;

b. Representing that goods, services, or property were of a particular standard, quality, or grade, or that goods were of a particular style or model, when RESPONDENT, acting through its representative, knew or should have known that they were of another; and

c. Failing to disclose known material information concerning goods, services, or property to induce CLAIMANTS to enter into a transaction.

85. These unfair and deceptive practices occurred in the course of RESPONDENT'S and its representative's business, these practices impacted the public as actual or potential consumers of goods, services, or property, and these practices caused injury to CLAIMANTS' legally protected interests.

86. Pursuant to § 6-1-113(2), C.R.S., CLAIMANTS are entitled to recovery of

CLAIMANTS' damages, costs, and attorney's fees.

**WHEREFORE**, CLAIMANTS requests recovery of damages, plus interest, attorney's fees, costs, and punitive damages in an amount to be determined by the arbitrators.

**COUNT IV**

**BREACH OF CONTRACT**

87. CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 86 above as if fully contained herein.

88. The contractual relationship which was entered into between CLAIMANTS and RESPONDENT incorporate by reference a brokerage house's duty to comply with all laws, rules, and regulations governing the transactions between RESPONDENT and CLAIMANTS. It must be emphasized that RESPONDENT fraudulently induced CLAIMANTS to enter into this contractual relationship by, among other things, the false representations and non-disclosures of material facts by RESPONDENT EMERSON, Bell and Finch that are itemized in this Statement of Claim.

89. RESPONDENT violated, among others, the following rules of FINRA *Rules of Fair Practice* in handling the transactions with CLAIMANTS, including:

A. FINRA Rules 2010, 2020, 2090, 2111, 2210 and 2310, among other things, by engaging in conduct inconsistent with high standards of commercial honor and just and equitable principles of trade, by failing to conduct a reasonable and proper due diligence investigation, by recommending a security that RESPONDENT did not "know," by recommending transactions that were unsuitable and excessive in view of CLAIMANTS' financial situation and needs, investment objectives and risk tolerance, by engaging in deceptive or other fraudulent devices or contrivances, by making material misrepresentations, and by failing to make material disclosures; and

B. FINRA Rule 3110, by failing to establish and enforce a

> proper supervisory system over the activities of registered representatives that was reasonably designed to achieve compliance with applicable securities laws, rules, regulations, and statements of policy and procedure promulgated thereunder.

90. These infractions breached the contractual relationship between CLAIMANTS and RESPONDENT, which incorporated a brokerage firm's duty to comply with the industry rules, customs, and procedures governing the transactions with CLAIMANTS. "[W]e note a number of cases in which customers of stockbrokers are deemed to have contemplated and authorized a course of dealing in accordance with rules and customs of the stock exchanges. Thus, the exchange rules are deemed incorporated into any agreement between customer and broker." Brumm v. McDonald & Co. Sec., 603 N.E.2d 1141, 1147 (Ohio Ct. App. PP1992) (citations omitted); Iowa Grain v. Farmers Grain and Feed, 293 N.W.2d 22 (Iowa 1980); White v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 218 A.2d 655 (N.J. Super. Ct. 1966). See also Midwest Television v. Scott, Lancaster, Mills & Atha, 252 Cal. Rptr. 573, 579 (Cal. Ct. App. 1988) ("The industry practice becomes a part of the contract, and the evidence of such custom is admissible. . . .").

91. The contracts between RESPONDENT and CLAIMANTS are further defined by the internal rules and regulations established to govern the conduct of RESPONDENT'S own employees, such as internal supervisory procedures and compliance manuals. (See, e.g., Miller v. Smith Barney, Fed. Sec. L. Rpts. CCH ¶92,498 (1986) at 93,031.) ("The relations between [brokerage firm and customer] were not defined solely in terms of the joint account agreement, but also . . . by the internal rules and regulations established to govern the conduct of [the firm's] own employees"). For example, in Thropp v. Bache Halsey Stuart Shields, Inc., 650 F. 2d 817 (6th Cir. 1981), the Sixth Circuit rejected Prudential-Bache Securities Inc.'s argument that the District Court should not have relied on Bache's internal rules, as codified in its *Standard Practice*

*Instructions Manual*, as evidence of the proper standard of care:

> When a defendant has disregarded rules that it has established to govern the conduct of its own employees, evidence of those rules may be used against the defendant to establish the correct standard of care. The content of such rules may also indicate knowledge of the risks involved and the precautions that may be necessary to prevent the risks. Montgomery v. Balt & Ohio R.R., 22 F.2d 359 (6th Cir. 1927). See also Prosser, The Law of Torts § 33 (4th ed. 1971). The District Court correctly measured Bache's conduct by the standard of prudence it has established for its own employees.

Id. at 820.

92. RESPONDENT violated many of its own internal rules and procedures in handling the above-described transactions with CLAIMANTS.

93. RESPONDENT also violated the duty of commercial reasonableness, fair dealing, and good faith, required of all parties to a contract. "Hornbook Law implies a covenant of good faith and fair dealing into the performance and enforcement of every contract. . . . [G]ood faith is part of every contract . . . ." First Texas Sav. Ass'n v. Comprop Inv. Properties, 752 F. Supp. 1568, 1573 (M.D. Fla. 1990); Burger King Corp. v. Austin, 805 F. Supp. 1007 (S.D. Fla. 1992). This covenant of fair dealing is particularly demanding for stockbrokers and brokerage firms, who are expert fiduciaries of their customers, who obtain their commissions only after advising and inducing customer investments, and who are thereby subject to an inherent conflict of interest.

> [P]etitioner acted simultaneously in the dual capacity of investment advisor and of broker and dealer. In such capacity, conflicting interests must necessarily arise. When they arise, the law has consistently stepped in to provide safeguards in the form of prescribed and stringent standards of conduct on the part of the fiduciary.

Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949).

94. The duty of good faith and fair dealing required RESPONDENT to do what the contracts presupposed would be done to accomplish their purpose and to protect the contracting parties' reasonable expectations. It presupposed that RESPONDENT would comply with

applicable industry and governmental rules, provide all necessary information to CLAIMANTS, and act reasonably and in good faith to recommend suitable investments for CLAIMANTS in light of CLAIMANTS' financial situation, needs, risk tolerance and investment objectives for their accounts. RESPONDENT violated this duty by putting its own interests first, not complying with industry rules, recommending wholly unsuitable investments to CLAIMANTS, and misrepresenting, concealing and not supplying material information. As a result, CLAIMANTS suffered damages from these breaches of duty and are entitled to recompense.

95. RESPONDENT'S infractions breached its written contracts with FINRA to follow securities laws and FINRA rules. As a condition of RESPONDENT'S FINRA membership applications pursuant to Article III, Section 1 of FINRA By-Laws, RESPONDENT contracted with FINRA to comply with all FINRA rules, federal securities laws, and federal securities rules and regulations in the handling of customer accounts.

96. Defrauded customers such as CLAIMANTS are intended third-party beneficiaries of RESPONDENT'S agreements with FINRA to comply with securities laws and regulations and FINRA rules. CLAIMANTS are entitled to redress for RESPONDENT'S breach of these contracts. Oppenheimer & Co. v. Neidhardt, [Current Binder] Fed. Sec. L. Rep. (CCH) ¶98,224 (S.D.N.Y. May 4, 1994) (customers are third-party beneficiaries of brokerage firm's obligation to follow FINRA rules); Creative Sec. v. Bear Stearns & Co., 671 F. Supp. 961, 966 (S.D.N.Y. 1987) ("Many courts recognize that securities exchange members are contractually bound by the regulations of their organizations."); Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d 828, 841 (2d Cir. 1971) ("Each member firm, by virtue of its admission, agrees to be governed by the Exchange's constitution and rules. When a transaction of purchase and sale of any security is effected, the contract is subject to all the provisions of the Exchange's constitution and rules. . . .

These provisions are binding on exchange members.").

97. RESPONDENT'S failure to comply with the contracts between the parties and with the laws, rules, and regulations governing the contracts between the parties, was intentional or reckless and was done in willful and wanton disregard of CLAIMANTS' rights. All of RESPONDENT'S actions and omissions were done solely for the purpose of generating commissions, and as such, is conduct for which the RESPONDENT should be punished.

**WHEREFORE**, CLAIMANTS request this panel to enter an award for actual and rescissionary damages together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitration panel, and such other relief as is deemed proper and necessary.

**COUNT V**

**COMMON LAW FRAUD**

98. CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 97 above, as if fully contained herein.

99. All of the misrepresentations and omissions of RESPONDENT were done with the intent to mislead CLAIMANTS and with the specific intent to have CLAIMANTS rely on said misrepresentations and omissions. At a minimum, the misrepresentations were done recklessly, without knowledge of their truth or falsity. CLAIMANTS did rely thereon and made investments to their detriment causing substantial losses.

100. Further, RESPONDENT'S misrepresentations and omissions constitute constructive fraud, which entails the use of a confidential or fiduciary relationship to take advantage of another.

101. The fraud, the misrepresentations, and the omissions claims are quasi-contractual in nature and arose from and are implied from the contractual relationship between CLAIMANTS and RESPONDENT. This claim also arose independently from the contractual relationship between CLAIMANTS and RESPONDENT.

**WHEREFORE**, CLAIMANTS request this panel to enter an award for actual damages and rescission together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitration panel, and such other relief as is deemed proper and necessary.

## COUNT VI

## BREACH OF FIDUCIARY DUTY

102. CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 101 above, as if fully contained herein.

103. At all times relevant hereto, there existed between the RESPONDENT and CLAIMANTS a fiduciary relationship by reason that:

A. The RESPONDENT at all times possessed superior knowledge, judgment, skill, and experience in the securities market in contrast to CLAIMANTS' lack of meaningful knowledge and understanding in that CLAIMANTS could not fully appreciate the substantial risk to which their monies were exposed; and

B. The RESPONDENT at all times had access to the books, records, and other sources of information concerning the financial and operating condition, rules, and policies of RESPONDENT, FINRA, and the State Statutes and Administrative Codes. This information was not readily accessible to CLAIMANTS; and

C. Bell and Finch, at all times while handling CLAIMANTS' monies, were experienced financial advisors acting within

the scope of their employment and authority and apparent authority with RESPONDENT EMERSON.

104. This fiduciary duty arose from and is implied from the contractual relationship between CLAIMANTS and RESPONDENT. This fiduciary duty also arose independently from the contractual relationship between CLAIMANTS and RESPONDENT.

105. Because of the RESPONDENT'S superior knowledge, skill, judgment, and experience in the securities market, the RESPONDENT owed to CLAIMANTS a duty to recommend suitable investments, to disclose all material facts, and to refrain from misleading CLAIMANTS. Further, the RESPONDENT owed this fiduciary duty to protect and further CLAIMANTS' interests over and above RESPONDENT'S desire to generate commissions through the transactions with CLAIMANTS and to promote its own interests. RESPONDENT specifically had a duty by virtue of the fiduciary relationship with CLAIMANTS to conduct a proper due diligence, to supervise Bell's and Finch's recommendations and representations, and to disclose to CLAIMANTS that RESPONDENT'S representations to CLAIMANTS concerning the DST investments were incomplete and inaccurate and that EMERSON was not properly supervising Bell and Finch.

106. A special relationship of trust and confidence exists between a securities salesman and his customer. Numerous courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients. See Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979) (a securities broker dealer is a fiduciary who owes his customer a high degree of care in transacting business); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2nd Cir. 1978) (registered representative, as broker for investor, owed investor a fiduciary duty); Moholt v. Dean Witter Reynolds, Inc., 478 F.Supp. 451 (D.D.C. 1979) (stockbrokers are in a position of quasi-fiduciaries and are held to high degree of trustworthiness and fair dealing); Pachter v. Merrill

Lynch, Pierce, Fenner & Smith, Inc., 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "the utmost good faith" toward him); Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker, stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker whether broker, for all practical purposes, controls the account); Jaksich v. Thomson McKinnon Securities, Inc., 582 F.Supp. 485 (S.D.N.Y. 1984) (under Oregon law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); Utah State University of Agriculture and Applied Science v. Sutro & Co., 646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the authority of a trustee dealing with public funds); E.F. Hutton & Co. v. Weeks, 166 Ga.App. 443, 304 S.E. 2d 420 (1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith).

107. The commentators uniformly agree with such characterization. See, e.g., 3 Loss, *Securities Regulation 1508* (2nd Ed. 1961) ("There is in effect and in law a fiduciary relationship"); 5C Jacobs, *Litigation and Practice Under Rule 10b-5 §210.03* (1994) ("Brokers owe a fiduciary duty to their customers"); 1 Restatement (Second) of Agency §13 (1957) ("A broker-dealer acting as an agent for his customer is a fiduciary with respect to matters within the scope of his agency"). The SEC has recognized this special relationship under both the fiduciary and shingle theories. See, e.g., Arleen Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949) (SEC revoked broker's registration for breach of fiduciary duty where the broker failed to disclose that he was not selling securities to his clients at the best prices available.); Charles Hughes & Co. v.

SEC, 139 F.2d 434 (2d Cir. 1943), cert. denied 321 U.S. 786 (1944) (A securities salesman, by virtue of being in the securities business ["hanging out his shingle"], makes an implied representation to the customer that the customer will be dealt with fairly).

108. Because of the fiduciary relationship between CLAIMANTS and the RESPONDENT, CLAIMANTS reasonably relied to their detriment on the RESPONDENT'S superior knowledge, skill, judgment, and experience in handling their monies.

109. RESPONDENT knowingly and deliberately breached its fiduciary duty to CLAIMANTS by making material misrepresentations, failing to conduct a proper due diligence investigation, failing to make material disclosures, and investing in high-risk securities in total disregard for CLAIMANTS' best interests, solely for the purpose of enriching and protecting the RESPONDENT, and concealing the unsuitable nature of the transactions by not making the requisite disclosures to CLAIMANTS. The RESPONDENT'S disregard and violation of the rules of the SEC and FINRA governing its conduct and the conduct of RESPONDENT'S agents and employees constitutes a breach of fiduciary duty to CLAIMANTS.

110. RESPONDENT also breached its fiduciary duties by failing to ensure compliance with all applicable state statutes and rules, including those relating to misrepresentations and omissions in the sale of securities and suitability.

111. RESPONDENT is jointly and severally liable because it participated in, supervised, or approved the previously noted transactions. In addition, RESPONDENT is jointly and severally liable under the principles of licensing, agency, controlling person and *respondeat superior* for the damage caused to CLAIMANTS by the breach of its fiduciary duty.

112. The acts committed by RESPONDENT, as alleged herein, were done by it personally through the use of the mails or other instrumentality of interstate commerce.

RESPONDENT is jointly and severally liable because it participated in, supervised, or approved the previously noted transactions. In addition, RESPONDENT is jointly and severally liable under the principles of licensing, agency, controlling person and *respondeat superior* for the damage caused to CLAIMANTS by its breach of fiduciary duty. The acts of RESPONDENT, and each employee, agent, or representative of RESPONDENT EMERSON, including Bell and Finch, are deemed to be the acts of and are chargeable to and binding upon RESPONDENT.

> a brokerage firm owes a high duty to its customers than to other employers. The implicit reasoning . . . that brokers have a higher duty public duty under the securities laws than do other persons leads to imposition of a duty to exercise a high standard of supervision. This duty is enforceable through imposition of secondary liability based on *respondeat superior*.

Sharp v. Coopers & Lybrand, 649 F.2d 175, 182 (3d Cir. 1981).

113. RESPONDENT'S breach of its fiduciary duty to CLAIMANTS constitutes conduct for which the RESPONDENT deserves to be punished to deter RESPONDENT from engaging in the same or similar conduct in the future.

**WHEREFORE**, CLAIMANTS request this panel to enter an award for actual damages together with benefit of the bargain damages, rescissionary damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitration panel, and such other relief as is deemed proper and necessary.

## COUNT VII

## NEGLIGENCE AND GROSS NEGLIGENCE

114. CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 113 above, as if fully contained herein.

115. RESPONDENT, by virtue of its position as CLAIMANTS' broker-dealer and

agent, their professional skill and ability, the level of confidence and care imposed upon other broker dealers and brokers in similar positions, and its fiduciary obligations owed to CLAIMANTS due care. The industry standard of care is set forth by FINRA, the SEC rules, the State Acts and Administrative Codes, and the firm's own internal guidelines.

116. RESPONDENT'S violations of FINRA Rules constitute negligence. As the Fifth Circuit observed in Miley v. Oppenheimer & Co., Inc., 637 F.2d 318, 333 (5th Cir. 1981), the "NYSE and FINRA rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account," and the lower court properly included a reference to these rules in its jury charge. See Mihara v. Dean Witter & Company, Inc., 619 F.2d 814, 824 (9th Cir. 1980) ("Appellants contend that the admission of testimony regarding the New York Stock Exchange and FINRA rules served to dignify those rules and regulations to some sort of standard. The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held.")

117. RESPONDENT also violated, among others, the following rules of the Colorado Division of Securities, 3 Code Colo. Regs. 704-1:51-4.7, *Unfair and dishonest dealings*:

> The following practices shall be deemed to be "unfair and dishonest dealings" . . .
>
> B. Recommending to a customer the purchase, sale or exchange of any security without reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the information furnished by the customer after reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other information known by the broker-dealer or sales representative . . . .
>
> G. Failing to comply with any of the following applicable fair practice or ethical standards contained in the following sections of the FINRA Rules:
> 1. Section 2000, Duties and Conflicts; and
> 2. Section 3000, Supervision and Responsibilities Relating to Associated Persons . . . .

118. RESPONDENT'S violations of Colorado statutes and rules constitute negligence

*per se* because these statutes and rules were enacted for the protection of investors such as CLAIMANTS.

> [B]ased on my finding that Plaintiffs are members of the class the Florida securities acts were designed to protect, and their injuries were of the kind the Acts were enacted to prevent, I find Plaintiffs have alleged sufficient facts to support their sixth claim based on negligence *per se*. See [Palmer v. Shearson Lehman Hutton, Inc., 622 So. 2d 1085, 1090 (Fla. Dist. Ct. App. 1993)] (denying summary judgment on plaintiff's negligence per se claim because "a jury could lawfully find that [defendant-securities firm] knowingly and willfully filed with the [state regulatory authorities] false information concerning the reason for [ex-employee/tortfeasor's] termination, in violation of the legal obligations intended to protect investors from such conduct that were imposed on [defendant-securities firm] by [state securities laws]"); accord [Twiss v. Kury, 25 F.3d 1551, 1555-56 (11th Cir. 1994)].

Prymak v. Contemporary Financial Solutions, Inc., 2007 WL 4250020, at *10 (D. Colo. Nov. 29, 2007).

119. RESPONDENT EMERSON had supervisory duties over Bell and Finch and failed to diligently and properly supervise its officers, employees, and agents.

120. Bell and Finch were, at all times material hereto, acting within the scope of their employment with EMERSON and EMERSON is also liable under principles of *respondeat superior*, licensing, controlling person, and agency.

121. RESPONDENT'S conduct, as set forth in previous Counts, is a breach of its duties to CLAIMANTS.

122. RESPONDENT breached its duty to CLAIMANTS by failing to provide sufficient control and supervision over its officers, employees, agents, and registered representatives and in not ensuring compliance with the applicable federal and state securities laws, rules, regulations, policies, self-regulatory organization policies, and procedures.

123. RESPONDENT'S actions as set forth above constitute both negligence and gross negligence.

124. As a result of the RESPONDENT'S conduct as set forth above, CLAIMANTS have suffered damages.

125. The RESPONDENT'S conduct as set forth above proximately caused CLAIMANTS' damages.

**WHEREFORE**, CLAIMANTS have been greatly damaged as a result of RESPONDENT'S misconduct. CLAIMANTS were saddled with high risk, high commission, illiquid private placement investments. CLAIMANTS seek the recovery of compensatory damages in an amount to be determined by the arbitration panel, as well as benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, reasonable attorney's fees, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed necessary and proper.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy hereof was furnished this 23rd day of September, 2025, via DR Portal to Craig A. Vollono, Esq., TTE Law Group, LLP, attorney for Respondent.

