Amir Tadjedin (CA Bar No.186967; OR Bar No.055613; WA Bar No. 47414)
Craig A. Vollono (NY Bar No. 4446431)
David G. Smitham (CA Bar No.335635; NY Bar No. 4194676)
Christopher Anthony (MD Bar No. 1512150017)
Tyler G. Mills (OR Bar No. 215303)

TADJEDIN THOMAS & ENGBLOOM LAW GROUP LLP
1211 NW Glisan Street, Suite 203
Portland, Oregon 97209
Tel: 503-224-9294
amirt@ttelawgroup.com
craigv@ttelawgroup.com
davids@ttelawgroup.com
christophera@ttelawgroup.com
tylerm@ttelawgroup.com

*Attorneys for Respondent*
*Emerson Equity LLC*

**IN THE ARBITRATION BEFORE THE**

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**

| | |
|---|---|
| BRETT W. HENRICKS AND ELIZABETH A. SHARP-HENRICKS, INDIVIDUALLY AND AS MEMBERS OF HENRICKS INVESTMENTS LLC,<br><br>Claimants,<br><br>v.<br><br>EMERSON EQUITY LLC (CRD# 130032),<br><br>Respondent. | Arbitration No. 25-01398<br><br>**RESPONDENT EMERSON EQUITY LLC'S ANSWER TO THE AMENDED STATEMENT OF CLAIM** |

Respondent Emerson Equity ("Emerson" or "Respondent") hereby submits its Statement of Answer pursuant to FINRA Rule 12303. Claimants Brent W. Henricks and Elizabeth A. Sharp-Henricks, Individually and as Members of Henricks Investments, LLC, dated August 21, 2025, (collectively, "Claimants" or "the Henricks") filed their First Amended Statement of Claim ("ASOC") against Respondent alleging: (1) violation of the federal securities laws; (2) violation

of Colorado securities act; (3) violation of Colorado Consumer Protection Act; (4) breach of contract; (5) common law fraud; (6) breach of fiduciary duty; and (7) negligence and gross negligence.

## I. PRELIMINARY STATEMENT

Respondent denies all allegations of wrongdoing or actionable conduct. Respondent affirmatively states that its actions were in conformity with all applicable laws, rules, and regulations, as well as industry standards and practices. To the extent that Claimants suffered any losses from the investments at issue, such losses were not the result of any culpable action or inaction by Respondent. Any allegation in Claimants' ASOC, not specifically addressed herein, shall be deemed denied by Respondent. Respondent reserves the right to further amend its Statement of Answer and/or Affirmative Defenses based on the discovery of additional facts and information.

Claimants allege in the ASOC that they were defrauded in purchasing certain investments completed with Emerson (the "Investments" or "investments at issue"). A number of claims are time barred, but all of the alleged claims are defective factually and legally.

First, Claimants were not unsophisticated investors who only desired "safe and secure" investments. They were "accredited investors" who had made unrealized profits from real estate investing, and they wished to avoid an immediate tax bill if they sold these investments. Second, contrary to what is portrayed in the ASOC, Claimants received numerous detailed disclosures about the Investments prior to investing, and signed paperwork confirming the amount of their assets, their liquidity needs and their net worth. The documents they received explained the nature of the Investments and the risks associated with these Investments. Any attempt to persuade this Panel that they are naïve, unsophisticated individuals, who were bamboozled into purchasing the Investments is utterly ridiculous.

Without basis, Claimants allege deficiencies in due diligence by Emerson. Emerson, however, sold the Investments after performing the requisite due diligence and approving them for sale to those clients for whom the Investments were deemed suitable, including these Claimants.

The reality is that no one tricked Claimants into making their investment decisions, let alone misrepresented risks associated with the Investments. This claim is nothing more than a transparent attempt by sophisticated investors to cast blame for those selected investments that may not have performed as well as they would have hoped. This attempt should be denied, and Claimants should not be permitted to make Emerson a guarantor of the Investments.

## II. STATEMENT OF FACTS

### A. Respondent Emerson Equity LLC

Emerson (CRD No. 130032) is a broker-dealer registered with FINRA, the United States Securities and Exchange Commission, and all fifty U.S. states. Emerson's principal place of business is in San Mateo, California.

### B. Claimants Were Experienced Real Estate Investors

Claimant Brett Henricks, age 70, is a graduate of California State Polytechnic who describes himself as a "DST and real estate investor." Formerly President and CEO of an industrial packing company, he is the owner of Henricks Investments LLC, a corporation seeking "investment vehicles inside and outside the common purchase of property."

Claimant Elizabeth Henricks, age 60, is Brett's wife and is also a Member of Henricks Investments LLC, owning 49% of the LLC, to Brett's 51%. She earned her BA from the University of Colorado at Colorado Springs in 1987, her MA from the University of Northern Colorado in 1990, and her Ph.D. from the University of Denver in 1994. After teaching at the university level for the first ten years of her career, Dr. Sharp worked in the corporate world, specializing in

organizational communication, marketing and public relations. She has recently returned to the classroom and loves interacting with her students.[1]

Based upon the information they provided to Emerson, their investments were suitable. Claimants told Emerson that they were "accredited investors" as defined by the SEC and they were experienced real estate investors. Their net worth (excluding the value of their home) was sufficient to permit them to make the Investments and they had "extensive knowledge" of investing in shares and mutual funds. They told Emerson that their liquidity needs were "low."

In addition to any other investments, Claimants also maintained real estate investments in which they had made significant unrealized profits. A cash sale of the real estate would have resulted in taxes being due and Claimants sought a way to defer payment of these taxes. Emerson recommended investments in in 1031 exchanges through Delaware Statutory Trusts ("DSTs").

