Amir Tadjedin (CA Bar No.186967; OR Bar No.055613; WA Bar No. 47414)
Craig A. Vollono (NY Bar No. 4446431)
David G. Smitham (CA Bar No.335635; NY Bar No. 4194676)
Christopher Anthony (MD Bar No. 1512150017)
Tyler G. Mills (OR Bar No. 215303)

TADJEDIN THOMAS & ENGBLOOM LAW GROUP LLP
1211 NW Glisan Street, Suite 203
Portland, Oregon 97209
Tel: 503-224-9294
amirt@ttelawgroup.com
craigv@ttelawgroup.com
davids@ttelawgroup.com
christophera@ttelawgroup.com
tylerm@ttelawgroup.com

*Attorneys for Respondent*
*Emerson Equity LLC*

**IN THE ARBITRATION BEFORE THE**

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**

| | |
|---|---|
| DAVID WALSER AND BARBARA GREENFIELD,<br><br>Claimants,<br><br>v.<br><br>EMERSON EQUITY LLC (CRD# 130032),<br><br>Respondent. | Arbitration No. 25-01799<br><br>**RESPONDENT EMERSON EQUITY LLC'S ANSWER TO THE STATEMENT OF CLAIM** |

Respondent Emerson Equity LLC ("Emerson" or "Respondent") hereby submits its Statement of Answer pursuant to FINRA Rule 12303. Claimants David Walser and Barbara Greenfield ("Claimants"), filed their Statement of Claim ("SOC") against Respondent alleging: (1) breach of contract; (2) violations of federal securities laws; (2) unsuitability; (3) violations of California securities laws; (4) fraud; (5) breach of fiduciary duty; (6) control person liability; (7) negligence; and (8) violations of Reg BI.



GN DEFENDANTS EXHIBIT 12

Respondent expressly denies all allegations of wrongdoing or actionable conduct. Respondent affirmatively states that its actions were in conformity with all applicable laws, rules, and regulations, as well as industry standards and practices. To the extent that Claimants suffered any losses from the investments at issue, such losses were not the result of any culpable action or inaction by Respondent. Any allegation in Claimants' SOC not specifically addressed herein shall be deemed denied by Respondent. Respondent reserves the right to amend its Statement of Answer and/or Affirmative Defenses based on the discovery of additional facts and information.

## I. PRELIMINARY STATEMENT

Claimants allege in the SOC that they were defrauded in purchasing certain investments made through Emerson (the "Investments" or "investments at issue"). All of the alleged claims are defective factually and legally.

First, Claimants were sophisticated investors who did not limit their objectives to safe and secure investments. They were experienced and "accredited investors" who had made unrealized profits from real estate investing, and they wished to avoid an immediate tax bill if they sold these investments. Second, contrary to what is portrayed in the SOC, prior to investing, Claimants received numerous detailed disclosures about the Investments, and signed paperwork confirming the amount of their assets, their liquidity needs, and their net worth. The documents they received explained the nature of the Investments and the risks associated with these Investments. Any attempt to persuade this Panel that he they are naïve, unsophisticated individuals, who were bamboozled into purchasing the Investments is utterly ridiculous.

Without basis, Claimants allege deficiencies in due diligence by Emerson. Emerson, however, sold the Investments after performing the requisite due diligence and approving them for sale to those clients for whom the Investments were deemed suitable, including these Claimants.

The reality is that no one tricked Claimants into making their investment decisions, let alone misrepresented risks associated with their Investments. This claim is nothing more than a transparent attempt by sophisticated investors to cast blame for those selected Investments that

may not have performed as well as they would have hoped. This attempt should be denied, and Claimants should not be permitted to make Emerson a guarantor of their Investments.

## II. STATEMENT OF FACTS

### A. Respondent Emerson Equity LLC

Emerson (CRD No. 130032) is a broker-dealer registered with FINRA, the United States Securities and Exchange Commission, and all fifty U.S. states. Emerson's principal place of business is in San Mateo, California.

### B. Claimants - David Walser and Barbara Greenfield

Claimants are residents of California, and they advised Respondent that they held real estate investments that had proved to be profitable and wished to reduce their tax burden. Claimants' allegations that they did not understand the investments at issue are belied by the documents that they each signed and presented to Emerson.

#### 1. *Claimant David Walser*

In March 2021, Claimant Walser was 74 years old. He told Emerson that he was an accredited investor as defined by the SEC and that he owned investment properties valued at over $1 million. Claimant Walser was familiar with the world of investing. He told Emerson that he had extensive experience of investing in mutual funds, stocks, bonds, LLCs, and commodities. Claimant Walser told Emerson that he had made profits from his real estate investments and wanted to make a "1031 Exchange" to avoid an immediate tax bill.

Claimant Walser's allegation that he was risk averse is denied by his own written statements and he advised Emmerson that he was willing to accept risks to achieve his goals. He executed a Confidential Investor Suitability Questionnaire (the "Questionnaire") in which he confirmed to Emerson that he was willing to accept a "high-risk investment" like the ones about which he now complains. He affirmed that:

> **I acknowledge this is a high-risk investment and is meant to be held long-term and further acknowledge that I am seeking investments that provide income, capital appreciation, or a combination thereof.**
>
> **I acknowledge receipt of a copy of this Investor Suitability Questionnaire and attached disclosures and certifications. I have read, understand, and agree to the terms and conditions in this Investor Suitability Questionnaire, which contains a pre-dispute arbitration clause (located on the *following* page) and a Patriot Act disclosure. I believe the information provided is true and accurate to the best of my knowledge**.
> **(Confidential Investor Suitability Questionnaire, page 4)**

**2. *Claimant Barbara Greenfield***

In March 2021, Claimant Greenfield submitted a separate Questionnaire to Emerson. [redacted]. She described herself as a retired social worker and travel agent and she too confirmed in writing that she was considering making a "high-risk" investment in a 1031 Exchange.

