Amir Tadjedin (CA Bar No.186967; OR Bar No.055613; WA Bar No. 47414)
Craig A. Vollono (NY Bar No. 4446431)
David G. Smitham (CA Bar No.335635; NY Bar No. 4194676)
Christopher Anthony (OR Bar No. 257313; MD Bar No. 1512150017)
Tyler G. Mills (OR Bar No. 215303)

TADJEDIN THOMAS & ENGBLOOM LAW GROUP LLP
1211 NW Glisan Street, Suite 203
Portland, Oregon 97209
Tel: 503-224-9294
amirt@ttelawgroup.com
craigv@ttelawgroup.com
davids@ttelawgroup.com
christophera@ttelawgroup.com
tylerm@ttelawgroup.com

*Attorneys for Respondent*
*Emerson Equity LLC*

**IN THE ARBITRATION BEFORE THE**

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**

| | |
|---|---|
| MICHAEL BARBARICK, INDIVIDUALLY AND ON BEHALF OF 3030 WEST SECOND STREET INC.,<br><br>Claimants,<br><br>v.<br><br>EMERSON EQUITY LLC (CRD# 130032) AND ARKADIOS CAPITAL,<br><br>Respondent. | Arbitration No. 25-02160<br><br>**RESPONDENT EMERSON EQUITY LLC'S ANSWER TO THE STATEMENT OF CLAIM** |

Respondent Emerson Equity ("Emerson" or "Respondent") hereby submits its Statement of Answer pursuant to FINRA Rule 12303. Claimants Michael Barbarick, individually and on behalf of 3030 West Second Street Inc., (collectively, "Claimants") filed their Statement of Claim ("SOC") against Respondent alleging: (1) unsuitability; (2) violation of Federal and state securities laws and fraud; (3) violation of state Consumer Protection Acts; (4) breach of contract; (5) negligence; (6) breach of fiduciary duty; and (7) violations of Reg BI.



GN DEFENDANTS EXHIBIT 23

## I. PRELIMINARY STATEMENT

Respondent denies all allegations of wrongdoing or actionable conduct. Respondent affirmatively states that its actions were in conformity with all applicable laws, rules, and regulations, as well as industry standards and practices. To the extent that Claimants suffered any losses from the investments at issue, such losses were not the result of any culpable action or inaction by Respondent. Any allegation in Claimants' SOC, not specifically addressed herein, shall be deemed denied by Respondent. Respondent reserves the right to further amend its Statement of Answer and/or Affirmative Defenses based on the discovery of additional facts and information.

Claimants allege in the SOC that they were defrauded in purchasing certain investments completed with Emerson (the "Investments" or "investments at issue"). All the alleged claims are defective factually and legally.

First, Claimants were not unsophisticated investors who only desired safe and secure investments. They were "accredited investors" who had made unrealized profits from real estate investing, and they wished to avoid an immediate tax bill if they sold these investments. Second, contrary to what is portrayed in the SOC, Claimants received numerous detailed disclosures about the Investments prior to investing, and signed paperwork confirming the amount of their assets, their liquidity needs and their net worth. The documents they received explained the nature of the Investments and the risks associated with these Investments. Any attempt to persuade this Panel that they are naïve, unsophisticated individuals, who were bamboozled into purchasing the Investments is utterly ridiculous.

Without basis, Claimants allege deficiencies in due diligence by Emerson. Emerson, however, sold the Investments after performing the requisite due diligence and approving them for sale to those clients for whom the Investments were deemed suitable, including these Claimants.

The reality is that no one tricked Claimants into making their investment decisions, let alone misrepresented risks associated with the Investments. Claimants made their own decision to invest. This claim is nothing more than a transparent attempt by disappointed investors to cast blame for those selected investments that may not have performed as well as they would have

hoped. This attempt should be denied, and Claimants should not be permitted to make Emerson a guarantor of the Investments.

## II. STATEMENT OF FACTS

### A. Respondent Emerson Equity LLC

Emerson (CRD No. 130032) is a broker-dealer registered with FINRA, the United States Securities and Exchange Commission, and all fifty U.S. states. Emerson's principal place of business is in San Mateo, California.

### B. Claimants Were Experienced Real Estate Investors

Based upon the information Claimants provided to Emerson, their investments were suitable. [redacted] Claimants told Emerson that they were "accredited investors" as defined by the SEC and they were experienced real estate investors. Their net worth (excluding the value of their home) was sufficient to permit them to make the Investments and they had "extensive knowledge" of investing in shares and mutual funds. They told Emerson that their liquidity needs were "low." Claimant Barbarick advised Emerson that he was willing to take "high-risk" to make the investments about which he now complains.

In addition to any other securities investments, Claimants also maintained real estate investments in which they had made significant unrealized profits. A cash sale of the real estate would have resulted in taxes being due and Claimants sought a way to defer payment of these taxes. Emerson recommended investments in in 1031 exchanges through Delaware Statutory Trusts ("DSTs").

### C. The Investments at Issue

The investments at issue in the SOC concern transactions by Claimants in real estate-based DSTs. Claimants allege that they invested approximately $380,000 in DSTs through Emerson, the amount raised from the sale of certain real investments that they had previously owned. These DSTs included purchases of Inspired Senior Living of Naperville DST and Inspired Senior Living

of Hamilton DST. Claimants made a number of DST investments through Emerson, but also allege that they consulted with Respondent Arkadios, before making another investment through that firm.

