**BEFORE THE ARBITRATION DISPUTE FORUM OF THE FINANCIAL INDUSTRY REGULATORY AUTHORITY**

***In the Matter of Arbitration Between:***

**MATTHEW T. O'REILLY,**

**CLAIMANT,**

**v.** **Case No. 25-02296**

**GREAT POINT CAPITAL LLC,**

**RESPONDENT.**

______________________________/

**ANSWER AND AFFIRMATIVE DEFENSES TO THE CORRECTED STATEMENT OF CLAIM**

This is the Answer and Affirmative Defenses to the Corrected Statement of Claim of Matthew T. O'Reilly ("O'Reilly" or "Claimant") by Great Point Capital LLC ("GPC").

**I**

**PRELIMINARY STATEMENT OF GPC**

O'Reilly has currently lost nothing. His investments in three Delaware Statutory Trusts ("DST") were perfectly suitable for him. His broker at GPC, Wolfgang Suess ("Wolfgang"), carefully collected all relevant information regarding O'Reilly—what his goals were, what his investment objectives concerned, his risk tolerance, his tax status, his previous investment experience. In short, Wolfgang obtained as much information as O'Reilly would supply. All of it complied with both Regulation Best Interest as well as all suitability requirements under FINRA Rules.

O'Reilly first came to Wolfgang in August 2021. At the time O'Reilly was 60 years old and owned real property in the form of a vacation rental in Palm Springs, California. He told Wolfgang that he had owned the property for 20 years and had sizeable capital gains taxes to pay if he decided to sell the property. He told Wolfgang he was interested in IRS Code Section 1031 "exchanges" for like-kind property. He inquired of Wolfgang further about the process. Over the ensuing months, Wolfgang and O'Reilly conversed on numerous occasions.

Through these discussions, Wolfgang learned that O'Reilly was considering various choices regarding the 1031 exchange process. He learned that O'Reilly was most interested in deferring taxes and increasing growth and income. Indeed, in his Investment/Placement Profile Worksheet (Attached as Exhibit A) he did not identify "Capital Preservation" or conservative investments as his investment objective. Instead he told GPC he wanted "Income and Growth." Underscoring this, he also indicated his risk tolerance was not limited to conservative investments like money market funds or government securities. Instead he told GPC and Wolfgang he was willing to invest in a range of less conservative investment like Real Estate Investment Trusts ("REITS"), Unit Investment Trusts ("UIT"), and variable products including diversified mutual funds. (See "Risk Tolerance" in Exhibit A). Many of these are similar to the Delaware Statutory Trusts in which he invested as "replacement property" in the Section 1031 exchange.

He also told Wolfgang not that he was retired, or retiring, but that he was "self-employed" with [redacted] He also represented that his overall investment knowledge was "good." O'Reilly also told GPC he was an accredited investor, which the securities law view as a generally sophisticated market participant.

O'Reilly asked about different components of the 1031 exchange. He and Wolfgang discussed the fact that an exchange required "replacement property" for the like kind exchange which qualified for the tax deferral. The types of replacement property which could be used were limited. For example, typical stocks and bonds could not be used. The replacement property required a real estate based investment—another real property, for example. Likewise certain DST investments could qualify as well, if the underlying asset was real estate, securitized through the DST process. DSTs are very commonly known and used for 1031 exchanges.

Wolfgang and O'Reilly discussed various underlying real estate investments using the DST structure. O'Reilly, however, decided initially to purchase another parcel of real estate for the exchange. Wolfgang had no issues with this and did not try to proceed further with DST candidates, or push O'Reilly to invest otherwise.

Sometime around March of 2022, however, the purchase of the real estate O'Reilly intended as the replacement property fell through, likely because of inspection issues. O'Reilly, who had been in touch with a financial advisor who was assisting him, suggested he consider using the DST structure, perhaps because the time limits for designating new replacement properties was otherwise limited. (O'Reilly had by law only 45 days to identify the replacement property.) O'Reilly on his own volition therefore reconnected with Wolfgang.