Respectfully Submitted,

GOODMAN & NEKVASIL, P.A.

*Kalju Nekvasil*

Kalju Nekvasil, Esq.
Florida Bar No. 0866946
Stephen Krosschell, Esq.
Florida Bar No. 0351199
624 1st Avenue South
St. Petersburg, Florida 33701
Telephone: 727-524-8486
Facsimile: 727-524-8786

**INDEX OF EXHIBITS**

| | |
|---|---|
| Exhibit "A" | Bell's Registration History |
| Exhibit "B" | Finch's Registration History |
| Exhibit "C" | FINRA Notice to Members 05-18 (dated March 2, 2005)<br>"PRIVATE PLACEMENTS OF TENANTS-IN-COMMON INTERESTS NASD Issues Guidance on Section 1031 Tax-Deferred Exchanges of Real Property for Certain Tenants-in-Common Interests in Real Property Offerings" |
| Exhibit "D" | Regulatory Notice 10-22 (dated April 2010)<br>"Regulation D Offerings" |
| Exhibit "E" | FINRA 2018 Examination Findings Report (December 7, 2018)<br>Reasonable Diligence for Private Placements |
| Exhibit "F" | Lawsuit by Preferred Equity Provider Against Brian Nelson |
| Exhibit "G" | Affidavit of Mark Jennings<br>Nelson Brothers Corporate Controller (March 2021 – September 2022) |
| Exhibit "H" | FINRA Rule 2111 Suitability |
| Exhibit "I" | Notice to Members 03-71 (dated November 2003)<br>*NASD Reminds Members of Obligations when Selling Non Conventional Investments* |

# EXHIBIT "A"

**BrokerCheck Report**

# Eric James Bell

CRD# 7015161


| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 - 4 |
| Registration and Employment History | 6 |


When communicating online or investing with any professional, make sure you know who you're dealing with. Imposters might link to sites like BrokerCheck from phishing or similar scam websites, or through social media, trying to steal your personal information or your money.

Please contact FINRA with any concerns.

**About BrokerCheck®**

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
- BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
- Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
- **Where did this information come from?**
- The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- **How current is this information?**
- Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
- To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.
- **Are there other resources I can use to check the background of investment professionals?**
- FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

**Thank you for using FINRA BrokerCheck.**

Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org

For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

# Eric J. Bell

CRD# 7015161

**Currently employed by and registered with the following Firm(s):**

B **EMERSON EQUITY LLC**
9250 E Costilla Avenue
Suite 105
Greenwood Village, CO 80112
CRD# 130032
Registered with this firm since: 04/20/2020

# Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

**This broker is registered with:**

- 1 Self-Regulatory Organization
- 10 U.S. states and territories

**This broker has passed:**

- 0 Principal/Supervisory Exams
- 2 General Industry/Product Exams
- 1 State Securities Law Exam

## Registration History

**This broker was previously registered with the following securities firm(s):**

B **COLORADO FINANCIAL SERVICE CORPORATION**
CRD# 104343
Greenwood Village, CO
12/2018 - 04/2020

## Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker? **No**



�2024 FINRA. All rights reserved. Report about Eric J. Bell.

# Broker Qualifications

## Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 1 SRO and is licensed in 10 U.S. states and territories through his or her employer.**

### Employment 1 of 1

Firm Name: **EMERSON EQUITY LLC**

Main Office Address: **155 BOVET ROAD, SUITE 725**
**SAN MATEO, CA 94402**

Firm CRD#: **130032**

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | FINRA | Direct Participation Programs | Approved | 04/20/2020 |

| | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|
| B | Arkansas | Agent | Approved | 11/09/2020 |
| B | California | Agent | Approved | 01/27/2022 |
| B | Colorado | Agent | Approved | 04/20/2020 |
| B | Florida | Agent | Approved | 10/27/2020 |
| B | Louisiana | Agent | Approved | 10/07/2024 |
| B | Michigan | Agent | Approved | 02/25/2021 |
| B | Ohio | Agent | Approved | 04/27/2022 |
| B | Oklahoma | Agent | Approved | 09/15/2022 |
| B | Pennsylvania | Agent | Approved | 10/11/2024 |
| B | Texas | Agent | Approved | 11/02/2022 |

## Branch Office Locations

**EMERSON EQUITY LLC**



�2024 FINRA. All rights reserved. Report about Eric J. Bell.

## Broker Qualifications

### Employment 1 of 1, continued

9250 E Costilla Avenue
Suite 105
Greenwood Village, CO 80112


�2024 FINRA. All rights reserved. Report about Eric J. Bell.

# Broker Qualifications

## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below. A passed exam or exam waiver does not permit a broker to do business without an active SRO or state registration.

**This individual has passed 0 principal/supervisory exams, 2 general industry/product exams, and 1 state securities law exam.**

### Principal/Supervisory Exams

| | Exam | Category | Date |
|---|---|---|---|
| | No information reported. | | |

### General Industry/Product Exams

| | Exam | Category | Date |
|---|---|---|---|
| B | Securities Industry Essentials Examination | SIE | 12/18/2018 |
| B | Direct Participation Programs Representative Examination | Series 22 | 12/17/2018 |

### State Securities Law Exams

| | Exam | Category | Date |
|---|---|---|---|
| B | Uniform Securities Agent State Law Examination | Series 63 | 07/27/2020 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.



�2024 FINRA. All rights reserved. Report about Eric J. Bell.

# Broker Qualifications

## Professional Designations

This section details that the representative has reported **0** professional designation(s).

No information reported.



�2024 FINRA. All rights reserved. Report about Eric J. Bell.

# Registration and Employment History

## Registration History

The broker previously was registered with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| B 12/2018 - 04/2020 | COLORADO FINANCIAL SERVICE CORPORATION | 104343 | Greenwood Village, CO |

## Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

**Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 04/2020 - Present | Emerson Equity LLC | Registered Representative | Y | San Mateo, CA, United States |
| 09/2018 - Present | Tangible Wealth Solution | Contractor | Y | Greenwood Village, CO, United States |
| 09/2018 - 03/2020 | Colorado Financial | Registered Representative | Y | Centennial, CO, United States |
| 02/2018 - 09/2018 | Unemployed | Unemployed | N | Denver, CO, United States |
| 09/2009 - 02/2018 | Transmontaigne | Business Developement | N | Denver, CO, United States |

## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

TANGIBLE WEALTH SOLUTIONS(DBA) INVESTMENT RELATED ,9250 E. COSTILLA AVE STE 105 GREENWOOD VILLAGE, CO 80112, CONTRACTOR 09/2018


�2024 FINRA. All rights reserved. Report about Eric J. Bell.

**End of Report**

**This page is intentionally left blank.**


�2024 FINRA. All rights reserved. Report about Eric J. Bell.

# EXHIBIT "B"

BrokerCheck Report

# RYAN DAVID FINCH

CRD# 6379871


| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 - 4 |
| Registration and Employment History | 6 - 7 |


When communicating online or investing with any professional, make sure you know who you're dealing with. Imposters might link to sites like BrokerCheck from phishing or similar scam websites, or through social media, trying to steal your personal information or your money.

Please contact FINRA with any concerns.

About BrokerCheck®

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- What is included in a BrokerCheck report?
- BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
- Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
- Where did this information come from?
- The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- How current is this information?
- Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
- What if I want to check the background of an investment adviser firm or investment adviser representative?
- To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.
- Are there other resources I can use to check the background of investment professionals?
- FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.
-

Thank you for using FINRA BrokerCheck.

Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org

For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

# RYAN D. FINCH

CRD# 6379871

Currently employed by and registered with the following Firm(s):

IA EMERSON EQUITY LLC
9250 E Costilla Avenue
Suite 105
Greenwood Village, CO 80112
CRD# 130032
Registered with this firm since: 05/04/2020

B EMERSON EQUITY LLC
9250 E Costilla Avenue
Suite 105
Greenwood Village, CO 80112
CRD# 130032
Registered with this firm since: 04/21/2020

## Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

### Broker Qualifications

This broker is registered with:

- 1 Self-Regulatory Organization
- 22 U.S. states and territories

This broker has passed:

- 0 Principal/Supervisory Exams
- 3 General Industry/Product Exams
- 2 State Securities Law Exams

### Registration History

This broker was previously registered with the following securities firm(s):

IA COLORADO FINANCIAL SERVICE CORPORATION
CRD# 104343
CENTENNIAL, CO
02/2018 - 04/2020

B COLORADO FINANCIAL SERVICE CORPORATION
CRD# 104343
Greenwood Village, CO
09/2017 - 04/2020

IA COBIZ WEALTH
CRD# 125910
DENVER, CO
09/2014 - 03/2017

### Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker? No



�2025 FINRA. All rights reserved. Report about RYAN D. FINCH.

## Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

This individual is currently registered with 1 SRO and is licensed in 22 U.S. states and territories through his or her employer.

### Employment 1 of 1

Firm Name: EMERSON EQUITY LLC

Main Office Address: 155 BOVET ROAD, SUITE 725
SAN MATEO, CA 94402

Firm CRD#: 130032

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | FINRA | Direct Participation Programs | Approved | 04/21/2020 |
| B | FINRA | General Securities Representative | Approved | 04/04/2024 |

| | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|
| B | Arizona | Agent | Approved | 04/13/2022 |
| B | Arkansas | Agent | Approved | 04/21/2020 |
| B | California | Agent | Approved | 04/21/2020 |
| B | Colorado | Agent | Approved | 04/21/2020 |
| IA | Colorado | Investment Adviser Representative | Approved | 05/04/2020 |
| B | Florida | Agent | Approved | 10/27/2020 |
| B | Georgia | Agent | Approved | 05/22/2025 |
| B | Hawaii | Agent | Approved | 01/07/2021 |
| B | Louisiana | Agent | Approved | 10/07/2024 |
| B | Missouri | Agent | Approved | 07/19/2022 |
| B | Montana | Agent | Approved | 06/05/2020 |


�2025 FINRA. All rights reserved. Report about RYAN D. FINCH.

## Employment 1 of 1, continued

| | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|
| B | Nebraska | Agent | Approved | 04/21/2020 |
| B | Nevada | Agent | Approved | 01/26/2021 |
| B | New Mexico | Agent | Approved | 06/02/2025 |
| B | New York | Agent | Approved | 06/21/2023 |
| B | North Dakota | Agent | Approved | 08/17/2023 |
| B | Ohio | Agent | Approved | 04/27/2022 |
| B | Oklahoma | Agent | Approved | 04/21/2020 |
| B | Oregon | Agent | Approved | 09/26/2023 |
| B | Tennessee | Agent | Approved | 12/12/2024 |
| B | Texas | Agent | Approved | 11/24/2021 |
| B | Virginia | Agent | Approved | 02/01/2023 |
| B | Washington | Agent | Approved | 04/01/2025 |

## Branch Office Locations

EMERSON EQUITY LLC
9250 E Costilla Avenue
Suite 105
Greenwood Village, CO 80112



�2025 FINRA. All rights reserved. Report about RYAN D. FINCH.

# Broker Qualifications

## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below. A passed exam or exam waiver does not permit a broker to do business without an active SRO or state registration.

This individual has passed 0 principal/supervisory exams, 3 general industry/product exams, and 2 state securities law exams.

### Principal/Supervisory Exams

| | Exam | Category | Date |
|---|---|---|---|
| | No information reported. | | |

### General Industry/Product Exams

| | Exam | Category | Date |
|---|---|---|---|
| B | General Securities Representative Examination | Series 7TO | 04/04/2024 |
| B | Securities Industry Essentials Examination | SIE | 10/01/2018 |
| B | Direct Participation Programs Representative Examination | Series 22 | 09/01/2017 |

### State Securities Law Exams

| | Exam | Category | Date |
|---|---|---|---|
| B | Uniform Securities Agent State Law Examination | Series 63 | 03/15/2018 |
| IA | Uniform Investment Adviser Law Examination | Series 65 | 09/16/2014 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.


�2025 FINRA. All rights reserved. Report about RYAN D. FINCH.

# Broker Qualifications

## Professional Designations

This section details that the representative has reported 1 professional designation(s).

### Certified Financial Planner

This representative holds or did hold 1 professional designation(s) that may have been used to qualify as an Investment Advisor representative. Please check with the appropriate designation authority for verification that the designation is still in effect. The contact information for these professional designation authorities can be found on the website for the North American Securities Administrators Association at http://www.nasaa.org



�2025 FINRA. All rights reserved. Report about RYAN D. FINCH.

# Registration and Employment History

## Registration History

The broker previously was registered with the following firms:

| | Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|---|
| IA | 02/2018 - 04/2020 | COLORADO FINANCIAL SERVICE CORPORATION | 104343 | Greenwood Village, CO |
| B | 09/2017 - 04/2020 | COLORADO FINANCIAL SERVICE CORPORATION | 104343 | Greenwood Village, CO |
| IA | 09/2014 - 03/2017 | COBIZ WEALTH | 125910 | DENVER, CO |

## Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.

| Employment | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 11/2020 - Present | Whitestone Real Estate Fund I LLC | Managing Member | Y | Denver, CO, United States |
| 04/2020 - Present | Emerson Equity LLC | Registered Representative | Y | San Mateo, CA, United States |
| 07/2019 - Present | SC RE I LLC | Managing Member | Y | Greenwood Village, CO, United States |
| 07/2015 - Present | 1395 Harlan LLC | Managing Partner | Y | Denver, CO, United States |
| 05/2015 - Present | Approach 99 LLC | Managing Partner | Y | Denver, CO, United States |
| 11/2014 - Present | Sharpe Capital LLC | Manager | Y | Denver, CO, United States |
| 09/2014 - Present | DBA Tangible Wealth Solutions | Owner-President | Y | Greenwood Village, CO, United States |
| 01/2013 - Present | Finch Sertich Capital LLC | Managing Partner | Y | Denver, CO, United States |
| 08/2016 - 12/2021 | Tangible Property Solutions LLC | Owner | Y | Greenwood Village, CO, United States |
| 09/2014 - 09/2021 | Sharpe Investment LLC | Managing Partner | Y | Denver, CO, United States |
| 08/2017 - 04/2020 | Colorado Financial Service Corporation | Registered Rep | Y | Centennial, CO, United States |


�2025 FINRA. All rights reserved. Report about RYAN D. FINCH.

## Employment History, continued

| Employment | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 04/2015 - 07/2017 | COBIZ WEALTH | WEALTH STRATEGIST | Y | DENVER, CO, United States |

## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

1)FINCH SERTICH CAPITAL LLC - P.O. BOX 372327 DENVER CO 80237, MANAGING PARTNER, INVESTEMENT RELATED, NO COMPENSATION, 2 HOURS PER MONTH, 01/2013, MONITOR AND MANAGE THE PROPERTY MANAGERS THAT MANAGE THE SINGLE FAMILY RENTALS OWNED BY THE LLC.

2) DBA TANGIBLE WEALTH SOLUTIONS LLC, 9250 E COSTILLA AVE., STE 105, GREENWOOD VILLAGE, CO 80112, OWNER - PRESIDENT, INVESTMENT RELATED, 15 HOURS, 10/2015

3) 1395 HARLAN LLC, P.O. BOX 372327 DENVER CO 80237, MANAGING PARTNER, INVESTEMENT RELATED, NO COMPENSATION, 2 HOURS PER MONTH, 07/2015, MONITOR AND MANAGE THE PROPERTY MANAGERS THAT MANAGE THE SINGLE FAMILY RENTALS OWNED BY THE LLC

4) APPROACH 99 LLC / P.O. BOX 372327 DENVER CO 80237 / MANAGING PARTNER / INVESTEMENT RELATED / NO COMPENSATION / 2 HOURS PER MONTH, 05/2015, MONITOR AND MANAGE THE PROPERTY MANAGERS THAT MANAGE THE SINGLE FAMILY RENTALS OWNED BY THE LLC

5) SHARPE CAPITAL LLC/9250 E. COSTILLA AVE., STE 105, GREENWOOD VILLAGE, CO 80112/MANAGER/REAL ESTATE INVESTMENT CO, INVESTMENT RELATED; NO COMPENSATION, RECEIVED INVESTMENT RETURNS/20 HOURS PER MONTH, 11/2014, MONITOR AND MANAGE THE COMMERCIAL PROPERTY MANAGER IN CHARGE OF MULTIPLE COMMERCIAL PROPERTIES

6) SC RE I LLC/PO BOX 372327 DENVER CO 80237/MANAGING MEMBER/INVESTMENT RELATED/START DATE 7/16/19, SPENDS ABOUT 10 HOURS PER MONTH DURING SECURITIES TRADING HOURS/EARNS MANAGEMENT FEES, ACQUITION AND DISPOSITION FEES, 07/2019, 5 HRS A MONTH DURING SECURITIES TRADING HOURS. MONITOR AND MANAGE THE PROPERTY MANAGERS THAT MANAGE THE SINGLE FAMILY RENTALS OWNED BY THE LLC

7)- WHITESTONE REAL ESTATE FUND I, LLC-INVESTMENT RELATED-PO BOX 372327, DENVER CO 80237-MANAGING MEMBER-INVESTMENT RELATED; ACQUIRING AND MANAGING REAL ESTATE PROPERTIES-10 HOURS DURING SECURITIES TRADING HOURS; 11/2020, MONITOR AND MANAGE THE PROPERTY MANAGERS THAT MANAGE THE SINGLE FAMILY RENTALS OWNED BY THE LLC

8)-SKYLINE SOCCER ASSOCIATION-NOT INVESTMENT RELATED-3799 S JASON ST ENGLEWOOD CO 80110-YOUTH SOCCER COACH-2 PRACTICES DURING THE WEEK AND ONE GAME ON WEEKENDS. ZERO HOURS DURING SECURITIES TRADING HOURS


�2025 FINRA. All rights reserved. Report about RYAN D. FINCH.

End of Report

This page is intentionally left blank.


�2025 FINRA. All rights reserved. Report about RYAN D. FINCH.

# EXHIBIT "C"

# Notice to Members

MARCH 2005

**SUGGESTED ROUTING**

Corporate Finance
Internal Audit
Legal & Compliance
Registered Representatives
Retail
Senior Management

**KEY TOPICS**

Broker-Dealer Registration
Due Diligence
Non-Conventional Investments
Private Placements
Real Estate
Rule 2420
Suitability

**GUIDANCE**

## Private Placements of Tenants-in-Common Interests

NASD Issues Guidance on Section 1031 Tax-Deferred Exchanges of Real Property for Certain Tenants-in-Common Interests in Real Property Offerings

### Executive Summary

This *Notice* addresses Section 1031 tax-deferred exchanges of real property for certain tenants-in-common (TIC) interests in real property offerings.[1] In a TIC exchange, interests in real property are exchanged for instruments that generally are securities for purposes of the federal securities laws and NASD rules.[2] This *Notice* reminds members that when offering TIC interests that are securities to customers, members and their associated persons must comply with all applicable NASD rules, including those addressing:

- suitability;
- due diligence;
- splitting commissions with unregistered individuals or firms;
- supervision; and
- recordkeeping.

In addition, members relying on private offering exemptions from the registration requirements of the Securities Act of 1933 must ensure that their manner of offering TIC interests complies with all applicable requirements, including the prohibition on general solicitation.

05-18

## Questions/Further Information

Questions concerning this *Notice* should be directed to Joseph E. Price, Vice President, Corporate Financing Department, at (240) 386-4623 or Gary L. Goldsholle, Associate Vice President and Associate General Counsel, Office of General Counsel, Regulatory Policy and Oversight, at (202) 728-8104.

## Characteristics of TIC Exchanges

**Tax Status**

Typically, the sale of an investment, including an investment in real estate, is a taxable event, with the seller being responsible for capital gains taxes on the appreciation of the investment. Under Section 1031 of the Internal Revenue Code, however, an investor in income-producing or rental real estate may exchange the investment for another investment in income-producing or rental real estate of equal or greater value and defer payment of capital gains. In order to qualify for a deferral under Section 1031, an investor must acquire an interest in real estate in the exchange, not an interest in a partnership.