**C. The Investments at Issue**

The investments at issue in the ASOC concern transactions by Claimants in real estate-based Delaware Statutory Trusts ("DSTs").[2] Claimants allege that they invested $1.75 million in DSTs, the amount raised from the sale of real investments that they had previously owned. These DSTs included purchases of Inspired Healthcare Capital ("IHC") Senior Living of Athens DST and IHC Peachtree DST, amongst other DST investments. Claimants also allege that they purchased DSTs of which Versity was the sponsor, as well as those sponsored by IHC.

**D. Claimants Invested in DSTs and Understood the Nature of Their Investments**

Claimants understood the nature and risks of the DST Investments. Any attempt to confuse the issues before the Panel by alleging that DSTs are complex investments and that the Claimants did not understand them is without foundation. A DST is simply an alternative way of making real estate investments and deferring taxes through a 1031 Exchange.[3] The structure and benefits of

---

[1] https://www.csupueblo.edu/profile/elizabeth-sharp-henricks/index.html

[2] The ASOC references purchases of "tenancy-in-common" investments ("TICs") but Claimants do not allege that they ever made such investments. TICs and DSTs are and different, separate and distinct from each other. This may be an error in the ASOC.

[3] A 1031 exchange is a real estate tax break that allows commercial property sellers to exchange one investment property for another, like kind, property while deferring capital gains tax on the sale. Without this tax break, sellers must pay capital gains tax at the time of sale. (https://calawyers.org/real-property-law/what-is-a-1031-exchange/)

DSTs, as well as their associated risks, were explained in detail to the Claimants through the documents they received and executed, and they may not argue that they did not understand their DST investments.

The structure of a DST is not complex, and its permitted structure and activities are defined by IRS Revenue Ruling 2002-86 ("IRS 86").[4] A DST is a special legal entity, typically created by a "Sponsor" that acquires commercial properties to be held in a trust. The Sponsor then sells beneficial interests in the trust to DST investors, which allows them to have an "undivided fractional interest" in the investment property owned by the trust. Because DSTs are qualified as replacement properties, as established by IRS 86, the seller of an investment property can defer their tax liability on profitable real estate sales if they acquire replacement property that is equal or greater value to the sale value, and if they utilize all of the proceeds resulting from their sale in the new DST investment. In short, the seller of property can choose to defer taxes by reinvesting 100% of the sale proceeds into a DST, rather than selling for cash and reinvesting the after-tax proceeds of the sale in other investments.

Investing in DSTs can offer other benefits as well as tax deferral through a 1031 Exchange. A DST investment can offer diversification into large-scale properties and also potentially provide regular, passive income. DST investors are passive owners, as the Sponsor controls the property's management and sale and a professional trustee manages the property, thus allowing investors to participate in real estate investments without any on-going landlord management responsibilities.

Claimants were made aware of the risks and benefits of DSTs and confirmed this in the documents they executed. Despite being fully aware of the nature of their investments, Claimants now take issue with the fact that those long-term investments may not have performed as they

---

[4] DSTs are qualified as replacement properties as established by IRS Revenue Ruling 2002-86 ("IRS 86"). IRS 86 holds that a DST formed to hold real property subject to a lease under a trust agreement is classified as a trust for Federal tax purposes under § 301.7701-4(c). Each of Trust's owners is treated as an owner of a pro-rata portion of Trust. Because an owner of an undivided fractional interest in Trust owns for Federal tax purposes the assets of Trust attributable to that interest, each owner is considered to own for those purposes an undivided fractional interest in the real rental property held by Trust. Accordingly, under § 1031 of the Code, a taxpayer may exchange an interest in real property for an interest in Trust without recognition of gain or loss, if the other requirements of § 1031 are satisfied.

would have hoped in the short term. Claimants' claims are without basis and premature, and it is wholly inappropriate for them to seek to have Emerson insure their investment decisions.

**E. Any Allegations Concerning Concentration Make No Sense**

Claimants' argument that they were over concentrated in real estate through their Investments in DSTs makes no sense. Claimants could easily have sold their original properties, paid the capital gains tax on the sale and reinvested in a portfolio of diverse investments, such as stock, bonds or commodities. Instead, they invested in DSTs to take advantage of the deferred tax opportunities that DSTs offer, advantages which could only have been obtained by investing in real estate again.

**F. Claimants Seek to Make Respondent a Guarantor of Their Investments**

Claimants vaguely allege misconduct by Respondent in connection with Claimants' decision to invest in DSTs, including those sponsored by Inspired Healthcare Capital LLC ("IHC"). Claimants are simply seeking to make Emerson a guarantor of the investments they made in IHC, a third-party entity over which Emerson had no control, following negative publicity about the activities of IHC.

IHC is an alternative investment sponsor dedicated exclusively to senior housing. Based in Scottsdale, Arizona, IHC focuses on properties that address the demands of seniors with an eye to America's aging population. IHC shared with the public its plans to acquire and develop senior housing facilities, including independent living, assisted living, and memory care.

In recent times, according to IHC, it managed assets exceeding $1.5 billion in value and acquired and ran senior living and healthcare facilities. Its offerings included private placements, such as DSTs and real estate investment trusts (REITs). At the time of writing, IHC has suspended investment offerings and investor distributions.

**G. Claimants' Allegations Concerning Due Diligence Have No Foundation**

Claimants allege unidentified failures of "due diligence," without any evidence or support for their claims. The "due diligence" process involves a review of a securities issuer's business prior to permitting the sale of an investment by a broker-dealer, but it is not a guarantee of the

future success of that business, nor does the process make a broker-dealer a guarantor of Claimants' investments.