In light of the above, any allegation that Claimants did not understand that the Investments carried potential risks, is baseless.

**C. The Investments at Issue**

Claimants invested in a number of real estate-based Delaware Statutory Trusts ("DSTs") and other investments through Emerson. The SOC discusses Tenancy-in-Common ("TIC") investments at length, but this discussion is a distraction. Claimants did not purchase TICs through Emerson, and TICs are not the same type of investment as DSTs. An investment in a DST, however, does offer an alternative way to invest in real estate. Amongst other investments, Claimants invested in DSTs sponsored by Inspired Healthcare Capital ("IHC"), including Inspired Senior Living of Hamilton DST and they also invested in a DST titled CS1031 MOB AZ I, DST.

**D. Claimants Invested in DSTs and Understood the Nature of Their Investments**

The investments at issue concern transactions by Claimants in DSTs. Any attempt to confuse the issues before the Panel by alleging that DSTs are complex investments and that the Claimants did not understand them is without foundation. A DST is simply an alternative way of making simply an alternative way of making real estate investments and offers the potential to

defer taxes on previously profitable real estate funds through a 1031-exchange.[1] The structure and benefits of DSTs, as well as their associated risks, were explained in detail to Claimants through the documents that he received and signed, and he may not argue that he did not understand his DST investments.

The structure of a DST is not complex, and its permitted structure and activities are defined by IRS Revenue Ruling 2002-86 ("IRS 86").[2] A DST is a special legal entity, typically created by a "Sponsor" that acquires commercial properties to be held in a trust. The Sponsor then sells beneficial interests in the trust to DST investors, which allows them to have an "undivided fractional interest" in the investment property owned by the trust. Because DSTs are qualified as replacement properties, as established by IRS 86, the seller of an investment property can defer their tax liability on profitable real estate sales if they acquire replacement property that is equal or greater value to the sale value, and if they utilize all of the proceeds resulting from their sale in the new DST investment. In short, the seller of a property can choose to defer taxes by reinvesting 100% of the sale proceeds into a DST rather than selling for cash and reinvesting the after-tax proceeds of the sale in other investments. However, contrary to the allegations in the SOC, sales of DSTs are not limited to sellers of profitable real estate.

Investing in DSTs can offer other benefits as well as tax deferral through a 1031-exchange. A DST investment can offer diversification into large-scale properties and also potentially provide regular, passive income. DST investors are passive owners, as the Sponsor controls the property's management and sale and a professional trustee manages the property, thus, allowing investors to participate in real estate investments without any on-going landlord management responsibilities.

---

[1] A 1031-exchange is a real estate tax break that allows commercial property sellers to exchange one investment property for another, like kind, property while deferring capital gains tax on the sale. Without this tax break, sellers must pay capital gains tax at the time of sale. (https://calawyers.org/real-property-law/what-is-a-1031-exchange/)

[2] DSTs are qualified as replacement properties as established by IRS Revenue Ruling 2002-86 ("IRS 86"). IRS 86 holds that a DST formed to hold real property subject to a lease under a trust agreement is classified as a trust for Federal tax purposes under § 301.7701-4(c). Each of Trust's owners is treated as an owner of a pro-rata portion of Trust. Because an owner of an undivided fractional interest in Trust owns for Federal tax purposes the assets of Trust attributable to that interest, each owner is considered to own for those purposes an undivided fractional interest in the real rental property held by Trust. Accordingly, under § 1031 of the Code, a taxpayer may exchange an interest in real property for an interest in Trust without recognition of gain or loss if the other requirements of § 1031 are satisfied.

Claimants were made aware of the risks and benefits of DSTs and confirmed their understanding in the documents that they executed. Despite being fully aware of the nature of their Investments, Claimants now take issue with the fact that those long-term investments may not have performed as they would have hoped in the short term. Claimants' claims are without basis and premature, and it is wholly inappropriate for them to seek to have Emerson insure their investment decisions.

**E. Claimants Seek to Make Emerson a Guarantor of Their Investments**

Claimants vaguely allege misconduct by Respondent in connection with Claimants' decision to invest in DSTs issued by Inspired Healthcare Capital LLC ("IHC"). Claimants are simply seeking to make Emerson a guarantor of the Investments they made in products sponsored by IHC, a third-party entity over which Emerson had no control, following negative publicity about the activities of IHC.

IHC is an alternative investment sponsor dedicated exclusively to senior housing. Based in Scottsdale, Arizona, IHC focuses on properties that address the demands of seniors with an eye to America's aging population. IHC shared with the public its plans to acquire and develop senior housing facilities, including independent living, assisted living, and memory care. In recent times, according to IHC, it managed assets exceeding $1.5 billion in value and acquired and ran senior living and healthcare facilities. Its offerings included private placements, such as DSTs. At the time of writing, IHC has suspended investment offerings and investor distributions.