It should be noted that the Statement of Claim discusses Tenancy-In-Common investments ("TICs") at length. This is a distraction. Claimants did not purchase TICs through Emerson, and such discussions are irrelevant.

**D. Claimants Invested in DSTs and Understood the Nature of Their Investments**

Claimants understood the nature and risks of DST Investments. Any attempt to confuse the issues before the Panel by alleging that DSTs are complex investments and that the Claimants did not understand them is without foundation. A DST is simply an alternative way of making real estate investments and deferring taxes through a 1031 exchange.[1] The structure and benefits of DSTs, as well as their associated risks, were explained in detail to the Claimants through the documents that they received and executed, and they may not argue that they did not understand their DST Investments.

The structure of a DST is not complex, and its permitted structure and activities are defined by IRS Revenue Ruling 2002-86 ("IRS 86").[2] A DST is a special legal entity, typically created by a "Sponsor" that acquires commercial properties to be held in a trust. The Sponsor then sells beneficial interests in the trust to DST investors, which allows them to have an "undivided fractional interest" in the investment property owned by the trust. Because DSTs are qualified as replacement properties, as established by IRS 86, the seller of an investment property can defer their tax liability on profitable real estate sales if they acquire replacement property that is equal

[1] A 1031 exchange is a real estate tax break that allows commercial property sellers to exchange one investment property for another, like kind, property while deferring capital gains tax on the sale. Without this tax break, sellers must pay capital gains tax at the time of sale. (https://calawyers.org/real-property-law/what-is-a-1031-exchange/)

[2] DSTs are qualified as replacement properties as established by IRS Revenue Ruling 2002-86 ("IRS 86"). IRS 86 holds that a DST formed to hold real property subject to a lease under a trust agreement is classified as a trust for Federal tax purposes under § 301.7701-4(c). Each of Trust's owners is treated as an owner of a pro-rata portion of Trust. Because an owner of an undivided fractional interest in Trust owns for Federal tax purposes the assets of Trust attributable to that interest, each owner is considered to own for those purposes an undivided fractional interest in the real rental property held by Trust. Accordingly, under § 1031 of the Code, a taxpayer may exchange an interest in real property for an interest in Trust without recognition of gain or loss, if the other requirements of § 1031 are satisfied.



GN DEFENDANTS EXHIBIT 23

or greater value to the sale value, and if they utilize all of the proceeds resulting from their sale in the new DST investment. In short, the seller of property can choose to defer taxes by reinvesting 100% of the sale proceeds into a DST, rather than selling for cash and reinvesting the after-tax proceeds of the sale in other investments.

Investing in DSTs can offer other benefits as well as tax deferral through a 1031 exchange. A DST investment can offer diversification into large-scale properties and also, potentially provide regular, passive income. DST investors are passive owners, as the Sponsor controls the property's management and sale and a professional trustee manages the property, thus allowing investors to participate in real estate investments without any on-going landlord management responsibilities.

Claimants were made aware of the risks and benefits of DSTs and confirmed this in the documents they executed. Despite being fully aware of the nature of their Investments, Claimants now take issue with the fact that those long-term Investments may not have performed as they would have hoped in the short term. Claimants' claims are without basis and premature, and it is wholly inappropriate for them to seek to have Emerson insure their investment decisions.

**E. Any Allegations Concerning Concentration Make No Sense**

Any argument by Claimants that they were over concentrated in real estate through their Investments in DSTs makes no sense. Claimants could easily have sold their original properties, paid the capital gains tax on the sale and reinvested in a portfolio of diverse investments, such as stock, bonds or commodities. Instead, they invested in DSTs to take advantage of the deferred tax opportunities that DSTs offer, advantages which could only have been obtained by investing in real estate again.

**F. Claimants Seek to Make Respondent a Guarantor of Their Investments**

Claimants vaguely allege misconduct by Respondent in connection with Claimants' decision to invest in DSTs, including those sponsored by Inspired Healthcare Capital LLC ("IHC"). Claimants are simply seeking to make Emerson a guarantor of the Investments they made in IHC, a third-party entity over which Emerson had no control, following negative publicity about the activities of IHC.

IHC is an alternative investment sponsor dedicated exclusively to senior housing. Based in Scottsdale, Arizona, IHC focuses on properties that address the demands of seniors with an eye to America's aging population. IHC shared with the public its plans to acquire and develop senior housing facilities, including independent living, assisted living, and memory care.

In recent times, according to IHC, it managed assets exceeding $1.5 billion in value and acquired and ran senior living and healthcare facilities. Its offerings included private placements, such as DSTs. At the time of writing, IHC has suspended investment offerings and investor distributions.

**G. Claimants' Allegations Concerning Due Diligence Have No Foundation**

Claimants allege unidentified failures of "due diligence," without any evidence or support for their claims. The "due diligence" process involves a review of a securities issuer's business prior to permitting the sale of an investment by a broker-dealer, but it is not a guarantee of the future success of that business, nor does the process make a broker-dealer a guarantor of Claimants' Investments.

A due diligence review offers a snapshot of an issuers' business based upon documents and information available at the time the due diligence is conducted. The process involves no crystal ball and those conducting due diligence cannot be held responsible for unforeseen future events, such as those that occurred at IHC. Claimants have not offered a single example or indeed any evidence of any failure to complete due diligence in connection with their IHC Investments and the allegations should be dismissed.