In March 2022, Wolfgang spent considerable time with O'Reilly, discussing various DST possibilities. These included a variety of offerings including: 1) NexPoint Storage III DST (storage-warehouse portfolio in Florida); 2) NexPoint Life Sciences DST (Pharmeceutical manufacturing facility in Danbury, Connecticut); 3) Storboard Dylan DST (a Class A Multifamily structure in Dallas, Texas); and 4) CS1031 One Riverside Apartments, DST (a Class A Multifamily facility in Chattanooga, Tennessee.). All the while, O'Reilly continued to

reconsider how he wished to proceed. He eventually decided to look at even additional DST offerings. Wolfgang and GPC felt the DST structure as a replacement property was appropriate and suitable for O'Reilly for a number of reasons. First, GPC had assisted a number of 1031 exchanges over a long period of time and had done considerable due diligence on a list of DSTs which it approved for recommended purchase. Secondly, given the fact that the mandates of a 1031 exchange limited the number of qualifying suitable replacement type properties, especially after O'Reilly rejected the idea of buying another parcel of real property, the DST structure was an ideal alternative. As described in the Form Regulation Best Interest which O'Reilly executed for each of his investments, the DST was designated to "Preserve his equity by doing an exchange and provide desired income. We discussed a multitude of DST offerings...after O'Reilly's real property fell through and the allocation became available." See Exhibit B attached to this Answer. Thus O'Reilly was suitable for such offerings.

Third, the DST qualified as replacement property for the Section 1031 transaction. O'Reilly could diversify out of his individual ownership of real estate into a real estate holding that paid a sizable income, reduced risk via diversification, and offered considerable tax advantages—both deferral of capital gains and harvested depreciation and other real estate related tax benefits.

Fourth, the DST offerings were sound since the underlying property had a proven track record in all cases. Wolfgang was careful to discuss and analyze each DST he showed O'Reilly. A sampling of e-mails regarding this is attached as Exhibit C. This plus the substantial due diligence performed by GPC made the offerings sound. GPC had its head of research discuss with O'Reilly the due diligence GPC had performed.

Wolfgang and O'Reilly studied the various offerings. O'Reilly eventually rejected the first four DSTs Wolfgang showed him, as well as a number of other multifamily offerings. He was particularly interested, however, in other DST possibilities sponsored by industry leader Inspired Healthcare Capital ("IHC"). IHC specialized in owning, managing and investing in senior housing developments across the United States. It had a proven track record of paying dividends and managing projects without issues. O'Reilly asked questions and Wolfgang gave him considerable information about each of the specific projects in which he was interested. The information included subscription agreements, contracts, a prospectus, and other disclosure documents.

There is no question O'Reilly was perfectly suitable for the three IHC investments he eventually chose. (Inspired Senior Living of Hamilton DST, Inspired Senior Living of Appleton DST, and Inspired Senior Living of Naperville DST.) He told GPC he was an accredited investor. He acknowledged "I am an accredited investor with sufficient investment knowledge to make an informed decision (about the investments)."

Nevertheless, suitability requires more than just the customers' decision to knowledgeably invest. It requires the broker-dealer to reasonably assess the client's suitability. GPC and Wolfgang do so here. The client's goals <u>were</u> satisfied: a 1031 exchange with qualified replacement property. The three IHC offerings O'Reilly selected were thoroughly analyzed by GPC and determined to be legitimate DSTs with a good track record, sound management, and good income experience and prospects. The DSTs also fall within O'Reilly's risk tolerance level.

Likewise, their characteristics formed the basis of a sound recommendation. In the first instance, the loan to value ratio on the property, i.e. lack of leverage, matched well with O'Reilly's current situation with the property he sold. Secondly, O'Reilly had emphasized an

income goal he needed which IHC could match. Thirdly, the senior living asset class had strong financial drivers of value. IHC possessed all these attributes, a very strong track record of operation and achieving pro forma financial projections. Fourthly, the fact that O'Reilly had a 5-10 year time horizon for investment, and a risk tolerance level which could include IHC, matched his needs perfectly.

As will be shown at Hearing in this case, all due diligence and suitability analysis was fully performed by GPC and Wolfgang. Wolfgang carefully analyzed each IHC offering independently, in addition to the work GPC performed. At the time of the purchase Wolfgang and O'Reilly decided to diversify risk by investing separately in three DSTs, located in geographically different areas. All the while, Wolfgang recommended O'Reilly not take on additional debt or "leverage" which further lessened risk of these DSTs.