For example, if an investor purchased rental real property in 1972 for $50,000, the property today may be worth $2 million dollars. The sale of the property would cause the seller to incur taxes on the profit. If the owner of the rental property exchanged the rental property for different real property, he could defer paying these taxes. Because of the difficulty of finding equal and offsetting properties for each investor, sponsors have offered interests in larger real estate offerings to pools of investors, in the form of TIC interests. In the example provided, rather than exchanging a rental property valued at $2 million for a similarly valued property, the owner could pool his interest with other similarly situated property owners to acquire property or properties with a large enough value to provide tax deferral for all the investors. If, however, the pool of investors is treated as a partnership under the principles of federal tax law, the exchange will not qualify under Section 1031, and the taxes on the investors' profits will not be deferred under that section.

TIC exchanges have grown dramatically, from approximately $150 million in sales in 2001 to approximately $2 billion in 2004.[3] The driving force behind the growth in TIC exchanges is their favorable tax treatment.

In March 2002, the IRS issued Revenue Procedure 2002-22, 1 C.B. 733 ("Rev. Proc. 2002-22"), which addresses the conditions under which the IRS will consider a request for a ruling that a TIC interest in rental real estate is not an interest in a partnership. Rev. Proc. 2002-22 describes the central characteristic of a tenancy in common (each owner is deemed to own individually a physically undivided part of the entire parcel of property) and sets forth 15 specific conditions that must be met before the IRS will consider issuing a ruling.[4] If the arrangement among the investors is respected as a TIC interest in rental real estate, rather than an interest in a partnership, an exchange may qualify under Section 1031 if the other conditions of that section are satisfied.

## Securities Law Status

When TICs are offered and sold together with other arrangements, they generally would constitute investment contracts and thus securities under the federal securities laws.[5] An investment contract includes any contract, transaction or scheme in which persons invest their money in a common enterprise, with the expectation of profits to be derived predominantly from the efforts of others.[6] TIC interests are generally investment contracts because the tenants in common invest in an undivided fractional interest in the rental real property by pooling their assets and sharing in the risks and benefits of the enterprise, while obtaining profits derived predominantly from the efforts of others, such as through contracts concerning leasing, management and operation of the acquired property. In addition to managing the property, TIC sponsors typically structure the TIC and negotiate the sale price and the loan. The fact that investors in a particular TIC program might have authority to terminate a management contract, or even to maintain or repair the property, would not demonstrate that the TIC interest is not an investment contract.[7]

Although Section 1031 does not apply to an exchange of investment property for "interests in a partnership," "stocks, bonds, notes," or "other securities," the federal securities law definitions of those terms do not control interpretation of the tax laws. Accordingly, the fact that TIC interests typically are investment contracts under securities laws does not inherently disqualify them as property that may be exchanged under Section 1031.

We have become aware that certain states may exempt particular types of TIC transactions from the definition of "security" under state law. We remind members, however, that a determination that a particular transaction does not involve a security for purposes of state law is not determinative for purposes of federal securities law.

## Application of NASD Rules to TIC Exchanges

TIC interests are a type of non-conventional investment ("NCI"). In NTM 03-71, NASD explained that members engaged in the sale of NCIs must ensure that those products are offered and sold in a manner consistent with the member's general sales conduct obligations, as well as address any special circumstances presented by the sale of those products. Among the issues highlighted in NTM 03-71 are members' responsibilities to:

- conduct appropriate due diligence;
- perform a reasonable-basis suitability analysis;
- perform customer specific suitability analysis for recommended transactions;
- ensure that promotional materials used by the member are fair, accurate, and balanced;
- implement appropriate internal controls; and
- provide appropriate training to registered persons involved in the sale of these products.

**Suitability and Due Diligence**

Before recommending a TIC exchange, members must have a clear understanding of the investment goals and current financial status of the investor. In many cases, a TIC interest will constitute a significant portion of an investor's total assets. Because of the favorable tax treatment, investors often elect to invest the entire proceeds from the sale of an investment property in a TIC exchange. Concentration of an investor's assets in a single asset class, however, is not suitable for many investors.[8] Members must, with respect to each customer for whom they make a recommendation, consider the risks from over-concentration against the benefits of tax deferral and the investment potential of the underlying real estate asset(s).

TIC interests are illiquid securities. NASD is not aware of any secondary market for TIC interests. Moreover, the tenant-in-common form of ownership may require unanimous consent to sell a TIC interest. The subsequent sale of TIC interests may only be possible at a significant discount to the net asset value of the undivided interest in the real estate. As fees charged in connection with a TIC exchange increase, the money saved as a consequence of tax deferral will be offset. Accordingly, members should consider the effect of fees on each TIC exchange.

TIC exchange sponsors routinely obtain legal opinions regarding whether a particular TIC's offering structure will qualify as a like-kind exchange of real property under Section 1031. Given the importance of that tax treatment, a member should obtain a "clean" legal opinion that a TIC "should" or "will" qualify for exchange under Section 1031. If a sponsor failed to obtain a legal opinion, or only obtained a "more likely than not" opinion, that would be a material fact. In such a case, a member, as part of its due diligence responsibilities would be required to ascertain the specific tax status risks of the TIC exchange and inform the investor of the risks involved.

In making a suitability determination in connection with a recommendation to a customer to purchase a TIC interest, a member must also consider whether the fees and expenses associated with TIC transactions outweigh the potential tax benefits to the customer. TICs structured with high up-front fees and expenses paid to the sponsor and/or salespersons of the selling broker-dealers raise particular concerns about the ability to make a suitable recommendation. In addition, TIC transactions in many cases may not provide complete tax-free exchanges for investors (*e.g.*, in situations where the investor's debt ratio on the replacement property decreases, the difference may result in a taxable event for the investor). Members must take all of these factors into consideration when recommending a particular TIC transaction to a customer.

NTM 03-71 reminds members that the type of due diligence that is appropriate will vary from product to product. NASD staff believes that it is not appropriate for members that recommend a TIC transaction simply to rely on representations made by the sponsor in an offering document. While the nature and extent of verification will vary with the facts and circumstances related to particular sponsors and offerings, members should make a reasonable investigation to ensure that the offering document does not contain false or misleading information. Such an investigation could include background checks of the sponsor's principals, review of the agreements (*e.g.*, property

management, purchase and sale, lease and loan agreements) and property inspection.[9] In addition, if the offering document contains projections, members should understand the basis for those projections, and the degree of likelihood that they will occur. For example, members should determine whether any projected yields can reasonably be supported by the property operations.

**Payment of Referral Fees**

Real estate agents sometimes refer their customers to broker-dealers that offer TIC exchanges. Moreover, some states may require that a licensed real estate agent participate in the transfer of a TIC interest to an investor. A broker-dealer that pays a fee to the real estate agent or splits its brokerage commissions with the agent in connection with a TIC exchange may be deemed to have violated NASD Rule 2420. This rule generally prohibits the payment of commissions and fees to entities that operate (or based on the proposed activities, would operate) as unregistered broker-dealers. Under Section 3(a)(4)(A) of the Securities Exchange Act of 1934, a "broker" is defined as a person "engaged in the business of effecting transactions in securities for the account of others." Section 15(a) of the Exchange Act sets forth the general registration requirements for brokers and dealers.[10]

The determination of whether an entity should be registered as a broker-dealer rests with the Securities and Exchange Commission. Among the activities the SEC staff has found require registration are:

- receiving transaction-based compensation;
- participating in presentations or negotiations;
- making securities recommendations or discussing or presenting the attributes of a securities investment;
- structuring securities transactions; and
- recommending lawyers, underwriters, or broker-dealers for the distribution or marketing of securities in the secondary market.[11]

It is our understanding that the SEC staff would deem a real estate agent's receipt of a referral fee from a broker-dealer in connection with the sale of a TIC interest to be the type of activity that would render the real estate agent an unregistered broker-dealer. Therefore, under Rule 2420, a member may not pay a real estate agent who is not registered as a broker-dealer for participating in the transfer of a TIC interest that is structured as a security, nor may a member pay such real estate agent for referring TIC business that involves securities.[12] A member also may not evade Rule 2420 through indirect payments; for example, a member may not engage in an arrangement in which it reduces its normal commission for a TIC exchange so that the customer will pay the difference to the real estate agent for participating in the TIC exchange or for referring business to the broker-dealer.

Members that act as TIC sponsors and pay fees to real estate agents should carefully review SEC and NASD precedent and, if necessary, consult an attorney with experience in these matters.

### Licensing, Supervision and Recordkeeping

Associated persons selling TIC interests must have passed the appropriate qualification examinations. Because TICs are typically structured as direct participation programs ("DPPs"), associated persons who sell them generally must have passed either the Series 7 or the Series 22 (Limited Representative — Direct Participation Program securities). In addition, most states require the Series 63 State Agent's license. Also, as with any security, a TIC interest transaction must be reviewed and endorsed by a qualified principal in accordance with the member's supervisory procedures.[13] A qualified principal for supervising TIC interests would be either a General Securities Principal (Series 24) or a DPP principal (Series 39).

In accordance with NASD Rule 3010, members should establish an appropriate supervisory system for the offer and sale of TIC interests. The system should include comprehensive written supervisory procedures reasonably designed to ensure compliance with all applicable rules, including suitability and sales practice requirements related to TIC transactions. The supervisory system should address the sales practice issues discussed in this Notice, including ensuring that neither the member nor its registered representatives pay referral fees or otherwise share transaction-based compensation from TIC transactions with persons that would be deemed to be unregistered broker-dealers.

NASD and SEC record keeping and retention requirements also apply to TIC transactions, and firms should establish appropriate procedures to comply with the applicable requirements in SEC Rules 17a-3 and 17a-4, and NASD Rule 3110. Due to the complexity and varying documentation requirements of TIC exchanges, firms should examine the records they maintain and ensure that applicable record keeping requirements are satisfied.

### Private Offering Exemption

Many TIC transactions are conducted without registration under the Securities Act of 1933 as private placements, most in reliance on Regulation D under that statute.[14] One of the fundamental requirements of most Regulation D offerings is a prohibition on general solicitation.[15] As a result of this prohibition, neither the issuer nor any person acting on its behalf may offer or sell securities based on general solicitation or general advertising, including communications published in any newspaper or similar media or any seminar or meeting whose attendees have been invited by any general solicitation or advertising.

A critical factor in determining whether a communication is appropriately limited, and thus not a "general solicitation," is the existence of an adequate pre-existing relationship between a member and the TIC offeree. An adequate pre-existing relationship will enable the member to evaluate the potential TIC investor's sophistication and financial circumstances.[16]

If a communication is made by general solicitation, then an issuer or its agents will have made a prohibited general solicitation if the communication includes an offer of the privately placed securities. If the communication references a security that is currently offered or contemplated to be offered at the time of the communication, the communication will generally be considered an offer of that security. In addition, if the person solicited via the communication is subsequently offered a security that was currently offered or contemplated to be offered at the time of the communication, the communication would generally be considered an offer of that security.

Members have requested guidance with regard to two specific methods of solicitation or advertising. In the first scenario, a registered representative who also holds a real estate license solicits potential investors by advertising a "real estate" seminar. At the seminar, investors are given a presentation on TIC exchanges and are made aware that the member offers TIC investments to its customers. Since the advertisement for the seminar would be a general solicitation, and since the references to the TIC investments currently being offered by members would be deemed an offer of those securities, the members engaged in such offerings would not be able to rely on the exemption from registration for private placements under Regulation D.[17]

In the second scenario, members place advertisements in newspapers and magazines that indicate that the member sells TIC interests, but the advertisements do not identify any particular TIC investment for sale by the member. Since the advertisement itself is a general solicitation, the issue for members is whether the advertisement includes an offer of securities. In general, such an advertisement would not be deemed an offer of securities if:

- the advertisement is generic;
- the advertisement is not being made in contemplation of an offering; and
- the member has procedures to ensure that an investor solicited via the advertisement will not be offered TICs that the member is currently offering or contemplating offering at the time of the initial contact.

Advertisements that do not meet each of these conditions are likely to be deemed general solicitations and inconsistent with the conditions for private placements conducted in compliance with Regulation D. Moreover, in addition to meeting these conditions, the other requirements under Regulation D also must be met, including establishing an adequate, substantive and pre-existing relationship with the investor and completing a suitability analysis prior to offering TICs to an investor.[18]

## Endnotes

1 This NTM is focused on investors exchanging real estate for TIC interests. NASD is aware that some investors purchase TIC interests directly, without a corresponding exchange of real estate. Many of the concepts discussed herein are applicable to investors in TIC interests who are not exchanging real property.

2 *See, e.g., SEC v. Edwards*, 540 U.S. 389 (2004), 124 S. Ct. 892 (2004). *See also* Triple Net Leasing, LLC, SEC No-Action Letter, SEC No-Act. LEXIS 824 (Aug. 23, 2000). (The staff of the SEC's Division of Corporation Finance stated that it was unable to assure the requestor that it would not recommend enforcement action to the Commission unless the described TIC exchanges subject to a master lease agreement were registered under the Securities Act of 1933 or exempt from such registration.)

3 Terry Fiedler, *Buying a Little Piece of a Big Deal*, Minneapolis Star Tribune, August 16, 2004; Terry Pristin, *Money Flowing New Way to Pool Buyers*, New York Times, September 22, 2004.

4 The 15 factors are: Tenancy in Common Ownership; Number of Co-Owners; No Treatment of Co-Ownership as an Entity; Co-Ownership Agreement; Voting; Restrictions on Alienation; Sharing Proceeds and Liabilities upon Sale of Property; Proportionate Sharing of Profits and Losses; Proportionate Sharing of Debt; Options; No Business Activities; Management and Brokerage Agreements; Leasing Agreements; Loan Agreements; and Payments to Sponsor. Detailed information concerning these conditions is provided in Rev. Proc. 2002-22.

5 TIC interests in real property standing alone generally are not securities, but are a form of ownership in which each tenant (*i.e.,* owner) holds a fractional undivided interest in real property under state real property law.

6 *See, e.g., SEC v. Edwards*, 540 U.S. 389 (2004); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975); *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

7 Rev. Proc. 2002-22 limits the activities of TIC interest holders to those "customarily performed in connection with the maintenance and repair of rental property." Rev. Proc. 2002-22, at 18 (2002). IRB LEXIS 122 *8.

8 *See Stephen Thorlief Rangen*, 52 S.E.C. 1304, 1308 (1997) (finding that broker's recommendations were unsuitable where they resulted in 80 percent of the equity in customers' accounts being concentrated in one stock – "by concentrating so much of their equity in particular securities, [the broker] increased the risk of loss for these individuals beyond what is consistent with the objective of safe, non-speculative investing"). *See also Stephen Thorlief Rangen*, 53 S.E.C. 290, 292 (1997) (Order Denying Motion for Reconsideration) ("[O]ur findings of undue concentration served to support our conclusion that Rangen's recommendations were unsuitable."); *Department of Enforcement v. Daniel R. Howard*, No. C11970032, 2000 NASD Discip. LEXIS 16, at *19 (Nov. 16, 2000) (holding that the broker's recommendations "also led to an undue concentration of these speculative securities, making the recommendations particularly unsuitable"), *aff'd*, Exchange Act Rel. No. 46269, 2002 SEC LEXIS 1909 (July 26, 2002), *aff'd*, No. 02-1939, 2003 U.S. App. LEXIS 19454 (1st Cir. Sept. 19, 2003); *Dane S. Faber*, Exchange Act Rel. No. 49216, 2004 SEC LEXIS 277, at *26 (Feb. 10, 2004) ("We have repeatedly found that high concentration of investments in one or a limited number of speculative securities is not suitable for investors seeking limited risk.").

9 For example, members should make a reasonable investigation to ensure that any agreement associated with the TIC transaction, such as a master lease agreement with a real estate investment trust or its operating partnership, does not mandate a transaction subsequent to the acquisition of the TIC interest that would threaten the tax treatment of the acquisition under Section 1031.

10 Section 15(a) of the Exchange Act excepts from registration "a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange." The intrastate exception in Section 15(a) traditionally has been narrowly and literally construed. *See* Buy Blue Chip Stocks Direct, SEC No-Action Letter, SEC No-Act. LEXIS 155 (Jan. 24, 1996); Legacy Motors, Inc., SEC No-Act. LEXIS 986 (Jul. 31, 1991); CMS Financial Group Inc., SEC No-Act. LEXIS 673 (Apr. 2, 1990); Don Chamberlain, SEC No-Act. LEXIS 3271 (Aug. 10, 1979); National Educator's Group, Inc., SEC No-Act. LEXIS 2884 (Oct. 17, 1977); American Liberty Financial Corp., SEC No-Act. LEXIS 2629 (Nov. 21, 1975).

11 *See, e.g.*, Dominion Resources, Inc., SEC No-Action Letter, 2000 SEC No-Act. LEXIS 304 (Mar. 7, 2000) (revoking prior no-action relief granted to a firm that assisted corporate and governmental issuers in structuring securities transactions and recommending broker-dealers); John Wirthlin, SEC No-Action Letter, 1999 SEC No-Act. LEXIS 83 (Jan. 19, 1999) (no-action relief denied to a person that would solicit investments in real estate limited partnership interests and would receive a fee if any referred investors purchased those interests); Davenport Management, Inc., SEC No-Action Letter, 1993 SEC No-Act. LEXIS 624 (Apr. 13, 1993) (registration required where business broker receives transaction fees and participates in negotiations); Woodmoor Corporation, SEC No-Action Letter, 1972 SEC No-Act. LEXIS 1052 (Feb. 3, 1972) (real estate agent could not discuss or present any of the attributes of the security, nor provide documents connected with the investment).

12 A member that pays fees to an unregistered person who acts as a finder would not be deemed to violate Rule 2420 if the member obtained a no-action letter from the SEC staff indicating that the finder is not required to register as a broker-dealer.

13 Rule 3010(d).

14 17 CFR 230.501-508.

15 Rule 504 under Regulation D has certain exceptions from the general solicitation limitations.

16 E.F. Hutton & Co. Inc., SEC No-Action Letter, 1985 SEC No-Act. LEXIS 2917 (Dec. 3, 1985) (In determining what constitutes general solicitation, the Division of Corporation Finance underscored the importance of substantive, pre-existing relationships with offerees prior to their being solicited); Bateman Eichler, Hill Richards, Inc., SEC No-Action Letter, 1985 SEC No-Act. LEXIS 2918 (Dec. 3, 1985) (Division concurs in the view that it would not constitute a general solicitation if proposed solicitation that would be generic in nature, would not make any reference to any specific investment currently offered or contemplated to be offered at the time of the solicitation, and persons solicited are not offered any securities that were offered or contemplated for offering at the time of the solicitation); *see also* H.B. Shaine & Co., Inc., SEC No-Action Letter, 1987 SEC No-Act. LEXIS 2004 (May 1, 1987); Woodtrails-Seattle, Ltd., SEC No-Action Letter, 1982 SEC No-Act. LEXIS 2662 (Aug. 9, 1982).

17 *Cf.* Aspen Grove, SEC No-Action Letter, 1982 SEC No-Act. LEXIS 3136 (Dec. 8, 1982) (no-action relief denied where promotional brochure for limited partnership offering would be distributed at a horse auction).

18 *See, e.g.*, Bateman Eichler, Hill Richards, Inc., supra note 16.