A due diligence review offers a snapshot of an issuers' business based upon documents and information available at the time the due diligence is conducted. The process involves no crystal ball and those conducting due diligence cannot be held responsible for unforeseen future events, such as those that occurred at IHC. Claimants have not offered a single example or indeed any evidence of any failure to complete due diligence in connection with their IHC investments and the allegations should be dismissed.

### H. The Written Documents That Claimants Signed Must Prevail Over Alleged Oral Statements

Courts have found that, as a matter of law, a Claimant may not claim reliance on alleged oral misrepresentations where those "misrepresentations" are contradicted by a written document. In short, where there is a shouting match about alleged conversations that took place some years ago, the written documents executed by Claimant must prevail.

Reliance on alleged oral fraudulent representations "…is unreasonable as matter of law where alleged misrepresentations contradict express terms of ensuing written agreement." *Garcia v. Santa Maria Resort, Inc.*, 528 F.Supp.2d 1283, 1295 (S.D. 2007). *See also First Union Discount Brokerage Services, Inc. v. Milos*, 997 F.2d 835, 846 (11th Cir. 1993). *Solution Z v. Alma Lasers, Inc.*, 2013 WL 12246356 * 10 (S.D. 2013) (Granting a motion to dismiss on the grounds that it was unreasonable to rely on alleged oral representations which were specifically and repeatedly contradicted by the express terms of the contract.)

Documents warning investors that commercial real estate limited partnerships were risky investments precluded common-law fraud claims based on alleged oral statements that Plaintiff's investment was safe and conservative. *Carr v. CIGNA Securities, Inc.*, 95 F.3d 544 (7th Cir. 1996).

A plaintiff's reliance on an oral statement is not reasonable when it is contradicted by a written contract between the parties or otherwise conflicts with a written document that is readily available to the plaintiff. *Daneshvar v. Kipke*, 266 F.Supp.3d 1031 (E.D. Mich. 2017). *See*, e.g.,

*Foremost Guar. Corp. v. Meritor Sav. Bank*, 910 F.2d 118, 125 (4th Cir. 1990) (finding that reliance on oral representations was not reasonable when contradicted by written offering memoranda); *Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 805 (1st Cir.1987) (when plaintiffs "closed their eyes and passively accepted the contradictions" between oral misrepresentations and written representations, reliance was not justifiable as a matter of law).

Claimants have acknowledged their understanding of the DST Investments. For example, in March 2021, Claimants Brett and Elizabeth made an investment in IHC Peachtree on behalf of Claimant Henricks Investments LLC. They completed a purchaser questionnaire form, (the "Form") in connection with this investment. In capitals, the Form advised Claimants as follows:

> EACH PROSPECTIVE INVESTOR SHOULD EXAMINE THE SUITABILITY OF THIS TYPE OF INVESTMENT IN THE CONTEXT OF HIS OWN NEEDS, PURCHASE OBJECTIVES, AND FINANCIAL CAPABILITIES AND SHOULD MAKE HIS OWN INDEPENDENT INVESTIGATION AND DECISION AS TO SUITABILITY AND AS TO THE RISK AND POTENTIAL GAIN INVOLVED. ALSO, EACH PROSPECTIVE INVESTOR IS ENCOURAGED TO CONSULT WITH HIS ATTORNEY, ACCOUNTANT, FINANCIAL CONSULTANT OR OTHER BUSINESS OR TAX ADVISOR REGARDING THE RISKS AND MERITS OF THE PROPOSED INVESTMENT.

Claimant Brett affirmed that he was sufficiently experienced in financial matters to understand and evaluate the Investment:

> **I have such knowledge and experience in financial and business matters that 1 am capable of evaluating the merits and risks of a purchase of the Interests. The following is a description of my experience in financial and business matters:**
>
> ***Past owner of 3 successful businesses. Real estate Investor and operator for over 30 years. Past CEO of another business (not my own)*. (Form at page 3) (Emphasis added)**

The Form also advised Claimants to "read carefully" the Confidential Private Placement Memorandum (the "Memorandum") for the investment. Claimant acknowledged that they had read the Memorandum (Form at page 4) Page (i) of the Memorandum included a summary of the risks of investing in the DST, including the illiquid nature of the Investment, then noted:

> **INVESTORS MUST READ AND CAREFULLY CONSIDER THE DISCUSSION SET FORTH UNDER "RISK FACTORS" FOR A**

> **COMPLETE DISCUSSION OF THESE AND OTHER RISKS PERTAINING TO THIS INVESTMENT.**

Page 13-28 (Risk Factor) of the Memorandum disclosed various risks associated with the Investment.

As a further example of Claimants' knowledge and understanding of DSTs, in July 2021, Claimants made a $400,000 investment in the IHC Senior Living of Athens DST. On July 21, Claimant Brett signed a Letter of Understanding to Emerson which stated:

> **To Whom it May Concern:**
>
> **I am fully aware of the risks involved with investing in Inspired Senior Living of Athens DST and am comfortable with these types of investments. This investment is the proceeds from the sale of a family-owned investment property and is not my only source of income and is only part of my overall net worth. I am not concerned with the lack of liquidity, as l have adequate resources for all my liquidity needs. I believe l am helping to diversify my overall portfolio by investing in these types of assets.**

In fact, this was not the first time that Claimants had made such a statement to Emerson. They sent a similar Letter of Understanding when they purchased the IHC Athens DST.

In light of the above and the other documents executed by Claimants, this Panel should reject Claimants' attempt to argue that that they relied on alleged statements from their registered representative which contradicted the information that they acknowledged receiving. To the extent that Claimants' claims rely on any oral purported misrepresentations, such claims fail as a matter of law. Claimants could not have reasonably relied on them given the numerous written warnings and disclosures that they have acknowledged receiving.