**F. Claimants' Allegations Concerning Due Diligence Have No Foundation**

Claimants allege unidentified failures of "due diligence," without any evidence or support for their claims. The "due diligence" process involves a review of a securities issuer's business prior to permitting the sale of an investment by a broker-dealer, but it is not a guarantee of the future success of that business, nor does the process make a broker-dealer a guarantor of Claimants' Investments.

A due diligence review offers a snapshot of an issuers' business based upon documents and information available at the time the due diligence is conducted. The process involves no crystal

ball, and those conducting due diligence cannot be held responsible for unforeseen future events such as those events that occurred at IHC. Claimants have not offered a single example, or indeed, any evidence of any failure to complete due diligence in connection with their IHC Investments, or indeed any of their Investments, and the allegations should be dismissed.

**G. The Written Documents That Claimants Signed Must Prevail Over Alleged Oral Statements**

Courts have found, that, as a matter of law, Claimants may not claim reliance on alleged oral misrepresentations where those "misrepresentations" are contradicted by a written document. In short, where there is a shouting match about alleged conversations that took place some years ago, the written documents executed by Claimants must prevail. Reliance on alleged oral fraudulent representations "…is unreasonable as matter of law where alleged misrepresentations contradict express terms of ensuing written agreement." *Garcia v. Santa Maria Resort, Inc.*, 528 F.Supp.2d 1283, 1295 (S.D. 2007). *See also* F*irst Union Discount Brokerage Services, Inc. v. Milos*, 997 F.2d 835, 846 (11th Cir. 1993). *Solution Z v. Alma Lasers, Inc.*, 2013 WL 12246356 * 10 (S.D. 2013) (Granting a motion to dismiss on the grounds that it was unreasonable to rely on alleged oral representations which were specifically and repeatedly contradicted by the express terms of the contract.) Documents warning investors that commercial real estate limited partnerships were risky investments that precluded common-law fraud claims based on alleged oral statements that a plaintiff's investment was safe and conservative. *Carr v. CIGNA Securities, Inc.*, 95 F.3d 544 (7th Cir. 1996).

A plaintiff's reliance on an oral statement is not reasonable when it is contradicted by a written contract between the parties or otherwise conflicts with a written document that is readily available to the plaintiff. *Daneshvar v. Kipke*, 266 F.Supp.3d 1031 (E.D. Mich. 2017). *See*, e.g., *Foremost Guar. Corp. v. Meritor Sav. Bank*, 910 F.2d 118, 125 (4th Cir. 1990) (finding that reliance on oral representations was not reasonable when contradicted by written offering memoranda); *Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 805 (1st Cir.1987) (when plaintiffs "closed their

eyes and passively accepted the contradictions" between oral misrepresentations and written representations, reliance was not justifiable as a matter of law).

Claimant Walser received numerous disclosures about DSTs, and he has acknowledged that he understood DST Investments. In August 2021, Claimant Walser made an investment in CS1031 MOB AZ I, DST. He completed a Purchaser Questionnaire form, (the "Form") in connection with this investment. The Form advised Walser that he needed to "read carefully" the DST's Confidential Private Placement Memorandum dated July 13, 2021, (the "Memorandum").

The Form advised Claimant Walser that the investment was not open to every investor, and that only "qualified" investors could make a purchase: **"This Offering is limited to a Purchaser who certifies that he meets all of the qualifications set forth in the Memorandum."** The Form also stated:

> **EACH PROSPECTIVE PURCHASER SHOULD EXAMINE THE SUITABILITY OF THIS TYPE OF INVESTMENT IN THECONTEXT OF HIS OWN NEEDS, PURCHASE OBJECTIVES, AND FINANCIAL CAPABILITIES AND SHOULD MAKE HIS OWN INDEPENDENT INVESTIGATION AND DECISION AS TO SUITABILITY AND AS TO THE RISK AND POTENTIAL GAIN INVOLVED. ALSO, EACH PROSPECTIVE PURCHASER IS ENCOURAGED TO CONSULT WITH HIS ATTORNEY, ACCOUNTANT, FINANCIAL CONSULTANT OR OTHER BUSINESS OR TAX ADVISOR REGARDING THE RISKS AND MERITS OF THE PROPOSED INVESTMENT.**

Claimant Walser confirmed to Emerson that:

> **I have such knowledge and experience in financial and business matters that I am capable of evaluating the merits and risks of a purchase of the Interests. (The Form page 12)**

Claimants jointly completed a Letter of Understanding (the "Letter") in connection with this purchase and others. In the Letter, they jointly affirmed as follows:

> **I am fully aware of the risks involved with investing in Astoria DST, Shadowglen DST & CS MOB AZ and are comfortable with these types of investments. I am not concerned with the lack of liquidity, as I have adequate resources for all my liquidity needs.**
>
> **In light of volatility of my stock investments, I believe I am helping to diversify my overall portfolio investing in these types of assets. (See Exhibit "A" attached hereto.)**

Claimant Greenfield separately executed a Form in connection with her purchase of Inspired Senior Living Hamilton DST in June 2022. The disclosures detailed above were also included in the Form that she executed. In the Form that she signed, Claimant Greenfield confirmed that she had reviewed the Memorandum for the Inspired Senior Living Hamilton DST. The Memorandum included a summary of the risks of investing in the DST and contained a whole section on the potential risks of investing in DSTs, captioned **"Risk Factors."**

Claimant Greenfield also signed a Purchase Agreement (the "Agreement") in connection with her DST investments. In that Agreement, Claimant Greenfield confirmed that the information regarding suitability of the investment that she had provided to Emerson was accurate:

> **4.3.3 All information and documentary evidence that Buyer has provided to Seller concerning its suitability to invest in the Interest is complete, accurate, and correct as of the date of its signature on the last page of this Agreement. Buyer hereby agrees to notify Seller immediately of any material change in any such information occurring prior to the Closing Date, including any information about changes concerning its net worth and financial position.**

Claimant again confirmed in the Agreement that she had read the Memorandum and that in making her investment decision, he had relied only on the information in the Memorandum and that she had not relied on any oral statements form any other person in choosing to make the Investment:

> **4.3.1 Buyer [Claimant] acknowledges that it has received, read, and fully understands the Memorandum. Buyer acknowledges that it is basing its decision to invest in the Interest on the Memorandum and Buyer has relied only on the information contained in said materials and has not relied upon any representations made by any other person. Buyer recognizes that an investment in the Interest involves substantial risk and Buyer is fully cognizant of and understands all of the risk factors related to the purchase of the Interest, including, but not limited to, those risks set forth in the section of the Memorandum entitled "RISK FACTORS."**

Claimant Greenfield also signed a second Letter on June 17, 2022, in connection with an investment in Vintage DST and other DST investments. Here too she confirmed that she was **"fully aware of the risks involved with investing." (See Exhibit "B" attached hereto.)**

In light of Claimants' statements, upon which Respondent reasonably relied, this Panel should reject Claimants' attempt to argue that they relied on alleged oral statements from any

registered representative which contradicted the information that he has acknowledged receiving. To the extent that Claimants' claims rely on any oral purported misrepresentations, such claims fail as a matter of law. Claimants could not have reasonably relied on them given the numerous written warnings and disclosures that they have acknowledged having received.

## III. LEGAL ARGUMENT

### A. Claimants' Claims of Unsuitability Must Be Dismissed

To state a claim for unsuitability, an investor must prove that (1) the investment was incompatible with the customer's investment objectives at the time the recommendation was made; (2) the broker recommended the investment anyway; and (3) the broker knew or reasonably believed the investment was inappropriate. *Keenan v. D.H. Blair & Co.*, 838 F. Supp. 82, 86-87 (S.D.N.Y. 1993); *see Mauriber v. Shearson/American Express, Inc.*, 567 F. Supp. 1231, 1237 (S.D.N.Y. 1983); *see Rhinehimer v. U.S. Bancorp Ins., Inc.*, 787 F.3d 797, 813 n.3 (6th Cir. 2015); *see O'Connor v. R.F. Lafferty & Co.,* 965 F.2d 893, 898 n.6 (10th Cir.1992). A suitability claim raises the question of whether the investment was appropriate at the time that it was recommended. *Keenan*, 838 F. Supp. at 86-87. In other words, a suitability analysis entails a "point of sale" analysis. Conclusory allegations regarding unsuitable investments will not suffice. A plaintiff must adequately describe their investment goals and give some indication of why plaintiff considers the investment at issue to have been unsuitable when purchased. *Keenan*, 838 F. Supp. at 87; *Betz v. Trainer Worthem & Co., Inc.*, No. C 03-3231 SI, 2004 WL 7340652, at *6 (N.D. Cal. Feb. 2, 2004) (Granting a motion to dismiss on ground that plaintiff failed to plead with particularity as to why the particular securities purchased were unsuitable for plaintiff at the time; why or in what way the defendants knew the securities were unsuitable for plaintiff; or what misrepresentations were made concerning suitability.).

In addition, the investor must also show that they *justifiably relied* on the broker's alleged wrongdoing. *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993). Finally, the investor must show that their losses were *caused* by the alleged wrongdoing. *See In re Merrill*

*Lynch & Co., Inc. Research Reports Secs. Litig.*, 273 F. Supp. 2d 351, 361-62 (S.D.N.Y. 2003), *aff'd in relevant part*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). Suitability is evaluated at the time of the recommendation, and not after the fact with 20/20 hindsight. Of course, "a subsequent diminution in value reveals nothing about the quality of the stock when it was purchased and does not illuminate the reasons why the stock was unsuitable for investment objectives." *Keenan*, 838 F. Supp. at 86-87.

Under federal securities law, an unsuitability claim falls under a § 10(b) fraud claim, which requires a finding "that, with scienter, the defendant made material misrepresentations. . . relating to the suitability of the securities" *Brown*, 991 F.2d at 1031. "Analytically, an unsuitability claim is a subset of the ordinary § 10(b) fraud claim." *Id.* Therefore, a plaintiff must show: (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which Appellants relied (5) which proximately caused their injury. *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002) (citing *McCormick v. Fund Am. Companies, Inc.*, 26 F.3d 869, 875 (9th Cir. 1994)); *see Brown*, 991 F.2d at 1031; *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986). *See generally*, *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 424 F. Supp. 1021 (S.D.N.Y. 1977), aff'd, 570 F. 2d 38 (2d Cir. 1978), *cert. denied*, 439 U.S. 1039 (1978).

As will be established at the hearing, Claimants cannot meet their burden of proof in this matter. The evidence will show that the Investments were suitable at the time of purchase, based upon the information they provided to Emerson. Claimants were provided with detailed risk disclosures that they acknowledged having received and understood. The suitability claims should be denied.

**B. Claimants Fail to Allege a Breach of Contract Claim**

A cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach. *Miles v. Deutsche Bank National Trust Co.*, 236 Cal.App.4th 394, 402 (2015).