**H. The Written Documents That Claimants Signed Must Prevail Over Alleged Oral Statements**

Courts have found that, as a matter of law, Claimants may not claim reliance on alleged oral misrepresentations where those "misrepresentations" are contradicted by a written document. In short, where there is a shouting match about alleged conversations that took place some years ago, the written documents executed by Claimants must prevail.

Reliance on alleged oral fraudulent representations "…is unreasonable as matter of law where alleged misrepresentations contradict express terms of ensuing written agreement." *Garcia v. Santa Maria Resort, Inc.*, 528 F.Supp.2d 1283, 1295 (S.D. 2007). *See also First Union Discount Brokerage Services, Inc. v. Milos*, 997 F.2d 835, 846 (11th Cir. 1993). *Solution Z v. Alma Lasers, Inc.*, 2013 WL 12246356 * 10 (S.D. 2013) (Granting a motion to dismiss on the grounds that it was unreasonable to rely on alleged oral representations which were specifically and repeatedly contradicted by the express terms of the contract.)

Documents warning investors that commercial real estate limited partnerships were risky investments precluded common-law fraud claims based on alleged oral statements that Plaintiff's investment was safe and conservative. *Carr v. CIGNA Securities, Inc.*, 95 F.3d 544 (7th Cir. 1996).

A plaintiff's reliance on an oral statement is not reasonable when it is contradicted by a written contract between the parties or otherwise conflicts with a written document that is readily available to the plaintiff. *Daneshvar v. Kipke*, 266 F.Supp.3d 1031 (E.D. Mich. 2017). *See*, e.g., *Foremost Guar. Corp. v. Meritor Sav. Bank*, 910 F.2d 118, 125 (4th Cir. 1990) (finding that reliance on oral representations was not reasonable when contradicted by written offering memoranda); *Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 805 (1st Cir.1987) (when plaintiffs "closed their eyes and passively accepted the contradictions" between oral misrepresentations and written representations, reliance was not justifiable as a matter of law).

Claimants have acknowledged their understanding of the DST Investments. For example, in March 2022, Claimants made an investment in Inspired Senior Living of Naperville. They completed a purchaser questionnaire form, (the "Form") in connection with this investment. In capitals, the Form advised Claimants as follows:

> **EACH PROSPECTIVE INVESTOR SHOULD EXAMINE THE SUITABILITY OF THIS TYPE OF INVESTMENT IN THE CONTEXT OF HIS OWN NEEDS, PURCHASE OBJECTIVES, AND FINANCIAL CAPABILITIES AND SHOULD MAKE HIS OWN INDEPENDENT INVESTIGATION AND DECISION AS TO SUITABILITY AND AS TO THE RISK AND POTENTIAL GAIN INVOLVED. ALSO, EACH PROSPECTIVE INVESTOR IS ENCOURAGED TO CONSULT WITH HIS ATTORNEY, ACCOUNTANT, FINANCIAL CONSULTANT OR OTHER BUSINESS OR**

**TAX ADVISOR REGARDING THE RISKS AND MERITS OF THE PROPOSED INVESTMENT.**

On the Form, Claimant Barbarick affirmed that he was sufficiently experienced in financial matters to understand and evaluate the investment:

> **I have such knowledge and experience in financial and business matters that 1 am capable of evaluating the merits and risks of a purchase of the Interests. The following is a description of my experience in financial and business matters:**
>
> ***10+ years of real estate investments.*** **(Form at page 3)**

The Form also advised Claimants to "read carefully" the Confidential Private Placement Memorandum (the "Memorandum") for the investment. Claimants acknowledged that they had read the Memorandum (Form at page 4) The Memorandum included a summary of the risks of investing in the DST, including the illiquid nature of the investment, then noted that a potential buyer must read and review the Memorandum, focusing on the section titled **"Risk Factors,"** which disclosed various potential risks associated with the investment.

As a further example of Claimants' knowledge and understanding of DSTs, in April 2022, Claimants made an investment in the IHC Senior Living of Hamilton DST. Claimants signed a Letter of Understanding to Emerson which stated:

> **To Whom It May Concern:**
>
> **I/We are fully aware of the risks involved with investing in *IHC Hamilton* and are comfortable with these types of investments. I/We are not concerned with the lack of liquidity, as we have adequate resources for all my/our liquidity needs.**
> **(See Exhibit "A," attached hereto.)**

In light of the above, Claimants' allegation that they did not receive adequate information about their purchase prior to investing is simply not credible.

In addition, Claimants also signed a Purchaser Agreement in connection with their IHC Hamilton purchase, in which Claimants acknowledged reading the Memorandum and explicitly agreed that they had relied on the written materials provided by Emerson, and not on any oral representations:

> **4.3.1 Buyer acknowledges that it has received, read, and fully understands the Memorandum. Buyer acknowledges that it is basing its decision to invest in the Interest on the Memorandum and Buyer has relied only on the information contained in said materials and has not relied upon any representations made by any other person. Buyer recognizes that an investment in the Interest involves substantial risk and Buyer is fully cognizant of and understands all of the risk factors related to the purchase of the Interest, including, but not limited to, those risks set forth in the section of the Memorandum entitled "RISK FACTORS."**

Considering the above statements by Claimants, and the other documents executed by them, this Panel should reject Claimants' attempt to argue that that they relied on alleged statements from their registered representative which contradicted the information that they acknowledged receiving. To the extent that Claimants' claims rely on any oral purported misrepresentations, such claims fail as a matter of law. Claimants could not have reasonably relied on them given the numerous written warnings and disclosures that they have acknowledged receiving.