All went well with the investments for more than three years. O'Reilly collected an estimated $20,000 in income, as he had sought. Only in late Summer 2025 did problems surface. Internal matters at IHC led to a sudden cessation of the dividend on DST. None of this could have been foreseen by Wolfgang and/or GPC more than three years earlier. None of the data to which GPC and Wolfgang had access suggested this would occur.

Whatever the case, the value of the investments—the underlying properties and business—continue as a going concern. O'Reilly has lost none of this value. The cessation of the dividend does not mean that GPC somehow failed to do due diligence or that O'Reilly was not suitable for the investments in this Section 1031 exchange.

GPC DENIES each and every allegation to claim that it was negligent, misrepresented anything, or that it is liable for any reason to O'Reilly. O'Reilly attempts to make GPC his insurer for investments he understood, was willing to make, and for which like every investment

risk existed. O'Reilly was well aware of all of this. The Claim should be denied. Below GPC answers the specific allegations of the Claim paragraphs.

## II
## ANSWER TO JURISDICTIONAL ALLEGATION

GPC ADMITS that FINRA Dispute Resolution has jurisdiction, but DENIES the various rationales about FINRA jurisdiction set out in the Claim.

## III
## ANSWER TO GENERAL ALLEGATIONS PARAGRAPHS 2-15

GPC DENIES the allegations of Paragraphs 2-15. O'Reilly was not unsophisticated and represented himself at all times as being an experienced investor, with good knowledge regarding investing as well as the risk that virtually any investment could wind up not performing as suggested. He thoroughly reviewed all information regarding the various options presented to him for the 1031 exchange in which he wished to participate. Moreover he was advised by at least one other Financial Advisor, not connected with GPC, to consider DSTs as replacement property.

Insofar as any allegation about Wolfgang, he has had a spotless record in the industry. He has had no customer complaints at any time. The other registered persons mentioned in this section of the Claim had little if any contact with O'Reilly, other than to discuss due diligence GPC had performed. For its part, GPC had no connection with Patrick Lam or Emerson Equity LLC. At all times GPC did sufficient due diligence on each of the investments as will be shown at Hearing. The introduction of these individuals is only a red herring intended to create an

unwarranted basis for supposed omissions in the material given O'Reilly. In view of his goals, O'Reilly was suitable to invest in the DSTs as part of a Section 1031 transaction.

Underscoring all of this, GPC had no fiduciary duty to O'Reilly. It acted solely as a broker. Indeed, O'Reilly acknowledged this in the Regulation Best Interest disclosure he received not once but three times: "Great Point is not your financial advisor" See Exhibit B.

He also acknowledged he understood the risks of the investments and all potential conflicts of interest. He executed the following at the end of the Regulation Best Interest Disclosure:

> By initialing below and signing you are acknowledging the aforementioned items are known to you and that you understood the rules associated with this investment and potential conflicts of interest (The aforementioned risks above as well as all risks disclosed in the PPM).

In short, there was full disclosure and no unsuitable investment offered by GPC. O'Reilly knew sufficient due diligence had been performed—a fact he conveniently forgets in his Claim.

## IV

## ANSWER TO ALLEGATIONS ABOUT DUE DILIGENCE PARAGRAPHS 16-30

GPC DENIES each and every allegation of the Claim, Paragraphs 16-30, regarding any assertion that due diligence on IHC was not performed. On the contrary, as will be shown at Hearing, GPC had a due diligence staff that met on numerous occasions, with IHC, reviewed third party reports about the offerings at issue, thoroughly analyzed all financials, assessed market conditions, examined competition, reviewed senior demographics, did site visits to review the physical condition of properties, did an analysis of management and prospects, interviewed management and various other issues as set our in FINRA notices and rules,

researched the managers of each offering and made sure all FINRA requirements were met. Keegan DeSilva who heads GPC's due diligence discussed these matters with O'Reilly.