©2005. NASD. All rights reserved. *Notices to Members* attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

# EXHIBIT "D"

# Regulatory Notice 10-22

## Regulation D Offerings

### Obligation of Broker-Dealers to Conduct Reasonable Investigations in Regulation D Offerings

April 2010

**Notice Type**
- Guidance

**Suggested Routing**
- Compliance
- Legal
- Registered Representatives
- Senior Management

**Key Topics**
- Communications With the Public
- Private Placements
- Suitability
- Supervision

**Referenced Rules & Notices**
- Regulation D
- Securities Act Section 17
- SEA Section 10(b)
- Rule 10b-5
- FINRA Rule 2010
- FINRA Rule 2020
- NASD Rule 2210
- NASD Rule 2310
- NASD Rule 3010
- NTM 03-71
- NTM 05-18
- NTM 05-48
- Regulatory Notice 09-05

### Executive Summary

FINRA reminds broker-dealers of their obligation to conduct a reasonable investigation of the issuer and the securities they recommend in offerings made under the Securities and Exchange Commission's Regulation D under the Securities Act of 1933—also known as private placements.

Regulation D provides exemptions from the registration requirements of Section 5 under the Act. Regulation D transactions, however, are not exempt from the antifraud provisions of the federal securities laws. A broker-dealer has a duty—enforceable under federal securities laws and FINRA rules—to conduct a reasonable investigation of securities that it recommends, including those sold in a Regulation D offering.

Moreover, any broker-dealer that recommends securities offered under Regulation D must meet its suitability requirements under NASD Rule 2310 (Suitability), and must comply with the advertising and supervisory rules of FINRA and the SEC.

Questions regarding this *Notice* should be directed to:

- Joseph E. Price, Senior Vice President Corporate Financing/Advertising, at (240) 386-4623;
- Paul Mathews, Director, Corporate Financing Department, at (240) 386-4639; or
- Gary Goldsholle, Vice President and Associate General Counsel, Office of General Counsel, at (202) 728-8104.

FINRA®
Financial Industry Regulatory Authority

## Background and Discussion

Part I of this *Notice* describes Regulation D. Part II describes broker-dealers' regulatory responsibilities to engage in a reasonable investigation of a Regulation D offering, enforceable under the antifraud provisions of the federal securities laws and FINRA rules. Part II also describes specific issues that pertain to a broker-dealer's (BD's) responsibilities and how the scope of a BD's responsibility to conduct a reasonable investigation will necessarily depend upon its affiliation with the issuer, its role in the transaction, and other facts and circumstances of the offering, including whether the offerees are retail investors or more sophisticated institutional investors.[1]

Part III describes practices that some broker-dealers have adopted to help them discharge their reasonable investigation obligations. These practices are especially relevant to Regulation D offerings of securities of companies that are non-reporting under the Securities Exchange Act of 1934. BDs, however, may find that many of the practices are appropriate for other types of offerings.

### I. Regulation D

The private placement market is an essential source of capital for American business, particularly small firms. According to one estimate, in 2008 companies intended to issue approximately $609 billion of securities in Regulation D offerings.[2] While the private placement market is an important source of capital for many U.S. companies, especially smaller issuers, FINRA has found significant problems in several recent examinations and investigations. These problems include fraud and sales practice abuses in Regulation D offerings. Recently, for example, broker-dealers were sanctioned for providing private placement memoranda and sales materials to investors that contained inaccurate statements or omitted information necessary to make informed investment decisions.[3]

Rule 504 under Regulation D provides an exemption from the registration provisions under Section 3(b) of the Securities Act for limited offerings for which the aggregate offering price of securities within a 12-month period does not exceed $1,000,000. Rule 505 provides an exemption under Section 3(b) of the Act for limited offerings for which the aggregate offering price of securities within a 12-month period does not exceed $5,000,000. Rule 505 permits an offering to an unlimited number of "accredited investors" and up to 35 non-accredited investors. Rule 501 defines "accredited investor" as any person who meets, or who the issuer reasonably believes meets, certain requirements, including natural persons with a net worth in excess of $1,000,000, or annual income in excess of $200,000 (or $300,000 jointly with a spouse).

Rule 506 provides a legal safe harbor for an exemption from registration under Section 4(2) of the Act for the sale of securities to an unlimited number of accredited investors and up to 35 non-accredited investors. Rule 506 (unlike Rule 505) does not limit the permissible size of the offering, but requires that non-accredited investors possess a degree of financial sophistication. Specifically, Rule 506 requires that each non-accredited investor, "either alone or with his purchaser representative(s)," have "such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment," or the issuer must reasonably believe immediately prior to making any sale that the purchaser comes within this description.

Rule 505 and Rule 506 do not require that an issuer provide any specific written information concerning the offering to accredited investors, although issuers must provide specified information to a non-accredited investor who purchases in an offering. In practice, issuers often provide a private placement memorandum that describes the offering to all prospective purchasers, including accredited investors.[4]

## II. BD Regulatory Requirements in Regulation D Offerings

### A. Antifraud Provisions and FINRA Rules

The Securities and Exchange Commission (SEC) and federal courts have long held that a BD that recommends a security is under a duty to conduct a reasonable investigation concerning that security and the issuer's representations about it.[5] This duty emanates from the BD's "special relationship" to the customer, and from the fact that in recommending the security, the BD represents to the customer "that a reasonable investigation has been made and that [its] recommendation rests on the conclusions based on such investigation."[6] Failure to comply with this duty can constitute a violation of the antifraud provisions of the federal securities laws and, particularly, Section 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder.[7] It also can constitute a violation of FINRA Rule 2010, requiring adherence to just and equitable principles of trade, and FINRA Rule 2020, prohibiting manipulative and fraudulent devices.[8]

Courts have found that the amount and nature of the investigation required depends, among other factors, upon the nature of the recommendation, the role of the broker in the transaction, its knowledge of and relationship to the issuer, and the size and stability of the issuer.[9] For example, the SEC and courts recognize that a more thorough investigation is required for "securities issued by smaller companies of recent origin,"[10] which could include many Regulation D issuers. While there are no "iron clad rules as to what a broker must do to meet his responsibility,"[11] the presence of any "red flags" also would alert the broker to the need for further inquiry.[12] Each BD must make a determination of the scope of its investigation based upon the facts and circumstances.

A BD that lacks essential information about an issuer or its securities when it makes a recommendation, including recommendations of securities in Regulation D offerings, must disclose this fact as well as the risks that arise from its lack of information.[13] The degree to which a broker-dealer that relies on information supplied by the issuer may be found to have conducted a reasonable investigation as a basis for its recommendation will depend on the facts and circumstances. With respect to reporting companies under the Securities Exchange Act, in the absence of red flags, a BD that is not an underwriter typically may rely upon the current registration statement and periodic reports of the public company.

In general, however, a BD "may not rely blindly upon the issuer for information concerning a company,"[14] nor may it rely on the information provided by the issuer and its counsel in lieu of conducting its own reasonable investigation.[15] While BDs are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a "high degree of care" in investigating and independently verifying an issuer's representations and claims.[16] Indeed, when an issuer seeks to finance a new speculative venture, BDs "must be particularly careful in verifying the issuer's obviously self-serving statements."[17]

The fact that a BD's customers may be sophisticated and knowledgeable does not obviate the duty to investigate.[18] Moreover, in Regulation D offerings the SEC advises issuers to provide the same information to accredited investors as they are required to provide to non-accredited investors, in view of the antifraud provisions.[19]

### B. FINRA Suitability Obligations

NASD Rule 2310 states that a BD must have reasonable grounds to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer.[20] This analysis has two principal components. First, the "reasonable basis" suitability analysis requires the BD to have a reasonable basis to believe, based on a reasonable investigation, that the recommendation is suitable for at least some investors. Second, the "customer specific suitability" analysis requires that the BD determine whether the security is suitable for the customer to whom it would be recommended.[21]

In the context of a Regulation D offering, Rule 2310 requires broker-dealers to conduct a suitability analysis when recommending securities to both accredited and non-accredited investors that will take into account the investors' knowledge and experience. The fact that an investor meets the net worth or income test for being an accredited investor is only one factor to be considered in the course of a complete suitability analysis. The BD must make reasonable efforts to gather and analyze information about the customer's other holdings, financial situation and needs, tax status, investment objectives and such other information that would enable the firm to make its suitability determination. A BD also must be satisfied that the customer "fully understands the risks involved and is...able...to take those risks."[22]

In order to ensure that it has fulfilled its suitability responsibilities, a BD in a Regulation D offering should, at a minimum, conduct a reasonable investigation concerning:

- the issuer and its management;
- the business prospects of the issuer;
- the assets held by or to be acquired by the issuer;
- the claims being made; and
- the intended use of proceeds of the offering.[23]

A BD must conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer.[24]

### C. Specific Issues Related to a BD's Responsibilities

The scope of a BD's investigation will necessarily depend upon a number of factors, including the BD's affiliation with the issuer, its role in the transaction, and other facts and circumstances of the offering, including whether the offerees are retail customers or more sophisticated institutional investors.

#### 1. BD That Is Affiliated With the Issuer

A BD that is an affiliate of an issuer in a Regulation D offering must ensure that its affiliation does not compromise its independence as it performs its investigation.[25] The BD must resolve any conflict of interest that could impair its ability to conduct a thorough and independent investigation. Indeed, its affiliation with the issuer typically would raise expectations by its customers, particularly some retail customers, that the BD has special expertise concerning the issuer.[26]

#### 2. BD That Prepares the Private Placement Memorandum

A BD that prepares the private placement memorandum or other offering document has a duty to investigate securities offered under Regulation D and representations made by the issuer in the private placement memorandum or other offering document.[27] In a recent enforcement action, FINRA found that a BD that prepared a private placement memorandum containing material misstatements and omissions about such matters as the amount and timing of distributions and the targeted return of principal to investors violated FINRA Rule 2010, which requires BDs to comply with just and equitable principles of trade.[28]

A BD that assists in the preparation of a private placement memorandum or other offering document should expect that it will be considered a communication with the public by that BD for purposes of NASD Rule 2210, FINRA's advertising rule. If a private placement memorandum or other offering document presents information that is not fair and balanced or that is misleading, then the BD that assisted in its preparation may be deemed to have violated NASD Rule 2210. Moreover, sales literature concerning a private placement that a BD distributes will generally be deemed to constitute a communication by that BD with the public, whether or not the BD assisted in its preparation.

3. **The Presence of Red Flags**

In the course of a reasonable investigation, a BD must note any information that it encounters that could be considered a "red flag" that would alert a prudent person to conduct further inquiry. Red flags might arise from information that is publicly available or information that is discovered during the course of the investigation. A BD's reasonable investigation responsibilities would obligate it to follow up on any red flags that it encounters during its inquiry as well as to investigate any substantial adverse information about the issuer.[29]

When presented with red flags, the BD must do more than simply rely upon representations by issuer's management, the disclosure in an offering document or even a due diligence report of issuer's counsel. In *Kunz and Cline*, the SEC found that the broker could not justifiably rely on financial statements in private placement memoranda that had been audited and certified by an accountant when numerous "red flags" indicated that the financial statements were inaccurate.[30] The broker had a duty, which it failed to discharge, to conduct a further, independent investigation of the financial condition of the issuer under the circumstances. The SEC also found that the broker acted contrary to just and equitable principles of trade when the private placement memorandum failed to disclose both the broker's consulting relationship with the issuer and the litigation history of the issuer's president and CEO.

An issuer's refusal to provide a broker-dealer with information that is necessary for the broker-dealer to meet its duty to investigate could itself constitute a red flag. If an issuer is not forthcoming with information requested by a broker-dealer (or provides information that is non-responsive or out-of-date), the broker-dealer must determine whether sufficient information is otherwise obtainable. While issuers are not required to provide accredited investors with a private placement memorandum in order to qualify for the exemptions in Rule 505 or Rule 506, these memoranda typically are used in Regulation D offerings and firms may need to consider whether the absence of a private placement memorandum itself might constitute a red flag.

4. **Reliance on Counsel and Syndicate Managers**

A BD may retain counsel or other experts to assist the firm in undertaking and fulfilling its reasonable investigation obligation. A BD must carefully review the qualifications and competency of counsel or experts retained to perform an investigation on its behalf[31] and must ensure that all gaps or omissions in the investigation by such counsel or experts are separately addressed by the BD. Moreover, the use of counsel or experts does not necessarily complete the BD's investigation responsibilities, insofar as a review of the counsel's or expert's report may identify issues or concerns that require further investigation by the BD.

It may be appropriate in a Regulation D offering in which a BD is merely a member of a syndicate or selling group to rely upon a reasonable investigation by the syndicate manager, provided the BD has reason to believe that the syndicate manager has the expertise and absence of conflicts to engage in a thorough and independent inquiry, and that it has in fact performed such an inquiry with respect to the particular Regulation D offering. Any BD who intends to rely upon the efforts of a syndicate manager should meet with the manager, obtain a description of the manager's reasonable investigation efforts, and ask questions of the manager concerning the independence and thoroughness of the manager's exercise of its responsibilities. A BD that relies upon the efforts of the syndicate manager retains its own responsibilities, to the extent that they are not addressed by the syndicate manager's efforts. For example, if there is reason to believe that the syndicate manager has not addressed a particular issue, then each BD participating in the offering will be responsible to the extent that it implicates the BD's own suitability analysis.

**D. Supervision**

A firm that engages in Regulation D offerings must have supervisory procedures under NASD Rule 3010 that are reasonably designed to ensure that the firm's personnel, including its registered representatives:

- engage in an inquiry that is sufficiently rigorous to comply with their legal and regulatory requirements;
- perform the analysis required by NASD Rule 2310;
- qualify their customers as eligible to purchase securities offered pursuant to Regulation D; and
- do not violate the antifraud provisions of the federal securities laws or FINRA rules in connection with their preparation or distribution of offering documents or sales literature.

These procedures must be reasonably designed to ensure that each Regulation D offering is properly supervised before it is marketed to other firms or sold directly to customers.[32]

**E. Documentation of Reasonable Investigation**

To demonstrate that it has performed a reasonable investigation, a BD should retain records documenting both the process and results of its investigation. Such records may include descriptions of the meetings that were conducted in the course of the investigation, including meetings with the issuer or other parties, the tasks performed, the documents and other information reviewed, the results of such reviews, the date such events occurred, and the individuals who attended the meetings or conducted the reviews.

## III. Reasonable Investigation Practices

A BD's reasonable investigation must be tailored to each Regulation D offering in a manner that best ensures that it meets its regulatory responsibilities. Accordingly, a single checklist of possible practices for a BD engaged in a Regulation D offering will not suffice for every offering, and mechanical reliance upon a single checklist may result in an inadequate investigation. Nevertheless, we are providing a list of practices that some firms have adopted to help them adequately discharge their responsibilities. Many of the practices described below are designed to satisfy BDs' regulatory requirements. These practices are especially relevant to Regulation D offerings of securities of companies that are non-reporting under the Securities Exchange Act.

Industry participants that we surveyed described the following as practices that help ensure they meet their reasonable investigation obligations.

### A. Issuer and Management

Reasonable investigations of the issuer and its management concerning the issuer's history and management's background and qualifications to conduct the business might include:

- Examining the issuer's governing documents, including any charter, bylaws and partnership agreement, noting particularly the amount of its authorized stock and any restriction on its activities. If the issuer is a corporation, a BD might determine whether it has perpetual existence.
- Examining historical financial statements of the issuer and its affiliates, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management.
- Looking for any trends indicated by the financial statements.
- Inquiring about the business of affiliates of the issuer and the extent to which any cash needs or other expectations for the affiliate might affect the business prospects of the issuer.
- Inquiring about internal audit controls of the issuer.
- Contacting customers and suppliers regarding their dealing with the issuer.
- Reviewing the issuer's contracts, leases, mortgages, financing arrangements, contractual arrangements between the issuer and its management, employment agreements and stock option plans.

- Inquiring about past securities offerings by the issuer and the degree of their success while keeping in mind that simply because a certain product or sponsor historically met obligations to investors, there are no guarantees that it will continue to do so, particularly if the issuer has been dependent on continuously raising new capital. This inquiry could be especially important for any blind pool or blank-check offering.
- Inquiring about pending litigation of the issuer or its affiliates.
- Inquiring about previous or potential regulatory or disciplinary problems of the issuer. A BD might make a credit check of the issuer.
- Making reasonable inquiries concerning the issuer's management. A BD might inquire about such issues as the expertise of management for the issuer's business and the extent to which management has changed or is expected to change. For example, a BD might inquire about any regulatory or disciplinary history on the part of management and any loans or other transactions between the issuer or its affiliates and members of management that might be inappropriate or might otherwise affect the issuer's business.
- Inquiring about the forms and amount of management compensation, who determines the compensation and the extent to which the forms of compensation could present serious conflicts of interest. A BD might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of the issuer.
- Inquiring about the length of time that the issuer has been in business and whether the focus of its business is expected to change.

**B. Issuer's Business Prospects**

Reasonable investigations of the issuer's business prospects, and the relationship of those prospects to the proposed price of the securities being offered, might include:

- Inquiring about the viability of any patent or other intellectual property rights held by the issuer.
- Inquiring about the industry in which the issuer conducts its business, the prospects for that industry, any existing or potential regulatory restrictions on that business and the competitive position of the issuer.
- Requesting any business plan, business model or other description of the business intentions of the issuer and its management and their expectations for the business, and analyzing management's assumptions upon which any business forecast is based. A BD might test models with information from representative assets to validate projected returns, break-even points and similar information provided to investors.

- Requesting financial models used to generate projections or targeted returns.
- Maintaining in the BD's files a summary of the analysis that was performed on financial models provided by the issuer that detail the results of any stress tests performed on the issuer's assumptions and projections.

**C. Issuer's Assets**

Reasonable investigations of the quality of the assets and facilities of the issuer might include:

- Visiting and inspecting a sample of the issuer's assets and facilities to determine whether the value of assets reflected in the financial statements is reasonable and that management's assertions concerning the condition of the issuer's physical plants and the adequacy of its equipment are accurate.
- Carefully examining any geological, land use, engineering or other reports by third-party experts that may raise red flags.
- Obtaining, with respect to energy development and exploration programs, expert opinions from engineers, geologists and others are necessary as a basis for determining the suitability of the investment prior to recommending the security to investors.

## Endnotes

1 As a general matter, any reference in this *Notice* to the obligations of a BD firm is also intended to cover the concomitant responsibilities of any registered representative who recommends a Regulation D offering to his/her customers and any registered principal who is charged by his/her firm with supervising this registered representative.

2 Office of the Inspector General, Securities and Exchange Commission, *Regulation D Exemption Process 2* (March 31, 2009).

3 *See, e.g.*, Provident Asset Management, LLC, FINRA Case No. 2009017497201 (2010); *Pacific Cornerstone Capital, Inc.* FINRA AWC No. 2007010591701 (2009).

4 A note to Rule 502(b)(1) states that when an issuer provides required information to any non-accredited investor, it should consider providing the information to accredited investors, too, "in view of the anti-fraud provisions of the federal securities laws."

5 *See Hanly v. SEC*, 415 F.2d 589, 595-96 (2d. Cir. 1969); *SEC v. Great Lake Equities Co.*, 1990 U.S. Dist. LEXIS 19819 at *16-17 (E.D. Mich. 1990); *SEC v. North American Research and Development Corp.*, 424 F.2d 63,84 (2d Cir. 1970). *See also SEC v. Current Financial Services, Inc.*, 100 F. Supp. 2d 1, 14-15 (D.D.C. 2000); *District Business Conduct Committee for District No. 4 v. Everest Securities, Inc., 1994 NASD Discip. Lexis 188* (Sept. 2, 1994), *aff'd*, 52 S.E.C.

© 2010 FINRA. All rights reserved. FINRA and other trademarks of the Financial Industry Regulatory Authority, Inc. may not be used without permission. *Regulatory Notices* attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

## **Endnotes** continued

958, 962-63 (Aug. 26, 1996), *aff'd*, 116 F. 3d 1235 (8th Cir. 1997); Securities Act Release No. 4445, 27 Fed. Reg. 1415 (Feb. 2, 1962).

6 *Hanly, supra* note 5 at 597.

7 *See generally Hanly, supra* note 5.

8 *See Everest Securities, Inc*, supra note 5.

9 *See Hanly, supra* note 5. *See also University Hill Foundation v. Goldman, Sachs & Co.*, 422 F. Supp. 879, 898 (S.D.N.Y. 1976).