## III. LEGAL ARGUMENT

### A. The Recommendations Made to Claimants Were Suitable

To state a claim for unsuitability, an investor must prove that (1) the investment was incompatible with the customer's investment objectives at the time the recommendation was made; (2) the broker recommended the investment anyway; and (3) the broker knew or reasonably believed the investment was inappropriate. *Keenan v. D.H. Blair & Co.*, 838 F. Supp. 82, 86-87

(S.D.N.Y. 1993); *see Mauriber v. Shearson/American Express, Inc.*, 567 F. Supp. 1231, 1237 (S.D.N.Y. 1983); *see Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 813 n.3 (6th Cir. 2015); *see O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 898 n.6 (10th Cir.1992).

A suitability claim raises a question of whether the investment was appropriate at the time it was recommended. *Keenan*, 838 F. Supp. at 86-87. In other words, a suitability analysis entails a "point of sale" analysis. Conclusory allegations regarding unsuitable investments will not suffice, a plaintiff must adequately describe their investment goals and give some indication why plaintiff considers the investment at issue to have been unsuitable when purchased. *Keenan*, 838 F. Supp. at 87; *Betz v. Trainer Worthem & Co., Inc.*, No. C 03-3231 SI, 2004 WL 7340652, at *6 (N.D. Cal. Feb. 2, 2004) (Granting a motion to dismiss on ground that plaintiff failed to plead with particularity as to why the particular securities purchased were unsuitable for plaintiff at the time; why or in what way the defendants knew the securities were unsuitable for plaintiff; or what misrepresentations were made concerning suitability.). In addition, the investor must also show that they justifiably relied on the broker's alleged wrongdoing. *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993). Finally, the investor must show that their losses were caused by the alleged wrongdoing. *See In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*, 273 F. Supp. 2d 351, 361-62 (S.D.N.Y. 2003), *aff'd in relevant part*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).

Suitability is evaluated at the time of the recommendation, and not after the fact with 20/20 hindsight. Of course, "a subsequent diminution in value reveals nothing about the quality of the stock when it was purchased and does not illuminate the reasons why the stock was unsuitable for investment objectives." *Keenan*, 838 F. Supp. at 86-87. Under federal securities law, an unsuitability claim falls under a § 10(b) fraud claim, which requires a finding "that, with scienter, the defendant made material misrepresentations. . . relating to the suitability of the securities" *Brown*, 991 F.2d at 1031. "Analytically, an unsuitability claim is a subset of the ordinary § 10(b) fraud claim." *Id.* Therefore, a plaintiff must show: (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which Appellants relied (5) which proximately caused their

injury. DSAM Glob. *Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002) (citing *McCormick v. Fund Am. Companies, Inc.*, 26 F.3d 869, 875 (9th Cir. 1994)).

Based upon the information provided by Claimants, the Investments were suitable for Claimants when they were purchased. Claimants were provided with numerous explicit risk disclosures regarding the Investments. They were experienced and prosperous real estate investors who purchased the Investments in accordance with their risk tolerance, liquidity needs and investment objectives. Claimants have not and cannot identify a single written statement or document evidencing material misrepresentations or omissions by Emerson or its agents which show an intent to deceive or defraud Claimants.

**B. Claimants' Causes of Action Based in Fraud Are Baseless**

***1. Claimants Have No Fraud Claim Under the Federal Securities Act***

Claimants have no 10b-5 fraud claim under the Federal Securities Act. In order to prove a 10b-5 claim, Claimants must plead and prove all of the following elements:

(1) a material misrepresentation (or omission);

(2) scienter, i.e., a wrongful state of mind;

(3) a connection with the purchase or sale of a security;

(4) reliance;

(5) economic loss; and

(6) "loss causation." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336,341 (2005).

In this action, Claimants cannot meet any of these standards. As noted previously, all material facts they may claim were omitted were in fact disclosed, and they cannot meet the burden of showing that their losses were caused by Emerson. Finally, Claimants cannot show scienter, as there is no evidence that Respondent acted intentionally to defraud them. On the contrary, Claimants purchased the 1031 eligible investments that they sought.

***2. Claimants' Common Law Fraud Claim Is Without Evidentiary Support***

Claimants cannot prove common law fraud. The elements essential to an action in tort for damages resulting from a material misrepresentation constituting fraud in Colorado require that:

(1) a party made a false representation of material fact;

(2) the party knew such a representation was false;

(3) the party who the representation was made to did not know of its falsity; and

(4) the representation was made with an intent that it be acted upon, and results in damages. *See Brody v. Bock*, 897 P.2d 769, 776 (Colo. 1995). Common elements of all fraud actions in Colorado also require showing that the plaintiff justifiably relied upon the representation or the nondisclosure and that this reliance resulted in damages. *Nelson v. Gas Rsch. Inst.*, 121 P.3d 340, 344 (Colo. App. 2005).

The ASOC fails to even recite these basic elements, let alone to plead with particularity any conduct on the part of Respondent that constitutes fraud. Claimants fail to cite any specific statements that Emerson misrepresented to and/or omitted from them. Similarly, Claimants cannot show that Respondent made any statements to them that Emerson knew were false. Even assuming that an oral misrepresentation or omission has occurred, the substantial written disclosures Claimants received, acknowledged and reviewed run counter to showing that any reliance on an allegedly misleading oral statement was justified. Rather than identify any such statement, Claimants vaguely assert that Emerson defrauded them by recommending unsuitable investments. However, as a matter of law, Claimants could not have reasonably relied on any such alleged misstatements, given the numerous written disclosures that were made available to them.