Furthermore, to allege a breach of contract in California, a claimant must identify not only

the contract at issue, but also which provisions were breached. Claimants have done neither. *See* e.g., *Caraccioli v. Facebook, Inc.*, 167 F.Supp.3d 1056 (2016). Here, no contract is even identified. Additionally, even assuming that this claim is a claim that Respondent is obligated to comply with under FINRA rules (as a regulated party), no private cause of action can arise from any hypothetical breach/violation.

Finally, Claimants' claim for breach of contract is derivative and arises from Claimants' other claims. As this claim is entirely derivative in nature, it fails for the same reasons discussed above and must be dismissed.

**C. Claimants Have No Basis for Their Fraud Claims**

***1. Claimants Have No Fraud Claim Under the Federal Securities Act***

Claimants have no 10b-5 claim under the Federal Securities Act. In order to prove a 10b-5 fraud claim, Claimants must plead and prove all of the following elements:

(1) a material misrepresentation (or omission);

(2) scienter, i.e., a wrongful state of mind;

(3) a connection with the purchase or sale of a security;

(4) reliance;

(5) economic loss; and

(6) "loss causation." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336,341 (2005).

In this action, Claimants cannot meet any of these standards. As noted previously, all facts that they claim were omitted were, in fact, disclosed, and they cannot meet the burden of showing that their losses were caused by Emerson. Finally, Claimants cannot show scienter, as there is no evidence that Respondent acted intentionally to defraud them.

***2. Claimants Have No Fraud Claim Under the California Securities Law***

Any allegation that Respondent violated the California Securities Act is baseless and alleged without reference to any of the requisite provisions of California's securities fraud statute. Claimants allege that Emerson somehow failed to advise them about the nature of their Investments by omitting and misrepresenting certain "material facts" during the process of

investing in the Investments, citing Cal. Corp. Code § 25401. To show a violation of section 25401, a plaintiff must allege **with particularity** that "there was a sale or purchase of stock in California by fraudulent untrue statements or by omitting material facts that would, by omission, make the statements misleading." *See MTC Electronic Technologies Co., Ltd. v. Leung*, 876 F. Supp. 1143, 1147 (C.D. Cal. 1995).

Here, the allegations as to "misrepresentations" and/or "omissions" in the SOC are not pled with the requisite particularity for such claims under California's securities fraud statute. Claimants simply make the conclusory statement that Emerson's conduct (somehow) amounted to fraudulently or negligently misrepresenting material facts. Respondent neither made false or material misrepresentations, nor omitted information from Claimants. To the contrary, Emerson provided substantial disclosure documents which Claimants acknowledged that they reviewed and then, knowingly made the Investments.

As with Claimants' 10b-5 fraud claim under the Federal Securities Act, courts have held that to show justifiable reliance on misrepresented or omitted information sufficient to constitute securities fraud, Claimants must show that with the exercise of reasonable diligence, they still could not have discovered the truth behind the alleged fraudulent omission or misrepresentation. In light of all the detailed disclosures Claimants received, no reliance on any alleged misstatement or omission could be justified.

**3. *Claimants Fail to Allege a Claim for Common Law Fraud***

Claimants generally allege causes of action under the broad umbrella of negligent misrepresentation or omissions, without pleading with any particularity the specific violations, let alone the applicable laws under which Claimants bring these causes of action under. Claimants cannot prove their claim of intentional or negligent misrepresentation. To prevail on a claim of fraudulent misrepresentation, Claimants must produce evidence that:

(1) the defendant represented to the plaintiff that an important fact was true;

(2) that representation was false;

(3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth;

(4) the defendant intended that the plaintiff rely on the representation;

(5) the plaintiff reasonably relied on the representation;

(6) the plaintiff was harmed; and

(7) the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff. *Perlas v. GMAC Mortg.*, LLC, 187 Cal. App. 4th 429, 434 (2010) (citing *Manderville v. PCG & S Group, Inc.*, 146 Cal.App.4th 1486, 1498 (2007)).

Each element in a cause of action for fraud or negligent misrepresentation must be factually and specifically alleged. *Cadlo v. Owens–Illinois, Inc.*, 125 Cal.App.4th 513, 519 (2004) ("the mere assertion of reliance is insufficient. The plaintiff must allege the specifics of his or her reliance on the misrepresentation to show a bona fide claim of actual reliance.").

In a fraud claim against a corporation, "a plaintiff must allege the names of the persons who made the misrepresentations, their authority to speak for the corporation, to whom they spoke, what they said or wrote, and when it was said or written." *Perlas* 187 Cal. App. 4th at 434 (citing *Lazar v. Superior Court*, 12 Cal.4th 631, 645 (1996)).

Claimants merely allege that Respondent had a duty to make accurate representations and disclosures to Claimants regarding the risks associated with their investments. Claimants then make the conclusory statement that Respondent breached this duty. The allegations as to "misrepresentations" and/or "omissions" in the SOC are nowhere near pled with the requisite particularity for such a claim. Claimants do not allege any specific statement by Respondent that Respondent knew was false and cannot show that any statement by Respondent directly and proximately caused the alleged damages. Respondent neither made false or material misrepresentations, nor omitted information from Claimants.

**D. The Breach of Fiduciary Duty Claim Should Be Dismissed**

Claimants cannot prevail on a claim for breach of fiduciary duty based on the purported facts outlined in their own SOC. In order to plead a cause of action for breach of fiduciary duty in California, "there must be shown the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. The absence of any one of these elements, of course, is fatal to the cause of action." *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101, 3 Cal. Rptr. 2d 236, 240 (1991). Claimants fail to plead with the necessary degree of particularity for such a claim.