## III. LEGAL ARGUMENT[3]

### A. The Recommendations Made to Claimants Were Suitable

To state a claim for unsuitability, an investor must prove that (1) the investment was incompatible with the customer's investment objectives at the time the recommendation was made; (2) the broker recommended the investment anyway; and (3) the broker knew or reasonably believed the investment was inappropriate. *Keenan v. D.H. Blair & Co.*, 838 F. Supp. 82, 86-87 (S.D.N.Y. 1993); *see Mauriber v. Shearson/American Express, Inc.*, 567 F. Supp. 1231, 1237 (S.D.N.Y. 1983); *see Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 813 n.3 (6th Cir. 2015); *see O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 898 n.6 (10th Cir.1992).

---

[3] Claimant Barbarick formerly resided in Pennsylvania, but he is now a Florida resident and filed this matter seeking a hearing in Florida. Although Claimants selected Florida as the venue for these claims, they also reference California and Pennsylvania law, presumably seeking some kind of advantage. Respondent denies violating the laws of any state. Respondent will answer only the Florida law-based allegations and will reserve the right to address the choice of venue and choice of law issues separately.



GN DEFENDANTS EXHIBIT 23

A suitability claim raises the question of whether the investment was appropriate at the time it was recommended. *Keenan*, 838 F. Supp. at 86-87. In other words, a suitability analysis entails a "point of sale" analysis. Conclusory allegations regarding unsuitable investments will not suffice, a plaintiff must adequately describe their investment goals and give some indication why plaintiff considers the investment at issue to have been unsuitable when purchased. *Keenan*, 838 F. Supp. at 87; *Betz v. Trainer Worthem & Co., Inc.*, No. C 03-3231 SI, 2004 WL 7340652, at *6 (N.D. Cal. Feb. 2, 2004) (Granting a motion to dismiss on ground that plaintiff failed to plead with particularity as to why the particular securities purchased were unsuitable for plaintiff at the time; why or in what way the defendants knew the securities were unsuitable for plaintiff; or what misrepresentations were made concerning suitability.). In addition, the investor must also show that they justifiably relied on the broker's alleged wrongdoing. *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993). Finally, the investor must show that their losses were caused by the alleged wrongdoing. *See In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*, 273 F. Supp. 2d 351, 361-62 (S.D.N.Y. 2003), *aff'd in relevant part*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).

Suitability is evaluated at the time of the recommendation, and not after the fact with 20/20 hindsight. Of course, "a subsequent diminution in value reveals nothing about the quality of the stock when it was purchased and does not illuminate the reasons why the stock was unsuitable for investment objectives." *Keenan*, 838 F. Supp. at 86-87. Under federal securities law, an unsuitability claim falls under a § 10(b) fraud claim, which requires a finding "that, with scienter, the defendant made material misrepresentations. . . relating to the suitability of the securities" *Brown*, 991 F.2d at 1031. "Analytically, an unsuitability claim is a subset of the ordinary § 10(b) fraud claim." *Id.* Therefore, a plaintiff must show: (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which Appellants relied (5) which proximately caused their injury. DSAM Glob. *Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002) (citing *McCormick v. Fund Am. Companies, Inc.*, 26 F.3d 869, 875 (9th Cir. 1994)).

Based upon the information provided by Claimants, the Investments were suitable for Claimants when they were purchased. Claimants were provided with numerous explicit risk disclosures regarding the Investments. They were experienced and prosperous real estate investors who purchased the Investments in accordance with their risk tolerance, liquidity needs and investment objectives. Claimants have not and cannot identify a single written statement or document evidencing material misrepresentations or omissions by Emerson or its agents which show an intent to deceive or defraud Claimants.

**B. Claimants' Causes of Action Based in Fraud Are Baseless**

***1. Claimants Have No Fraud Claim Under the Federal Securities Act***

Claimants have no 10b-5 fraud claim under the Federal Securities Act. In order to prove a 10b-5 claim, Claimants must plead and prove all of the following elements:

(1) a material misrepresentation (or omission);

(2) scienter, i.e., a wrongful state of mind;

(3) a connection with the purchase or sale of a security;

(4) reliance;

(5) economic loss; and

(6) "loss causation." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336,341 (2005).

In this action, Claimants cannot meet any of these standards. As noted previously, all material facts they may claim were omitted were in fact disclosed, and they cannot meet the burden of showing that their losses were caused by Emerson. Finally, Claimants cannot show scienter, as there is no evidence that Respondent acted intentionally to defraud them. On the contrary, Claimants purchased the 1031 eligible Investments that they sought.

***2. Claimants' Common Law Fraud Claim Is Without Evidentiary Support***

Claimants cannot prove common law fraud. The elements of a fraud claim under Florida common law are: (1) a false statement of fact; (2) known by the person making the statement to be false at the time it was made; (3) made for the purpose of inducing another to act in reliance thereon; (4) action by the other person in reliance on the correctness of the statement; and (5)

resulting damage to the other person. *Gandy v. Trans World Comput. Tech. Grp.,* 787 So. 2d 116, 118 (Fla. 2d DCA 2001).

The SOC fails to even recite these basic elements, let alone to plead with particularity any conduct on the part of Respondent that constitutes fraud. Claimants fail to cite to any specific statements that Emerson misrepresented to and/or omitted from Claimants. Similarly, Claimants cannot show that Respondent made any statements to Claimants that Emerson knew were false. Even assuming that a misrepresentation and/or omission had occurred, the substantial disclosures Claimants reviewed and acknowledged run counter to showing that any reliance on an allegedly misleading oral statement or omission was actually justifiable. Instead, Claimants vaguely assert that Respondent defrauded them by recommending unsuitable investments and by making oral misrepresentations and/or omissions regarding the risks of the Investments, for which Claimants could not have reasonably relied upon given the numerous written warnings and disclosures they acknowledged receiving.