Ironically, the Claim at these paragraphs discusses "TIC" exchanges (Tenant-in-common). The investment vehicles in this case were not TIC's. The mention of this different vehicle in the Claim shows the "boilerplate" nature of the Claim. It is not even specific to O'Reilly's situation. Nonetheless, all requirements of NTM 03-71, FINRA Rule 2310 and other rules were met by GPC.

No misrepresentations were made either. O'Reilly was fully informed regarding each of the properties he used for his Section 1031 exchange. None of the legal cites contained in these paragraphs of the Claim support any notion that GPC violated any rule or regulation. At Hearing, GPC will also present a legal brief which discusses the proper legal standards applicable to this case.

## V

## ANSWER TO ALLEGATIONS ABOUT LACK OF SUITABILITY PARAGRAPHS 31-72

GPC DENIES each and every allegation of the Claim, Paragraphs 31-72 regarding any assertion that it violated any suitability standard—under Regulation Best Interest, the FINRA suitability Rule 2111, and 2310 or any Blue Sky Law regulation of California, Massachusetts, or Illinois.

As detailed above, Wolfgang was very careful to conduct a full suitability analysis of O'Reilly. O'Reilly's objective, for example was not, as the Claim suggests, "preservation of capital" but instead to defer a very large capital gain plus receive income while using a

replacement property with no more than moderate risk. The IHC investment provided all of this. O'Reilly did have a "moderate risk" profile. This fit perfectly with a real estate based DST. Indeed, the rental property he exchanged was likely at least the same level of risk that DSTs offered him. Like Real Estate Investment Trusts in which he acknowledged he was suitable to invest, the replacement property DSTs he sought here were also suitable.

In each instance O'Reilly was limited by his desire to also engage in a 1031 exchange with the types of investments in which he could use as a replacement property. Since he ultimately rejected a real property exchange, a DST was in many ways the next best type of investment he could make. At all times GPC and Wolfgang complied with all suitability requirements.

Nor do Claimants' citations in these paragraphs suggest otherwise. None of them address the suitability of a customer in a situation like this one. All speak solely to black letter law in general regarding responsibilities which both GPC and Wolfgang met in their dealings with O'Reilly.

Nor is there any doubt that GPC met "customer-specific" suitability as discussed by Claimant at these paragraphs of the Claim. Not only did O'Reilly sign three separate documents regarding Regulation Best Interest acknowledging that he understood the risks of the investment, See Exhibit B regarding these disclosures and acknowledgements, but he conversed by e-mail with Wolfgang regarding his own analysis of the investments. See Exhibit C. Claimant at all times well understood the investment strategy behind the 1031 exchange and the use of DSTs to perfect it.

Further underscoring all of this, the prospectus O'Reilly acknowledged having received discussed all risks plus those O'Reilly claims he was unaware: a) The financial condition of the

issuer, the risks of investing, the use of investment proceeds, the nature of the association between the issuer and the companies that rendered service, the percentage of commissions, and the background of those associated with the projects, plus the fact that like any investment there was a risk of total loss.

In these Claim paragraphs, O'Reilly again asserts a fiduciary duty existed between himself and GPC. As stated above, this was specifically disclaimed by GPC in the "services section" of its Regulation Best Interest disclosure. As stated here, GPC at all times acted solely as a broker and not a financial advisor. **See** Exhibit B.

## VI
## ANSWER TO THE VARIOUS COUNTS OF THE CLAIM

### A. Count 1 - Violation of the Federal Securities Laws

GPC DENIES each and every allegation of Paragraphs 73-79 of the Claim. All material facts regarding the transactions involving the use of the three IHC DSTs were fully disclosed to O'Reilly. There was neither fraud nor negligence as will be shown at Hearing. A careful review of the various documents O'Reilly acknowledged receiving and reading confirm this—in a Regulation Best Interest disclosure, as part of the contract he entered with IHC, and fully disclosed in the prospectus for each product.

### B. Count 2 – Violations of The California Securities Act

GPC DENIES each and every allegation of Paragraphs 80-84 of the Claim. As discussed above, there was no material misrepresentation of any kind—O'Reilly was fully informed of all

facts regarding the DSTs. There was no fraud or negligent misrepresentation—either under the Federal Statutes or The California Securities Act, by everyone connected with GPC. Superseding events years after the fact are not the basis of fraud or misrepresentation.