10 *Hanly, supra* note 5 at 597.

11 *University Hill Foundation, supra* note 9 at 898.

12 *See, e.g., SEC v. Milan Capital Group, Inc.*, 2000 U.S. Dist. LEXIS 16204 (S.D.N.Y. 2000), where the court held that the duty to independently investigate is greater "where promotional materials are in some ways questionable, for example by promising unusually high returns."

13 *See Hanly, supra* note 5 at 597 ("Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information"). *See also* Securities Act Release No. 4445, *supra* note 5; *Regulatory Notice 09-05* (Guidance to Member Firms Participating in Unregistered Resales of Restricted Securities) (January 2009).

14 *Hanly, supra* note 5 at 597. The duty of inquiry under the antifraud provisions is distinguished from the "reasonable investigation" that, under Section 11(b) of the Securities Act, permits an underwriter to escape liability for misrepresentations in a registration statement. Courts have compared the Section 11 reasonable investigation and the BD's general duty to investigate and concluded that "somewhat more is required of an underwriter than a broker to discharge its obligation to the investing public." *University Hill Foundation, supra* note 9 at 898-99. This is because "an underwriter's relationship to the issuer is more substantial" than a BD that is only recommending a security, and the underwriter "plays a more central role in the marketing process." *Id.*

15 *See Everest Securities, Inc.* v. US, supra note 5 at 1239 ("reliance on others does not excuse [the respondents] own lack of investigation").

16 *Everest Securities, Inc., supra* note 5 at 963.

17 *Everest Securities, Inc., supra* note 5 at 963.

18 *Hanly* at 596, *supra* note 5.

19 Note to Rule 502(b)(1).

20 FINRA has previously discussed the responsibilities of a BD to conduct a reasonable investigation of securities it is recommending. *See, e.g., Notice to Members 03-71* (concerning non-conventional investments)(November 2003); *Notice to Members 05-18* (concerning private placements of tenants-in-common interests) (March 2005).

21 *F.J. Kaufman & Co.*, 50 S.E.C. 164, 168-69 (Dec. 13, 1989). *See also In the Matter of Michael Frederick Siegel*, Securities Exchange Act Release No. 58737 (October 6, 2008), 2008 SEC Lexis 2459, at *28.

22 *See James B. Chase*, 56 S.E.C. 149, 159 (2003).

23 BDs should analyze whether the investor's money is likely to be applied according to the stated use of proceeds, and whether the stated use of proceeds is reasonable in light of the issuer's business purpose and prospects. *See In Re Brian Prendergast*, 2001 SEC LEXIS 1533 (August 1, 2001); *Legend Merchant Group, Inc.*, NASD No. C10030058, summarized in NASD Disciplinary Actions (July 2004); *Shelman Securities, Inc.*, NASD No. C06030013, summarized in NASD Disciplinary Actions (February 2004).

## **Endnotes** continued

24 *See, e.g., Shelman Securities, supra* note 23 (private placement memoranda contained material misrepresentations and omissions about use of proceeds in a previous offering).

25 *See In the Matter of C. Gilman Johnston*, 42 S.E.C. 217 (Aug. 14, 1964) (broker-dealer's control person prepared memorandum describing broker-dealer's own "highly speculative" securities without any reasonable basis for believing that the securities were suitable for some purchasers). *See generally Pacific Cornerstone Capital, supra* note 3 at 10 (person providing information for and reviewing and approving private placement memorandum and sales literature was BD's control person and issuer's founder). Regulation D generally prohibits a broker or other person that is affiliated with the issuer from serving as a purchaser representative to an investor. *See* Rule 501(h)(1)(definition of "purchaser representative").

26 *Cf.* FINRA Rule 5122 (requiring members to comply with certain requirements when engaging in private placement of securities issued by the member or a control entity).

27 *SEC v. Kunz and Cline Investment Management, Inc.* Admin. Proc. File No. 3-9960, *aff'd* 2003 U.S. App. LEXIS 6011 (10th Cir. 2003) (unpublished opinion).

28 *Pacific Cornerstone Capital, Inc., supra* note 3.

29 *Everest Securities, Inc. v. SEC, supra* note 5 at 1239 (finding "the investigation that was performed was itself insufficient," and even a cursory investigation would have uncovered facts showing offering memorandum was materially misleading).

30 *Kunz and Cline*, supra note 27.

31 *See Notice to Members 05-48* (Members' Responsibilities When Outsourcing Activities to Third-Party Service Providers) (July 2005) (discussing a member's accountability and supervisory responsibility for outsourced functions).

32 *Pacific Cornerstone Capital, Inc., supra* note 3 at 9.

# EXHIBIT "E"

FINRA



2018 EXAMINATION FINDINGS REPORT

*December 7, 2018*

# Reasonable Diligence for Private Placements

FINRA has observed instances where some firms that have suitability obligations under FINRA Rule 2111 (Suitability) failed to conduct reasonable diligence on private placements and failed to meet their supervisory requirements under FINRA Rule 3110 (Supervision). *FINRA Regulatory Notice 10-22* describes the circumstances under which firms have an obligation to conduct a "reasonable investigation" by evaluating "the issuer and its management; the business prospects of the issuer; the assets held by or to be acquired by the issuer; the claims being made; and the intended use of proceeds of the offering."

FINRA has observed that firms that performed reasonable diligence conducted meaningful, independent research on material aspects of the offering; identified any red flags with the offering or the issuer; and addressed and resolved concerns that would be relevant to a potential investor. Depending on their size, firms' diligence processes included creating a due diligence committee (at larger firms) or otherwise formally designating one or more qualified persons (at smaller firms), and charging them with investigating and determining whether to approve the offering for sale to investors. As part of their process, firms independently verified information that was key to the performance of the offering, and some received support from due diligence firms, experts and third-party vendors.

Further, in offerings involving issuers that were affiliates of the firm or whose control persons were also employed by the firm, firms used the reasonable diligence process to mitigate conflicts of interest, ensured that the offerings were suitable for investors in spite of such conflicts of interest, and developed comprehensive disclosures. Firms also used insights from the diligence analysis to establish post-approval processes and investment limits based on the complexity or risk level of the offering. After the offering, firms conducted ongoing diligence to ascertain whether offering proceeds were used in a manner consistent with the offering memorandum, particularly when the firms engaged in ongoing sales of an offering after initial closing.

FINRA reminds firms conducting diligence required by the reasonable-basis suitability obligations to document both the "process and results" of such reasonable diligence analysis.[14] Although firms may use a risk-based approach to documenting compliance with the suitability rule,[15] even when

using such an approach, firms ordinarily would be expected to document their diligence efforts regarding recommendations of private placements.

# Selected Examination Findings

FINRA has observed instances where some firms' reasonable diligence was not sufficient in scope or depth to be considered a "reasonable investigation of the issuer and the securities."

- **No Reasonable Diligence** – Some firms failed to perform reasonable diligence on private placement offerings prior to recommending the offerings to retail investors. In some instances, firms performed no additional research about new offerings because they relied on their experience with the same issuer in previous offerings. In other instances, some firms reviewed the offering memorandum and other relevant offering documentation, but did not discuss the offering in greater detail with the issuer or independently verify, research or analyze material aspects of the offerings. FINRA also observed that some firms did not investigate red flags identified during the reasonable diligence process. For example, in offerings involving conservation tax easements,[16] some firms did not investigate red flags that included, but were not limited to, significant risk of the Internal Revenue Service (IRS) disallowing tax deductions, as well as concerns regarding land appraisals.
- **Overreliance on Third Parties** – Where some firms obtained and reviewed due diligence reports provided by due diligence consultants, experts or other third-party vendors, they sometimes did not

independently evaluate the third parties' conclusions, respond to red flags or significant concerns noted in the reports, or address concerns regarding the issuer or the offering that were apparent outside the context of the report.

- **Potentially Conflicted Third-Party Due Diligence** – Some firms used third-party due diligence reports that issuers paid for or provided in their due diligence analysis. While some of these reports provided valuable and relatively objective information, in some cases, firms did not consider the related conflicts of interest in their evaluation and assessment of the reports' conclusions and recommendations.

# End Notes

14 *See FINRA Regulatory Notice 10-22*.

15 *See* FINRA Rule 2111 (Suitability) FAQ, Question A3.1 ("The suitability rule allows firms to take a risk-based approach with respect to documenting suitability determinations. For example, the recommendation of a large-cap, value-oriented equity security generally would not require written documentation as to the recommendation. In all cases, the suitability rule applies to recommendations, but the extent to which a firm needs to evidence suitability generally depends on the complexity of the security or strategy in structure and performance and/or the risks involved.")

16 Land conversation easements are unique private offerings structured to generate land conservation charitable contribution tax deductions for investors.

**Previous:**
Fixed Income Mark-up Disclosure
**Up:**
Reasonable Diligence for Private Placements
**Next:**
Abuse of Authority

DOWNLOAD AS PDF

Rules & Guidance
Registration,
Exams & CE
Events & Training
Filing & Reporting
Compliance Tools
For Investors

ABOUT FINRA
CAREERS
BROKERCHECK
DATA
MEDIA CENTER
FOR FIRMS

ARBITRATION & MEDIATION
FINRA operates the largest securities dispute

CONTACT US

General Inquiries

301-590-6500

Securities Helpline for Seniors®

844-574-3577 (Mon-Fri 9am-5pm ET)

File a Regulatory Tip

To report on abuse or fraud in the industry

File an Investor Complaint

File a complaint about fraud or unfair practices.

Small Firm Help Line

833-26-FINRA (Mon-Fri 9am-6pm ET)

Office of the Ombuds

Report a concern about FINRA at 888-700-0028

SITE MAP

TRANSLATE

PRIVACY POLICY

CONTACT

TERMS OF USE

©2024 FINRA. All Rights Reserved.

FINRA IS A REGISTERED TRADEMARK OF THE FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.

# EXHIBIT “F”

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| TERRA PROPERTY TRUST, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>NB JV PARTNER, LLC, NELSON BROTHERS PROPERTY MANAGEMENT, INC., NELSON BROTHERS PROFESSIONAL REAL ESTATE, LLC, PATRICK NELSON, BRIAN NELSON, and DOES 1-10, inclusive,<br><br>Defendants. | Index No. ________________<br><br>Date Purchased: ________________<br><br>**SUMMONS**<br><br>Venue is proper under CPLR §§ 302 and 503(a) |

**To the above named Defendants:**

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve notice of appearance, on the Plaintiff's attorney within 20 days after service of this summons, exclusive of the date of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is under CPLR §§ 302 and 503(a) because (i) the parties' Credit Agreement and Guaranty contain New York, New York choice-of-law and choice-of-venue provisions; and (ii) Defendants have transacted business within the State, including acts related to the Credit Agreement and Guaranty at issue.

DATED: March 15, 2019

**GROSSMAN LLP**

By: ______________________________

Judd B. Grossman, Esq.
jgrossman@grossmanllp.com
745 Fifth Avenue - 5th Floor
New York, New York 10151
Telephone: (646) 770-7445
Facsimile: (646) 417-7997

-and-

David M. Rownd
drownd@thompsoncoburn.com
THOMPSON COBURN LLP
157 East 86th Street, Suite 204
New York, New York 10028
Telephone: (312) 933-6608
Facsimile: (312) 580-2201

*Attorneys for Plaintiff*
*Terra Property Trust, Inc.*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| TERRA PROPERTY TRUST, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>NB JV PARTNER, LLC, NELSON BROTHERS PROPERTY MANAGEMENT, INC., NELSON BROTHERS PROFESSIONAL REAL ESTATE, LLC, PATRICK NELSON, BRIAN NELSON, and DOES 1-10, inclusive,<br><br>Defendants. | Index No. ________________<br><br>**COMPLAINT** |

Plaintiff Terra Property Trust, Inc. ("Terra Property" or "Plaintiff") for its claims against Defendants NB JV Partner, LLC, formerly known as NB Stadium View, LLC ("NB JV"), Nelson Brothers Property Management, Inc. ("Nelson Property Management"), Nelson Brothers Professional Real Estate, LLC ("Nelson Professional"), Patrick Nelson, and Brian Nelson (collectively, "Defendants") respectfully alleges as follows:

**NATURE OF THE ACTION**

1. Plaintiff brings this action against Defendant NB JV for breach of a Credit Agreement between Plaintiff and NB JV, and against the remaining Defendants for breach of a related Guaranty.

**PARTIES, JURISDICTION AND VENUE**

2. Plaintiff Terra Property Trust, Inc. is a corporation organized and existing under the laws of the State of Maryland with its principal place of business in New York, New York.

3. Defendant Nelson Property Management is a corporation organized and existing under the laws of the State of California with its principal place of business in Aliso Viejo, California.

4. Defendant Nelson Professional is a limited liability company organized and existing under the laws of the State of California with its principal place of business in Aliso Viejo, California.

5. Defendant NB JV is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Aliso Viejo, California.

6. Upon information and belief, Defendant Patrick Nelson is an individual who is a resident of Aliso Viejo, California.

7. Upon information and belief, Defendant Brian Nelson is an individual who is a resident of Mission Viejo, California.

8. Plaintiff is unaware of the names and true capacities of DOES 1 through 10, inclusive, and therefore sues them by their fictitious names. Plaintiff will seek leave to amend this complaint when their true names and capacities are ascertained. Plaintiff is informed and believes, and based thereon alleges, that said DOES 1 through 10, inclusive, are in some manner responsible for the wrongs alleged herein and, that at all times referenced, each Defendant was the agent and servant of the other Defendants and was acting within the course and scope of said agency and employment.

9. This Court has personal jurisdiction over the Defendants under CPLR § 302 because Defendants have transacted business within the State, including acts related to the Credit Agreement and Guaranty at issue, and the Credit Agreement and Guaranty contain a New York choice-of-law provision.

10. Venue is proper in this County under CPLR § 503(a) because the Credit Agreement and Guaranty contain a New York, New York choice-of-venue provision.

**FIRST CAUSE OF ACTION**

**Breach of Contract**
**(Against Defendant NB JV and DOES 1 through 5)**

11. Plaintiff specifically realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 10 hereof.

12. On or about July 27, 2016, Plaintiff entered into a Credit Agreement with Defendant NB JV. A true and correct copy of the Credit Agreement, as amended (the " Credit Agreement") is attached as Exhibit "A."

13. Plaintiff has performed all of its obligations under the Credit Agreement, except for those excused by the material breaches of Defendants.

14. On or about February 1, 2019, Defendant NB JV and DOES 1-5 breached the terms of the Credit Agreement by failing and refusing to pay the amounts due, in the principal amount of $3,903,358, plus interest and late charges.

15. As a direct and proximate result of such conduct, Plaintiff has sustained damages in an amount to be determined at trial, but in no event less than $4,300,000.

**SECOND CAUSE OF ACTION**

**Breach of Guaranty**
**(Against Defendants Nelson Property Management, Nelson Professional, Patrick Nelson and Brian Nelson and Does 6 through 10)**

16. Plaintiff specifically realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 15 hereof.

17. On or about July 27, 2016, Defendants Nelson Property Management, Nelson Professional, Patrick Nelson, and Brian Nelson executed and delivered to Plaintiff a Guaranty (the "Guaranty"). A true and correct copy of the Guaranty is attached as Exhibit "B."

18. Plaintiff has at all times performed its obligations under the Guaranty, except for such terms and conditions as have been waived or excused by the conduct and breaches of Defendants.

19. On or about February 1, 2019, Defendants Nelson Property Management, Nelson Professional, Patrick Nelson, Brian Nelson, and DOES 6-10 breached the terms of the Guaranty by failing and refusing to pay the amounts due, in excess of $4,300,000.

20. As a direct and proximate result of such conduct, Plaintiff has sustained damages in an amount to be determined at trial, but in no event less than $4,300,000.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Terra Property Trust, Inc. respectfully requests that the Court enter a judgment: (1) awarding compensatory damages in an amount to be determined at trial, but in no event less than $4,300,000; (2) awarding interest and late charges at the maximum legal rate; (3) awarding attorney's fees and costs; and (4) granting any other and further relief as the Court may deem just and proper.

DATED: March 15, 2019

**GROSSMAN LLP**

By: ______________________

Judd B. Grossman, Esq.
jgrossman@grossmanllp.com
745 Fifth Avenue - 5th Floor
New York, New York 10151
Telephone: (646) 770-7445
Facsimile: (646) 417-7997

-and-

David M. Rownd
drownd@thompsoncoburn.com
THOMPSON COBURN LLP
157 East 86th Street, Suite 204
New York, New York 10028
Telephone: (312) 933-6608
Facsimile: (312) 580-2201

*Attorneys for Plaintiff*
*Terra Property Trust, Inc.*

# EXHIBIT A

CREDIT AGREEMENT

between

NB Stadium View, LLC

a California limited liability company
as Debtor

and

Terra Property Trust, Inc.,
a Maryland Corporation,
as Creditor

---

Dated as of July 27, 2016

---

11220834.10

# GUARANTY

THIS GUARANTY (this "**Guaranty**") is made as of July 27, 2016 by Nelson Brothers Property Management, Inc., a California corporation, NB Stadium View, LLC, a Delaware limited liability company ("**Debtor**"), Patrick Nelson, Brian Nelson, and Nelson Brothers Professional Real Estate, LLC, a California limited liability company (individually, a "**Guarantor**"; collectively, "**Guarantors**"), in favor of Terra Property Trust, Inc., a Maryland corporation ("**Creditor**").

## RECITALS

WHEREAS, Debtor and Creditor have or will enter into that certain Credit Agreement between even date herewith (the "**Credit Agreement**"). Any capitalized terms not otherwise defined in this Guaranty shall have the meaning provided in the Credit Agreement;

WHEREAS, Creditor has made, or committed to make, a "Preferred Equity Investment" (as defined in the Credit Agreement), in an amount up to Eight Million Dollars ($8,000,000) in NB Stadium View JV, a Delaware limited liability company (the "**Initial Preferred Equity Investment**") pursuant to the Credit Agreement and the applicable "Preferred Equity Operating Agreement" (as defined in the Credit Agreement);

WHEREAS, Creditor may make additional Preferred Equity Investments;

WHEREAS, each of the Guarantors acknowledges that each Guarantor will receive substantial benefit from the making of the Initial Preferred Equity Investment and Creditor's entry into the Credit Agreement; and

WHEREAS, it is a condition precedent to Creditor's entering into the Credit Agreement and making the Initial Preferred Equity Investment that each Guarantor enter into this Guaranty (and Creditor would not enter into the Credit Agreement or make the Initial Preferred Equity Investment without this Guaranty);

NOW THEREFORE, to induce Creditor to enter into the Credit Agreement and make the Initial Preferred Equity Investment, and in consideration thereof, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Guarantors unconditionally covenants, guarantees and agrees, jointly and severally as follows:

1. Guaranty.

(a) Each of the Guarantors hereby irrevocably and unconditionally guarantees to Creditor and its successors and assigns the payment and performance of the Guaranteed Obligations (as defined herein) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Each of the Guarantors hereby irrevocably and unconditionally covenants and agrees that Guarantors is liable for the Guaranteed Obligations as a primary obligor. Each of the Guarantors further agrees to indemnify, defend, protect and hold Creditor harmless from any against any cost (including reasonable attorneys' fees and costs), loss, damage, or claim arising out of the failure of any of the Guaranteed Obligations to be performed.

(b) As used herein, the term "**Guaranteed Obligations**" means the timely payment and performance of all obligations in favor of Creditor under the Credit Agreement, the "Related Documents" (as defined in the Credit Agreement), and each Preferred Equity Operating Agreement entered into by Creditor (as all such documents may be modified or amended from time to time).