**3. *Respondent Did Not Violate the Colorado Securities Act***

Claimants' allegations that Respondent violated Colorado's securities fraud and statute is baseless. Claimants allege that Respondent failed to advise them about the nature of their Investments by making "untrue statements of material facts" during the process of investing in the Investments. Colorado Securities Act § 11-51-501 states that it is unlawful for a person, in connection with the sale or purchase of a security, directly or indirectly: (a) To employ any device, scheme, or artifice do defraud; (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they are made, not misleading; or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

As with all claims sounding in fraud, section 11-51-501 claims for fraudulent conduct are subject to Rule 9(b)'s heightened pleading standards. *See Est. of Bogue v. Adams*, 405 F. Supp. 3d 929, 939–40 (D. Colo. 2019) These heightened pleading standards require a plaintiff to plead "the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000). A fraud claim must be alleged with particularity, conclusory statements will not suffice. *Lamothe v. Decentral Life, Inc.*, No. 23-CV-03251-RMR-STV, 2024 WL 5055576, at *6 (D. Colo. Oct. 24, 2024) ("Defendants are correct in pointing out that mere conclusory statements like 'Plaintiff relied on the misrepresentations' are often insufficient to survive a motion to dismiss claim."); *see* e.g., *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 321-22 (8th Cir. 1997) (dismissing a securities fraud claim despite allegation that plaintiffs acted "in reliance upon the defendants' misrepresentations," because plaintiffs "did not allege specific facts showing that they relied on the Prospectus").

The allegations as to misrepresentations in the ASOC are nowhere near pled with the requisite particularity for such claims. However, Claimants make the conclusory statement that Respondent's conduct (somehow) amounted to fraudulently or negligently misrepresenting material facts. Respondent neither knowingly nor recklessly made false or material misrepresentations, nor was Emerson a participant who provided "substantial assistance" in the fraudulent sale of a security. To the contrary, Respondent provided substantial disclosure documents replete with cautionary language. Claimants, who represented familiarity with real estate investments, reviewed and knowingly made their own decisions to invest.

### C. Claimants Have No Claim Under Colorado's Consumer Protection Act Because This Act Does Not Apply to Securities Transactions

Colorado's Consumer Protection Act ("CCPA") imposes civil liability for "any claim against any person who has engaged in or caused another to engage in any deceptive trade practice

listed in this article." Colo. Rev. Stat. Ann. § 6-1-113. More specifically, the CCPA is "concerned with unfair or deceptive trade practices that significantly impact the 'public' as actual or potential 'consumers' of a defendant's 'goods' or services." *Robinson v. OppenheimerFunds, Inc.*, No. 12-CV-1528-JLK, 2013 WL 754417, at *4 (D. Colo. Feb. 27, 2013) (citing *Rhino Linings USA, Inc. v. Rocky Mountain Rhino*, 62 P.3d 142, 147 & 150–51 (Colo.2003)).

However, the CCPA does not apply to securities transactions. *Lamothe v. Decentral Life, Inc.*, No. 23-CV-03251-RMR-STV, 2024 WL 5055576, at *14 (D. Colo. Oct. 24, 2024) ("The Court agrees with this reasoning and agrees with Defendants that Plaintiff's CCPA claim, which is based on allegations of fraud related to the purchase of securities in Decentral and MjLink, falls outside the scope of the CCPA. This alone warrants dismissal of Plaintiff's CCPA claim."); *Robinson*, 2013 WL 754417, at *4 ("Where the 'goods' at issue are shares in mutual funds or other securities investments, however, misrepresentations as to the nature or risk of the fund or the investment are governed by the Colorado Securities Act.").

As with the complaints in this matter, the *Robinson* and *Lamonthe* cases asserted claims for fraud, misrepresentation, and violations of federal and/or state securities laws, as well as violations of the CCPA. In both cases, the U.S. District Court for the District of Colorado granted dismissal of the CCPA claims, holding that securities transactions do not fall under the CCPA's definition of "consumer goods and services," and thus, claims involving the purchase or sale of securities are generally excluded from the scope of the CCPA. *Lamothe*, 2024 WL 5055576, at *14; *Robinson*, 2013 WL 754417, at *4. With the above Colorado legal precedent in mind, Claimants' Colorado Consumer Protection Act claims are entirely inapplicable and must be dismissed as a matter of law, as the issues in this case are limited to the sale of securities to Claimants.

**D. Claimants Fail to Allege a Breach of Contract Claim**

Under Colorado law, a cause of action for breach of contract requires proof of the following elements:

(1) a contract was formed;

(2) the plaintiff performed the conditions precedent;

(3) the defendant breached the contract; and

(4) resulting damages. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

Here, no contract and provisions are even identified by Claimants, let alone a breach. This is another boilerplate claim in an ASOC replete with such claims.

Additionally, even assuming that this incoherent claim is a claim that Emerson is obligated to comply with FINRA rules (as a regulated party), no private cause of action can arise from any hypothetical breach. There is no contract between Clamants and Respondent that would require Emerson to guarantee the conduct of an issuer or sponsor.

Finally, Claimants' claim for breach of contract is derivative and arises from Claimants' other claims — namely, their allegations of fraud. As this claim is entirely derivative in nature, it fails for the same reasons discussed above and must be dismissed.

**E. The Breach of Fiduciary Duty Claim Should Be Dismissed**

Claimants cannot prevail on a claim for breach of fiduciary duty based on the purported facts outlined in their own ASOC. In order to prove a claim for breach of fiduciary duty in Colorado, a plaintiff must show:

(1) the existence of a fiduciary duty;

(2) a breach of that duty;

(3) causation; and

(4) damages." *Destefano v. Grabrian*, 763 P.2d 275, 284 (Colo. 1988).