Emerson did not breach any fiduciary duty to Claimants. Moreover, if Respondent had, hypothetically speaking, breached its duty, the action or inaction of Emerson did not cause the alleged harm suffered by Claimants. The act of opening an account and investing in the Investments was all authorized and approved by Claimants. Claimants ultimately made their decision to make such Investment purchases after receiving, reviewing, and signing a number of documents and disclosures in advance of his decisions. Emerson satisfied any duties that it owed to Claimants, and no false or misleading information was provided to them by Respondent.

To the extent that Claimants suffered any losses in relation to the investments at issue, such losses are the result of third-party actors and factors, and Emerson cannot be held liable for such losses. Claimants' breach of fiduciary duty claim should be denied in its entirety.

**E. Claimants Have No Negligence Claim**

To prove negligence, California tort law requires five essential elements to be pled in order to bring a cause of action for negligence: duty, breach, actual cause, proximate cause, and damages. *Clarke v. Hoek,* 174 Cal.App.3d 208, 213, 219 Cal.Rptr. 845, 850 (1985); *MTC Elec. Techs. Co. v. Leung*, 889 F. Supp. 396, 402 (C.D. Cal. 1995). In pleading a negligence claim, it must also be noted that there are "limits to the generality with which a plaintiff is permitted to state his cause of action, and ... the plaintiff must indicate the acts or omissions which are said to have been negligently performed. He may not recover upon the bare statement that the defendant's negligence has caused him injury." *Berkley v. Dowds*, 152 Cal. App. 4th 518, 527 (2007) (citing *Guilliams v. Hollywood Hospital*, 18 Cal.2d 97, 101 (1941)).

Claimants fail even to properly recite these basic elements, and their vague allegations as to any alleged duty and breach thereof are not pled with the requisite particularity for such a claim. Claimants do not allege any specific act by Respondent that breached any duty and cannot show that any act by Respondent directly and proximately caused the damages alleged by Claimants.

**F. Respondent Has No Control Person Liability**

The SOC does not present any case for control person liability or vicarious liability under the doctrine of *respondeat superior*, or any applicable law, against Respondent or its agents. Control person liability under California law is substantially the same as the federal statute, and California courts have stated their reliance on federal law for interpreting the pleading requirements for stating a claim under Title 15 and Section 20(a) of the Securities Act. *Hellum v. Breyer*, 194 Cal. App. 4th 1300, 1315, 123 Cal. Rptr. 3d 803, 813 n.8 (2011).

To establish a cause of action under Section 20(a) of the Securities Act, a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b–5 and then show that the defendant exercised actual power over the primary violator. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014). Similarly, a cause of action for vicarious liability through the doctrine of *respondeat superior*, requires that a plaintiff first establish the tortious conduct committed by an employee acting within the scope of employment and then demonstrate that the employer had the power and ability to control the method and results of the employee's professional activities. See *Oravecz v. New York Life Ins. Co.*, 95 Cal.Rptr.3d 1, 15 (Ct. App. 2009).

Here, there was no primary wrongdoing by Claimants' registered representative and therefore, there is no basis for liability under the doctrine of *respondeat superior* or under the control person liability statute. *See Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1064 (N.D. Cal. 2013) ("in the absence of a viable claim of primary liability, plaintiff cannot state a claim…for control person liability under § 25504.").

Even if Claimants had alleged and then proved that Respondent's agent violated California securities laws, Respondent would still not be liable as a control person. The California statute



GN DEFENDANTS EXHIBIT 12

imposes control person liability on those who *materially aid* others in primary violations under the California Securities Act. *Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC,* 158 Cal. App. 4th 226, 255-256, 70 Cal. Rptr. 3d 199, 223 (2007) ("To be jointly and severally liable under section 25504, Roth must have materially aided, not simply in the transaction, but in the violation—that is, in eNucleus's sales of the bridge notes by means of false or misleading statements in the offering documents. Merely "play[ing] an active role in the Bridge Note offering" does not suffice"). Respondent denies any and all alleged wrongdoing and basis for liability, including any misconduct on the part of Claimants' registered representative. There was no primary wrongdoing by an agent of the firm, nor was there any evidence that Emerson "materially aided" in any violation of the California securities act. Therefore, there is no basis for control person or vicarious liability against Respondent under California law.

**G. Any Failure to Supervise Claim Is Baseless**

Any attempt to impose liability on Emerson by alleging that Emerson failed to supervise its agents is without factual or legal basis. "Failure to supervise" is not an independent basis for imposing liability. To prove a claim of failure to supervise, Claimants must first prove their substantive claims and then prove that Respondent allowed those alleged series of events to occur and/or was negligent in supervising Claimants' registered representative. *See Indemnified Cap. Invs., SA. v. R.J. O'Brien & Assocs., Inc.*, 12 F.3d 1406, 1412 (7th Cir. 1993); *See Lehoczky v. Commodity Futures Trading Comm'n*, 125 F.3d 844, 1997 WL 606863, *3 (2d Cir. 1997); *See* e.g. *Samedi v. Miami–Dade County*, 134 F. Supp. 1320, 1352-53 (S.D. Fla. 2001).