Claimants ultimately made their decision to make the Investment purchases after receiving, reviewing, and signing a number of documents and disclosures in advance of his decision. Emerson satisfied any duties it owed to Claimants, and no false or misleading information was provided to him by Respondent. To the extent that Claimants suffered any losses in relation to the investment at issue, such losses are the result of third-party actors and factors, and Emerson cannot be held liable for such losses.

**3. *Respondent Did Not Violate the Florida Securities Act***

Claimants' allegation that Respondent violated Florida's securities fraud statute is baseless. Claimants allege that Respondent somehow failed to advise them about the nature of the Investments by omitting and, or, misrepresenting certain "material facts" during the process of investing in the Investments. The allegations as to "misrepresentations" and/or "omissions" in the SOC are not pled with the requisite particularity for such claims. However, Claimants make the conclusory statement that Emerson's conduct (somehow) amounted to fraudulently or negligently misrepresenting material facts. Respondent neither made false or material misrepresentations, nor

omitted information from Claimants. On the contrary, Respondent provided substantial disclosure documents, which Claimants then acknowledged they reviewed and then knowingly made the Investments.

As with a 10b-5 fraud claim under the Federal Securities Act, courts have held that to show justifiable reliance on misrepresented or omitted information sufficient to constitute securities fraud, Claimants must show that with the exercise of reasonable diligence, they still could not have discovered the truth behind the alleged fraudulent omission or misrepresentation. In light of all the detailed disclosures Claimants received, no reliance on any alleged misstatement or omission could be justified. Claimants, who represented familiarity with real estate investments, reviewed and knowingly made their own decisions to invest.

**C. Claimants Fail to Allege a Breach of Contract Claim**

A cause of action for breach of contract requires proof of the following elements under Florida law: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach. *Rollins, Inc. v. Butland,* 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006). Further, Florida law requires a plaintiff to "point toward an express provision in the contract that creates the obligation allegedly breached." *Brush v. Miami Beach Healthcare Grp. Ltd.,* 238 F. Supp. 3d 1359, 1367 (S.D. Fla. 2017). Otherwise, when a plaintiff fails to do so, "it is unclear what provision or obligation under the contract has been violated," and a court must dismiss the claim. *Id.* at 1366–67. Here, no enforceable contract is even identified, let alone a breach or actual damages. This is another boilerplate claim in an SOC replete with such claims. To the extent that Claimants allege a breach of any contract, such claims must be denied.

Additionally, even assuming that this incoherent claim is a claim that Emerson is obligated to comply with under FINRA rules (as a regulated party), no private cause of action can arise from any hypothetical breach/violation. There is no contract between Respondent and Claimants obligating Emerson to guarantee a course of conduct by the issuers.

Finally, Claimants' claim for breach of contract is derivative and arises from Claimants' other claims — namely, their allegations of fraud. As this claim is entirely derivative in nature, it fails for the same reasons discussed above and must be dismissed.

**D. The Breach of Fiduciary Duty Claim Should Be Dismissed**

Claimants cannot prevail on a claim for breach of fiduciary duty based on the purported facts outlined in their own SOC. The elements necessary to state a cause of action for breach of fiduciary duty under Florida law are: (1) the existence of a fiduciary duty (2) the breach of that duty; and (3) such that it is the proximate cause of the plaintiff's damages. *Gracey v. Eaker,* 837 So. 2d 348, 353 (Fla. 2002). The fiduciary duty of dealing honestly and with good faith is breached "where there is a showing of fraud, deceit or absence of good faith." *Messer v. E.F. Hutton & Co.,* 833 F.2d 909, 920 (11th Cir.1987) (citing Florida common law), amended on reh'g on other grounds, 847 F.2d 673 (11th Cir.1988). Thus, mere negligence is not sufficient to demonstrate a breach of fiduciary duty. *JDI Holdings, LLC v. Jet Mgmt., Inc.,* 732 F. Supp. 2d 1205, 1231 (N.D. Fla. 2010).

Claimants fail to plead the requisite elements with the necessary degree of particularity for such a claim. Emerson did not breach any fiduciary duty to Claimants. Moreover, if Respondent had, hypothetically speaking, breached their duty, the action or inaction of Emerson did not proximately cause the alleged harm suffered by Claimants. Respondent's conduct fell well within the scope of any duty it may have owed Claimants. Emerson satisfied any duties it owed to Claimants, and no false or misleading information was provided to them by Respondent.

Claimants are experienced investors, capable of making well-informed investment decisions. Indeed, Claimants were quite capable of analyzing the recommendations and exercised ultimate control and decision-making in completing the Investments. Claimants' registered representative did not take any action in Claimants' accounts prior to discussing the potential action and receiving instructions from Claimants to take such action. With full knowledge, substantial information, and a complete understanding of the risks, Claimants made the decisions regarding the investments at issue. Claimants knew and, until now, accepted the risks they were taking. Now,

Claimants must bear any consequences, whether positive or negative, of their informed investment decisions. Claimants' breach of fiduciary duty claim should be denied in its entirety.