**C. Count 3 – Violation of Massachusetts Securities Act**

GPC DENIES each and every allegation of Paragraphs 85-91 of the Claim. Like the preceding two Counts, the Massachusetts Blue Sky Law requires a material misrepresentation. As stated above, there were none in this case. O'Reilly received both orally as well as in the DST prospectuses full disclosure regarding the investments. The event that lead to the current dividend suspension occurred years after he made his purchase and was not foreseeable when O'Reilly made his exchanges.

**D. Count 4 – Violations of The Illinois Securities Law**

GPC DENIES each and every allegation of Paragraphs 92-96 of the Claim. As stated above, there were no misrepresentations. There was no deception on any issue which could create any confusion for O'Reilly whatsoever. Moreover, O'Reilly has not complied with the provision of the Illinois Blue Sky Law, regarding notice. (See Affirmative Defenses). Again, a superseding event years after a purchase says nothing about the situation at the time of purchase.

**E. Count 5 – Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**

GPC DENIES each and every allegation of Paragraphs 97-100 of the Claim. There was no fraud or negligence in this case. Moreover, the Illinois Statute does not apply since none of the alleged actions "primarily and substantially occurred in Illinois as the law of the State

requires." See International Profit Associates v. Linus Alarm Corporation, 2012 IL. App. (2d) 110958. There are no damages or prejudgment interest due Claimant.

**F. Count 6 – Breach of Contract**

GPC DENIES each and every allegation of Paragraphs 101-111 of the Claim. In the first instance, there was no contract as alleged in the Claim between GPC and O'Reilly. Indeed the Purchase Questionnaire between O'Reilly and the issuer sets out the details of the relationship. These are attached as Exhibit D to this Answer. Claimant and GPC's only contract was one of a broker securing an investment for his customer. (The Purchase Contract between O'Reilly and IHC is attached here as Exhibit E.)

None of the cases cited at these Paragraphs of the Claim suggest otherwise. In order to be a third party beneficiary, the parties must show that was their intention. At Hearing in this case GPC will present its brief which discusses the concept of third party beneficiary and show that Claimant was neither an intentional, intended, or incidental beneficiary of any contract. O'Reilly was neither identified in any contract as a beneficiary nor assumed any responsibilities in any contract. See e.q. Danna v. Med Data, 2012 Ill. App. (2d 120122-U(8/29/2012)). Indeed, there is always a strong presumption in the law that the actual parties to a contract are the only ones to which the contracts' obligations apply. See Wilfong v. L.J. Dodd Construction 401 ILL. App. 3d 1044, 1057, (2010). This is the situation here.

Whatever the case, GPC acquitted each and every one of its contract obligations in any contract in which it was involved. This includes any involving the Claimant O'Reilly. There is no claim for breach of contract.

**G. Count 7 – Common Law Fraud**

GPC DENIES each and every allegation of Paragraphs 112-115 of the Claim. As is the case with the earlier Counts for statutory securities fraud, Claimant can point to no misrepresentation made to him by GPC. Indeed his Claim is not about any fraud conducted by Wolfgang or GPC. Instead it is initiated purely by the cessation of dividend payments by IHC. This of course occurred years after the purchase by O'Reilly of the three DSTs, and is not something GPC could have predicted. As an intervening circumstance that was otherwise unforeseeable, it is not fraud of any sort for which GPC is otherwise responsible.

**H. Count 8 – Breach of Fiduciary Duty**

GPC DENIES each and every allegation of Paragraphs 116-127 of the Claim. In all respects GPC acted fairly and fulfilled all duties it might have owed to O'Reilly. Due diligence was performed on the IHC DSTs. This was done completely in compliance with all FINRA requirements.

Moreover, as O'Reilly acknowledged in his Regulation Best Interest disclosure acknowledgement, (Exhibit B) he understood GPC was not acting as his financial advisor in any way. The parties understood GPC acted solely as a broker for the purchase of the IHC DSTs by O'Reilly and not as any financial advisor.