2. Remedies. If any Guarantor fails to promptly pay any of the Guaranteed Obligations, Creditor may from time to time, and without first requiring payment by any Debtor Party, bring

any action at law or in equity or both to compel any or all of the Guarantors to pay the Guaranteed Obligations, and to collect in any such action compensation for all loss, cost, damage, injury and expense sustained or incurred by Creditor as a direct or indirect consequence of the failure of any of the Guarantors to pay the Guaranteed Obligations together with interest thereon at the "Default Rate" (as defined in the Credit Agreement)

3. Rights of Creditor. Each of the Guarantors authorizes Creditor, without giving notice to any of the Guarantors or obtaining any of the Guarantors' consent and without affecting the liability of any of the Guarantors, from time to time to: (a) terminate, renew or extend all or any portion of any of the obligations under the Credit Agreement, any other Related Documents and any Preferred Equity Operating Agreement (collectively, the "**Credit Documents**") ; (b) declare all amounts owing to Creditor under any of the Credit Documents due and payable upon the occurrence of an "Event of Default" (as defined in the Credit Agreement) or otherwise as permitted under the Credit Documents or applicable law; (c) make changes in the dates specified for payments of any sums payable under any of the Credit Documents; (d) otherwise modify or amend the terms of any of the Credit Documents; (e) take and hold security for the performance of any obligation to Creditor under any of the Credit Documents and exchange, enforce, waive and release any such security; (f) apply such security and direct the order or manner of sale thereof as Creditor in its sole discretion may determine; (g) release, substitute or add any one or more endorsers of any of the Credit Documents or guarantors of any obligations in favor of Creditor under any of the Credit Documents; (h) apply payments received by Creditor under any of the Credit Documents in such order as Creditor shall determine in its sole and absolute discretion; (i) assign this Guaranty (and any of the Credit Documents) in whole or in part; and (j) assign, transfer or negotiate all or any part of the Guaranteed Obligations.

4. Guarantors' Waivers.

(c) Each of the Guarantors waives:

(i) any defense based upon any legal disability or other defense of any Person (including any of the "Debtor Parties" (as defined in the Credit Agreement) from any cause;

(ii) any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of any Debtor Parties or any member of any Debtor Parties or any defect in the formation of any Debtor Parties or member of any Debtor Parties;

(iii) any defense based upon the application by any Debtor Parties (or any "Preferred Entity" (as defined)) of the proceeds of any Preferred Equity Investment for purposes other than the purposes represented any Debtor Party or Preferred Entity to Creditor or intended or understood by Creditor or any Guarantor;

(iv) any defense based upon Creditor's or any Preferred Entity's election of (or election not to pursue) any remedy against any Guarantor or any other Debtor Party or Preferred Entity or any of them, whether or not such defense might otherwise be available under applicable law;

(v) any defense based upon Creditor's, any Debtor Party or any Preferred Entity's failure to disclose to any Guarantor any information concerning the financial condition or any other circumstances bearing on any Debtor Party's ability to pay all sums payable under or to otherwise fully perform the obligations in favor of Creditor in accordance with the Credit Agreement, any Related Documents and any Preferred Equity Operating Agreement;

(vi) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal;

(vii) any defense based upon Creditor's or any other Person's election of the application of Section 1111(b)(2) of the Bankruptcy Code or any similar provision of any successor statute;

(viii) any defense based upon any borrowing or any grant of a security interest under Section 364 of the Bankruptcy Code;

(ix) any and all rights and defenses, including, without limitation, any rights of subrogation, reimbursement, indemnification and contribution, which might otherwise be available to any Guarantor under any applicable laws, any right to enforce any remedy which Creditor may have against any Debtor Party or Preferred Entity and any right to participate in, or benefit from, any security therefore;

(x) presentment, demand, protest and notice of any kind;

(xi) the benefit of any statute of limitations affecting the liability of any Guarantor hereunder or the enforcement hereof; and

(xii) any defense whether otherwise available to any Guarantor under any applicable laws, based upon Creditor's election to (or election not to) pursue any remedy against all or any collateral, if any, securing any of the obligations in favor of Creditor.

(d) Each Guarantor agrees that the payment of all amounts owed to Creditor by any Preferred Entity or Debtor Party or any other act that tolls any statute of limitations applicable to any obligations in favor of Creditor shall similarly operate to toll the statute of limitations applicable to each Guarantor's liability hereunder.

5. <u>Guarantors' Representations, Warranties, Acknowledgments and Covenants</u>. Each Guarantor represents, warrants, acknowledges and covenants, jointly and severally, that:

(a) (i) Each Guarantor has the legal capacity to execute and deliver this Guaranty and to perform its obligations in accordance with the terms hereof; and (ii) this Guaranty constitutes the legal, valid and binding obligation of each of the Guarantors, enforceable in accordance with the terms hereof, subject to the effect of any applicable bankruptcy or similar law affecting creditors' rights generally and to the effect of general principles of equity;

(b) There are no conditions precedent to the effectiveness of this Guaranty, and this Guaranty shall be in full force and effect and binding on each Guarantor regardless of whether Creditor obtains other collateral or any guaranties from others or takes any other action contemplated by any Guarantor or under the Credit Agreement, any Related Document or any Preferred Equity Operating Agreement;

(c) Each of the Guarantors (i) has established adequate means of obtaining from sources other than Creditor on a continuing basis financial and other information pertaining to each Debtor Party's and each Preferred Entity's financial condition and the status of each Debtor Party's performance of obligations imposed by the Credit Agreement, any Related Document or any Preferred Equity Operating Agreement, (ii) agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect any Guarantor's risks hereunder, and (iii) acknowledges that Creditor has made no representation to anyGuarantor as to any such matters;

(d) All tax returns required to be filed by or on behalf of each Guarantor have been filed and all taxes payable by or on behalf of Guarantor have been paid;

(e) The obligations of each Guarantor hereunder rank and will continue to rank at least pari passu (in priority of payment, security and otherwise) with all other unsecured obligations of whatsoever nature in respect of borrowed money (including guarantees and other contingent obligations) of such Guarantor outstanding from time to time;

(f) No Guarantor is involvent (as such term is defined in Section 101(32) of the Bankruptcy Code) and will not be rendered insolvent (as so defined) by execution of this Guaranty or by the consummation of the transactions contemplated hereby;

(g) None of the Guaranteed Obligations are usurious and no Guarantor has nor will have any counterclaim, offset or defense with respect to any of the Guaranteed Obligations or with respect to this Guaranty hereunder, or any other related agreement, instrument or document to which Guarantor is a party;

(h) No Guarantor will convey, transfer or assign, directly or indirectly, property of any nature, whether real, personal or mixed, tangible or intangible, or any interest therein, for less than fair market value, including, without limitation, transfers to any entities controlled by such Guarantor;

(i) The most recent financial statements of each Guarantor previously delivered to Creditor are true and correct in all material respects, have been prepared in accordance with sound and prudent cash-based accounting principles consistently applied (or other principles accepted by Creditor in writing) and fairly present the financial condition of each Guarantor as of the respective dates thereof, and no material adverse change has occurred in the financial condition of each Guarantor since the respective dates thereof; and

(j) Creditor would not enter into or contribute funds under any Preferred Equity Investment (or enter into the Credit Agreement) but for this Guaranty.

Each Guarantor agrees that the foregoing representations and warranties shall be deemed to have been made hereunder by each Guarantor on and as of the date hereof and on the date of any further advance of funds under any Preferred Equity Investment.

6. Guarantors' Acknowledgments. Each Guarantor hereby agrees and acknowledges:

(a) Each Guarantor has been advised by legal counsel in the negotiation, execution and delivery of this Guaranty;

(b) Each Preferred Equity Operating Agreement, the Credit Agreement, the Related Documents and all dealings between the any Debtor Party or Preferred Entity and Creditor, and any of them, shall conclusively be deemed and presumed to have been created, contracted, incurred, and consummated in reliance upon this Guaranty;

(c) Creditor does not have any fiduciary relationship to any Guarantor or any other Debtor Party or Preferred Entity;

(d) Each Guarantor is deriving or expects to derive a financial or other advantage from the entering any Preferred Equity Investment by Creditor (including the Initial Preferred Equity Investment);

(e) It is not a condition to effectiveness or enforceability of this Guaranty (i) that any other person or entity execute and deliver this Guaranty or any other guarantee (in any form whatsoever) or (ii) that any collateral or security interest be taken or effective or perfected in respect of

the Guaranteed Obligations or (iii) that all or any conditions precedent to the Credit Agreement, any Related Document or any Preferred Entity or any of the transactions contemplated thereby be satisfied, and this Guaranty shall be immediately effective notwithstanding the absence of any circumstance referred to in clause (i), (ii) or (iii) above;

(f) There are no other conditions precedent to effectiveness of this Guaranty;

(g) Each Guarantor has received and approved the Credit Agreement, each Related Document and the Preferred Equity Operating Agreement for the Initial Preferred Equity Investment ; and

(h) Each of the waivers, agreements and acknowledgments set forth herein are made with each Guarantor's full knowledge of their significance and consequences and that, under the circumstances, such waivers, agreements and acknowledgments are reasonable and not contrary to public policy or laws. If any of such waivers, agreements and acknowledgments is determined to be contrary to any applicable laws or public policy, such waivers, agreements and acknowledgments shall be effective only to the maximum extent permitted by applicable laws.

7. Financial Reports.

(a) Each Guarantor hereby agrees, as a material inducement to Creditor to enter into the Credit Agreement and make any Preferred Equity Investment, to furnish to Creditor, within sixty (60) calendar days after the end of each calendar year and within thirty (30) days of the end of each calendar quarter, current financial statements detailing the assets and liabilities of each Guarantor and a statement in form and substance satisfactory to Creditor confirming compliance with Section 10 hereof, certified by Guarantors to be true, correct and complete. Each such financial statement shall include, without limitation, a schedule of all contingent liabilities and all other notes and schedules relating thereto, shall be in a form reasonably acceptable to Creditor, and shall be prepared in accordance with generally accepted accounting principles consistently applied and shall be certified as being true and accurate by each Guarantor. Each Guarantor hereby warrants and represents to Creditor that any and all balance sheets, net worth statements and other financial data which have heretofore been given or may hereafter be given to Creditor with respect to any Guarantor were, or will be at the time of delivery, true and correct in all material respects and did, or will, at the time of delivery, fairly and accurately present the financial condition of each Guarantor.

(b) Each Guarantor shall notify Creditor in the event (i) the covenant contained in Section 10 hereof is breached, or (ii) a material adverse change has occurred in the financial condition of any Guarantor which may have a materially adverse impact on such Guarantor's ability to discharge its obligations hereunder.

(c) Creditor is authorized by each Guarantor to obtain such information about each Guarantor from time to time as Creditor determines necessary or beneficial. Such information may include, without limitation, employment data, savings deposits, checking accounts, consumer credit balances, payments and history, including mortgage payment records and balances, state and federal civil and criminal records and insurance information. Each Guarantor authorizes Creditor and/or its agents to obtain information from, and provide information to credit bureaus, credit reporting agencies, independent accountants and all other Persons deemed to be necessary by Creditor in connection with the Credit Agreement or any Preferred Equity Investment. Without limiting the foregoing, Creditor and/or its agents are authorized to obtain consumer reports on each Guarantor from any consumer reporting agency. The authority granted under this Section is for Creditor's protection only and Creditor shall not be deemed to have assumed any responsibility to Guarantor or any third party as a result of any such action. Each Guarantor shall further provide any and all such information specified in this Agreement and any other information required by Creditor immediately upon request.

8. Tax Returns. Within fifteen (15) calendar days after the date on which they are required to be filed, each Guarantor shall provide to Creditor a copy of each Guarantor's federal and state tax income returns and all schedules attached thereto, or if Guarantor has requested an extension within which to file such returns, a copy of all the forms filed in connection with such requests for extension. In the latter event, each Guarantor shall provide to Creditor a copy of such returns within fifteen (15) calendar days after the actual filing thereof.

9. Bankruptcy . Guarantor shall not, without the prior written consent of Creditor, commence or join with, or take any action in furtherance of, any other person or entity in commencing any voluntary or involuntary bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement proceedings of or against any other Debtor Party or Preferred Entity (all of the foregoing, collectively, "**Bankruptcy Proceedings**"). The obligations of each Guarantor under this Guaranty shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any Bankruptcy Proceeding or by any defense that any other Debtor Party or Preferred Entity or other Person may have by reason of any order, decree or decision of any court or administrative body resulting from or relating to any such Bankruptcy Proceeding or the existence of such Bankruptcy Proceeding.

10. Minimum Net Worth/Liquidity. Patrick Nelson and Brian Nelson (i) shall at all times maintain a Net Worth in excess of $15,000,000, and (B) Liquid Assets that are uncommitted to any obligation having a market value of at least $500,000. Each Guarantor shall deliver to Creditor (i) within five (5) Business Days of receipt, copies of any default notices received by any Guarantor in respect of any Indebtedness of any Guarantor, and (ii), concurrently with the delivery of each financial statement required to be delivered by or on behalf of Guarantors hereunder or under the Related Documents, a certificate signed by Patrick Nelson and Brian Nelson setting forth in reasonable detail such person's Net Worth and Liquid Assets, based on such financial statement. As used in this paragraph, the following terms shall have the respective meanings set forth below:

(i) "GAAP" shall mean generally accepted accounting principles, consistently applied.

(ii) "Liquid Assets" shall mean assets in the form of cash, cash equivalents, obligations of (or fully guaranteed as to principal and interest by) the United States or any agency or instrumentality thereof (provided the full faith and credit of the United States supports such obligation or guarantee), certificates of deposit issued by a commercial bank having net assets of not less than $500 million, securities listed and traded on a recognized stock exchange or traded over the counter and listed in the National Association of Securities Dealers Automatic Quotations, or liquid debt instruments that have a readily ascertainable value and are regularly traded in a recognized financial market.

(ii) "Net Worth" shall mean, as of a given date, (x) the total assets of Guarantors as of such date, less (y) Guarantors' total liabilities as of such date, determined in accordance with GAAP.

11. Attorneys' Fees; Enforcement. Gaurantors shall reimburse Creditor for all actual attorneys' fees, costs and expenses, arising from and after the date hereof, incurred by Creditor in connection with the enforcement of Creditor's rights under this Guaranty or the Operating Agreement, including, without limitation, attorneys' fees, costs and expenses for trial, appellate proceedings, out-of-court negotiations, workouts and settlements, and for enforcement of rights under any state or federal statute, including, without limitation, actual attorneys' fees, costs and expenses incurred in bankruptcy and insolvency proceedings such as (but not limited to) in connection with seeking relief from stay in a bankruptcy proceeding. The term "**expenses**" means any expenses incurred by Creditor in connection with any of the out-of-court, or state, or federal or bankruptcy proceedings referenced above, including but not limited to the fees and expenses of any appraisers, consultants and expert witnesses retained or consulted by Creditor in connection with any of those proceedings. Creditor shall also be entitled to its attorneys' fees, costs and expenses incurred in any post-judgment proceedings to collect and enforce any

judgment. This provision is separate and several and shall survive the merger of this Guaranty into any judgment on this Guaranty.

12. Additional and Independent Obligations. This Guaranty is a continuing guaranty of payment and performance and not of collection, cannot be revoked by any Guarantor and shall continue to be effective with respect to each Guarantor's obligations hereunder arising or created after any attempted revocation hereof. The Guarantors' obligations hereunder shall be in addition to and shall not limit or in any way affect the obligations of each Guarantor under any other existing future guaranties or indemnities, unless said other guaranties or indemnities are expressly modified or revoked in writing so as to preclude such warranties from limiting or affecting this Guaranty, and any payment under such other guaranties or indemnities shall not reduce any of the Guarantors' obligations hereunder. This Guaranty is independent of the obligations in favor of Creditor under the Credit Agreement, any Related Document and any Preferred Equity Operating Agreement. Creditor may bring a separate action to enforce the provisions hereof against any Guarantor without taking action against any other Debtor Party or other Person. Creditor's rights under this Guaranty shall be in addition to the rights and benefits Creditor may have under the Credit Agreement, any Related Document and any Preferred Equity Operating Agreement.

13. Rules Of Construction. The term "**person**" as used herein shall include any individual, company, trust or other legal entity of any kind whatsoever. When the context and construction so require, all words used in the singular herein shall be deemed to have been used in the plural and vice versa. All headings appearing in this Guaranty are for convenience only and shall be disregarded in construing this Guaranty.

14. Recourse Against Creditor. No Guarantor shall have any right of recourse against Creditor by reason of any lawful action Creditor may take or omit to take under this Guaranty, the Credit Agreement, any Related Document or any Preferred Equity Operating Agreement.

15. Enforceability. Each Guarantor hereby acknowledges that: (a) the Guaranteed Obligations are complex in nature; (b) numerous possible defenses to the enforceability of the Guaranteed Obligations may presently exist and/or may arise hereafter; (c) as part of Creditor's consideration for entering into the Credit Agreement and any Preferred Equity Investment, Creditor has specifically bargained for the waiver and relinquishment by each Guarantor of all such defenses; and (d) each Guarantor has had the opportunity to seek and receive legal advice from skilled legal counsel in the area of financial transactions of the type of the Credit Agreement and Preferred Equity Investments. Given all of the above, each Guarantor does hereby represent, warrant and acknowledge to Creditor that Guarantor is fully informed regarding, and that each Guarantor does thoroughly understand: (i) the nature of all such possible defenses; (ii) the circumstances under which such defenses may arise; (iii) the benefits which such defenses might confer upon each Guarantor, and (iv) the legal consequences to each Guarantor of waiving such defenses. Each Guarantor acknowledges that each Guarantor makes this Guaranty with the intent that this Guaranty and all of the informed waivers herein shall each and all be fully enforceable by Creditor, and that Creditor is induced to enter into this transaction in material reliance upon the presumed full enforceability thereof.

16. Security Interest.

(a) Without limitation on the other terms and conditions hereof, to secure the payment and performance of the Guaranteed Obligations, Manager grants to Creditor a continuing security interest in and lien upon, and pledges to Creditor, all of its right, title and interest in any Personal Property (including the Management Control Account (as defined in the Credit Agreement) and all rights to payments under any management agreements in which Manager is a party), whether now owned or hereafter acquired.. Creditor shall have all rights and remedies of a secured creditor in connection therewith. Manager represents and warrants that such collateral is not subject to (and agrees that it shall not be subject to) any other security interest.

(b) Without limitation on the other terms and conditions hereof, to secure the payment and performance of the Guaranteed Obligations, Debtor grants to Creditor a continuing security interest in and lien upon, and pledges to Creditor, all of its right, title and interest in any Personal Property (including the Control Account (as defined in the Credit Agreement)), whether now owned or hereafter acquired.. Creditor shall have all rights and remedies of a secured creditor in connection therewith. Debtor represents and warrants that such collateral is not subject to (and agrees that it shall not be subject to) any other security interest.

(c) As used herein, "**Personal Property**" means all "Accounts", "Cash proceeds", "Chattel paper", "Collateral", "Commercial tort claims", "Deposit accounts", "Documents", "Electronic chattel paper", "Equipment", "Fixtures", "General intangibles", "Goods", "Instruments", "Inventory", "Investment property", "Letter-of-credit rights", "Noncash proceeds", "Payment intangibles", "Proceeds", "Software", "Supporting Obligations", and "Tangible chattel paper", as defined in the Uniform Commercial Code of New York (as such Uniform Commercial Code may be amended from time to time) and any and all other personal property in which either Debtor or Manager has any interest, whether currently owned or hereafter acquired.