Claimants fail to plead the requisite elements with the necessary degree of particularity for such a claim. Quite simply, Emerson did not breach any fiduciary duty to the Claimants. Moreover, if Respondent had, hypothetically speaking, breached its duty, the action or inaction of Emerson did not cause the alleged harm suffered by Claimants. Respondent's conduct fell well within the scope of any duty it may have owed Claimants.

Furthermore, Claimants' registered representative did not take any action in Claimants' accounts prior to discussing the potential action and receiving instructions from Claimants to take

such action. With full knowledge, substantial information, and a complete understanding of the risks, Claimants made the decisions regarding the investments at issue. Claimants knew and, until now, accepted the risks they were taking. Claimants must bear any consequences, whether positive or negative, of their informed investment decisions. Claimants' breach of fiduciary duty claim should be denied in its entirety.

**F. Claimants Have No Negligence Claim**

Claimants fail to assert any statutory violation of federal or Colorado securities laws involving liability for a claim based in negligence. Moreover, Claimants cannot allege a private right of action under FINRA rules because no such private right of action exists Therefore, any purported negligence claim would fall within Colorado tort law. Colorado tort law requires proof of the following essential elements in order to maintain a cause of action for negligence:

(1) the existence of a duty of care;

(2) a breach of that duty;

(3) an injury; and

(4) that the breach of the duty was a proximate cause of the injury. *Raleigh v. Performance Plumbing & Heating*, 130 P.3d, 1011, 1015 (Colo. 2006). Claimants fail to even properly recite these basic elements, and their vague allegations as to any alleged duty and breach thereof are not pled with the requisite particularity for such a claim.

Claimants do not allege any specific act by Respondent that breached any duty and cannot show that any act by Emerson directly and proximately caused the alleged damages. Rather, Claimants make the conclusory statement that Respondent's conduct somehow may have amounted to negligence. Emerson did not violate any duty nor did its conduct amount to negligence in connection with the investments at issue. To the contrary, Respondent exercised reasonable care and provided detailed disclosure documents, which Claimants were then able to review, research, and they knowingly made their decisions to purchase the investments at issue. Any decline in the value of Claimants' Investments was not due to any negligent act by Emerson. Accordingly, Claimants' negligence claim must be dismissed with prejudice.

### G. Any Failure to Supervise Claim Is Baseless

Any attempt to impose liability on Respondent by alleging that Emerson failed to supervise registered representatives is without factual or legal basis. In Colorado, an employer "who knows or should have known that an employee's conduct would subject third parties to an unreasonable risk of harm may be directly liable to third parties for harm proximately caused by his conduct." *Destefano v. Grabrian*, 763 P.2d 275, 288 (Colo.1988) (adopting doctrine of negligent supervision in Colorado). An employer's duty to supervise an agent or employee arises when the principal or employer "has reason to know" that the agent or employee "is likely to harm others" because of "his [or her] qualities" and "the work or instrumentalities entrusted to him [or her]." *Settle v. Basinger*, 2013 COA 18, ¶ 26, 411 P.3d 717, 723 (citing Destefano, 763 P.2d at 288).

To establish a cause of action for negligent supervision, a plaintiff must allege and prove that: (1) the defendant owed the plaintiff a legal duty to supervise others; (2) the defendant breached that duty; and (3) the breach of the duty caused the harm that resulted in damages to the plaintiff. *Settle*, 2013 COA at ¶ 23 (citing *Keller v. Koca*, 111 P.3d 445, 447 (Colo.2005)). In examining such a claim, it must also be noted that an employer may be held responsible for tortious conduct by an employee only if the tort is committed within the course and scope of employment. *Destefano*, 763 P.2d at 286-87; *McDonald v. Lakewood Country Club*, 170 Colo. 355, 461 P.2d 437 (1969); *see also National Cash Register Co. v. Lightner*, 154 Colo. 98, 111, 388 P.2d 781, 788 (1964) (The principal is ordinarily not liable for the independent acts of the agent done in his own name outside the scope of his employment.). An employee is acting within the scope of their employment if they are engaged in the work which has been assigned to them by their employer, or they are doing what is necessarily incidental to the work which has been assigned to them or which is customary within the business in which the employee is engaged. *Destefano*, 763 P.2d at 287; *Russell v. First Am. Mortgage Co.*, 39 Colo.App. 360, 565 P.2d 972 (1977).

Here, Claimants not only fail to properly plead the requisite elements of a negligent supervision claim under Colorado law, but also fail to even allege the appropriate category of injury. Moreover, Claimants do not even establish an actual cognizable economic injury beyond

mere hypothetical and speculative damages. Claimants make no attempt to show that Emerson had any prior knowledge of any propensity by its agents to commit the tortious conduct alleged in the ASOC.

In light of the fact that Claimants cannot prove any of their underlying claims with respect to any transaction or events in their account, any derivative causes of action for negligent supervision should be dismissed.

**H. Emerson and Its Agents Have No Control Person Liability**

The ASOC does not present any case of control person liability or vicarious liability under the doctrine of *respondeat superior* against Respondent or its agents. Control person liability under Colorado law is substantially the same as the federal statute, and Colorado courts have stated their reliance on federal law for interpreting claims under Title 15 and Section 20(a) of the Securities Act. *Houston v. Se. Invs. N.C., Inc.*, 2017 COA 66, ¶ 31, 399 P.3d 783, 789 ("the language of section 11-51-604(5)(b) of the Colorado Act is substantially similar to its federal counterpart, section 20(a) of the 1934 Act…we find that insofar as the provisions and purposes of our statute parallel those of the federal enactments, such federal authorities are highly persuasive."). To establish a cause of action under Section 20(a) of the Securities Act, a plaintiff must first show the existence of a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b–5, and then show control over the primary violator by the alleged controlling person. *See Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998).