Here, Claimants not only fail to cite any relevant statutory or legal authority to support such a claim, but he also fails to establish an actual cognizable injury beyond mere hypothetical and speculative damages. Similarly, Claimants have failed to state with any specificity exactly how Emerson was derelict in any duty to supervise its agent, and instead, make general claims that Respondent breached its duty of care to supervise its agent. These allegations are patently false and wholly unsupported by any factual information presented in the SOC. Even if Claimants could

show a failure of supervision, which they cannot, it is irrelevant when the broker being supervised did nothing wrong.

In light of the fact that Claimants cannot prove any of their underlying claims with respect to any transaction or event in Claimants' accounts, any derivative causes of action for failure to supervise should be dismissed.

### H. There Is No Private Right of Action for Violation of FINRA Rules

To the extent that Claimants cite to FINRA rules as the basis for causes of action, such claims should be denied. First, courts have considered this point for decades and have consistently come away with the conclusion that no such cause of action exists. *See*, e.g., *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) ("It is well established that violation of an exchange rule will not support a private claim; *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 680–81 (9th Cir.1980) (Securities Exchange Act does not provide a private cause of action for violation of stock exchange rules, NASD rules); *Rolf v. Blyth Eastman Dillion & Co.*, 424 F.Supp. 1021, 1041 (S.D.N.Y. 1977), *aff'd*, 570 F.2d 88 (2d Cir. 1978) ("Each court that has considered the question has concluded that mere negligent violations of the NYSE or NASD rules are not actionable in federal court; rather, to form the basis for liability in damages, the broker's violations of the rules must be "tantamount to fraud."). *See also Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200 (3d Cir. 1990) (no right of action for violation of NASD rules); *Thompson v. Smith Barney, Harris Upham & Co.*, 709 F.2d 1413 (11th Cir. 1983) (no private right of action for violation of know your customer or suitability rules of SROs); *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 493 (6th Cir. 1990) ("NYSE Rule 405 does not imply a private right of action"). *See also Kirkland v. E.F. Hutton and Co., Inc.*, 564 F. Supp. 427 (E.D. Mich., S.D., 1983); *Emmons v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 532 F. Supp. 480 (S.D. Ohio, W.D.); *Golob v. Nauman Vandervoort, Inc.,* 353 F. Supp. 1264 (N.D. Ohio, W.D., 1972).

Even assuming that there was a private right of action for violation of FINRA rules, Respondent complied with all applicable rules and regulations. Emerson did not breach any duty that it owed to Claimants, nor did it fail to conduct adequate due diligence regarding either the

recommended investment or the issuer of the investment at issue. Any allegations to the contrary entirely lack support in the evidence.

**I. Respondent's Conduct Was Consistent with the Standards of Reg BI**

The SEC's REG BI established a "best interest" standard of conduct for broker-dealers and associated persons when they make a recommendation to a retail customer of any securities transaction or investment strategy involving securities, including recommendations of types of accounts."[3] All of Respondent's recommendations met this standard. (*See also* "Suitability - Section A" above).

## IV. <u>AFFIRMATIVE DEFENSES</u>

The foregoing discussion demonstrates that Respondent is not liable to Claimants under any of the theories of recovery set forth in the SOC. In addition, Respondent, as permitted by Rule 12303(a) of the Customer Code, offers the following defenses:

### FIRST AFFIRMATIVE DEFENSE

The SOC, and each purported cause of action contained therein, is barred because they fail to state facts sufficient to constitute a cause of action against Respondent.

### SECOND AFFIRMATIVE DEFENSE

In further response to the SOC, Respondent states that there is no private right of action and Claimants cannot state a claim for a violation of the rules of FINRA, the NASD, the NYSE, the SEC, or any other self-regulatory organization, including, without limitation, claims and allegations concerning unsuitability and failure to supervise.

### THIRD AFFIRMATIVE DEFENSE

The causes of action are barred by the applicable statutes of limitation and repose.

[3] https://www.finra.org/rules-guidance/key-topics/regulation-best-interest

**FOURTH AFFIRMATIVE DEFENSE**

Claimants are barred from recovery by the equitable doctrines of waiver, estoppel, unclean hands, and laches.

**FIFTH AFFIRMATIVE DEFENSE**

Respondent is informed and believes, and on that basis alleges, that Claimants have failed to mitigate their damages, if any, and any damages awarded should be reduced accordingly.

**SIXTH AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that Claimants at all times retained authority for all transactions and investments at issue, purchased through Respondent.

**SEVENTH AFFIRMATIVE DEFENSE**

Claimants are barred from recovery to the extent they authorized, affirmed, and/or ratified the Investments, transactions, and all actions and/or omissions of which they now complain.

**EIGHTH AFFIRMATIVE DEFENSE**

The damages, if any, allegedly suffered by Claimants were proximately caused by, or were the consequence of, the conduct, actions, omissions, negligence, or intentional acts of Claimants and/or parties other than Respondent.

**NINTH AFFIRMATIVE DEFENSE**

Claimants expressly or implicitly consented to each and every action on the part of Respondent of which Claimants now complain.

**TENTH AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that Respondent did not know, and in the exercise of reasonable care, could not have known of the alleged materially misleading statements and omissions suggested in Claimants' SOC, and at all times, acted in good faith.

**ELEVENTH AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that a reasonable and justified statement of opinion regarding investments or market conditions is not actionable.

**TWELFTH AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that it is not liable for failing to predict market fluctuations, the performance of any of Claimants' Investments, or any other matters at issue in the SOC.

**THIRTEENTH AFFIRMATIVE DEFENSE**

Claimants knowingly and voluntarily assumed the risk of losing their invested assets.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Claimants are not entitled to an award of attorney's fees or costs because there is no basis under statute, contract, or otherwise for such an award for Claimants.