**E. Claimants Have No Negligence Claim**

Claimants fail to assert any statutory violation of federal or Florida securities laws involving liability for a claim based on negligence. Moreover, Claimants cannot allege a private right of action under FINRA rules because no such private right of action exists Therefore, any purported negligence claim would fall within Florida tort law. A claim of negligence requires Claimants to plead and prove: a duty owed to Claimants by Respondent, a breach of that duty, causation, and damages. *Miller By and Through Miller v. Foster*, 686 So.2d 783 (1997), *citing Paterson v. Deeb,* 472 So.2d 1210, 1214 (Fla. 1st DCA 1985). Claimants fail to even properly recite these basic elements, and their vague allegations as to any alleged duty and breach thereof are not pled with the requisite particularity for such a claim.

Nor do Claimants adequately allege gross negligence. In Florida, in order to further a claim in gross negligence, Claimants must plead and prove: 1) circumstances constituting an imminent or clear and present danger amounting to a more than normal or usual peril, (2) knowledge or awareness of the imminent danger on the part of the tortfeasor, and (3) an act or omission that evinces a conscious disregard of the consequences." *Moriadelios v Gerelcon Traffic Controls, Inc.,* 176 So. 3d 329, 331 (Fla. 3d DCA 2015). Claimants cannot prove any of these elements.

In fact, Claimants do not allege any specific act by Respondent that breached any duty and cannot show that any act by Emerson directly and proximately caused the alleged damages. Rather, Claimants make the conclusory statement that Respondent's conduct somehow may have amounted to negligence. Emerson did not violate any duty nor did its conduct amount to negligence in connection with the investments at issue. To the contrary, Respondent exercised reasonable care and provided detailed disclosure documents, which Claimants were then able to review, research, and they knowingly made their decisions to purchase the investments at issue. Nor can Claimants prove causation - any decline in the value of Claimants' Investments was not due to any negligent act by Emerson. Accordingly, Claimants' negligence claim must be dismissed with prejudice.

### F. Any Failure to Supervise Claim Is Baseless

Any attempt to impose liability on Respondent by alleging that Emerson failed to supervise registered representatives is without factual or legal basis. Negligent supervision occurs "when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment." *See* e.g. *Acts Ret.-Life Communities Inc. v. Est. of Zimmer*, 206 So. 3d 112, 114 (Fla. Dist. Ct. App. 2016). To prove a cause of action for negligent supervision under Florida law, the plaintiff must show: "(1) the existence of a relationship giving rise to a legal duty to supervise; (2) negligent breach of that duty; and (3) proximate causation of injury by virtue of the breach." *Wynn v. City of Lakeland,* 727 F. Supp. 2d 1309, 1319 (M.D. Fla. 2010); *Watson v. City of Hialeah,* 552 So.2d 1146, 1149 (Fla. 3d DCA 1989); *Dep't of Env't Prot. v. Hardy*, 907 So. 2d 655, 660–61 (Fla. Dist. Ct. App. 2005).

However, a claim of negligent supervision alone is not an independent basis for imposing liability against an employer, as a "plaintiff must first show that he was injured by the wrongful act of an employee." *Texas Skaggs, Inc. v. Joannides*, 372 So. 2d 985, 987 (Fla. Dist. Ct. App. 1979); *Lange v. B & P Motor Express, Inc.,* 257 F. Supp. 319 (N.D.Ind.1966); cases cited at *53 Am. Jur. 2d Master and Servants 422* (1970). There must be a connection and foreseeability between the employee's employment history and the current tort committed by the employee. *Dickinson v. Gonzalez*, 839 So.2d 709, 713–14 (Fla. 3d DCA 2003) (*citing Island City Flying Serv. v. Gen. Elec. Credit Corp.,* 585 So.2d 274, 277 (Fla.1991)). It must also be noted that a negligent supervision claim may not be premised on a theory of vicarious liability. *Watts*, 146 F. Supp. 3d at 1263.

Claimants not only fail to properly plead the requisite elements of a negligent supervision claim under Florida law but also fail to establish an actual cognizable injury beyond mere hypothetical and speculative damages. Claimants cannot identify any Florida-recognized common-law tortious conduct committed by any agent of Emerson occurring outside the scope of their employment and make no attempt to connect any agent of Emerson's employment history to

any alleged tortious conduct leading to any alleged injury. Similarly, Claimants have failed to state with any specificity exactly how Emerson was derelict in any duty to supervise any agent of Emerson and cannot show that any hypothetical breach proximately caused any alleged injury suffered by Claimants. Instead, Claimants simply make blanket and general statements that Emerson breached its duty of care to supervise.

In actuality, Emerson exercised more than reasonable supervision over its agents as it relates to the investments at issue by carefully reviewing the new account forms, subscription documents, and other materials that Claimants reviewed, as required by FINRA rules. Even if Claimants could show that Emerson negligently supervised any of its agents, which they cannot, it is irrelevant when the broker being supervised did nothing wrong.

In light of the fact that Claimants cannot prove any of their underlying claims with respect to any transaction or event in Claimants' accounts, any derivative causes of action for failure to supervise should be dismissed.

**G. Emerson and Its Agents Have No Control Person Liability**

The SOC does not present any case of control person liability or vicarious liability under the doctrine of *respondeat superior* against Respondent or its agents under any law, state or Federal. First, a control person liability claim must also satisfy the heightened pleading requirements of the federal Private Securities Litigation Reform Act ("PSLRA"). *Lustgraaf v. Behrens*, 619 F.3d 867, 958 (8th Cir. 2010). Under PSLRA's falsity requirement, it is not enough to simply allege that fraud has occurred, a complaint must indicate the false statements that were made and why the alleged misstatements were false when made. *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir.2005). Also, under PSLRA's scienter requirement, it is not enough to allege generally that the defendant acted with scienter, the plaintiff must, "with respect to each act or omission alleged ..., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012) (citing 15 U.S.C. § 78u–4(b)(2)). Here, Claimants fail to show any evidence to support their control person claim.