None of the cases cited by O'Reilly in his Claim suggest otherwise. All of these depend on the acceptance by the parties of a fiduciary duty. This was not the case here. Moreover, the law generally does not create a fiduciary duty in a broker for his customer. See e.q. Caravan Mobile Home Sales v. Lehman Bros. 769 F. 2d 561, 567 (9th Cir. 1985); Robinson v. Merrill Lynch 337 F. Supp. 107, 111 (N.D. Ala. 1971); Leib v. Merrill Lynch, 461 F. Supp. 951, 953

(E.D. Mich 1978); Leboce S. A. v. Merrill Lynch, 709 F. 2d 605, 607 (9th Cir. 1983) (broker liable as a fiduciary only when he or she controls the account and is acting as more than mere agent for placement.). GPC will file a hearing brief which more fully analyzes the lack of any fiduciary duty in this case.

**I. Count 9 – Negligence and Gross Negligence**

GPC DENIES each and every allegation of Paragraphs 128-141 of the Claim. As discussed above, at Hearing GPC will file a brief discussing the appropriate legal concepts. Nor of the citations in this section of the Claim suggest GPC is liable for any negligence, much less "gross negligence." Moreover, there is no private cause of action for violation of any FINRA Rule. See e.q. Luis v. RBC Capital Markets, No 19-2706 (8th Cir. 12/28/20). None can Claimant recover economic damages in negligence. See e.q. Moorman Manufacturing v. National Tank, 91 ILL. 2d 69 (1982). Claimant lards his Claim with off-point cases, on standard black letter law, but presents not one case like the one he attempts to bring. Whatever the law might otherwise be, there was no breach of duty on GPC's part. There is no claim for negligence or gross negligence.

**VII**

**GPC'S AFFIRMATIVE DEFENSES**

GPC reincorporates its previous statements above. Additional affirmative defenses are:

1. The Claim fails to state any cause of action upon which relief can be granted since Claimant cannot prove the elements of his claims.

2. The Claims are barred by relevant statutes of limitation and/or repose in each case.

3. Claimant is guilty of contributory negligence insofar as any negligence claim he alleges is concerned.

4. Under the doctrine of no recovery for economic damages in negligence, Claimant cannot recover damages based on any purported negligence claim, especially because he asserts duties which purportedly arise under contract.

5. Claimant's claims are barred by the doctrines of waiver, estoppel, and laches.

6. Claimant's claims are barred by the doctrine of ratification since he proceeded with the investments at issue after having received full knowledge of the facts concerning them and had ratified ownership and accepted the benefits of such ownership.

7. There is no private cause of action under FINRA Rules for any of the claims, or any cause of action under any administrative rules.

8. Claimant can show no alleged misstatement or omission of fact, or any realized damages.

9. Claimant's claims are barred under the doctrine of election of remedies, since he apparently seeks both damages and restitution or unjust enrichment.

10. There is no basis under a *respondent superior* claim for punitive damages or prejudgment interest.

11. Any damage claimed by Claimant must be offset based on his own breach of contract, as well as amounts he already received income.

12. Claimant failed to mitigate his damages.

13. Any damage to the Claimant must be offset against amounts received and accepted.

14. Claimant breached any contract which existed, therefore releasing GPC from any alleged contract obligations.

15. The Claims are not eligible for Arbitration pursuant to FINRA Arbitration Rule 12206.

16. GPC had all supervisory rules in place and acted in good faith. It qualifies as meeting any "control person" defenses.

17. Claimant has not complied with the requirements of the California, Massachusetts, or Illinois "Blue Sky" or securities laws. There are no viable claims under any of these statutes.

18. Claimant is not a third-party beneficiary of any contract.

**VIII**

**CONCLUSION**

For the reasons stated above, GPC asks for an award from the Panel of no liability and its costs and fees in defending this action. It asks that all FINRA fees be assessed against the Claimant.

Respectfully Submitted

GREAT POINT CAPITAL, LLC

By: ______________________
David A. Genelly
One of its attorneys.

David A. Genelly
DAVID A. GENELLY, LTD.
150 South Wacker Dr., Suite 2400
Chicago, IL 60606
Telephone: (312) 786-5103
DAG@genellylaw.com