(c) Each of Manager and Debtor will execute, acknowledge, deliver and cause to be recorded or filed, in the manner and place required by any present or future law, any instrument that may be requested by Creditor to publish notice or protect, perfect, preserve, continue, extend, or maintain the security interest and lien, and the priority thereof, of the security interest of Creditor in the Personal Property provided above, including, without limitation, financing statements, continuation statements, and instruments of similar character, and each of Manager and Debtor shall pay or cause to be paid (i) all filing and recording taxes and fees incident to each such filing or recording, (ii) all expenses, including without limitation, actual attorneys' fees and costs, incurred by Creditor in connection with the preparation, execution, and acknowledgement of all such instruments, and (iii) all federal, state, county and municipal stamp taxes and other taxes, duties, imposts, assessments, and charges arising out of or in connection with the execution and delivery of such instruments. Each of Debtor and Manager hereby irrevocably constitutes and appoints Creditor as the attorney-in-act of each of Debtor and Manager to execute, deliver and, if appropriate, file with the appropriate filing officer or office any such instruments if either should fail to do so. In addition, each of Debtor and Manager hereby authorizes Creditor to cause any financing statement or fixture filing to be filed or recorded without the necessity of any signature of either Debtor or Manager on such financing statement or fixture filing. Upon the occurrence of any Event of Default (as defined in the Credit Agreement), in addition to all other rights and remedies, Creditor shall have the right to cause any of the Personal Property and subject to the security interest of Creditor hereunder to be sold at any one or more public or private sales as permitted by applicable law, and Creditor shall further have all other rights and remedies, whether at law, in equity, or by statute, as are available to secured creditors under applicable law. Any such disposition may be conducted by an employee or agent of Creditor. Any person, including Creditor, shall be eligible to purchase any part or all of such property at any such disposition. Expenses of retaking, holding, preparing for sale, selling or the like shall be borne by each Guarantor and shall include, without limitation, Creditor's actual attorneys' fees and legal expenses. Each of Manager and Debtor, upon demand of Creditor, shall assemble such Personal Property and make it available to Creditor at such place as shall be required by Creditor in its sole discretion. Creditor shall give each of Debtor or Manager, as applicable, at least ten (10) days' prior written notice of the time and place of any public sale or other disposition of such personal property or of the time of or after which any private sale or any other intended disposition is to be made, and if such notice is sent to Debtor or Manager (as applicable), at the same address as is provided for the mailing of notices herein, it is hereby deemed that such notice shall be and is reasonable notice to Debtor or Manager (as applicable). Neither Manager nor Debtor shall change its state of formation or its address without prior written notice to creditor.

17. Notices. Any notices to be given under this Guaranty must be in writing and shall be (a) delivered personally, (b) mailed by certified or registered mail, return receipt requested, (c) sent via nationally recognized overnight courier (e.g. Federal Express), OR (d) transmitted by e-mail, so long as a second method of delivery permitted by this paragraph is also used, in each case to the parties at the following addresses:

| | |
|---|---|
| If to Guarantor: | c/o Nelson Brothers Professional Real Estate<br>168 Journey<br>Aliso Viego, California 92656 |
| If to Creditor: | c/o Terra Capital Partners<br>805 3rd Avenue, 8th Floor<br>New York, New York 10022<br>Attention: Bruce Batkin<br>E-mail: bbatkin@tcp-us.com |
| With a copy to: | Pircher, Nichols & Meeks<br>1925 Century Park East, Suite 1700<br>Los Angeles, California 90067<br>Attention: Real Estate Notices (DLP/5288.36)<br>E-mail: dpacker@pircher.com |

Any party hereto may change its address for service of notices by giving notice to the other parties in the manner provided in this Paragraph. Any such notice shall be deemed to have been received: (a) when the notice is received by the recipient or when delivery to said address is attempted but refused or on the date of attempted delivery if the address is no longer valid if sent by registered or certified mail or overnight courier, (b) on the date of sending by electronic mail to said e-mail address if sent during business hours on a Business Day (otherwise on the next Business Day), and (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day).

18. WAIVERS.

(a) JURY WAIVER. TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, IN CONSIDERATION OF CREDITOR'S AGREEMENT TO THE PROVISIONS OF THIS GUARANTY AND THE CREDIT AGREEMENT AND ANY PREFERRED EQUITY OPERATING AGREEMENT, EACH GUARANTOR HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY CREDITOR OR ANY GUARANTOR IN CONNECTION WITH ANY PREFERRED EQUITY INVESTMENT OR THE CREDIT AGREEMENT AND/OR THIS GUARANTY, ANY AND EVERY RIGHT IT MAY HAVE TO A TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY OR ANY PREFERRED EQUITY OPERATING AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH INCLUDING, BUT NOT LIMITED TO THOSE RELATING TO (A) USURY OR PENALTIES OR DAMAGES THEREFOR; (B) ALLEGATIONS OF UNCONSCIONABLE ACTS, DECEPTIVE TRADE PRACTICE, LACK OF GOOD FAITH OR FAIR DEALING, LACK OF COMMERCIAL REASONABLENESS, OR SPECIAL RELATIONSHIPS (SUCH AS FIDUCIARY, TRUST OR CONFIDENTIAL RELATIONSHIP); (C) ALLEGATIONS OF DOMINION, CONTROL, ALTER EGO, INSTRUMENTALITY, FRAUD, REAL ESTATE FRAUD, MISREPRESENTATION, DURESS, COERCION, UNDUE INFLUENCE, INTERFERENCE OR NEGLIGENCE; (D) ALLEGATIONS OF TORTIOUS INTERFERENCE WITH PRESENT OR PROSPECTIVE BUSINESS RELATIONSHIPS OR OF ANTITRUST; OR (E) SLANDER, LIBEL OR DAMAGE TO REPUTATION. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH GUARANTOR AND CREDITOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. CREDITOR IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GUARANTOR AND CREDITOR.

(b) ADDITIONAL WAIVERS. TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, IN CONSIDERATION OF CREDITOR'S AGREEMENT TO THE PROVISIONS OF THIS GUARANTY AND EACH PREFERRED EQUITY OPERATING AGREEMENT, EACH GUARANTOR HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY CREDITOR IN CONNECTION WITH THE

PREFERRED INVESTMENT AND/OR THIS GUARANTY, ANY AND EVERY RIGHT IT MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN, EXCEPT TO THE EXTENT THAT SAID COUNTERCLAIM MUST BE ASSERTED PURSUANT TO APPLICABLE LAW OR OTHERWISE BE BARRED FROM BEING ASSERTED IN ANY OTHER ACTION AND (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING. NOTHING HEREIN CONTAINED SHALL PREVENT OR PROHIBIT ANY GUARANTOR FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION WITH RESPECT TO ANY ASSERTED CLAIM SUBJECT TO ANY LIABILITY ARISING BY REASON THEREOF.

19. [Omitted]

20. Entire Agreement; Waiver. This Guaranty contains the entire understanding and agreement of each of the Guarantors and Creditor with respect to the subject matter hereof. This Guaranty may not be altered or amended except by the written agreement of each Guarantor and Creditor. No action, failure, delay or omission by Creditor in exercising any rights and remedies hereunder or the Credit Agreement, any Related Document, or any Preferred Equity Operating Agreement or this Guaranty or otherwise shall constitute a waiver of, or impair, any of the rights or privileges of Creditor hereunder. No single or partial exercise of any such right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. Such rights and remedies are cumulative and not exclusive of any rights and remedies provided by laws or otherwise available. No waiver of any such right or remedy shall be effective unless given in writing by Creditor. No waiver of any right or remedy shall be deemed a waiver of any other right or remedy hereunder.

21. Miscellaneous. The provisions of this Guaranty will bind and benefit the heirs, executors, administrators, legal representatives, nominees, successors and permitted assigns of each Guarantor and Creditor. The liability of all persons and entities who are in any manner obligated hereunder shall be joint and several. If any provision of this Guaranty shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that portion shall be deemed severed from this Guaranty and the remaining parts shall remain in full force and effect as though the invalid, illegal or unenforceable portion had never been part of this Guaranty.

22. Time of the Essence. Time shall be of the essence with regard to the performance by Guarantor of Guarantor's obligations under this Guaranty.

23. Governing Law. THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GUARANTOR AND ACCEPTED BY CREDITOR IN THE STATE OF NEW YORK, AND ANY CAPITAL CONTRIBUTIONS HAVE BEEN AND WILL BE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION RELATED HERETO, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH GUARANTOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY AND THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

24. Jurisdiction and Forum. ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST CREDITOR OR ANY GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY, AT CREDITOR'S OPTION, BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE STATE OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL

OBLIGATIONS LAW AND EACH GUARANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date appearing on the first page of this Guaranty.

**GUARANTORS:**

Nelson Brothers Property Management, Inc.,
a California corporation

By: ______________________
Name: Patrick Nelson
Title: Authorized Signatory

NB Stadium View, LLC,
a Delaware limited liability company

By: ______________________
Name: Patrick Nelson
Title: Authorized Signatory

______________________
Patrick Nelson

______________________
Brian Nelson

Nelson Brothers Professional Real Estate, LLC, a California limited liability company

By: ______________________
Name: Patrick Nelson
Title: Authorized Signatory

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**FORM D**

**Notice of Exempt Offering of Securities**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

## 1. Issuer's Identity

CIK (Filer ID Number): 0001682272

Previous Names: [X] None

Name of Issuer: NB STADIUM VIEW, DST

Jurisdiction of Incorporation/Organization: DELAWARE

Year of Incorporation/Organization
- [ ] Over Five Years Ago
- [X] Within Last Five Years (Specify Year) 2016
- [ ] Yet to Be Formed

Entity Type
- [ ] Corporation
- [ ] Limited Partnership
- [ ] Limited Liability Company
- [ ] General Partnership
- [ ] Business Trust
- [X] Other (Specify)

Delaware statutory trust

## 2. Principal Place of Business and Contact Information

Name of Issuer: NB STADIUM VIEW, DST

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 16B JOURNEY, SUITE 200 | | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| ALISO VIEJO | CALIFORNIA | 92656 | 949-916-7300 |

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| NELSON | PATRICK | |
| **Street Address 1** | **Street Address 2** | |
| 16B Journey, Suite 200 | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Aliso Viejo | CALIFORNIA | 9 |

Relationship: [ ] Executive Officer [X] Director [X] Promoter

Clarification of Response (if Necessary):

Mr. Nelson is a manager of the statutory trustee of NB Stadium View, DST

| Last Name | First Name | Middle Name |
|---|---|---|

Nelson Brothers Professional Real Estate, LLC

| Street Address 1 | Street Address 2 | |
|---|---|---|
| 16B Journey, Suite 200 | | |
| City | State/Province/Country | ZIP/PostalCode |
| Aliso Viejo | CALIFORNIA | 92656 |

Relationship: ☐ Executive Officer ☐ Director ☒ Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Nelson | Brian | |
| Street Address 1 | Street Address 2 | |
| 16B Journey, Suite 200 | | |
| City | State/Province/Country | ZIP/PostalCode |
| Aliso Viejo | CALIFORNIA | 92656 |

Relationship: ☐ Executive Officer ☐ Director ☒ Promoter

Clarification of Response (if Necessary):

Mr. Nelson is a manager of the statutory trustee of NB Stadium View, DST

---

**4. Industry Group**

☐ Agriculture
Banking & Financial Services
- ☐ Commercial Banking
- ☐ Insurance
- ☐ Investing
- ☐ Investment Banking
- ☐ Pooled Investment Fund

  Is the issuer registered as an investment company under the Investment Company Act of 1940?

  ☐ Yes ☐ No
- ☐ Other Banking & Financial Services

☐ Business Services
Energy
- ☐ Coal Mining
- ☐ Electric Utilities
- ☐ Energy Conservation
- ☐ Environmental Services
- ☐ Oil & Gas
- ☐ Other Energy

Health Care
- ☐ Biotechnology
- ☐ Health Insurance
- ☐ Hospitals & Physicians
- ☐ Pharmaceuticals
- ☐ Other Health Care

☐ Manufacturing
Real Estate
- ☐ Commercial
- ☐ Construction
- ☐ REITS & Finance
- ☐ Residential
- ☒ Other Real Estate

☐ Retailing
☐ Restaurants
Technology
- ☐ Computers
- ☐ Telecommunications
- ☐ Other Technology

Travel
- ☐ Airlines & Airports
- ☐ Lodging & Conventions
- ☐ Tourism & Travel Services
- ☐ Other Travel

☐ Other

---

**5. Issuer Size**

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [X] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [ ] Rule 505
- [X] Rule 506(b)
- [ ] Rule 506(c)
- [ ] Securities Act Section 4(a)(5)

- [ ] Investment Company Act Section 3(c)
- [ ] Section 3(c)(1)
- [ ] Section 3(c)(2)
- [ ] Section 3(c)(3)
- [ ] Section 3(c)(4)
- [ ] Section 3(c)(5)
- [ ] Section 3(c)(6)
- [ ] Section 3(c)(7)
- [ ] Section 3(c)(9)
- [ ] Section 3(c)(10)
- [ ] Section 3(c)(11)
- [ ] Section 3(c)(12)
- [ ] Section 3(c)(13)
- [ ] Section 3(c)(14)

**7. Type of Filing**

[X] New Notice Date of First Sale 2016-07-27 [ ] First Sale Yet to Occur

[ ] Amendment

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year? [ ] Yes [X] No

**9. Type(s) of Securities Offered (select all that apply)**

- [ ] Equity
- [ ] Debt
- [ ] Option, Warrant or Other Right to Acquire Another Security
- [ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
- [ ] Pooled Investment Fund Interests
- [ ] Tenant-in-Common Securities
- [ ] Mineral Property Securities
- [X] Other (describe)

Beneficial interest in Delaware statutory trust reflecting a beneficial interest in real estate

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $50,000 USD

## 12. Sales Compensation

| Recipient | Recipient CRD Number ☐ None | |
|---|---|---|
| Brian Nelson | 5065593 | |
| (Associated) Broker or Dealer ☐ None | (Associated) Broker or Dealer CRD Number ☐ None | |
| Emerson Equity LLC | 130032 | |
| Street Address 1 | Street Address 2 | |
| 16B Journey, Suite 200 | | |
| City | State/Province/Country | ZIP/Postal Code |
| Aliso Viejo | CALIFORNIA | 92656 |

State(s) of Solicitation (select all that apply)
Check “All States” or check individual States ☐ All States ☐ Foreign/non-US

| |
|---|
| CALIFORNIA |
| UTAH |

| Recipient | Recipient CRD Number ☐ None | |
|---|---|---|
| Curtis Sathre | 2459115 | |
| (Associated) Broker or Dealer ☐ None | (Associated) Broker or Dealer CRD Number ☐ None | |
| JRL Capital Corporation | 10225 | |
| Street Address 1 | Street Address 2 | |
| 23121 Vurdugo Drive, Suite 205 | | |
| City | State/Province/Country | ZIP/Postal Code |
| Laguna Hills | CALIFORNIA | 92653 |

State(s) of Solicitation (select all that apply)
Check “All States” or check individual States ☐ All States ☐ Foreign/non-US

| |
|---|
| CALIFORNIA |
| OREGON |

| Recipient | Recipient CRD Number ☐ None |
|---|---|
| Mike Culwell | 5989109 |
| (Associated) Broker or Dealer ☐ None | (Associated) Broker or Dealer CRD Number ☐ None |
| Emerson Equity LLC | 130032 |
| Street Address 1 | Street Address 2 |
| 9940 Research Drive, Suite 200 | |

City | State/Province/Country | ZIP/Postal Code
Irvine | CALIFORNIA | 92618

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
☐ All States
☐ Foreign/non-US

CALIFORNIA

---

Recipient: Troy Thomas
Recipient CRD Number ☐ None: 4691720
(Associated) Broker or Dealer ☐ None: McDermott Investment Services, LLC
(Associated) Broker or Dealer CRD Number ☐ None: 154926
Street Address 1: 101 Main Street, Suite 260
Street Address 2:
City: Huntington Beach
State/Province/Country: CALIFORNIA
ZIP/Postal Code: 92648

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
☐ All States
☐ Foreign/non-US

UTAH

---

Recipient: Corbin S. Thomas
Recipient CRD Number ☐ None: 4234748
(Associated) Broker or Dealer ☐ None: McDermott Investment Services, LLC
(Associated) Broker or Dealer CRD Number ☐ None: 154926
Street Address 1: 101 Main Street, Suite 260
Street Address 2:
City: Huntington Beach
State/Province/Country: CALIFORNIA
ZIP/Postal Code: 92648

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
☐ All States
☐ Foreign/non-US

CALIFORNIA

---

Recipient: Robert Tweed
Recipient CRD Number ☐ None: 2339324
(Associated) Broker or Dealer ☐ None: Cabot Lodge Securities LLC
(Associated) Broker or Dealer CRD Number ☐ None: 159712
Street Address 1: 2060 Huntington Drive, Suite 1
Street Address 2:

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| San Marino | CALIFORNIA | 91108 |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☐ Foreign/non-US

CALIFORNIA

---

Recipient: Leslie Pappas
Recipient CRD Number ☐ None: 1735372

(Associated) Broker or Dealer ☐ None: Lightpath Capital, Inc.
(Associated) Broker or Dealer CRD Number ☐ None: 34617

Street Address 1: 555 Bryant Street, Suite 363
Street Address 2:

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Palo Alto | CALIFORNIA | 94301 |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☐ Foreign/non-US

CALIFORNIA

---

## 13. Offering and Sales Amounts

Total Offering Amount $20,137,558 USD or ☐ Indefinite

Total Amount Sold $6,264,062 USD

Total Remaining to be Sold $13,873,496 USD or ☐ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 23

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $2,013,756 USD ☒ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

This response is based upon the assumption that the full amount of the potential sales commission will be earned and paid

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$2,665,950 USD [X] Estimate

Clarification of Response (if Necessary):

**Signature and Submission**

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Regulation D for one of the reasons stated in Rule 505(b)(2)(iii) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| NB STADIUM VIEW, DST | Patrick Nelson | Patrick Nelson | Manager | 2016-09-06 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

# EXHIBIT "G"

**Affidavit of Mark Jennings**

STATE OF CALIFORNIA )
) SS
COUNTY OF ORANGE )

1. I, Mark Jennings, being duly sworn, state under penalty of perjury under the laws of the State of California that the following statements are true and correct and based upon my personal knowledge:

2. I am over the age of 18 and am competent to make this Affidavit. I affirm that the facts stated herein are true and correct.

3. If called as a witness, I could testify competently about the facts presented in this Affidavit.

4. From March 2021 to September 2022, I was employed by Versity Investments and Versity Invest (together, "Versity") as Corporate Controller. (To the best of my recollection, the company's name was changed from Versity Investments to Versity Invest in the Summer of 2022.)

5. In that capacity, I reported to Versity's CFO, Jennifer Welker, and was involved in Versity's accounting and financial operations – including its financial reporting process, authorizing bank transfers, managing transaction reporting, coordinating audit activity, gathering financial data, and the preparation of syndication reports to its bridge equity lenders.

6. When I commenced my employment at Versity, it was a real estate company owned, managed, and controlled by Tanya Muro, Blake Wettengel, and Brian Nelson. (At some point in the Summer of 2022, Mr. Nelson ceased to be involved in the company.) During my employment, Versity was involved in the business of acquiring and managing student housing and multi-family housing properties, which it acquired through Delaware Statutory Trusts ("DSTs"). Through each DST it sponsored, Versity would acquire a single commercial real estate property and then syndicate beneficial interests in the DST to investors.

7. With respect to each DST, Mr. Wettengel, Ms. Muro, and Mr. Nelson (or solely Mr. Wettengel and Ms. Muro depending on which entity sponsored such DST) – through Versity's business and its related affiliates and subsidiaries – controlled the administration of the DST, the real estate asset owned by the DST, and the funds generated by each DST, including the funds generated from the syndication of the beneficial interests in the DST.

8. To obtain bridge equity financing to fund its acquisition of real estate, Versity entered into a loan agreement with Knights Hill Ireland II DAC. (I believe KHCA Funding LLC was also a named lender on the loan agreement, but I am not certain. I refer to the two entities jointly in this affidavit as "Plaintiffs"). I recall the loan agreement was comprised of a Senior Secured Term Loan Agreement, dated as of May 27, 2021, and a First Amendment, dated as of April 12, 2022 (the "Loan Agreement").

9. Under the terms of the Loan Agreement, Plaintiffs agreed to loan Versity funds to acquire certain real estate, subject to Plaintiffs' asset-by-asset approval rights, which would then be held in the names of specific DSTs. The Loan Agreement contained certain "waterfall" provisions, which (to the best of my recollection) required that the funds collected by the DSTs be paid into Plaintiffs' collection account towards the amounts owed on the Loan before funding DST reserves, Versity acquisition fees, sponsor fees, or other items relating to the DST.