A control person liability claim must also satisfy the heightened pleading requirements of the federal Private Securities Litigation Reform Act ("PSLRA"). *Lustgraaf v. Behrens*, 619 F.3d 867, 958 (8th Cir. 2010). Under PSLRA's falsity requirement, it is not enough to simply allege that fraud has occurred, a complaint must indicate the false statements that were made and why the alleged misstatements were false when made. *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir.2005). Also, under PSLRA's scienter requirement, it is not enough to allege generally that the defendant acted with scienter, the plaintiff must, "with respect to each act or omission alleged ..., state with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012) (citing 15 U.S.C. § 78u–4(b)(2)).

Here, there was no primary wrongdoing by Respondent or its agents, and therefore, no basis for liability under the doctrine of *respondeat superior* or under the control person liability statute. *See* 15 U.S.C. § 78t(a); *see Schwartz v. Celestial Seasonings, Inc.*, 904 F. Supp. 1191, 1201 (D. Colo. 1995) (holding that the failure of claimant to adequately plead securities fraud under either the Securities Act or the Exchange Act also precluded any finding of control person liability under either Act).

Emerson denies any and all alleged wrongdoing and basis for liability, including any misconduct on the part of the registered representatives at issue. There was no primary wrongdoing by any agent of Emerson, nor was there any evidence that Emerson provided "substantial assistance" in any violation of the Colorado securities act. Therefore, there is no basis for control person or vicarious liability against Emerson under Colorado law.

**I. There is No Private Right of Action for Alleged Violation of FINRA Rules**

Claimants cite to numerous FINRA rules as the basis of several causes of action. First, courts have considered this point for decades and have consistently come away with the conclusion that no such cause of action exists. *See*, e.g., *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) ("It is well established that violation of an exchange rule will not support a private claim; *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 680–81 (9th Cir.1980) (Securities Exchange Act does not provide a private cause of action for violation of stock exchange rules, NASD rules); *Rolf v. Blyth Eastman Dillion & Co.*, 424 F.Supp. 1021, 1041 (S.D.N.Y. 1977), *aff'd*, 570 F.2d 88 (2d Cir. 1978) ("Each court that has considered the question has concluded that mere negligent violations of the NYSE or NASD rules are not actionable in federal court; rather, to form the basis for liability in damages, the broker's violations of the rules must be "tantamount to fraud."). *See also Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200 (3d Cir. 1990) (no right of action for violation of NASD rules); *Thompson v. Smith Barney, Harris Upham & Co.*, 709 F.2d 1413 (11th Cir. 1983) (no private right of action for violation of know your customer or suitability rules of SROs);

*Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 493 (6th Cir. 1990) ("NYSE Rule 405 does not imply a private right of action"). *See also Kirkland v. E.F. Hutton and Co.*, Inc., 564 F.Supp. 427 (E.D. Mich., S.D., 1983); *Emmons v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 532 F.Supp. 480 (S.D. Ohio, W.D.); *Golob v. Nauman Vandervoort, Inc.*, 353 F.Supp. 1264 (N.D. Ohio, W.D., 1972).

Even assuming that there was a private right of action for violation of FINRA rules, Respondent complied with all applicable rules and regulations. Emerson did not breach any duty that it owed to Claimants, nor did it fail to conduct adequate due diligence regarding either the recommended Investments or the issuers of the investments at issue. Any allegations to the contrary entirely lack support in the evidence.

**J. Emerson's Conduct Was Consistent With the Standards of Reg BI**

The SEC's REG BI established a "best interest" standard of conduct for broker-dealers and associated persons when they make a recommendation to a retail customer of any securities transaction or investment strategy involving securities, including recommendations of types of accounts." All of Emerson's recommendations met this standard. (*See also* "Suitability - Section A" above). In addition, Reg BI was effective from June 30, 2020. To the extent that any claims pre-date June 30, 2020, then the regulation is inapplicable.

**K. Certain Claims Are Time Barred Under Colorado Law**

Claimants' ASOC sets forth several causes of action, including violations of the Colorado Securities Act, negligence, negligent supervision, common law fraud, breach of fiduciary duty, and breach of contract. As will be shown at the hearing, certain claims are time barred under Colorado law:

- <u>Negligence</u>: two years (C.R.S. § 13-80-102);
- <u>Negligent Supervision</u>: two years (C.R.S. § 13-80-102);
- <u>Common Law Fraud</u>: three years (after discovery) (C.R.S. § 13-80-101);
- <u>Securities Fraud</u>: three years (after discovery) (C.R.S. § 11-1-604(8));
- <u>Breach of Fiduciary Duty</u>: three years (C.R.S. § 13-80-101); and

- Breach of Contract: three years (C.R.S. § 13-80-101).

To the extent that Claimants seek redress for their Investments on claims that may not have been filed within the statutorily-allotted time-period, those claims should be dismissed.

## IV. AFFIRMATIVE DEFENSES

The foregoing discussion demonstrates that Respondent is not liable to Claimants under any of the theories of recovery set forth in the ASOC. In addition, Respondent, as permitted by Rule 12303(a) of the Customer Code, offers the following defenses:

### FIRST AFFIRMATIVE DEFENSE

The ASOC, and each purported cause of action contained therein, is barred because they fail to state facts sufficient to constitute a cause of action against Respondent.

### SECOND AFFIRMATIVE DEFENSE

In further response to the ASOC, Respondent states that there is no private right of action and Claimants cannot state a claim for a violation of the rules of FINRA, the NASD, the NYSE, the SEC, or any other self-regulatory organization, including, without limitation, claims and allegations concerning unsuitability and failure to supervise.