**FIFTEENTH AFFIRMATIVE DEFENSE**

The causes of action are barred, in whole or in part, by Claimants' acquiescence in the purported acts and/or omissions upon which they are predicated.

**SIXTEENTH AFFIRMATIVE DEFENSE**

Respondent's acts were not willful, malicious, in bad faith, or motivated by ill-will or fraud.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

The damages for which Claimants seek to hold Respondent liable resulted in whole or in part from acts or omissions of third parties, and Respondent is not responsible for or liable to Claimants for the wrongful or negligent acts or omissions by these third parties.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

The claims-at-issue are barred in their entirety by the "bespeaks caution doctrine." *See In re Worlds of Wonder*, 35 F.3d 1407, 1413 (9th Cir. 1994).

**NINETEENTH AFFIRMATIVE DEFENSE**

Claimants' damages, if any, should be offset and reduced by the amount received from the investments at issue.

**TWENTIETH AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that Claimants' negligence-based claims are barred by the economic loss doctrine, which prevents recovery on an unintentional tort basis for pure economic loss.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that, as a matter of law, the damages Claimants seek are too speculative to be awarded. *See Chanoff v. U.S. Surgical Corp.,* 857 F. Supp. 1011 (D. Conn. 1994).

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

Claimants' damages, if any, were the consequence of the superseding cause of one or more third-party's conduct.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that Claimants have failed to allege a factual or legal basis for an award of punitive damages, and to the extent that they seek such relief, any such request for recovery of punitive damages must be denied. Furthermore, any claim for punitive damages is barred because an award of punitive damages would violate Respondent's constitutional rights under the due process clause of the Fourteenth Amendment and the excessive penalties clause of the Eighth Amendment of the United States Constitution.

**ADDITIONAL AFFIRMATIVE DEFENSES**

Respondent reserves its right to assert additional affirmative defenses in the event that discovery and/or investigation indicates that additional affirmative defenses are applicable.

## V. RELIEF REQUESTED

Respondent Emerson Equity LLC respectfully requests:

1. That all causes of action be dismissed in their entirety;
2. That Claimants take nothing by way of the SOC;
3. That Respondent be awarded their attorney fees and costs incurred defending the claims;

4. That Respondent's portion of the forum fees be assessed against Claimants; and

5. Such other and further relief as the Panel deems just and proper.

Dated: December 12, 2025

Respectfully submitted,

TADJEDIN THOMAS & ENGBLOOM LAW GROUP LLP

*/s/ David G. Smitham*

Amir Tadjedin
Craig A. Vollono
David G. Smitham
Christopher Anthony
Tyler G. Mills

*Attorneys for Respondent Emerson Equity LLC*



GN DEFENDANTS EXHIBIT 12

DocuSign Envelope ID: 511E0120-7589-4F11-B525-DE771FFEFA7B

David Walser & Barbara Greenfield

[redacted]

08-19-2021

redacted

Emerson Equity LLC

155 Bovet Road, Suite 725

San Mateo, CA 94402

Re: Letter of Understanding-Investment in **Astoria, DST, Shadowglen DST & CS MOB AZ**

To Whom It May Concern:

I am fully aware of the risks involved with investing in **Astoria DST, Shadowglen DST & CS MOB AZ** and are comfortable with these types of investments. I am not concerned with the lack of liquidity, as I have adequate resources for all my liquidity needs.
In light of volatility of my stock investments, I believe I am helping to diversify my overall portfolio investing in these types of assets.

Sincerely,

DocuSigned by:
9C6FDF685129474...
______________________________

David Walser

DocuSigned by:
Barbara Greenfield
A16AD978B8FC45B
______________________________

Barbara Greenfield

**Exhibit A**

**GN DEFENDANTS EXHIBIT 12**

DocuSign Envelope ID: 748A0A3E-A1CD-48F7-B228-F7C6BA8C8E4F

Barbara Greenfield
[redacted]

06-17-2022

Emerson Equity LLC

redacted

155 Bovet Road, Suite 725

San Mateo, CA 94402

Re: Letter of Understanding-Investment in *VINTAGE DST, CS1031 ZERO COUPON FULFILLMENT CENTER, DST, Inspired Senior Living of Hamilton DST*

To Whom It May Concern:

I am fully aware of the risks involved with investing in *VINTAGE DST, CS1031 ZERO COUPON FULFILLMENT CENTER, DST, Inspired Senior Living of Hamilton DST* and are comfortable with these types of investments. I am not concerned with the lack of liquidity, as I have adequate resources for all my liquidity needs.

In light of volatility of my stock investments, I believe I am helping to diversify my overall portfolio investing in these types of assets.

Sincerely,

DocuSigned by:
Barbara Greenfield
A16AD978B8FC45B...

Barbara Greenfield

Exhibit B

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing *RESPONDENT EMERSON EQUITY LLC'S ANSWER TO THE STATEMENT OF CLAIM* was uploaded to the FINRA DR Portal by which the following were to receive service on December 12, 2025:

GOODMAN & NEKVASIL, P.A.
Kalju Nekvasil, Esq.
624 1st Avenue South
St. Petersburg, FL 33701
Email: gnmain@gnfirm.com

*Attorneys for Claimants*

TADJEDIN THOMAS & ENGBLOOM LAW GROUP LLP

*/s/ Chris Harris*
Chris Harris