Second, to find someone liable as a control person, Claimants must first prove an underlying wrong. There was no primary wrongdoing by Respondent or its agents and therefore, no basis for liability under the doctrine of *respondeat superior* or under the control person liability statute. *See* 15 U.S.C. § 78t(a); *see Schwartz v. Celestial Seasonings, Inc.*, 904 F. Supp. 1191, 1201 (D. Colo. 1995) (holding that the failure of claimant to adequately plead securities fraud under either the Securities Act or the Exchange Act also precluded any finding of control person liability under either Act).

Third, in Florida, to find an officer of a corporation joint and severally liable to an investor for the sale of an unregistered security, a Claimant must plead and prove that the officer personally participated or aided in the sale of an unregistered security. *Dillon v. Axxsys Intern., Inc*., 385 F.Supp.2d 1307, 1311 (2005). The requirement that a defendant "personally participate or aid in making the sale" necessarily "implies some activity in inducing the purchaser to invest." *Id.* In other words, the officer must actively and directly, rather than passively, derivatively, or by attribution or imputation, influence or induce the investor to buy. Claimants do not and cannot allege the participation of a corporate officer inducing Claimants to make a purchase.

Emerson denies any and all alleged wrongdoing and any basis for liability, including any misconduct on the part of the registered representatives at issue. Therefore, there is no basis for control person or vicarious liability against Emerson under any state or Federal law.

**H. There Is No Private Right of Action for Alleged Violation of FINRA Rules**

Claimants cite to numerous FINRA rules as the basis of several causes of action. First, courts have considered this point for decades and have consistently come away with the conclusion that no such cause of action exists. *See*, e.g., *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) ("It is well established that violation of an exchange rule will not support a private claim; *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 680–81 (9th Cir.1980) (Securities Exchange Act does not provide a private cause of action for violation of stock exchange rules, NASD rules); *Rolf v. Blyth Eastman Dillion & Co.*, 424 F.Supp. 1021, 1041 (S.D.N.Y. 1977), *aff'd*, 570 F.2d 88 (2d Cir. 1978) ("Each court that has considered the question has concluded that mere negligent violations



GN DEFENDANTS EXHIBIT 23

of the NYSE or NASD rules are not actionable in federal court; rather, to form the basis for liability in damages, the broker's violations of the rules must be "tantamount to fraud."). *See also Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200 (3d Cir. 1990) (no right of action for violation of NASD rules); *Thompson v. Smith Barney, Harris Upham & Co.*, 709 F.2d 1413 (11th Cir. 1983) (no private right of action for violation of know your customer or suitability rules of SROs); *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 493 (6th Cir. 1990) ("NYSE Rule 405 does not imply a private right of action"). *See also Kirkland v. E.F. Hutton and Co.*, Inc., 564 F.Supp. 427 (E.D. Mich., S.D., 1983); *Emmons v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 532 F.Supp. 480 (S.D. Ohio, W.D.); *Golob v. Nauman Vandervoort, Inc.*, 353 F.Supp. 1264 (N.D. Ohio, W.D., 1972).

Even assuming that there was a private right of action for violation of FINRA rules, Respondent complied with all applicable rules and regulations. Emerson did not breach any duty that it owed to Claimants, nor did it fail to conduct adequate due diligence regarding either the recommended Investments or the issuers of the investments at issue. Any allegations to the contrary entirely lack support in the evidence.

**I. Emerson's Conduct Was Consistent With the Standards of Reg BI**

The SEC's REG BI established a "best interest" standard of conduct for broker-dealers and associated persons when they make a recommendation to a retail customer of any securities transaction or investment strategy involving securities, including recommendations of types of accounts." All of Emerson's recommendations met this standard. (*See also* "Suitability - Section A" above).

## IV. <u>AFFIRMATIVE DEFENSES</u>

The foregoing discussion demonstrates that Respondent is not liable to Claimants under any of the theories of recovery set forth in the SOC. In addition, Respondent, as permitted by Rule 12303(a) of the Customer Code, offers the following defenses:

**FIRST AFFIRMATIVE DEFENSE**

The SOC, and each purported cause of action contained therein, is barred because they fail to state facts sufficient to constitute a cause of action against Respondent.

**SECOND AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that there is no private right of action and Claimants cannot state a claim for a violation of the rules of FINRA, the NASD, the NYSE, the SEC, or any other self-regulatory organization, including, without limitation, claims and allegations concerning unsuitability and failure to supervise.

**THIRD AFFIRMATIVE DEFENSE**

The causes of action are barred by the applicable statutes of limitation and repose.

**FOURTH AFFIRMATIVE DEFENSE**

Claimants are barred from recovery by the equitable doctrines of waiver, estoppel, unclean hands, and laches.

**FIFTH AFFIRMATIVE DEFENSE**

Respondent is informed and believes, and on that basis alleges, that Claimants have failed to mitigate their damages, if any, and any damages awarded should be reduced accordingly.

**SIXTH AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that Claimants, at all times, retained authority for all transactions and investments at issue, purchased through Respondent.