10. Mr. Wettengel and/or Ms. Muro, as Versity's Chief Executive Officer and Chief Operating Officer, respectively, directed the transfers of cash flows generated by the DSTs financed by Plaintiffs. I typically received such direction through a funding request signed by Mr. Wettengel and/or Ms. Muro and provided to me by Ms. Welker. I also recall receiving such direction from Mr. Wettengel on one or two occasions by telephone. The written funding requests directing me to transfer funds (generally on a form titled "Funding Request") would typically include a section for "sources" of the funds and another section containing line items identifying specific "uses" to which the funds were to be applied.

11. On multiple occasions beginning two or three months after the start of my employment, Mr. Wettengel and/or Ms. Muro (through Funding Requests signed by one of them or a phone call with Mr. Wettengel) directed that cash flows received from the DSTs be applied in a manner that was not consistent with the Loan Agreement waterfall provisions. In other words, I was directed to apply the cash flow to later steps in the waterfall (e.g., Versity fees) prior to depositing money into Plaintiffs' collection account. I do not recall having been directed to apply DST funds to the repayment of loans from NB Student Housing Fund 2 or 3.

12. I first raised objections and concerns to Ms. Welker about this practice after the first such funding request provided to me. She told me to proceed and that it would be only a short-term problem until cash flow improved. I raised more objections with Ms. Welker as the problems did not subside over the subsequent months, but my concerns were dismissed – and I was told to proceed as instructed. My concerns about such directions were eased because (a) the payments I was being directed to make were all within the waterfall structure (albeit in the wrong order of priority provided by the Loan Agreement), and as long as Versity was able to raise all of the syndication equity for the DST within a reasonable period of time, Plaintiffs in any given DST offering would be fully repaid through that offering, and (b) Versity was successful at quickly syndicating the DST deals during my time at the company. I therefore believed that even though waterfall payments were being made in the wrong order (*i.e.*, to Versity first before payment into Plaintiffs' collection account), Plaintiffs would very likely still be repaid all amounts owed to them under the Loan Agreement.

13. Among my duties as Controller was to send Plaintiffs "Monthly Servicer Reports," the purpose for which was to provide Plaintiffs with information about the monthly syndications generated by the DSTs they financed. The Monthly Servicer Reports included the "Remaining Syndication" figures (representing the remaining amount to be syndicated), "Gross Syndication Proceeds," "Equity Raised," and "Net Syndication Proceeds" – among other information. I was involved in the preparation of those Reports,

which I always submitted to Mr. Wettengel, Ms. Muro, and/or Ms. Welker for review and approval prior to sending them to Plaintiffs. On occasion, one or more of them would direct changes to certain numbers (including the amount of DST interests which had been syndicated as well as the amount of DST interests still remaining in the DST financed by the Plaintiffs) in the Reports, which caused the amounts reflected on the Reports to no longer reconcile with the DST syndication proceeds received by Versity.

14. On or shortly before September 2, 2022, Mr. Wettengel and Ms. Muro issued directions, through a Funding Request provided to me by Ms. Welker, to move cash flows generated by the DSTs financed by Plaintiffs to entities affiliated with Mr. Wettengel and Ms. Muro instead of to Plaintiffs' collection account– thereby moving cash "outside of the structure" in the sense that the funds were no longer being applied to one of the steps in the repayment waterfall in the Loan Agreement. This meant the waterfall, and thereby Plaintiffs, would likely be short-funded at the end of syndication on the specific DST. It is my understanding that these funds were intended, at least in part, to finance the acquisition of real estate in Dana Point, California. As a result of such instruction, I decided to terminate my employment with Versity – and I gave my two-week notice on September 2, 2022.

15. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Mark Jennings

Sworn to before me on
May 29, 2025

Notary Public

HANNA CLARK
Notary Public - California
Orange County
Commission # 2453814
My Comm. Expires Jul 18, 2027

# EXHIBIT "H"

FINRA

Print

## 2111. Suitability

(a) A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

(b) A member or associated person fulfills the customer-specific suitability obligation for an institutional account, as defined in Rule 4512(c), if (1) the member or associated person has a reasonable basis to believe that the institutional customer is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies involving a security or securities and (2) the institutional customer affirmatively indicates that it is exercising independent judgment in evaluating the member's or associated person's recommendations. Where an institutional customer has delegated decisionmaking authority to an agent, such as an investment adviser or a bank trust department, these factors shall be applied to the agent.

---

**• • • Supplementary Material: --------------**

**.01 General Principles.** Implicit in all member and associated person relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of FINRA rules, with particular emphasis on the requirement to deal fairly with the public. The suitability rule is fundamental to fair dealing and is intended to promote ethical sales practices and high standards of professional conduct.

**.02 Disclaimers.** A member or associated person cannot disclaim any responsibilities under the suitability rule.

**.03 Recommended Strategies.** The phrase "investment strategy involving a security or securities" used in this Rule is to be interpreted broadly and would include, among other things, an explicit recommendation to hold a security or securities. However, the following communications are excluded from the coverage of Rule 2111 as long as they do not include (standing alone or in combination with other communications) a recommendation of a particular security or securities:

(a) General financial and investment information, including (i) basic investment concepts, such as risk and return, diversification, dollar cost averaging, compounded return, and tax deferred investment, (ii) historic differences in the return of asset classes (e.g., equities, bonds, or cash) based on standard market indices, (iii) effects of inflation, (iv) estimates of future retirement income needs, and (v) assessment of a customer's investment profile;

(b) Descriptive information about an employer-sponsored retirement or benefit plan, participation in the plan, the benefits of plan participation, and the investment options available under the plan;

(c) Asset allocation models that are (i) based on generally accepted investment theory, (ii) accompanied by disclosures of all material facts and assumptions that may affect a reasonable investor's assessment of the asset allocation model or any report generated by such model, and (iii) in compliance with Rule 2214 (Requirements for the Use of Investment Analysis Tools) if the asset allocation model is an "investment analysis tool" covered by Rule 2214; and

(d) Interactive investment materials that incorporate the above.

**.04 Customer's Investment Profile.** A member or associated person shall make a recommendation covered by this Rule only if, among other things, the member or associated person has sufficient information about the customer to have a reasonable basis to believe that the recommendation is suitable for that customer. The factors delineated in Rule 2111(a) regarding a customer's investment profile generally are relevant to a determination regarding whether a recommendation is suitable for a particular customer, although the level of importance of each factor may vary depending on the facts and circumstances of the particular case. A member or associated person shall use reasonable diligence to obtain and analyze all of the factors delineated in Rule 2111(a) unless the member or associated person has a reasonable basis to believe, documented with specificity, that one or more of the factors are not relevant components of a customer's investment profile in light of the facts and circumstances of the particular case.

**.05 Components of Suitability Obligations.** Rule 2111 is composed of three main obligations: reasonable-basis suitability, customer-specific suitability, and quantitative suitability.

(a) The reasonable-basis obligation requires a member or associated person to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least *some* investors. In general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the member's or associated person's familiarity with the security or investment strategy. A member's or associated person's reasonable diligence must provide the member or associated person with an understanding of the potential risks and rewards associated with the

recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule.

(b) The customer-specific obligation requires that a member or associated person have a reasonable basis to believe that the recommendation is suitable for a particular customer based on that customer's investment profile, as delineated in Rule 2111(a).

(c) Quantitative suitability requires a member or associated person who has actual or de facto control over a customer account to have a reasonable basis for believing that a series of recommended transactions, even if suitable when viewed in isolation, are not excessive and unsuitable for the customer when taken together in light of the customer's investment profile, as delineated in Rule 2111(a). No single test defines excessive activity, but factors such as the turnover rate, the cost-equity ratio, and the use of in-and-out trading in a customer's account may provide a basis for a finding that a member or associated person has violated the quantitative suitability obligation.

**.06 Customer's Financial Ability.** Rule 2111 prohibits a member or associated person from recommending a transaction or investment strategy involving a security or securities or the continuing purchase of a security or securities or use of an investment strategy involving a security or securities unless the member or associated person has a reasonable basis to believe that the customer has the financial ability to meet such a commitment.

**.07 Institutional Investor Exemption.** Rule 2111(b) provides an exemption to customer-specific suitability regarding institutional investors if the conditions delineated in that paragraph are satisfied. With respect to having to indicate affirmatively that it is exercising independent judgment in evaluating the member's or associated person's recommendations, an institutional customer may indicate that it is exercising independent judgment on a trade-by-trade basis, on an asset-class-by-asset-class basis, or in terms of all potential transactions for its account.

Amended by SR-FINRA-2014-016 eff. May 1, 2014.
Amended by SR-FINRA-2013-001 eff. Feb. 4, 2013.
Adopted by SR-FINRA-2010-039 and amended by SR-FINRA-2011-016 and SR-FINRA-2012-027 eff. July 9, 2012.

**Selected Notices:** 11-02, 11-25, 12-25, 12-55.

© FINRA. All rights reserved.

# EXHIBIT "I"

# Notice to Members

NOVEMBER 2003

SUGGESTED ROUTING

Legal/Compliance
Retail
Senior Management
Internal Audit

KEY TOPICS

Advertising and Sales Literature
Due Diligence
Non-Conventional Investments
Suitability

INFORMATIONAL

## Non-Conventional Investments

NASD Reminds Members of Obligations When Selling Non-Conventional Investments

### Executive Summary

In the aftermath of the recent downturn in the equity markets, NASD reviewed the services and products offered by members and observed that retail investors were being offered an array of different investments as alternatives to conventional equity and fixed-income investments. These alternative investments do not fall under a common category; the staff review indicates that brokers and retail investors have shown increased interest in products such as asset-backed securities, distressed debt, and derivative products (for ease of reference these products are collectively refered to as non-conventional investments or "NCIs"). NCIs often have complex terms and features that are not easily understood. NASD staff reminds members that the fact that an investment is an NCI does not in any way diminish a member's responsibility to ensure that such a product is offered and sold in a manner consistent with the member's general sales conduct obligations. This *Notice to Members* reminds members offering NCIs of their obligations to: (1) conduct adequate due diligence to understand the features of the product; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis in connection with any recommended transactions; (4) provide a balanced disclosure of both the risks and rewards associated with the particular product, especially when selling to retail investors; (5) implement appropriate internal controls; and (6) train registered persons regarding the features, risks, and suitability of these products.

## Questions/Further Information

Questions regarding this *Notice* may be directed to Gary L. Goldsholle, Associate General Counsel, Regulatory Policy and Oversight, NASD, at (202) 728-8104; or Janene Marasciullo, Senior Attorney, Regulatory Policy and Oversight, NASD, at (202) 974-2978.

## Background and Discussion

As a result of the recent downturn in the equity markets and historically low interest rates, brokers and retail investors have been turning to alternative investment vehicles in search of a better return or yield on investments. A review of members indicated that there is an increased interest in a variety of NCIs that have a wide array of terms, conditions, risks, and rewards.[1] Some of these NCIs are marketed as offering greater security or a "guaranteed" return on investments. Other products seek to maximize the potential return on investments. Some of these products have unique features relating to risk and reward that may not be readily understood, especially by retail investors.

For example, certain asset-backed securities and corporate bonds are secured by a range of collateral such as mobile homes, future royalty payments on popular music, payments from consumer credit cards or other consumer goods. The credit risks associated with these myriad forms of collateral are varied and for many non-institutional parties may be difficult to understand and assess. Other NCIs, such as distressed corporate bonds and certain derivative contracts, may be offered to retail investors in an attempt to maximize the return on investment, but they correspondingly may involve greater degrees of risk. These products also tend to have less market liquidity, less transparency as to their pricing and value and may entail significant credit risks that are difficult to understand and assess.

In sum, recent trends indicate that brokers and investors may be turning to NCIs in search of increased yield or return. Although these products may have attractive qualities, it is crucial that members understand the distinct features, and risks and rewards, of any product they sell. Thus, whenever members recommend NCIs to investors, they must take special care to ensure that all registered persons understand the features of the product in order to be in a position to perform the required suitability analysis before executing a transaction. Likewise, members have an obligation to ensure that all marketing materials used by the member provide an accurate and balanced description of the risks and rewards.

NASD is issuing this *Notice to Members* to remind members of their sales conduct obligations.[2] Given the complex nature of NCIs and the potential for customer harm or confusion, members are cautioned to ensure that their sales conduct procedures fully and accurately address any of the special circumstances presented by the sale of NCIs. Additionally, NASD is concerned that investors, particularly retail investors, may not fully understand the risks associated with these products. Accordingly, NASD reminds members that the sale of NCIs, like more traditional investments, requires them to:

(1) conduct appropriate due diligence with respect to these products; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis for recommended transactions; (4) ensure that promotional materials used by the member are fair, accurate, and balanced; (5) implement appropriate internal controls; and (6) provide appropriate training to registered representatives that sell these products. Given the complex and, at times, difficult-to-understand nature of NCIs, members should take particular care to assure that they are fulfilling these obligations.

## Due Diligence/Reasonable-Basis Suitability

As NASD noted most recently in *Notice to Members 03-07* (pertaining to hedge fund sales to customers), performing appropriate due diligence is crucial to a member's obligation to undertake the required reasonable-basis suitability analysis.[3] A reasonable-basis suitability determination is necessary to ensure that an investment is suitable for some investors (as opposed to a customer-specific suitability determination, discussed below, which is undertaken on a customer-by-customer basis). Thus, the reasonable-basis suitability analysis can only be undertaken when a member understands the investment products it sells. Accordingly, a member must perform appropriate due diligence to ensure that it understands the nature of the product, as well as the potential risks and rewards associated with the product. Moreover, the fact that a member intends to offer an NCI only to institutional investors does not relieve the member of its responsibility to conduct due diligence and a reasonable-basis suitability analysis.

The type of due diligence investigation that is appropriate will vary from product to product. However, there are some common features that members must understand about products before registered representatives can perform the appropriate suitability analysis. These features include, but are not limited to:

- The liquidity of the product
- The existence of a secondary market and the prospective transparency of pricing in any secondary market transactions
- The creditworthiness of the issuer
- The creditworthiness and value of any underlying collateral
- Where applicable, the creditworthiness of the counterparties
- Principal, return, and/or interest rate risks and the factors that determine those risks
- The tax consequences of the product
- The costs and fees associated with purchasing and selling the product

Members should examine these and other appropriate factors when conducting due diligence. A member may in good faith rely on representations concerning an NCI contained in a prospectus or disclosure document. However, reliance on such materials alone may not be sufficient for a member to satisfy its due diligence requirements where the content of the prospectus or disclosure document does not provide the member with sufficient information to fully evaluate the risk of the product or to educate and train its registered persons for sales purposes. In such case, the member must seek additional information about the NCI or conclude that the product is not appropriate for sale to the public. In addition, members should ensure that the persons responsible for conducting due diligence have appropriate training and skill to evaluate the terms of the investment as well as the potential risks and benefits.

## Customer-Specific Suitability

Members and their associated persons must reasonably believe that the product is a suitable investment prior to making a recommendation to a particular customer. To ensure that a particular investment is suitable for a specific customer, members and their registered persons must examine: (1) the customer's financial status; (2) the customer's tax status; (3) the customer's investment objectives; and (4) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer. [4]

NASD cautions members against relying too heavily upon a customer's financial status as the basis for recommending NCIs. A customer's net worth alone is not necessarily determinative of whether a particular product is suitable for that investor. Given the unique nature of NCIs, these products may present challenges when it comes to a member's duty to dispense its suitability obligation; however, the difficulty in meeting such challenges cannot be considered as a mitigating factor in determining whether members have met their suitability obligations. NCIs with particular risks may be suitable for recommendation to only a very narrow band of investors capable of evaluating and being financially able to bear those risks.

## Promotional Materials

Sales materials and oral presentations regarding NCIs must present a fair and balanced picture regarding both the risks and benefits of investing in these products. For example, members may not claim that certain NCI products, such as asset-backed securities, distressed debt, derivative contracts, or other products, offer protection against declining markets or protection of invested capital unless these statements are fair and accurate. Moreover, when promoting the advantages of NCIs, it is critical that members balance their promotional materials with disclosures of the corresponding risks and limitations of the product discussed above in the "Due Diligence/Reasonable Basis Suitability" section of this *Notice*.

Additionally, if applicable, members should provide investors with any prospectus and other disclosure material provided by the issuer or the sponsor. NASD reminds members, however, that simply providing a prospectus or offering memoranda does not cure unfair or unbalanced sales or promotional materials, whether prepared by the member, sponsor, or issuer.[5]

## Internal Controls

Members must establish sufficient internal controls, including supervision and training requirements, that are reasonably designed to ensure that sales of NCIs comply with all applicable NASD and SEC rules. Members must ensure that their written procedures for supervisory and compliance personnel require that (1) the appropriate due diligence/reasonable-basis suitability is completed before products are offered for sale; (2) associated persons perform appropriate customer-specific suitability analysis; (3) all promotional materials are accurate and balanced; and (4) all NASD and SEC rules are followed. In addition to establishing written procedures, members also must document the steps they have taken to ensure adherence to these procedures.

## Training

Members must train registered persons about the characteristics, risks, and rewards of each product before they allow registered persons to sell that product to investors. Likewise, members should train registered persons about the factors that would make such products either suitable or unsuitable for certain investors. Members' focus on training should not be limited to representatives selling such products; members also should provide appropriate training to supervisors of registered persons selling NCIs.

For a variety of reasons, the need for adequate training is heightened when registered persons sell NCIs. First, due to the unique nature of these products, many investors, especially retail investors, may not understand the features of the product, and may not fully appreciate the associated risks of investing in them. Moreover, in light of the fact that investors may be turning to these products as an alternative to traditional equity and fixed income investments, it is crucial for registered persons to provide a full and balanced disclosure regarding both the risks and the rewards of these products.

Educational brochures, videos, lectures, explanatory memoranda, and Web-based seminars are all appropriate ways of delivering training. The particular training methods will vary based upon the products themselves, as well as the size and customer base of the firm. NASD encourages firms that offer NCIs to offer training about these products as part of the Firm Element of their Continuing Education Program.

## Conclusion

NCIs can be unusual and complex investment vehicles that may appear increasingly attractive to investors during periods in which traditional equity and fixed income investments come into disfavor. However, the unique and complex features of some NCIs may be difficult to understand and may obscure the risks. Accordingly, members must conduct appropriate due diligence/reasonable-basis suitability before offering any product to the public. Likewise, members must conduct a customer-specific suitability analysis prior to making any recommendations to a customer. Members also must ensure that all promotional materials are fair, accurate, and balanced. Finally, in connection with the recommendation and sale of NCIs, members must ensure that they implement appropriate supervisory internal control and appropriate training to all registered persons who sell such products to customers.

## Endnotes

1 Approximately 35% of the firms reviewed sold NCIs in denominations that raise the possibility of sales to retail investors. The list of NCIs being offered is broad and includes asset-backed securities, index-linked notes, non-traded REITS, equity-linked notes, multi-callable step up notes, redeemable secured notes, auction rate preferred securities, principal protected index-linked CDs, distressed debt, derivative products, and emerging market debt securities.

2 Members also are reminded of the application of IM-2310-2(e) (Fair Dealing with Customers with Regard to Derivative Products or New Financial Products), which emphasizes members' obligations for fair dealing with customers when making recommendations or accepting orders for new financial products.

3 NASD's use of the term "due diligence" is not intended to equate the responsibilities of a member for its sales conduct obligations with the requirements of an underwriter under Section 11 of the Securities Act of 1933 and Securities Act Rule 176.

4 NASD Conduct Rule 2310(b).

5 *See* NASD Letter of Acceptance, Waiver and Consent, Altegris Invs., Inc., and Robert Amedeo, No. CAF030015 (April 15, 2003).

©2003. NASD. All rights reserved. *Notice to Members* attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.