### THIRD AFFIRMATIVE DEFENSE

The causes of action are barred by the applicable statutes of limitation and repose.

### FOURTH AFFIRMATIVE DEFENSE

Claimants are barred from recovery by the equitable doctrines of waiver, estoppel, unclean hands, and laches.

### FIFTH AFFIRMATIVE DEFENSE

Respondent is informed and believes, and on that basis alleges, that Claimants have failed to mitigate their damages, if any, and any damages awarded should be reduced accordingly.

### SIXTH AFFIRMATIVE DEFENSE

In further response to the ASOC, Respondent states that Claimants at all times retained authority for all transactions and investments at issue, purchased through Respondent.

**SEVENTH AFFIRMATIVE DEFENSE**

Claimants are barred from recovery to the extent they authorized, affirmed and/or ratified the Investment, transactions, and all actions and/or omissions of which they now complain.

**EIGHTH AFFIRMATIVE DEFENSE**

The damages, if any, allegedly suffered by Claimants were proximately caused by, or were the consequence of, the conduct, actions, omissions, negligence, or intentional acts of Claimants and/or parties other than Respondent.

**NINTH AFFIRMATIVE DEFENSE**

Claimants expressly or implicitly consented to each and every action on the part of Respondent of which Claimants now complain.

**TENTH AFFIRMATIVE DEFENSE**

In further response to the ASOC, Respondent states that Respondent did not know, and in the exercise of reasonable care could not have known, of the alleged material misleading statements and omissions suggested in Claimants' ASOC, and at all times acted in good faith.

**ELEVENTH AFFIRMATIVE DEFENSE**

In further response to the ASOC, Respondent states that a reasonable and justified statement of opinion regarding investments or market conditions is not actionable.

**TWELFTH AFFIRMATIVE DEFENSE**

In further response to the ASOC, Respondent states that it is not liable for failing to predict market fluctuations, the performance of any of Claimants' investments, or any other matters at issue in the ASOC.

**THIRTEENTH AFFIRMATIVE DEFENSE**

Claimants knowingly and voluntarily assumed the risk of losing their invested assets.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Claimants are not entitled to an award of attorney's fees or costs because there is no basis under statute, contract, or otherwise for such an award for Claimants.

**FIFTEENTH AFFIRMATIVE DEFENSE**

The causes of action are barred, in whole or in part, by Claimants' acquiescence in the purported acts and/or omissions upon which they are predicated.

**SIXTEENTH AFFIRMATIVE DEFENSE**

Respondent's acts were not willful, malicious, in bad faith, or motivated by ill-will or fraud.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

The damages for which Claimants seek to hold Respondent liable resulted in whole or in part from acts or omissions of third parties, and Respondent is not responsible for or liable to Claimants for the wrongful or negligent acts or omissions by these third parties.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

The claims-at-issue are barred in their entirety by the "bespeaks caution doctrine." *See In re Worlds of Wonder*, 35 F.3d 1407, 1413 (9th Cir. 1994).

**NINETEENTH AFFIRMATIVE DEFENSE**

Claimants' damages, if any, should be offset and reduced by the amount received from the investment at issue.

**TWENTIETH AFFIRMATIVE DEFENSE**

In further response to the ASOC, Respondent states that Claimants' negligence-based claims are barred by the economic loss doctrine, which prevents recovery on an unintentional tort basis for purely economic loss.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

In further response to the ASOC, Respondent states that, as a matter of law, the damages Claimants seek are too speculative to be awarded. *See Chanoff v. U.S. Surgical Corp.*, 857 F. Supp. 1011 (D. Conn. 1994).

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

Claimants' damages, if any, were the consequence of the superseding cause of one or more third-party's conduct.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

In further response to the ASOC, Respondent states that Claimants have failed to allege a factual or legal basis for an award of punitive damages and to the extent they seek such relief, any such request for recovery of punitive damages must be denied. Furthermore, any claim for punitive damages is barred because an award of punitive damages would violate Respondent's constitutional rights under the due process clause of the Fourteenth Amendment and the excessive penalties clause of the Eighth Amendment of the United States Constitution.

**ADDITIONAL AFFIRMATIVE DEFENSES**

Respondent reserves its right to assert additional affirmative defenses in the event discovery and/or investigation indicates that additional affirmative defenses are applicable.

## V. RELIEF REQUESTED

Respondent Emerson Equity LLC respectfully requests:

1. That all causes of action be dismissed in their entirety;
2. That Claimants take nothing by way of the ASOC;
3. That Respondent be awarded its attorney fees and costs incurred defending the claims;
4. That Respondent's portion of the forum fees be assessed against Claimants; and
5. Such other and further relief as the Panel deems just and proper.

Dated: November 12, 2025

Respectfully submitted,

TADJEDIN THOMAS & ENGBLOOM LAW GROUP LLP

*/s/ Amir Tadjedin*

Amir Tadjedin
Craig A. Vollono
David G. Smitham
Christopher Anthony
Tyler G. Mills

*Attorneys for Respondent Emerson Equity LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing *RESPONDENT EMERSON EQUITY LLC'S ANSWER TO THE AMENDED STATEMENT OF CLAIM* was uploaded to the FINRA DR Portal by which the following were to receive service on November 12, 2025:

GOODMAN & NEKVASIL, P.A.
Kalju Nekvasil, Esq.
624 1st Avenue South
St. Petersburg, FL 33701
Email: gnmain@gnfirm.com

*Attorneys for Claimants*

TADJEDIN THOMAS & ENGBLOOM LAW GROUP LLP

*/s/ Chris Harris*
Chris Harris