**SEVENTH AFFIRMATIVE DEFENSE**

Claimants are barred from recovery to the extent they authorized, affirmed and/or ratified the Investments, transactions, and all actions and/or omissions of which they now complain.

**EIGHTH AFFIRMATIVE DEFENSE**

The damages, if any, allegedly suffered by Claimants were proximately caused by, or were the consequence of, the conduct, actions, omissions, negligence, or intentional acts of Claimants and/or parties other than Respondent.

**NINTH AFFIRMATIVE DEFENSE**

Claimants expressly or implicitly consented to each and every action on the part of Respondent of which Claimants now complain.

**TENTH AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that Respondent did not know and, in the exercise of reasonable care, could not have known of the alleged material misleading statements and omissions suggested in Claimants' SOC, and at all times, acted in good faith.

**ELEVENTH AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that a reasonable and justified statement of opinion regarding investments or market conditions is not actionable.

**TWELFTH AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that it is not liable for failing to predict market fluctuations, the performance of any of Claimants' investments, or any other matters at issue in the SOC.

**THIRTEENTH AFFIRMATIVE DEFENSE**

Claimants knowingly and voluntarily assumed the risk of losing their invested assets.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Claimants are not entitled to an award of attorney's fees or costs because there is no basis under statute, contract, or otherwise for such an award for Claimants.

**FIFTEENTH AFFIRMATIVE DEFENSE**

The causes of action are barred, in whole or in part, by Claimants' acquiescence in the purported acts and/or omissions upon which they are predicated.

**SIXTEENTH AFFIRMATIVE DEFENSE**

Respondent's acts were not willful, malicious, in bad faith, or motivated by ill-will or fraud.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

The damages for which Claimants seek to hold Respondent liable resulted in whole or in part from acts or omissions of third parties, and Respondent is not responsible for or liable to Claimants for the wrongful or negligent acts or omissions by these third parties.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

The claims-at-issue are barred in their entirety by the "bespeaks caution doctrine." *See In re Worlds of Wonder*, 35 F.3d 1407, 1413 (9th Cir. 1994).

**NINETEENTH AFFIRMATIVE DEFENSE**

Claimants' damages, if any, should be offset and reduced by the amount received from the investments at issue.

**TWENTIETH AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that Claimants' negligence-based claims are barred by the economic loss doctrine, which prevents recovery on an unintentional tort basis for pure economic loss.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that, as a matter of law, the damages Claimants seek are too speculative to be awarded. *See Chanoff v. U.S. Surgical Corp.*, 857 F. Supp. 1011 (D. Conn. 1994).

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

Claimants' damages, if any, were the consequence of the superseding cause of one or more third-party's conduct.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

In further response to the SOC, Respondent states that Claimants have failed to allege a factual or legal basis for an award of punitive damages, and to the extent that they seek such relief, any such request for recovery of punitive damages must be denied. Furthermore, any claim for punitive damages is barred because an award of punitive damages would violate Respondent's

constitutional rights under the due process clause of the Fourteenth Amendment and the excessive penalties clause of the Eighth Amendment of the United States Constitution.

**ADDITIONAL AFFIRMATIVE DEFENSES**

Respondent reserves its right to assert additional affirmative defenses in the event that discovery and/or investigation indicates that additional affirmative defenses are applicable.

## V. RELIEF REQUESTED

Respondent Emerson Equity LLC respectfully requests:

1. That all causes of action be dismissed in their entirety;
2. That Claimants take nothing by way of the SOC;
3. That Respondent be awarded its attorney fees and costs incurred defending the claims;
4. That Respondent's portion of the forum fees be assessed against Claimants; and
5. Such other and further relief as the Panel deems just and proper.

Dated: December 10, 2025

Respectfully submitted,

TADJEDIN THOMAS & ENGBLOOM LAW GROUP LLP

*/s/ David G. Smitham*

Amir Tadjedin
Craig A. Vollono
David G. Smitham
Christopher Anthony
Tyler G. Mills

*Attorneys for Respondent Emerson Equity LLC*

Name: Michael Barbarick
Address: 1 Granville Way
Exton, PA 19341

Date: 04 / 29 / 2022

Emerson Equity LLC
155 Bovet Road, Suite 725
San Mateo, CA 94002

Re: Letter of Understanding - Investment In IHC Hamilton

To Whom It May Concern:
I/We are fully aware of the risks involved with investing in *(list investment)* IHC Hamilton and are comfortable with these types of investments. I/We are not concerned with the lack of liquidity, as I/we have adequate resources for all my/our liquidity needs.

In light of volatility of my/our stock investments, I/we believe I/we are helping to diversify my/our overall portfolio investing in these types of assets.

Sincerely,

Signature: Michael Barbarick
Name: Michael Barbarick

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing *RESPONDENT EMERSON EQUITY LLC'S ANSWER TO THE STATEMENT OF CLAIM* was uploaded to the FINRA DR Portal by which the following were to receive service on December 10, 2025:

GOODMAN & NEKVASIL, P.A.
Kalju Nekvasil, Esq.
624 1st Avenue South
St. Petersburg, FL 33701
Email: gnmain@gnfirm.com

*Attorney for Claimants*

ARKADIOS CAPITAL
Gary Schwartz, CCO
2827 Peachtree Rd NE, Suite 510
Atlanta, GA 30305
gschwartz@arkadios.com

TADJEDIN THOMAS & ENGBLOOM LAW GROUP LLP

*/s/ Chris Harris*
Chris Harris